# Exhibit 2

```
1              IN THE DISTRICT COURT OF OKLAHOMA COUNTY

2                         STATE OF OKLAHOMA

3   STATE OF OKLAHOMA,              )
                                    )
4           Plaintiff,              )
                                    )
5       vs.                         )
                                    )
6   JOVAN DAVID FLEMING,            )   CASE NO. CF-2022-4777
    JEFFERY DANIEL MONTGOMERY,      )   CASE NO. CF-2022-3891
7                                   )
            Defendants.             )
8

9

10

11                          *   *   *   *   *

12                        SHOW CAUSE HEARING

13                     TRANSCRIPT OF PROCEEDINGS

14                             HAD ON THE

15                    12TH DAY OF JANUARY, 2024

16      BEFORE THE HONORABLE CINDY H. TRUONG, DISTRICT JUDGE

17                          *   *   *   *   *

18

19

20

21

22  Reported By:

23    Cynthia Kay Jones, RMR
      Official Court Reporter
24    321 W. Park, Room 700
      Oklahoma City, Oklahoma 73102
25    (405) 713-1406
```

```
 1   A.   Yes.
 2   Q.   For purposes of the record, we are talking about
 3   diverting mental health patients, or people with a mental
 4   health need, away from both the system and competency; is that
 5   correct?
 6   A.   Correct, yeah.  It's one of, I believe, nine diversion
 7   programs.
 8   Q.   You -- what is your title?  You gave -- you said you were
 9   a therapist.  Tell me your title.
10   A.   I'm a senior triage specialist and then I'm a licensed
11   marital and family therapist.
12   Q.   You're not a psychologist, correct?
13   A.   No, I'm not.
14   Q.   You're not a psychiatrist, right?
15   A.   No.  Correct.
16   Q.   Do you have any forensic training?
17   A.   What I've -- not specifically in terms of -- well, let me
18   back up.  Yes.  Probably about 12 hours.
19        And then I have been -- I felt it was incumbent on me to
20   continue my education and to learn more about that, so I've
21   looked into one of the programs that's in Ohio and so I've
22   studied that.  I spent about a week looking into that.
23   Q.   You looked into it?
24   A.   Uh-huh.
25   Q.   Did you go?
```

1  A.  Oh, no, I didn't.
2  Q.  You haven't completed any programs in forensic
3  psychology?
4  A.  No, I've not.
5  Q.  What training have you had in competency restoration?
6  A.  The specific training I've had has been provided by the
7  Department of Mental Health and that was, oh, maybe three or
8  four months ago, and then I signed up to participate in
9  another one.
10 Q.  So the first training you had in competency restoration
11 was three or four months ago?
12 A.  Correct.
13 Q.  How long has this program existed?
14 A.  To my knowledge -- I was hired late February of last year
15 from -- I was working for the Department and then they had
16 asked me to come to the jail and start doing this.
17 Q.  When did they ask you to do that?
18 A.  That was in February of 2023.
19 Q.  So approximately -- a little less than a year ago.
20 A.  Correct, yeah.
21 Q.  Prior to February of 2023, was there a competency
22 restoration program in the jail?
23 A.  Not to my knowledge.
24 Q.  Tell me about that training a little bit.  What did that
25 consist of?

1  A.   It spoke to what you want to try to accomplish with the
2  individual, approaches that you use for resistant people.
3  Q.   What do you mean, "resistant people"?
4  A.   Oh.  Folks that are not wanting to participate or they're
5  argumentative or they're hostile.  You know, approaches for
6  dealing with a challenging person, somebody who's resistant to
7  actually even talking to or participating in any way.
8  Q.   Who put on the training?
9  A.   It was the Department of Mental Health.
10 Q.   Where was it?
11 A.   The -- it was out of Vinita but I participated by Zoom,
12 so I was in the detention center.
13 Q.   How long was it?
14 A.   A little over six hours.
15 Q.   Who taught it?
16 A.   It was Dr. Scott Orth--
17 Q.   So --
18 A.   -- from the forensic center.  He is one of the head
19 psychologists -- or I think he is the head psychologist.
20 Q.   So since the inception of this program you've had
21 six hours of Zoom training for competency restoration.
22 A.   As far as formal.  And then when I first went to the jail
23 I had a great deal of time on my hands the first probably
24 three or four weeks trying to put an office together there in
25 the detention center.

