# Exhibit 3

```
 1                 IN THE DISTRICT COURT OF OKLAHOMA COUNTY
                              STATE OF OKLAHOMA
 2

 3   STATE OF OKLAHOMA,                  )
         Plaintiff,                      )
 4                                       )
         vs.                             )
 5                                       )
     JOVAN DAVID FLEMING,                )   CASE NO. CF-2022-4777
 6   JEFFERY DANIEL MONTGOMERY,          )   CASE NO. CF-2022-3891
         Defendants/Petitioners.         )
 7

 8

 9

10                        *     *     *     *     *

11              SEVENTH JUDICIAL DISTRICT OF OKLAHOMA

12                   CONTINUED SHOW CAUSE HEARING

13             HAD ON THE 26TH DAY OF JANUARY, 2023

14      BEFORE THE HONORABLE CINDY H. TRUONG, DISTRICT JUDGE

15                        *     *     *     *     *

16

17

18

19

20

21   Reported By:

22      Regina Garnett, CSR
        Official Court Reporter
23      321 Park Avenue
        Suite 706
24      Oklahoma City, Oklahoma 73102
        (405) 713-7116
25
```

1    order of the witnesses for this afternoon.  So first we'll
2    call Debbie Moran.
3              THE COURT:  Okay.
4              MR. SULLIVAN:  Petitioner calls Debbie Moran.
5              THE COURT: All right.  Ms. Moran, if you would
6    please come on up.  All right.  If you would please raise your
7    right hand for me.
8              (The witness is sworn.)
9              THE COURT:  If you would please have a seat here and
10   pull the microphone in front of you and speak as loud as you
11   can for me.
12             Mr. Sullivan, you may proceed when you're ready.
13             MR. SULLIVAN:  Thank you, Judge.
14                      **DIRECT EXAMINATION**
15   BY MR. SULLIVAN:
16   Q.   Ms. Moran, am I saying that correctly?
17   A.   Yes.
18   Q.   Okay.  Can you state your name and spell the last name
19   for the court reporter?
20   A.   Debbie Moran, M-O-R-A--N.
21   Q.   What do you do, Ms. Moran?
22   A.   I'm the executive director at the Oklahoma Forensic Unit
23   and I'm also the executive director at Carl Albert Community
24   Mental Health Center.
25   Q.   Are you directly employed by the Department of Mental

1  A.   A person requiring treatment, statutory.  It would be
2  like -- and examples would be most recently, the people who
3  are eating their feces, the people who are bashing their heads
4  against the wall, the people who are hitting the other guards
5  or stripping off naked and then trying to assault others.
6  Q.   So those people will always go to the front of the line?
7  A.   Always.
8  Q.   Okay.  Is it affected by whether there is a show cause
9  motion pending?
10 A.   For me, it's not.
11 Q.   Well, who makes the call?
12 A.   Basically at this point myself -- myself.
13 Q.   Okay.  Is it affected by whether the Department is being
14 fined $500 a day for every day that somebody is not admitted
15 to the Forensic Center?
16 A.   My decision will always be based on the consumer.
17 Q.   And it's solely your decision?
18 A.   Right now, I mean it's me.  I've got Dr. Orth, I have
19 Dr. Tandon, we can all bounce things off people.  I mean, to
20 me, for the lack of a better way to say it, it's a no-brainer
21 if someone is eating their feces.  That's not healthy.  That
22 is dangerous for them.  It's dangerous if they're throwing it
23 on guards and on other consumers.  That's dangerous.  But if I
24 have someone that's just no aggressive outbursts, not
25 displaying any of that, attempting to take their medicine

1    correct?

2    A.    I disagree with you.

3    Q.    Okay.

4          THE COURT:  Hold on.  So is it your position that you
5    are going to leave Mr. Fleming and Mr. Montgomery in the
6    Oklahoma County Jail indefinitely because they're not
7    qualified to go to the Forensic Center?

8          MS. MORAN:  At some point, I mean, if we get through
9    the dangerousness list, you know, and they are not proceeding,
10   their growth -- and I don't have that statute right in front
11   of me, so I can't really quote it, and I apologize for that --
12   but, you know, they will eventually be able to come to a bed.
13   I just don't have the beds.  And there is just --
14   unfortunately, I'm not willfully trying to disregard your
15   order at all, I wish I had beds for everybody that was found
16   incompetent, but that doesn't -- that is not the system that I
17   have.

