# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) LESLIE BRIGGS, as next friend of T.W. and B.S.;
(2) EVAN WATSON, as next friend of C.R.; and,
(3) HENRY A. MEYER, III, as next friend of A.M., for themselves and for others similarly situated,

　　　　　　　Plaintiffs,

v.

(1) ALLIE FRIESEN in her official capacity as Commissioner of the Oklahoma Department of Mental Health and Substance Abuse Services; and
(2) DEBBIE MORAN, in her official capacity as Interim Executive Director of the Oklahoma Forensic Center,

　　　　　　　Defendants.

Case No: 23-cv-81-GKF-JFJ

## DECLARATION OF DR. CRYSTAL HERNANDEZ

I, Crystal Hernandez, hereby declare as follows:

1. I make this declaration in support of the parties' *Joint Motion for Preliminary Approval of Consent Decree, Class Certification, and Plan of Notice to Class* (Doc. 46). I have personal knowledge of the matters set forth herein and can testify thereto if called upon to do so.

2. I hold a doctorate in forensic psychology (Psy.D.), as well as a Master of Business Administration (MBA).

3. I was the Executive Director of the Oklahoma Forensic Center (OFC) in Vinita, Oklahoma, between December 2019 and August 2023. I was originally named, in my official capacity, as a defendant in this lawsuit when it was filed in March 2023.

4. OFC is the sole forensic mental health hospital for the state, serving all adults determined incompetent to stand trial and requiring competency restoration, in addition to other individuals determined incompetent for execution, as well as those found not guilty by reason of insanity/mental illness.

5. In my role as OFC's Executive Director, I was an employee of the Oklahoma Department of Mental Health and Substance Abuse Services ("ODMHSAS"), and I had a direct view into, and involvement with, the workings and management of ODMHSAS's adult forensic mental health system, including competency restoration.

6. Based on my observations, the competency restoration system has been and continues to be significantly broken. During my tenure at ODMHSAS, I observed a manifest disregard, on the part of the ODMHSAS administration, for the urgent need to address the health and safety of those clients declared incompetent to stand trial and committed to ODMHSAS care and custody via court order . The broken nature of the competency restoration system is illustrated by, among other things, ODMHSAS's history of mismanaging the OFC waitlist.

7. When I started as the OFC's Executive Director, OFC executive administrative staff/ODMHSAS maintained a waitlist of persons declared incompetent and ordered to receive restoration treatment. The waitlist was readily available to ODMHSAS administration, as well as OFC executive leadership. The waitlist was separated by referring county and listed the date on which the order for competency restoration was received by OFC. There were also notes and other relevant information for each person, such as "refusing food," "lawyer/judge called on this case," or "show cause" court dates.

8. Individuals on the waitlist should have been admitted, in order of their time on the waitlist or according to the severity of the client's mental health condition and need for treatment, as beds became available at OFC. In practice, however, the date of the commitment order for competency restoration, and the client's clinical condition, were not always the determining factors that established a person's order of admission. Instead, the procedure which predated my employment and that was directed by ODMHSAS administration was that incompetent persons from Oklahoma County could "bump the line" as a priority. This priority status afforded to Oklahoma County was the result of an arrangement from years prior to avoid "show cause" filings and other negative actions against ODMHSAS for not moving incompetent defendants from the jail quickly enough.

9. Contempt "show cause" filings, or even threats of "show cause" filings, by defense attorneys and/or district attorney offices from other Counties, also impacted the order in which people were scheduled to be admitted to OFC. It was a common practice for ODMHSAS administration and legal to instruct staff that those defendants who had filed "show cause" or contempt motions be "bumped" ahead of others on the waitlist and into an OFC bed to avoid judicial scrutiny. In my view, this practice was an egregious and arbitrary management of the waitlist because it disregarded the waitlisted persons' medical needs and time waiting on the list while incarcerated in jail, in favor of advancing the administration's goal to avoid judicial scrutiny of the competency restoration program.

10. The issues with the OFC waitlist began well before my employment with ODMHSAS started in December 2019. When I arrived, operating procedures were questionable at best, and the data painted a clear picture that the system was in desperate need of revamp and investment. I notified ODMHSAS administration almost

immediately upon hire that the existing system was flawed, and that the number of forensic beds at OFC was insufficient given the waitlist and trend line for demand. In early 2020, I submitted the first of many proposals to ODMHSAS administration aiming to alleviate the worsening problem of defendants waiting prolonged periods of time in jail for competency restoration services. Such proposals over the years included community-based competency restoration services, additional forensic dedicated beds, a pilot jail-based competency program operated as an extension of OFC, and several other concepts aimed at alleviating the issues.

