# Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) LESLIE BRIGGS, as next friend of T.W. and B.S.; <br> (2) EVAN WATSON, as next friend of C.R.; and, <br> (3) HENRY A. MEYER, III, as next friend of A.M., for themselves and for others similarly situated, <br><br>          Plaintiffs, <br> v. <br><br> (1) ALLIE FRIESEN in her official capacity as Commissioner of the Oklahoma Department of Mental Health and Substance Abuse Services; and <br> (2) DEBBIE MORAN, in her official capacity as Interim Executive Director of the Oklahoma Forensic Center, <br><br>          Defendants. | Case No: 23-cv-81-GKF-JFJ |

---

## COMBINED DECLARATION OF WILLIAM NEIL GOWENSMITH, Ph.D. and LAUREN ELIZABETH KOIS, Ph.D.

### I.
### CONSULTANTS' EXPERIENCE WORKING WITHIN FORENSIC BEHAVIORAL HEALTH SYSTEMS AND ENVIRONMENTS, AND AS EXPERT CONSULTANTS IN SIMILAR CONSENT DECREE AND CLASS ACTION AGREEMENTS

William Neil Gowensmith, Ph.D., and Lauren Elizabeth Kois, Ph.D., upon oath and under penalty of perjury, and upon personal knowledge, state:

1.      Dr. Gowensmith is a licensed forensic psychologist and the president of Groundswell Services, Inc. ("Groundswell"), which is a consulting business dedicated to reviewing, coordinating, and improving public forensic mental health systems across the United States. His career has been spent in the specialty area of forensic psychology, which represents the

intersection of mental health and the legal system. His main focus in forensic psychology is on competence to stand trial (CST) – in lay terms, the constitutional assurance that a person has the requisite mental and developmental capacities to meaningfully understand and participate in their legal defense after being charged with a crime. To this end, he conducts CST evaluations, researches CST practices and standards, serves on national boards regarding forensic psychology and CST, writes articles and books on CST, teaches graduate students about CST, trains graduate students and postdoctoral fellows to conduct high-quality CST evaluations, and consults with forensic mental health systems throughout the country regarding CST practices and standards.

    a.   In addition to overseeing Groundswell Services, he is a full professor of psychology at the University of Denver, created and directs our forensic psychology clinic (The University of Denver's Forensic Institute for Research, Service, and Training, i.e., Denver FIRST), and oversees and supervises their postdoctoral fellowship in forensic psychology. Previously he served as the Chief of Forensic Services for the State of Hawaii's Department of Health, overseeing all forensic evaluations and staff, community forensic programs and staff, and legislative and policy efforts to improve the state's forensic mental health system (including CST).

    b.   As President of Groundswell Services, he subcontracts with many exceptionally qualified forensic mental health experts from across the country to accomplish the various tasks and demands needed across states. For Oklahoma, he has worked (and will continue to work) closely with Dr. Lauren Kois.

2.     Dr. Kois is a licensed forensic psychologist and Assistant Professor of Psychiatry and Neurobehavioral Sciences at the University of Virginia School of Medicine's Institute of Law, Psychiatry, and Public Policy. Her clinical, research, and consulting work focus on enhancing the

quality, efficiency, and implementation of forensic mental health services in the public sector, specifically competency evaluation and restoration practices. She has implemented forensic programs in inpatient, jail, and community settings, including in areas lacking infrastructure and resources, such as rural areas. She is nationally recognized for her research and consulting activities and has assisted many state systems in addressing restoration demands prior to and since joining Groundswell in 2022.

    a.   Prior to joining the University of Virginia, she served as core faculty of the University of Alabama's Clinical Psychology-Law doctoral program, where she trained undergraduate and graduate students in forensic psychology and assisted the Alabama Department of Mental Health in its efforts to improve forensic services.

    b.   Dr. Kois has taught Criminal Forensic Assessment courses and seminars to doctoral, postdoctoral, and professional trainees. She has trained thousands of mental health and legal professionals in matters of competence evaluation and restoration standards and practices throughout the country.