1        And so what I did, I took it upon myself to start looking
2   on the internet and find out what other programs are doing and
3   that's when I discovered the one from Ohio.  So I downloaded
4   that packet and then I read it several times.
5   Q.   That packet is part of a course that somebody actually
6   puts on, correct?
7   A.   Well, no.  The one from Ohio is actually their program.
8   It's the State of Ohio's program.
9   Q.   Well, tell me about the State of Ohio's program.  What
10  does that consist of?
11  A.   Well, similar -- similar things.  An emphasis on training
12  the individual to assist them or facilitate their
13  understanding of courtroom processes, behavioral expectations
14  in the courtroom, potential outcomes.
15  Q.   What kind of staff do they use?
16  A.   They used, if I recall, correctly --
17           MR. BERRY:  Your Honor, if I could object.  I don't
18  see the relevancy of Ohio's program with how it relates to
19  Oklahoma and the motion that defense counsel has filed in this
20  matter.
21           THE COURT:  Well, he's saying he is using that as
22  part of his training, so I would like to know what kind of
23  training he received, so go ahead.
24  A.   Okay.  So if I recall correctly, they are using master's
25  level therapists, PhD psychologists and psychiatrists, and

1   then also medical doctors.
2   Q.   Okay.
3   A.   And I think a neurologist or two.  I think.
4   Q.   Are the inmates housed in a separate unit?
5   A.   In Ohio?
6   Q.   Yes.
7   A.   It didn't go into that.  It was talking about what you
8   would do and the approaches that you would take.  If I read
9   that, I don't recall.
10  Q.   So you don't know if there is anything about the Ohio
11  program that is designed to model an inpatient or hospital
12  setting?
13  A.   No, I don't.  I'm going to guess it would.  I don't
14  recall.
15  Q.   Are you familiar with other programs?  Have you
16  researched other programs across the nation, competency
17  restoration?  For example, Fulton County, Georgia or Arizona?
18  A.   I've not.  I use Google and Google thought Ohio's was the
19  better one.
20  Q.   You didn't use any medical research search engine?
21  A.   I didn't.
22  Q.   So in other words, you looked for things that I could
23  find.
24  A.   Yes.
25  Q.   Before you started doing what the Department asked you to

1  do, had you ever done any competency restoration before in
2  your role as a therapist?
3  A.    Not -- not formally, no.
4  Q.    What did you do before you were asked to do this?
5  A.    So I have been a licensed therapist since 1991.  And so
6  I've provided counselling and psychotherapy to individuals
7  with depression, anxiety, perceptual disturbances like
8  schizophrenia or schizoaffective disorder, bipolar disorder.
9  Q.    Where was that?
10 A.    That was in Oklahoma City and then --
11 Q.    Like a family practice?
12 A.    Oh, no.  I started at Red Rock Behavioral Health in 1988
13 and that's where I got -- I started actually as a case
14 manager.  I finished a master's degree and then I went
15 through -- at that time they had a really good training
16 program and they paid for the last part of my master's.
17       And then I became a licensed therapist, and so then I
18 started practicing with outpatient folks.  And then I also did
19 what are called -- what were called hospitals, now called day
20 treatments for folks with chronic mental illness.
21       The goals are kind of similar because you want -- you
22 want the person to be reality oriented and to understand
23 what's going on and to understand how their thinking affects
24 their moods and then also how their behaviors can affect
25 everything.

1  Q.   What was your experience with jail population prior to
2  taking this on in February of 2023?
3  A.   I had never worked specifically with people that were
4  incarcerated.  I had worked with people -- I had worked with
5  guys that had gotten out of prison and that had been in prison
6  for some time, but I never worked with inpatient or in-jail
7  folks.
8  Q.   As far as Oklahoma County's competency restoration
9  program in the jail, what does the staff consist of for that?
10 A.   For -- for my part, we have, of course, a forensic
11 center.  And then Dr. Stan Ardoin is the head psychiatrist and
12 he is housed at Griffin Memorial Hospital.  And then there is
13 Dr. Scott Orth who is the head psychologist and then --
14 Q.   Let's back up right there.  Who is the first person you
15 said?
16 A.   Oh, Dr. Stan Ardoin.
17 Q.   Sorry.  The first thing you said was the forensic center.
18 What does the forensic center do in the jail?
19 A.   Okay.  They actually -- they work through me.  I'm kind
20 of their eyes and ears, and so I get my direction and guidance
21 from them in terms of what they want me to do with a specific
22 person.
23      So every two weeks we'll have a staffing, and that's
24 where we will discuss each and every case.  And then what
25 we're doing, what changes need to be enacted, who needs to go

1   much time -- well, let's do it this way.
2          Jovan Fleming, for example.  How often do you meet with
3   Jovan Fleming?
4   A.   Approximately every 10 days.  I try to get there once a
5   week and sometimes I'm able to accomplish that.
6   Q.   What do you mean "get there once a week"?
7   A.   Well, I have to be escorted by a detention officer.
8   Q.   To the pod.
9   A.   To each and every cell, yes.  So optimally it happens
10  once a week.  Sometimes it happens about every 10 days.
11  Q.   And for how long do you meet with Jovan Fleming, for
12  example?
13  A.   With Jovan it's usually a little bit longer.
14  Q.   Does it vary?
15  A.   It does.
16  Q.   Okay.
17  A.   It can be anywhere from 10, 12 minutes to 30, 45 just
18  depending on how much time I have and what we have to talk
19  about.
20  Q.   Can the same be said about Mr. Montgomery?
21  A.   Uh-huh.
22  Q.   Do you remove them from the cell?
23  A.   If I'm allowed to.  It depends on how many staff members
24  they have.  If there's a -- if there's a monitor in the pod,
25  and then I have my detention officer, then I request that they