18         THE COURT:  That's not an excuse, so...

19         MS. MORAN:  I'm not saying -- I'm not trying to make
20   an excuse, you know.  I apologize if it came off that way.

21         THE COURT:  Go ahead, Mr. Sullivan.

22   Q.    (By Mr. Sullivan)  I'm going to take one more stab at
23   this, and then at that point I feel like we're going around in
24   circles.  But I do need to establish this for purposes of the
25   record.

1  A.  Okay.

2  Q.  Okay.  One cannot be committed to the Department of

3  Mental Health without a finding of dangerousness, a/k/a a

4  person requiring treatment, is that fair?  Under 1175.7c, "The

5  Court may not commit the incompetent person to the custody of

6  the Department of Mental Health and Substance Abuse Services

7  unless the person is a person requiring treatment as defined

8  by Title 43A in the Oklahoma Statutes."

9  A.  That is correct.

10 Q.  Okay.  The definition of dangerousness is also defined by

11 Title 43A, correct?

12 A.  Correct.

13 Q.  Both of these individuals have already had a finding of

14 dangerousness or a person requiring treatment, correct?

15 A.  That is -- they have had -- it has been marked yes on the

16 most recent competency evaluation, yes.

17 Q.  That would be a finding by the Court, correct?

18 A.  I guess.  I'm not really sure what you're asking me.  I'm

19 telling you that on the last competency evaluation --

20 Q.  Do you know how the orders from the court work --

21 A.  I do understand orders.

22 Q.  -- when the Court makes a finding that somebody is both

23 incompetent and a person requiring treatment so that they can

24 be committed, do you --

25 A.  I do understand, yes.

1  Q.   Okay.  So given what I've just said, how can someone be
2  not clinically dangerous, a/k/a a person requiring treatment,
3  and still lawfully be committed to the Department of Mental
4  Health?
5  A.   43A says immediate.  Immediate dangerousness to self or
6  others.  "Immediate" is the word.
7  Q.   And that's the same finding that's already been made --
8  A.   Okay.
9  Q.   -- correct?
10 A.   That is what paperwork I've seen, yes.
11 Q.   Okay.  So everybody that is committed to the Department
12 of Mental Health has had a finding of substantial and
13 immediate dangerousness that they are a person requiring
14 treatment, correct?
15 A.   That is what the order says, yes.
16 Q.   And you cite in your letter Title 22, 1175.6a, to say
17 that it allows for individuals to remain in the jail when in
18 their best interest.  I think you've already said that your
19 determination of whether it's in their best interest is
20 whether or not they are dangerous, and if they're not
21 dangerous, it's not in their best interest to go to the
22 Forensic Center.
23 A.   That is what I said earlier, yes, sir.
24 Q.   Okay.  So if everybody with a commitment has already been
25 found to be dangerous, what else do you rely upon?  Like what

```
 1   is more dangerous?  I'm just trying to --
 2   A.   I -- in my opinion, Mr. Fleming -- if we're just talking
 3   about these two cases, Mr. Fleming and Mr. Montgomery do not
 4   meet the level of dangerousness of those that I have been
 5   admitting.
 6   Q.   So more -- who's more dangerous?
 7   A.   Yes.
 8   Q.   Okay.  Have you ever been in the county jail?
 9   A.   The Oklahoma County Jail, I have not.
10   Q.   Okay.  Have you ever seen where Jovan Fleming and Jeffery
11   Montgomery stay?
12   A.   I have not.
13   Q.   How can you determine what's in their best interest?
14   A.   Again, it's all about how -- what they're doing.  There
15   have been no acts -- when I read the notes, there have been no
16   acts of any aggressiveness, assaultiveness, they have not had
17   any acting out, they're denying any suicidal/homicidal
18   ideations, they're denying any auditory/visual hallucinations,
19   and get back to the immediate dangerousness.  When I have
20   someone that's throwing feces or eating their feces, I'm
21   going to pick that person over someone who is not having any
22   issues.
23   Q.   Okay.  I'm not talking about comparing people, I'm
24   talking about what's in one individual's best interest.
25   A.   Sorry.  There was a squealing bothering my ear.
```