11. In October and November 2022, ODMHSAS administration presented a proposal to launch Certified Community Behavioral Health Clinics (CCBHCs) into a purported statewide jail-based competency program, despite the CCBHCs' lack of expertise and experience in competency-to-stand-trial work.

12. In December 2022, ODMHSAS attempted to launch the CCBHC jail-based restoration treatment program in 76 counties.[1] In an attempt to alleviate growing legal pressure created by burgeoning waitlist, ODMHSAS rushed to launch the program without (i) sufficient planning, lead time, training of providers, and infrastructure; (ii) assigning/having OFC staff necessary for administration or monitoring; or (iii) providing adequate notice to most of the jail administrators or other stakeholders at the county level. This created chaos and resulted in a flood of complaint calls and emails to OFC from jails, defense attorneys, prosecutors, and judges.

---

[1] ODMHSAS administration decided to structure a different program in the Oklahoma County Jail. Rather than a CCBHC provider rendering services, an embedded ODMHSAS staff member was supposed to provide services and provide feedback to OFC staff and ODMHSAS administration.

13. The launch included a mere two-sentence statement of work added to all existing CCBHC contracts, indicating that the CCBHC provider should see the inmate a minimum of twice monthly and provide psychotropic medications to them in jail. Several CCBHCs voiced concerns over the lack of training, lack of lead time, and difficulty managing stakeholders' frustrations; some also expressed anger directed at ODMHSAS about being forced into providing a service they were ill-equipped to provide.

14. Following the launch of the jail-based program, ODMHSAS administration directed OFC and CCBHC providers to cease using the term "waitlist" for those still in jail and pending competency restoration services. ODMHSAS administration devised this semantic directive because it was thought to minimize the legal risks associated with having a waitlist of incompetent defendants waiting to receive restoration treatment. Instead, we were asked to use an alternative name, which developed into the euphemistic phrase "treat to competency by location." A second "waitlist" evolved following the launch of the jail-based program for those needing to be admitted to OFC due to (i) refusal of medications or program participation in jail, (ii) high-profile cases, or (iii) threats of legal action.

15. When ODMHSAS administration launched its purported statewide jail-based restoration program, there were approximately 300 people on the waitlist, many clients had been waiting many months to receive restoration treatment. ODMHSAS's public statements, at that time, that there was "no waitlist," or that all persons declared incompetent were receiving restoration treatment, were false. The 300-plus people on the waitlist did not all suddenly start to receive restoration treatment when ODMHSAS administration launched its statewide jail-based restoration program.

16. In my opinion, the ODMHSAS administration statewide jail-based restoration program did not provide legitimate competency restoration services consistent with accepted professional standards in most, if not all, Oklahoma counties. The ODMHSAS administration hastily launched the program as a tactic to attempt to reduce ODMHSAS's legal risk associated with its waitlist and prolonged waiting times for clients to receive competency restoration services.

17. From January to June 2023, ODMHSAS administration continued to receive a flood of complaints regarding the CCBHCs' lack of experience in competency restoration services from county jails, defendant's families, and courts. OFC administrative staff began maintaining data regarding treatment compliance and issues of the jail-based restoration program. Those data tables were sent nearly weekly via emails to ODMHSAS administration. The data I observed until my departure were abysmal, with a large percentage of inmates refusing to participate in the program, refusing to comply with medications prescribed, and receiving suboptimal frequency of treatment. Additionally, data demonstrated that some of the CCBHCs were failing to provide the minimum twice monthly appointments, were inserting themselves into the criminal proceedings, and lacking understanding of competency restoration knowledge.

18. During my tenure at ODMHSAS, I observed other areas of concern as well. For example, I witnessed ODMHSAS administration inappropriately insert themselves into many decisions at OFC, including decisions impacting clinical services and movement of patients. Additionally, staffing at OFC has been a concern predating my tenure, with difficulty recruiting and retaining the quality and the quantity of staff necessary to perform a difficult and expertise-driven service in a safe manner. Salaries are low, the

degree of risk for the job is great, and the environment of care is significantly lacking (including inappropriate furnishings, fixtures, and layout for a high-security psychiatric environment). Without the number and type of staffing necessary, treatment quality and availability are negatively impacted. With compromised treatment and supervision, length of stay and overall effectiveness of care are questionable.

19.   I have read the proposed Consent Decree (Doc. 46-1), and I believe it is a step in the right direction to address the concerns discussed above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 21, 2024.

_____
Crystal Hernandez, Psy.D., MBA