3.    Groundswell Services works in multiple states regarding the challenges presented within CST systems. Presently, Groundswell is working in the states of Washington, California, Texas, Colorado, Georgia, Minnesota, and North Carolina on issues regarding CST wait times and other challenges associated with competence services. We have also worked successfully in Hawaii, Nevada, Alaska, and Alabama on CST systems issues.

4.    In Colorado, Dr. Gowensmith serves as one of two Special Masters overseeing a Consent Decree and associated processes designed to transform Colorado's competence services system into one that provides timely, high quality competence evaluations and competence restoration services.

5.    In some states, Groundswell is at times retained by attorneys or mental health advocacy agencies to explore solutions to competence wait times. In others, Groundswell is retained by the requisite state mental health agency to implement new programs and policies to mitigate competence services challenges. Regardless of the retaining party, Groundswell's recommendations represent a consistent approach; that is, while our recommendations are tailored to specific state realities, they do not change substantially whether we are retained by plaintiffs or defendants.

6.    The challenges Oklahoma faces with its CST system are in some ways unique to Oklahoma and in other ways very commonly experienced by most other states. Oklahoman defendants ordered to competence evaluation and restoration routinely face long waits for those services to occur, or for appropriate court-ordered settings to become available. As reflected in the proposed Consent Decree, Oklahoma's CST system faces a wide range of challenges, including but not limited to:

a.  A lack of adequately trained and experienced CST evaluators across the state

b.  Inadequate conditions for the clinical treatment of persons with serious mental illness in county jails across the state, especially for individuals needing long term treatment

c.  Insufficient capacity for competence restoration, including lack of sufficient inpatient hospital beds, community / outpatient options, and jail-based programs aligned with standard restoration practices

d.  A lack of adequately trained competence restoration staff

e.  Poor coordination with courts and other relevant legal stakeholders to resolve competence in a timely fashion

f.  Inadequate diversion options in most counties across the state

7.     As a result of these systemic deficits, as reflected and outlined in the proposed Consent Decree, Oklahoman defendants court-ordered to CST services are at heightened risk and vulnerability for physical and mental harms, as well as inhumane and unconstitutional delays to both legal trial proceedings and clinical treatment.

8.     These challenges are similar or identical to those found in other states. Many other states face long waitlists of defendants who have been court-ordered to competence evaluations and/or competence restoration. As a result, these states are either facing class-action lawsuits and other legal remedies to these waitlists. Some are in the midst of federal oversight for those waitlists or have just emerged from federal oversight given successful resolution of those waitlists.

9.     Given Groundswell's experience and expertise in successfully mitigating CST-related delays and harms across several states, Groundswell has been retained by plaintiff's counsel to address similar CST-related delays and harms in Oklahoma.

## II.
## HOW WE DEVELOPED KNOWLEDGE AND UNDERSTANDING OF COMPETENCY RESTORATION ISSUES IN OKLAHOMA

10.     Over the past year, Groundswell has spent many hours learning about the Oklahoma forensic system.

a.  We have reviewed statutes and proposed legislation; policy papers; media accounts; ODMHSAS data, presentations, and reports; ODMHSAS service plans and proposals; and other sources of material specific to competence services and delays in Oklahoma.

b.  We have toured mental health and correctional facilities on multiple occasions within the last 12 months, including the Oklahoma Forensic Center and the Tulsa County Jail.

c.  We have interviewed dozens of stakeholders, including current and former state mental health administrators, jail-based and hospital-based mental health staff, defense

attorneys, prosecutors, governmental staff, law enforcement and correctional staff, and multiple individuals ordered to competence services themselves.

d.   We have also compared all of this information with similar sources of information from other states, national trends, best practices, and evidence-based information within the forensic mental health literature.

11. After reviewing and synthesizing all the above information, we worked with plaintiff's counsel and the defendants, including ODMHSAS's independent expert, John Petrila, J.D., to craft a collaborative Consent Decree and concurrent remedial Plan to address the delays and challenges found in Oklahoma's current competence services system.