1  be removed from the cell and then we go set at a table.
2      If that's -- if that's not the case then I have to
3  basically talk to them through the door, through the crack in
4  the door.
5  Q.   So today is January 12th.  Let's go back to the beginning
6  of December, approximately 45 days, 43 days.  Let's say you've
7  met with Jovan Fleming approximately 5 to 6 times, is that
8  fair, going back to the beginning of this month?
9  A.   No.  I took a 10-day vacation.
10 Q.   Okay.  And nobody is holding that against you.  So did I.
11 A.   Right.
12 Q.   So maybe a little bit -- we can use any -- let's just use
13 any span you want to.  Over a month you see somebody about
14 four times?
15 A.   Three to four times, yeah.
16 Q.   Three to four times.  And of those three or four times,
17 on average how many times do they get removed from the cell?
18 A.   Probably one.
19 Q.   So about 75 percent of the time they are staying in the
20 cell --
21 A.   Uh-huh, yes.
22 Q.   -- for the treatment period.
23 A.   That's correct.
24 Q.   How do you accomplish that?  Is that through the bean
25 hole or is that --

1   A.   Sometimes if the officer has the keys to the bean hole.
2   Other times it's through the crack and then we look at each
3   other through the glass.
4   Q.   I've been over there, tried to talk to somebody through a
5   crack and the bean hole, or through the bean hole or through
6   the crack.  Are you yelling?  Are you -- I'm being pretty loud
7   right now.
8   A.   We're talking very -- yes.  Not quite yelling, but I'm
9   talking very loud and then I have to get very close to be able
10  to hear.  Like in Jovan's case, he talks a little bit softer.
11  Q.   He is not a loud person, is he?
12  A.   Huh-uh.  Jeffery can enunciate -- or enunciates a little
13  bit better.  Jovan talks kind of softly.  I have to talk loud,
14  yes.
15  Q.   For Mr. Fleming, does -- I mean, does he speak back to
16  you?
17  A.   Uh-huh.
18  Q.   Is that a "yes"?
19  A.   Yes.
20  Q.   Are you able to hear what he's saying?  I mean, I know
21  Mr. Fleming.  I've met with him many, many times.  I can't
22  imagine ever being able to communicate with Mr. Fleming
23  through a cell door in any meaningful way.  Is that fair?
24  A.   That's not been my experience.
25  Q.   Okay.  Are there other cellmates in the cell?

1  been first duly sworn, testified as follows:

2  **DIRECT EXAMINATION**

3  BY MR. SULLIVAN:

4  Q.   Dr. Roberson, will you tell the court reporter and the

5  Court your name?

6  A.   It is Dr. Shawn Roberson, R-O-B-E-R-S-O-N.

7  Q.   And tell us about your qualifications for what we are

8  going to talk about here today.

9  A.   I have a bachelor's degree in psychology and a master's

10  degree in experimental psychology, both from the University of

11  Central Oklahoma.

12       I have a doctorate in counselling psychology from the

13  University of Missouri, Kansas City.

14       I completed a predoctoral internship at Western Missouri

15  Mental Health Center in Kansas City where I was trained in

16  forensic psychology.

17       I am licensed as a psychologist in the State of Oklahoma

18  as well as holding a temporary license in the State of Texas

19  to practice there a limited number of days a year.

20       And I previously worked as the director of forensic

21  psychology at the Oklahoma Forensic Center for a number of

22  years.

23  Q.   Tell us about the rest of your professional background.

24  A.   Well, I initially started working at what was called

25  Eastern State Hospital which turned into the Oklahoma Forensic

1  before they decided that this wasn't working and we would send
2  somebody to inpatient treatment?
3  A.   It was approximately three months.
4  Q.   Is that -- is that a fair number in your opinion for --
5  to be -- well, let's say this.  Do you think jail-based
6  competency restoration could work theoretically?
7  A.   It's not particularly effective as compared to hospital
8  settings, but it is an alternative when you cannot put people
9  in a hospital setting.  And it can be effective for some
10 people if done correctly.
11 Q.   Does it sound to you like Oklahoma County is doing this
12 correctly?
13 A.   Not in any way, shape or form.
14 Q.   Even if jail-based competency restoration could be
15 effective, if implemented correctly, is an inpatient setting
16 still preferable?
17 A.   Absolutely.
18 Q.   For any reason that we haven't already discussed?
19 A.   Well, I would just say this.  Jail-based competency
20 restoration has arisen in relation to lawsuits and in relation
21 to long waiting lists.  That's the only reason it's in
22 existence.
23      If those weren't the issue you would not see jail-based
24 competency restoration.
25      We did not have this even a handful of years ago.  We did