1  Q.   That's okay.  I'm not talking about comparing people to
2  see who's more dangerous, I'm talking about deciding what's in
3  Jovan Fleming's best interest.
4  A.   Okay.
5  Q.   Without knowing what his setting is like in the county
6  jail, how can you make a determination of what's in his best
7  interest?
8  A.   This is what I do.  I mean, I have to pick the people who
9  are the most dangerous.
10 Q.   So it really doesn't have anything to do with what's in
11 his best interest?
12 A.   In my opinion, they're better off in the Oklahoma County
13 Jail.  And I haven't seen it and I know, but I have seen OFC
14 and I have -- I do deal with that every day.
15 Q.   Someplace that you've never been to?
16 A.   Oh, I go to OFC all the time.
17 Q.   No.
18 A.   Sorry.
19 Q.   In your opinion they're better off in a place that
20 you've never been to that's been condemned by the federal
21 government?
22 A.   At this point, yes.
23 Q.   Okay.  And I want to read to you the statute in 1175.6aA,
24 where it does state, "The Department may designate a willing
25 entity to provide such competency restoration."  Skipping down

1    to the part about best interest.  "The Court shall further
2    order the Department to take custody of the individual as soon
3    as a forensic bed becomes available unless both the Department
4    and the county jail where the person is being held determine
5    that it is in the best interest of the person to remain in the
6    county jail."
7             Who do you consult with as a part of the county jail
8    to determine if it's in Jovan Fleming's or Jeffery
9    Montgomery's best interest to stay in that county jail?
10   A.   I have not consulted with the Oklahoma County Jail.
11   Q.   You also say that jail-based competency treatment reduces
12   the time for an individual's disposition.  Do you have any
13   records to back that up, or numbers?
14   A.   Well, I can tell you, again, since the beginning of the
15   -- in December of 2022 to current, 119 individuals have been
16   found competent and have never set foot in OFC.  And all
17   that's been through jail-based competency.
18   Q.   Is that all you have to back up your statement that
19   jail-based competency reduces the time for individuals?
20   A.   That's the only immediate number I have in my head.  I
21   mean, I didn't go down and try to get specifics.
22   Q.   Did you average how long it took for those 119?
23   A.   I did not.
24   Q.   Okay.  Well, say if Jovan Fleming suddenly, a year later,
25   regains judicial competency, would you include him in that

1  number just the same even though it took a year?
2  A.   I would.
3  Q.   And is it your position that that could not have happened
4  faster at the Forensic Center?
5  A.   Again, it's six to nine months is what the average is.
6  Q.   You also state that -- in both Exhibit 1 and 2, that both
7  individuals are currently compliant with their medication as
8  of January 12th of 2024.
9  A.   Yes.
10 Q.   Where do you get those numbers from?
11 A.   That comes from the documentation in this case that Brad
12 puts in the competency app.
13 Q.   Is it that he tells you that word "compliant" or do you
14 actually look at the days that they took medication and don't
15 take medication?
16 A.   He tells us that they're compliant.
17 Q.   So he just gives you that word and that's what you write?
18 A.   He puts in there that they're medication compliant, yes.
19 Q.   Have you ever asked -- so you don't review the notes of
20 whether, you know, Jovan Fleming took his medication every
21 single day --
22 A.   I do not.
23 Q.   -- the records from the jail?
24 A.   I do not.
25 Q.   Okay.  Have you asked him what his number is for saying

```
 1   the word "compliant"?
 2   A.   I have not.  I have not spoken to either of these
 3   individuals ever.
 4   Q.   No.  No.  No.  I mean Brad McKay.
 5   A.   Oh, sorry.
 6   Q.   Sorry.
 7   A.   Can you repeat your question?
 8   Q.   Have you ever asked Brad McKay what his number is to use
 9   the word "compliant"?
10   A.   I have not.
11   Q.   What would be an appropriate number for you?
12   A.   Compliant means they take it on a regular basis.
13   Q.   I mean, how often?
14   A.   I don't know.
15   Q.   What do you mean by "regular basis"?
16   A.   I mean, I'm not a medical provider, so that would be a
17   better question for them.  I mean, even if I take my own self
18   and I miss a day here or there my own self, so -- but I would
19   consider myself compliant.
20   Q.   Okay.  Is Brad McKay a medical provider?
21   A.   No, he's an LMFT.
22   Q.   So two people who are not medical providers are relaying
23   to the Court whether or not somebody is medication compliant
24   on antipsychotic medication?
25   A.   That is where I get my documentation, yes, sir.
```