**III.**
**THE PLAN IS DESIGNED TO REDUCE WAIT TIMES AND IMPROVE THE QUALITY OF COMPETENCY EVALUATIONS AND RESTORATION TREATMENT FOR ALL CLASS MEMBERS**

12.   The Plan and Consent Decree apply uniformly to all defendants in Oklahoma, and they will address services and options before, during, and after competence services occur. The Plan and Consent Decree contain elements intended to deliver benefit to all Class Members equally.  Individual circumstances of specific defendants will not materially change the services mandated by the Plan or Consent Decree. Although individual circumstances might dictate that some services be individually tailored to the defendant, just as reasonable medical care would, individual circumstances will not preclude anyone from accessing timely, high quality, robust options for competence services developed and implemented under the Plan. Some Plan and Consent Decree components aim to divert or remove appropriate individuals from the restoration waitlist, while others focus on maximizing the efficiency and quality of competence services for those that must remain in the competence system; both sets of components will ultimately reduce the overall restoration wait times for all defendants.

13.     For example, the Plan sets specific maximum allowable wait time deadlines that apply to all Class Members regardless of individual factors or case characteristics. These deadlines reduce incrementally over time, ultimately requiring all class members to receive restoration services within the same period of time. Another component of the Plan mandates that a triage screening protocol will apply statewide to expedite Class Members in acute need of hospitalization, so that the sickest individuals will access care immediately – regardless of geographical location.

14.     The Plan addresses defendants, settings, deadlines, and court-mandated requirements across the state of Oklahoma. While some pilot programs are included in specific locations, these will operate locally to provide proof of concept; once they have been determined to be effective, they will serve as templates for similar programs and policies to be implemented statewide.

**IV.**
**THE PLAN'S ELEMENTS ARE STRONGLY ASSOCIATED WITH REDUCING WAIT TIMES IN OTHER JURISDICTIONS AND WITHIN OTHER SYSTEMS**

15.     Each of the components of the Plan and Consent Decree has been implemented in other states facing similar competence-related delays. However, not all components from other states' Plans are included in Oklahoma's Plan and Consent Decree, nor are all components from the Oklahoma Plan and Consent Decree found in all other states' Plans. The Oklahoma Plan and Consent Decree, then, borrow only those components from other Plans that fit best for Oklahoma's unique circumstances.

16.     The Plan and Consent Decree contain remedies that have been specifically tailored to Oklahoma, including the following:

a.   Reevaluating all current incompetent defendants by qualified staff

b.  increasing inpatient and outpatient competence restoration capacity

c.  hiring qualified forensic mental health staff

d.  improving forensic literacy and training in ODMHSAS staff

e.  implementing a triage system to promote quick access to inpatient treatment for those in acute need and to promote discharge to alternative settings for those whose symptoms and risks are manageable

f.  imposing deadlines for competence evaluations

g.  enhancing mental health services to incarcerated incompetent defendants

h.  creating pilot programs for jail-based competence restoration aligned with standard practice

i.  creating pilot programs for outpatient competence restoration aligned with standard practice

j.  enhancing forensic mental health data collection, analysis, and dissemination

k.  enhancing communication and training among relevant stakeholders, including ODMHSAS, local jails, courts, law enforcement, community providers, housing agencies, and peers

17.    These remedial components, both individually and collectively, have been very effective in reducing delays for competence evaluations and restoration services in other states. In the next sections we describe their impacts in Colorado, California, and Washington.

18.    Colorado uses many of the same plan components in its current Consent Decree. Colorado operates three jail-based competence restoration units, a large outpatient competence restoration program, several coordinated community housing and service options, a strong forensic training and oversight program, enhanced mental health services for incarcerated

incompetent defendants, and a triage system that oversees the placement and timing of incompetent defendants.