1  Q.  Is it coming from anybody else?
2  A.  You would have to ask Brad where he's getting his
3  information.
4  Q.  No, I mean you, when you write these letters?
5  A.  No, that's where I get my information.
6  Q.  Okay.  Is there any limit to the amount of time that you
7  would have somebody continue jail-based competency restoration
8  services before you would say they need to be transported to
9  the Forensic Center and bump them up the list if they're not
10 throwing feces and attacking guards?
11 A.  I mean as we review and 90 days out and they are not
12 making any progress, then they will go on that expedite list.
13 But even on the expedite list -- and I hate to use the word
14 "list," but they will be at the bottom of that list and then
15 make their way to the top, depending on the dangerousness.
16 Q.  There's no guarantee they'll ever get to the top, right?
17 A.  Yeah, I can't answer that question.
18 Q.  You make the decision.  How can you not answer that
19 question?
20 A.  Because I don't know at any given time how many dangerous
21 -- more severely acute dangerous people will be presenting
22 that need to be admitted.
23 Q.  And my question was:  So there's no guarantee that they
24 will ever get to the top of the list?
25 A.  I can't.

1  Q.    Sounds like you're saying yes.

2  A.    I can't guarantee that, no, I cannot.

3              MR. SULLIVAN:  Okay.  May I have a moment Judge?

4              THE COURT:  Yes, you may.

5              Mr. Sullivan, Ms. Moran is asking for a rest room

6  break, so let's give her a 10-minute break.

7              How many more witnesses do you have?

8              MR. SULLIVAN:  Four.

9              THE COURT:  Okay.  And how many witnesses do you

10 have?

11             MR. BERRY:  Three.

12             THE COURT:  Okay.

13             MR. SULLIVAN:  A lot of them are the same.

14             MR. TUBB:  Yeah.  I think that what Mr. Berry is

15 saying is he would only question Ms. Moran afterwards and

16 question Mr. McKay afterwards.  There aren't any independent

17 witnesses that are not already incapsulated in the addition of

18 this that the petitioner has called.

19             THE COURT:  Okay.  So do we plan to stay here as long

20 as it takes or do we plan to come back?

21             MR. SULLIVAN:  I can talk to my witnesses and see

22 what they would prefer.  I would prefer to just go as long as

23 it takes and get done.  I'm almost done here.

24             THE COURT:  Okay.

25             MR. SULLIVAN:  But I also realize it's a Friday and

1  43A.

2  Q.  When was the most recent one by Ms. Christopher again --
3  by Dr. Christopher?

4  A.  It was in the first part of January.  I don't know, it
5  was the 4th or 5th, something like that.

6  Q.  So a couple of weeks ago?

7  A.  Right.

8  Q.  And you want to change that?

9  A.  I'm not asking to change her evaluation, no, sir, that's
10 not what I said.

11 Q.  You disagree with her?

12 A.  I'm saying in my opinion, they do not meet the immediate
13 dangerousness of 43A.

14 Q.  So you disagree with Dr. Christopher?

15 A.  As of today, I disagree.  I don't know what she saw on
16 that day.  I am not --

17 Q.  When is the last time you met with Mr. Fleming?

18 A.  Again, I have already told you that I didn't meet with
19 either one of them.  It was a review of the records.

20 Q.  So are you giving the Court --

21 A.  And I'm saying that it would be prudent for the State to
22 have an evaluation of dangerousness, 43A -- an evaluation of
23 43A to see if they meet that criteria.