a.  Groundswell Services is very familiar with jail-based mental health services in Colorado.  At some jails, enhanced mental health services are provided to defendants who are either awaiting competence evaluations or who have already been found incompetent to proceed and are awaiting transfer to an inpatient restoration program. As part of the enhanced services to these defendants, psychiatric and mental health services are offered on a more frequent basis to more efficiently treat identifiable psychiatric symptoms that may be a barrier to competence. While these enhanced services have been found to improve the likelihood of defendants either being initially opined competent or achieving competence while awaiting transfer to a more formal restoration program, a program such as this still has limitations. Despite these enhanced services (which are significantly greater than services offered to most defendants in traditional jail settings), defendants still occasionally refuse to engage in treatment until they are sent to the more formal restoration treatment programs where the structure and more comprehensive services increase the likelihood of compliance with both medication treatment and legal education. Our experience with the challenges that confront Colorado's jail-based restoration services supports our view that, in Oklahoma, a pilot jail-based program is the best approach rather than re-launching a statewide program without sufficient infrastructure and experience to promote a successful outcome.

b.  Colorado has time frames for competence evaluations that range from 7-21 days and for restoration that range from 7-28 days. Most months, Colorado has met its time

frames for conducting jail-based competence evaluations, all while maintaining the most stringent examiner qualification standards in the country.

c.  Colorado's restoration time frame compliance has proven more challenging, with the pandemic causing unexpected delays and barriers to compliance. In May of 2023, 480 defendants remained in Colorado jails awaiting transfer to restoration services. One year later, as restoration staffing and capacity returned to pre-pandemic levels, the number is now 251. Colorado estimates full compliance by May 2025.

d.  The Colorado Consent Decree mandated new procedures and programs that have increased access, capacity, and efficiency for defendants awaiting competence related services. These initiatives facilitated a significant decrease in median wait times for defendants accessing inpatient competence restoration. In the past year, these wait times have reduced by months.

e.  Colorado maintains the nation's most robust outpatient competence restoration system. More than 500 defendants participate in outpatient restoration across the state.

f.  Colorado maintains the nation's most sophisticated competence triage system. Defendants are categorized into one of two tiers upon a finding of incompetence: immediate need (Tier 1) vs less urgent need (Tier 2). In May of 2023, approximately 50 Tier 1 individuals were awaiting inpatient restoration; in May 2024, the number was 14. The median wait time for those individuals has reduced significantly and the state is now often in compliance with Tier 1 time frames, with full compliance expected in the fall of 2024.

19.    California, which requires a 28-day time frame for incompetent defendants to be placed in competency restoration services, also uses many of the components of Oklahoma's Plan

and Consent Decree to mitigate their competence delays.

a. California operates a robust, evidence-informed system of jail-based competence restoration units, a strong outpatient competence restoration program in Los Angeles, several coordinated community housing and service options, a strong forensic training and oversight program, enhanced mental health services for incarcerated incompetent defendants, a strong array of diversion options, and an assertive re-evaluation service for persons on their waitlist. California also employs a robust involuntary medication service for incompetent defendants; although this is not a specific element of Oklahoma's Plan and Consent Decree, it does align with their plans for enhanced mental health service efforts in many county jails.

b. Formal jail-based competence restoration occurs in several California jails. These contrast to the enhanced mental health services found in several jails in other states (and within California). In one such program, defendants meet weekly with the psychiatric provider, which allows targeted medication adjustments to efficiently treat psychiatric symptoms that may be a barrier to competence. The defendant also meets with a forensic mental health specialist several times a week in order to receive manualized legal education as well as therapeutic support based upon identified treatment needs specific to that individual. The program team meets on a weekly basis to provide updates on the progress of the program participants which allows for comprehensive communication of an individual's ongoing psychiatric status and response to treatment from mental health providers and security personnel. This program also has a psychologist on the treatment team who reevaluates competence monthly, though this can occur more frequently if the treatment team believes that the

11

defendant is ready.

c. California also operates a new but sophisticated administrative oversight system for their population of incompetent defendants. This oversight system provides support and resources for enhanced mental health services, re-evaluations of competence, medication consultation, and background psychosocial benefit acquisition to those individuals in jail on the waitlist for transfer to inpatient settings. The program started as a pilot in a small number of jails, but it is now expanding significantly and should be implemented statewide by 2025.

d. In November 2021, more than 1700 incompetent defendants were incarcerated in county jails across California awaiting transfer to inpatient services, with wait times often exceeding several months. In April 2024, after implementing the above components, California now has fewer than 400 people waiting for competence restoration, and the average wait time is now approximately 14 days. California has achieved compliance in most settings with most of their defendants.