24 Q.  Even though it was just done two weeks ago?

25 A.  A competency evaluation was done two weeks ago.

1  Q.   Which always includes the question of whether they're
2  presently dangerous and a person requiring treatment, correct?
3  A.   That question is in there, yes, sir.
4  Q.   And it was answered in the affirmative for both?
5  A.   It was.
6  Q.   Do you want to do another competency evaluation every two
7  weeks?
8  A.   No.
9  Q.   And, in fact, that's not even feasible, is it?
10 A.   No, it's not.
11 Q.   It took Jeffery Montgomery two months to get his first
12 one.  Did you look at those records?
13 A.   I did look at his records, yes.
14 Q.   Who determines whether they get evaluated?
15 A.   By the people who are going in to, like, in Oklahoma
16 County, Brad.
17 Q.   The Department of Mental Health determines when they get
18 evaluated?
19 A.   He puts in the documentation and deems whether he
20 believes they are ready to be reevaluated.  And when he thinks
21 that they are, he will submit a request for a second
22 evaluation.
23 Q.   And so it's your position to this Court that Jovan
24 Fleming should be conditionally released?
25 A.   That's not what I -- no, sir, that's not what I said.

1  a person requiring treatment, having never met him?
2  A.   I said -- again, I said it was my opinion and that they
3  should be evaluated for that.
4  Q.   Okay.  Yeah.  And my question was:  Do you think it's
5  appropriate to be relaying that opinion to the Court, having
6  never met him?
7  A.   By the review of the records, I gave you my opinion.
8  Q.   That's still not an answer to my question.  Do you
9  believe it's appropriate to be giving that information to the
10 Court, your opinion of that, having never met Mr. Fleming?
11 A.   Yes.  It's my opinion, it can be taken or not taken.
12 Q.   That's similar to your opinion of whether competency
13 restoration is effective in Oklahoma County when you don't
14 know the numbers.
15 A.   I don't have the data for that, no, sir.
16 Q.   When is he scheduled to be re-evaluated?
17 A.   I don't know.  I did not look.
18 Q.   Well, who sets that up?
19 A.   Again, Mr. McKay will put into the app when he believes
20 that he has progressed enough to be able to do another
21 evaluation.
22 Q.   Why does he need to do that if you've looked at the
23 records and you decided that he does?
24 A.   Now, what I just said was he needed to be evaluated for
25 dangerousness.  That's a totally different thing in

```
 1   going to consider it.
 2   Q.   Okay.  But considering it, is it fair to say that someone
 3   who is dangerous would not be allowed to have that
 4   consideration and move to general population?
 5   A.   Yes.
 6   Q.   Okay.  So similar to Mr. Montgomery, Mr. Fleming you
 7   didn't -- you haven't observed any signs of dangerousness,
 8   anything like that in your most recent --
 9   A.   No, I have not.
10   Q.   Okay.  So where they're at now has been an improvement,
11   do you believe that improvement is based on the treatment that
12   you're providing along with the medication that these
13   defendants are taking?
14   A.   Yes.
15            MR. BERRY:  I have no further questions.
16            THE COURT:  Redirect.
17                       **REDIRECT EXAMINATION**
18   BY MR. SULLIVAN:
19   Q.   Mr. Berry used the term "psych evals."  What is "psych"
20   short for?
21   A.   Psychological.
22   Q.   Do you do psychological evaluations?
23   A.   I do not do formal psychological evaluations as a Ph.D.
24   psychologist would do.
25   Q.   You wouldn't be allowed to do those, would you?
```

1  A.  Correct.
2  Q.  Okay.  So I mean, it sounds like you're saying they've
3  improved, they're getting better, both Mr. Montgomery and
4  Mr. Fleming?
5  A.  Yes.
6  Q.  Okay.  Why are they on the expedited list?  Things are
7  going well.
8  A.  They are.
9  Q.  Why are they on the expedited list?
10 A.  I guess it's an issue of movement.  These guys have been
11 incarcerated for a while, they're looking good.  It's my goal
12 to help them get on with the process as quickly as possible,
13 to get through the court process.
14 Q.  Well, why not make that call at three months instead of
15 12?  How long have they been on the expedited list?
16 A.  I'm not sure.
17 Q.  I mean, I could --
18 A.  I don't know.
19 Q.  We could look at e-mails and stuff, but when did you
20 first recommend that they be put on the expedited list?
21 A.  I don't know.  I don't recall.
22 Q.  Did you ever do that?
23 A.  Yes.  After -- okay.  Shortly after I learned of them not
24 having been deemed competent, which would have been -- hang
25 on -- two weeks ago, before the hearing here.