20.    Washington also uses many components found in the Oklahoma Plan and Consent Decree in their response to the seminal *Trueblood* lawsuit. Washington operates several outpatient competence restoration programs, several coordinated community housing and service options, a strong forensic training and oversight program, enhanced mental health services for incarcerated incompetent defendants, and a wide array of diversion options. Unlike the Plans in Colorado, California, and the proposed Plan in Oklahoma, Washington does not operate jail-based restoration.

a. The Settlement Agreement constructed in Washington requires that competence evaluations be conducted within 14 days and that IST defendants begin competence

restoration services within 7 days.

b. Previously, wait times in Washington for evaluations exceeded several weeks. Wait times for jail-based evaluations are now within two weeks, and nearly always meets compliance.

c. Previously, wait times in Washington for competence restoration to begin exceeded several months. Inpatient restoration now typically occurs within 10 days.

21.    Other states rely on similar components and have seen similar results. Hawaii has no waitlist for inpatient restoration, instead relying on outpatient restoration and increased inpatient capacity to manage demand. Alaska's waitlist is minimal, thanks in part to the recent launch of a pilot outpatient restoration program in Anchorage. Virginia operates a very minimal waitlist, instead relying on outpatient and jail-based restoration options as well as a highly qualified forensic examiner pool and good collaborations with community mental health service providers. Pennsylvania has relied on increasing the number of forensic staff in jails to ameliorate crises and reduce wait times. Utah and Oregon recently increased inpatient restoration capacity, resulting in drastic reductions in their respective waitlists.

22.    Given that these components are associated with reduced wait times across multiple states – each with its own unique collection of geographical and cultural factors, population size, statutory limitations and service provision options – the evidence, and our experience, strongly suggests that these components will have similar impacts in Oklahoma. Several of the above states achieved compliance (or are on their way to achieving compliance) with similar time frames and mandated services outlined in Oklahoma's Plan and Consent Decree.

**V.**
**LOCALIZED PILOT PROGRAMS ARE SHORT-TERM, RESOURCEFUL STRATEGIES FOR SOLVING LONG-TERM, STATEWIDE ISSUES**

23.    Pilot programs are early alternatives to wide-scale implementation. Pilot programs allow new initiatives to "start small," identify trouble areas, learn from challenges, and capitalize on emerging successes. Pilot programs are designed to collect reliable and valid data to allow stakeholders and administrators to review, analyze, and share outcomes and lessons learned as larger-scale projects are considered. Administrators learn what works and what does not, and then use this information to adapt and expand the pilot to other settings.

24.    The pilot programs specific to the Plan and Consent Decree are the Community-Based Restoration Treatment Pilot Program and the Jail-Based Competency Restoration Pilot Program. Both are designed as strategic, initial steps toward potential statewide implementation, with the goal of eventually allowing all Class Members equal opportunity to participate. The pilot strategy should launch in select locations, which has several key advantages, suggesting it is the most appropriate approach to developing such programs in Oklahoma.

a.    Oklahoma is unique, and programs should be implemented based on Oklahoma-specific needs and realities. For example, Oklahoma has a significant shortage of forensic mental health providers. Full, statewide implementation of these programs would be impossible given the infrastructure, staffing, and training necessary to run these programs safely, effectively, and with fidelity.

b.    The controlled, smaller-scale implementation of piloting allows for closer monitoring and quicker course-corrections than would be possible during a simultaneous, statewide implementation.

c.    Pilots encourage reliable and valid data collection, such as information on restoration rates and lengths of stay, which will allow ODMHSAS to assess pilot success and adjust pilot components as needed. This method allows administrators and other

stakeholders to review, analyze, and disseminate outcomes and lessons learned as larger-scale projects are considered.

d.  By starting small, pilots mitigate risk and potential negative impacts compared to a full implementation.

e.  Pilots reserve full access to resources until administrators and other stakeholders are satisfied that the pilot has demonstrated feasibility.

f.  The thoughtful rollout of a pilot encourages stakeholder engagement and feedback, which are then incorporated into program adjustments.

g.  By using the controlled pilot approach, ODMHSAS can systematically develop, test, and refine programs in alternative restoration settings. If successful, they can be expanded across the state to reduce restoration wait times and improve service delivery for all Class Members.

25.    Statewide implementation of a jail-based restoration program, at this point, it is not feasible nor advisable. Our investigation and analysis found that ODMHSAS does not currently have the infrastructure, expertise, or experience to launch and administer an effective jail-based program across Oklahoma's 77 counties at once. Indeed, competence services are already quite complex because they require interfacing of the mental health, correctional, and legal systems. The pilot approach can focus only on a small number of jurisdictions. Statewide implementation would require a level of coordination across local courts, jails, and ODMHSAS that would be extremely challenging, if possible. These programs also require significant "buy-in" and cooperation from mental health and legal stakeholders, as well as community residents. Educating such a wide range of stakeholders, engaging in discussion, and securing stakeholder approval and readiness—without the ability to share established evidence of pilot success *specific to Oklahoma*—would be a

monumental task.

26.    Considering these constraints, the pilot program approach is a balanced strategy for maximizing the long-term success of the Plan and Consent Decree for all Class Members.

## VI.
## THE FINES STRUCTURE IS AN EFFECTIVE AND NECESSARY MECHANISM TO ENCOURAGE COMPLIANCE

27.    The collection of financial penalties for non-compliance ("fines") is a commonly utilized, crucial component of any state's oversight and transformation. Reasonable fines amounts can be constructed to address delays in accessing competence services, and they can be constructed to be reduced or eliminated as compliance is demonstrated.

28.    Fines provide an incentive for compliance, progress, hard work, and desired outcomes. They serve as tangible deterrents against non-compliance and foster accountability. Based on our experience, parties are more likely to adhere to the terms of the settlement to avoid financial loss. Of course, compliance is critical for achieving success and ensuring the agreed-upon measures are implemented effectively. Indeed, states without a fines mechanism typically show slower progress and poorer compliance. For example, Alabama, a state that has been under federal oversight for its restoration waitlist since 2016, has not faced fines for non-compliance. Despite ongoing federal oversight, Alabama's waitlist has only grown: as of this writing, it has ballooned to approximately two years long. Without the consequence of potential fines, parties may view agreed-upon plans as lacking enforceability, which undermines the settlement's objectives. In addition, fines underscore the seriousness of the issue. They convey a clear and motivating message that non-compliance will have consequences. They can also be directed to targeted ancillary services (housing, specialized community programs, innovative court initiatives, collaboration with law enforcement, etc.) that can further maximize the goals of the Consent

Decree.

29.     Our experience in other states strongly suggests that fines are effective *and* necessary mechanisms to encourage compliance within the context of restoration waitlists. Fines in Washington and Colorado are specifically earmarked to address gaps in the competence service array. They have been used to secure community housing options, intensive case management, court innovations, additional inpatient restoration capacity, tangible resources, diversion staff, training and education efforts, and other ancillary services that mitigate waitlists and competence service delays.

30.     Also, the specter of fines often motivates states and legislatures to encourage change and compliance with mandated expectations of federal oversight.

31.     Risk management research indicates the imposition of fines substantially increases compliance in regulated entities.[1, 2] In many cases, consent decrees have included provisions for fines, but the real cost of penalties remained minimal because plaintiffs made reasonable progress in implementing agreed-upon efforts and achieving results.[3, 4]

32.     Ultimately, fines uphold the integrity of the Plan and Consent Decree.

## VII.
## THE TIMETABLE FOR REACHING THE ULTIMATE TARGET WAIT TIME
## (21 DAYS IN 16 MONTHS AFTER CONSENT DECREE ENTRY)
## IS ACHIEVABLE AND REALISTIC

33.     As mentioned earlier, states with similar oversight Plans to the Consent Decree proposed in Oklahoma have shown remarkable improvement in their competence systems. Wait

---

[1] Shimshack, J. P., & Ward, M. B. (2005). Regulator reputation, enforcement, and environmental compliance. *Journal of Environmental Economics and Management, 50*(3), 519-540. https://doi.org/10.1016/j.jeem.2005.02.002

[2] Kim, K. M., Max, W., White, J. S., Chapman, S. A., & Muench, U. (2020). Do penalty-based pay-for-performance programs improve surgical care more effectively than other payment strategies? A systematic review. *Annals of Medicine and Surgery, 2012*(60), 623–630. https://doi.org/10.1016/j.amsu.2020.11.060

[3] United States v. City of Los Angeles, No. 00-11769 GAF (C.D. Cal. June 15, 2001).

[4] Charlie and Nadine H. v. Murphy, No. 99-3678 (D.N.J. June 9, 2003).

times are reduced, the number of people on waitlists are reduced, and fewer harms are suffered by those waiting. Moreover, once the basic components are implemented to fidelity, significant changes and drastically improved outcomes often occur within two years.

34.     Some states, like Colorado, implement a "stairstep" approach to compliance time frames. That is, states utilize gradually decreasing maximums over the course of months to years before hitting their ultimately fixed time frames. This approach allows for grace and acknowledgement of the complexity and difficulty needed to overhaul a competence service system.

35.     In Oklahoma, the proposed fixed time frame will ultimately reach 21 days for evaluations and transfer to restoration services. However, time frames start much higher and gradually decrease over the span of 16 months before that final time frame is met.

36.     Combined with the several months that it would take for a Consent Decree to be vetted and finally approved by the Court, along with the 16 months' worth of gradually decreasing time frames currently outlined by the Consent Decree itself, ODMHSAS should have ample opportunity to achieve compliance given the outcomes found by other states facing similar delays and implementing similar remedies.

## VIII.
### ALL THREE CONSULTANTS PARTICIPATED IN CRAFTING THE PLAN'S COMPONENTS, AND ALL THREE CONSULTANTS AGREE THAT THE CONSENT DECREE IS A REASONABLE AND EFFECTIVE STRATEGY FOR REDUCING WAIT TIMES FOR THE CLASS

37.     The Plan and Consent Decree were crafted through collaborative efforts of several stakeholders. The Plan and Consent Decree call for the utilization of a three-person consulting panel ("Consultants"). This panel as named includes Neil Gowensmith, PhD, John Petrila, Esq., and Darren Lish, MD. All three Consultants worked collaboratively to research and draft the

components and elements of the Plan and Consent Decree, along with important contributions from other consultants and subject matter experts (in particular, Lauren Kois, PhD).

38.    The Consultants were mutually agreed to by counsel for plaintiffs' and defendants. In fact, ODMHSAS had previously and independently retained Mr. Petrila before the proposed Consent Decree was formally drafted and the Consultants were formally designated.

39.    All three Consultants collaborated with plaintiff's counsel, defendants, and other subject matter experts to help create the Plan and Consent Decree.

40.    All three Consultants believe, based on their individual and collective experiences and expertise in forensic mental health and law, that the Plan and Consent Decree represent reasonable and effective strategies for reducing wait times and improving the quality of competence services for the Class.

41.    Based on our professional experience, education, and training, the Plan and Consent Decree, if successfully implemented, will reduce wait times to competence evaluations and competence restoration for Oklahoma's Class Members. These same elements have been implemented and tested in other states, with subsequent successful outcomes.

## IX.
## CONCLUSION

42.    We submit this affidavit in support of the parties' Joint Motion for Preliminary Approval of Consent Decree, Class Certification, and Plan of Notice to Class, filed June 17, 2024 (Doc. 46) (the "Motion").


We affirm under penalty of perjury that the foregoing is true and correct to the best of our knowledge.

Further Affiants Sayeth Naught.


Executed on: 07/23/24

W. Neil Gowensmith, Ph.D.


Executed on: 07/23/24

Lauren Elizabeth Kois, Ph.D.