IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

LESLIE BRIGGS, as next friend      )
of T.W. and B.S.; EVAN WATSON,     )
as next friend of C.R.; and,       )
HENRY A. MEYER, III, as next       )
friend of A.M., for themselves     )
and for others similarly situated, )
                                   )
            Plaintiffs,            )
                                   )
v.                                 ) Case No.  23-cv-81-GKF-JFJ
                                   )
ALLIE FRIESEN, in her official     )
capacity as Commissioner of the    )
Oklahoma Department of Mental      )
Health and Substance Abuse         )
Services; and DEBBIE MORAN, in     )
her official capacity as Interim   )
Executive Director of the Oklahoma )
Forensic Center,                   )
                                   )
            Defendants.            )


TRANSCRIPT OF MOTION HEARING

**BEFORE THE HONORABLE GREGORY K. FRIZZELL**

**UNITED STATES DISTRICT JUDGE**

AUGUST 15, 2024


*REPORTED BY:*        ***BRIAN P. NEIL, RMR-CRR***
                     ***United States Court Reporter***

1                    A P P E A R A N C E S

2

3          **Frederic Dorwart, Paul DeMuro, and David W. Leimbach,**
   Attorneys at Law, Frederic Dorwart Lawyers, 124 East 4th
4  Street, Tulsa, Oklahoma, 74103, attorneys on behalf of the
   Plaintiffs;

5

6          **Nicholas Southerland,** Attorney at Law, Oklahoma
   Disability Law Center, 5555 East 71st Street, Suite 9100,
7  Tulsa, Oklahoma, 74136, attorney on behalf of the Plaintiffs;

8          **Gentner F. Drummond,** Attorney General, Office of
   Oklahoma Attorney General, 313 N.E. 21st Street, Oklahoma City,
9  Oklahoma, 73105, attorney on behalf of the Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Thursday, August 15, 2024

 2                          *  *  *  *  *

 3              DEPUTY COURT CLERK:  This is Case No.

 4    23-CV-081-GKF-JFJ, Leslie Briggs, et al., v. Allie Friesen,

 5    et al.  Counsel, please state your appearances for the record.

 6              MR. DEMURO:  May it please the court, Your Honor,

 7    Paul DeMuro, David Leimbach, Fred Dorwart, and Nick Southerland

 8    on behalf of the plaintiffs.  And we also have one of the named

 9    plaintiffs, Hank Meyer, here.  Leslie Briggs, the named

10    plaintiff -- the lead named plaintiff was intending to here.

11    She's got COVID so she's not here.  We also have in attendance

12    Dr. Lauren Kois who was one of our consultants who submitted

13    the declaration in support of our supplement.  And that's our

14    team, Your Honor.

15              THE COURT:  Good morning.

16              MR. DRUMMOND:  Morning.  Gentner Drummond on behalf

17    of the state.

18              THE COURT:  Good morning.  I don't believe after

19    looking at the submissions by the parties here that we need to

20    spend any time this morning, unless you believe it's necessary,

21    with regard to the Rule 23(a) and (b)(2) factors.

22              Any disagreement?  I can make those findings, I think,

23    at the outset.

24              MR. DEMURO:  Mr. Leimbach was going to handle that.

25              MR. LEIMBACH:  Your Honor, no disagreement.  I think
```

1    we set forth the position in the parties' papers.

2            **THE COURT:**  All right.  I think that will get us to

3    what the real issues -- or at least the issues that I'm

4    concerned with are.

5            So the court finds, based upon the parties' submissions

6    and for purposes only of preliminary approval, that the Rule

7    23(a) factors are met.  Specifically, the class is so numerous

8    that joinder of all members is impracticable, the numerosity

9    factor; that there are questions of law or fact common to the

10   class, the commonality factor; that the claims or defenses of

11   the representative parties are typical of the claims or

12   defenses of the class, the typicality factor; and that the

13   representative parties will be fairly and adequately

14   protected -- or will fairly and adequately protect the

15   interests of the class.

16           In addition, the court finds that the Rule 23(b)(2)

17   factor is met here.  The defendants' conduct is generally

18   applicable to all class members; that is, a systemic failure in

19   Oklahoma's competency restoration system through the department

20   and OFC's failure to provide timely competency restoration

21   treatment.  Further, the proposed consent decree adequately

22   addresses the class as a whole and it is unnecessary to

23   differentiate between class members.

24           Thus, the requirements of Rule 23(b)(2) are satisfied

25   and this factor weighs in favor of preliminary certification.

1        Now, the court's main concerns here -- and I know you
2   all need to meet the standard of whether the court will likely
3   be able to approve the proposed settlement.  I just wanted to
4   alert you to the things that I believe are the most important
5   with regard to that which has been presented.
6        First of all, as it relates to Rule 23(e)'s requirement
7   of adequacy, whether Section 1175.6a permits outpatient
8   restorative treatment, that's something that you need to
9   address.
10       Secondly, as it relates to the Rule 23(e) factor
11  regarding the effectiveness of the proposed method of
12  distributing relief to the class, whether the time frames for
13  decreasing maximum allowable wait times are reasonable.
14       And then third -- and this is a small matter -- but we
15  also need to discuss the Rule 23(e) factor relating to class
16  notice of the terms of any proposed award of attorney fees.  I
17  don't find that the fees requested are unreasonable at all.  I
18  simply believe that Rule 54, as Newberg on Class Actions
19  states, that the notice requires that a motion for attorney
20  fees state the amount sought.  So I think that's a technical
21  matter.
22       Also, it strikes me that with regard to notice to
23  unknown future class members, if we get that far, I happen to
24  be on a list of e-mail recipients to OBA criminal law section
25  members, and it would seem to me that that's an easy notice

```
 1    group to include with regard to unknown future class members.

 2          So Mr. DeMuro.

 3              MR. DEMURO:  Yes, Your Honor.  May I have one second

 4    to bring up the statute in question?

 5          May it please the court, the competency restoration

 6    statute, Your Honor, allows the department -- or requires the

 7    department to take custody of class members who are declared

 8    incompetent and it specifically allows designees,

 9    quote/unquote, designees to provide treatment.

10              THE COURT:  Yes.  But in that case, the statute says

11    specifically in which case custody of the person shall be

12    transferred to the department.  It doesn't -- it doesn't refer

13    to outpatient treatment.

14              MR. DEMURO:  So our position, Your Honor, is like in

15    other instances in state court criminal proceedings, that a

16    community placement can be done with the technical overlay of

17    custody.  In other words --

18              THE COURT:  So you're saying it's merely legal

19    custody?

20              MR. DEMURO:  That's absolutely correct.

21              THE COURT:  So how can a person that is under

22    Oklahoma statutes determined to be "dangerous" be released

23    under 1175.6a?

24              MR. DEMURO:  Well, I don't -- two points on that.

25    Competency doesn't involve a finding of dangerousness.  It
```

1    just --

2            THE COURT:  No, no, no.  The statute defines these

3    people as dangerous under -- what is the statute? -- 1-103.

4    They are dangerous.

5            MR. DEMURO:  Well, the --

6            THE COURT:  Well, it's not 1-103.  Just a second.

7    Let me get -- this is a spider's web of statutes here.

8        Well, I apparently don't have the statute in front of

9    me determining dangerousness.  You probably know it by heart

10   having spent two years looking -- oh, here we go.  22 O.S.

11   Section 1175.1.  Dangerous means a person who is a person

12   requiring treatment as defined in Section 1-103 of Title 43A of

13   the Oklahoma statutes.

14           MR. DEMURO:  Yes.  And that's not a person --

15   respectfully that is not a person who's been declared

16   incompetent.  A Title 43 commitment is completely different

17   than a competency finding of incompetency.

18       The only requirement in the same statute that you're

19   citing, Your Honor, 1175.1, it also defines "incompetent" and

20   "competency."  Subsection (4) of that statute, incompetent

21   person means the present inability of a person arrested for or

22   charged with a crime to understand the nature of the charges

23   and proceeding brought against him or her and to effectively

24   and rationally assist in his or her defense.

25       So the way this breaks out, Your Honor, is it's

1    possible a person who is incompetent is also deemed and

2    declared by the state court upon proper showing to be a Title

3    43A dangerous -- to be dangerous, but that is not a component

4    of these class members.  Incompetent defendants are not

5    defendants who are declared dangerous and --

6            **THE COURT:**  Now, wait.  You're going to have to walk

7    me through this.  Because 1175.6a specifically references in

8    the first sentence Section 1-103 of the Title 43A of the

9    Oklahoma statutes.  As you know, 1-103 has the five different

10   categories of persons requiring treatment, and then 1175.1 says

11   that dangerous means a person who is a person requiring

12   treatment as defined in Section 1-103 of Title 43A of the

13   Oklahoma statutes.

14           So how can you ignore 1175.1 and the definition of

15   "dangerous" if to be found incompetent prior to conviction

16   1175.6a explicitly says that because he or she is a person

17   requiring treatment as defined in Section 1-103 of Title 43A of

18   the Oklahoma statutes?

19           I'm not disputing with you that there may be people who

20   are incompetent who are not dangerous but you and I are tied to

21   the statutes here.  The Oklahoma statutes say that anyone who

22   is a person requiring treatment under 1-103 of Title 43A is

23   dangerous.

24           **MR. DEMURO:**  Well, that's not how the statute is

25   interpreted in the state courts, Your Honor.

1          **THE COURT:**  Well, but --

2          **MR. DEMURO:**  And --

3          **THE COURT:**  -- I'm not bound by practice, am I?  I'm

4     bound by the statute.

5          **MR. DEMURO:**  I don't disagree with that.  Let me get

6     back to the point.

7          I think if you break out the person requirement

8     treatment statute, you have to look at the definition of what

9     an incompetent person is and it doesn't require a finding of

10    being dangerous.  So I think there's an ambiguity in the

11    statute.

12         **THE COURT:**  I don't think it's ambiguous at all.

13    Because a person requiring treatment is defined in 43A, 1-103,

14    and Section 1175.1 says that dangerous means a person who is a

15    person requiring treatment.  Now, you and I can differ or you

16    and I can both disagree as a matter of policy but that's what

17    the statute says.

18         **MR. DEMURO:**  So let me jump to another point, and

19    that is the consent decree in the community -- in this

20    community placement pilot program makes a specific finding

21    that -- has a specific provision in it that says only the

22    people who are deemed to be not dangerous are eligible for that

23    placement.

24         **THE COURT:**  Yeah.  But how can we -- how can we

25    ignore the statute?

1          **MR. DEMURO:**  Well, I'm not ignoring the statute.

2     It's just read differently by the courts.  And if you look, for

3     example, at the orders of the --

4          **THE COURT:**  Well, I would suggest to you that if

5     that's true, it's ignored by the courts, the very Oklahoma

6     statutes that we've just been discussing.  Because I'll agree

7     with you that there is a statute -- let me see if I can find it

8     here -- 1175.7 that says that persons incompetent but capable

9     of achieving competency within a reasonable time can receive

10    treatment by medical supervisors.  But subsection (b) of that

11    statute says that those services have to be paid from court

12    funds.

13          And alternatively, subsection (d) says the person -- or

14    the court may allow the person to receive treatment from

15    private facilities, if such facilities are willing, and neither

16    the state nor the court fund is required to directly pay for

17    such care.  But those individuals under 1175.7 are not persons

18    requiring treatment under Section 1-103.

19          **MR. DEMURO:**  So, Judge, respectfully I do think in

20    that regard the statute is ambiguous and has to be construed in

21    the manner in which it's been applied across the state.  The

22    courts -- if you look at some of the -- if you look at the

23    transfer orders, the orders requiring treatment, there's not a

24    finding that these people are dangerous.  There's just a

25    finding that they're incompetent and subject to the custody of

1    the department because of that.

2        In addition, the consent decree, Your Honor, I'm fairly

3    certain, if we turn to that provision if your concern is about

4    the community -- the pilot community-based restoration program,

5    it excludes -- it has very narrow requirements.

6        **THE COURT:**  I understand.  I've read the consent

7    decree.  I just can't approve a consent decree that violates

8    Oklahoma law and you and I can urge the legislature to change

9    the statutes.  But I'm telling you you need to explain to me

10   how I can possibly read these statutes to allow outpatient

11   treatment under 1176 -- once again, this is a mess of statutes

12   -- 1175.6a.

13       **MR. DEMURO:**  What I -- Your Honor, what I would

14   propose is the following.

15       We didn't anticipate you raising this issue.  If we

16   could jump to the other issues that Your Honor is concerned and

17   maybe we could take a break and I could confer with our team.

18   I respect the court's work in looking --

19       **THE COURT:**  I may be wrong, I mean, but you need to

20   explain to me because I can't violate state law or supersede --

21   or impose my policy preference and at the same time violate the

22   statutory scheme.

23       **MR. DEMURO:**  Well, see, I think that if you look at

24   the law as applied -- the consent decree as applied, if you

25   entered this consent decree, you would not be violating state

 1   law because there would be no -- there would be no person who

 2   was --

 3            **THE COURT:**  The consent decree can't supersede the

 4   state law.

 5            **MR. DEMURO:**  Well, the consent decree in operation

 6   would not violate state law because it's not placing people who

 7   are dangerous in the community.  So it's not going to end up --

 8            **THE COURT:**  Who need outpatient treatment.

 9            **MR. DEMURO:**  Right.  So it wouldn't --

10            **THE COURT:**  And they would be in the community.  In

11   fact, you called them community-based restoration programs.

12            **MR. DEMURO:**  Correct.  But I think the consent

13   decree has a specific finding that the -- or specific provision

14   that the only people who are qualified for that program are

15   people that the court and the district attorney agree are not a

16   risk -- are not a risk to harm -- are not dangerous and a risk

17   to harm people.

18            **THE COURT:**  Well, I mean, that may be a rational way

19   to approach it.  I'm just saying that's contrary to the

20   statutes.  Because the statute says -- again, the first line --

21   that if the person is -- if the person is found to be

22   incompetent prior to conviction because he or she is a person

23   requiring treatment, as defined in Section 1-103 of Title 43A,

24   and because the Oklahoma statutes tell me that a person

25   requiring treatment is dangerous, then it says that the court

1   shall suspend the criminal proceedings and order the Department

2   of Mental Health and Substance Abuse Services to provide

3   treatment, therapy, or training, and it says the court shall

4   further order the department to take custody --

5           **MR. DEMURO:**  Right.

6           **THE COURT:**  -- of the individual as soon as a

7   forensic bed becomes available.

8           Then the next paragraph does say that the department

9   can designate a designee of the department to provide

10  restoration -- competency restoration services, in which case

11  custody of the person shall be transferred to the department.

12          I'm trying to understand how custody can somehow

13  transmogrify into outpatient treatment services.  I'm not

14  saying it's a bad idea.  I'm just saying it's not consistent

15  with Oklahoma law as I read it unless you persuade me

16  otherwise.

17          **MR. DEMURO:**  Well, like I said, Judge, I'd be

18  repeating the same arguments that I already made and I don't

19  want to do that.  What I suggest is that we go through the

20  other points, we take a break, I can confer with my team, and

21  we can come back.

22          **THE COURT:**  Sure.

23          **MR. DEMURO:**  I can also tell with you great

24  confidence that when a person is declared incompetent, the

25  state courts do not make findings -- are not required to and do

```
 1   not -- unless they're also a danger and they get committed

 2   under Title 43, incompetent defendants are not practically in

 3   the statement treated as -- dependent on a finding of

 4   dangerousness or risk.

 5           THE COURT:  Well, there are other incompetents under

 6   that because of -- what is it? -- intellectual disabilities --

 7           MR. DEMURO:  Sure.

 8           THE COURT:  -- that are not within your class;

 9   correct?

10           MR. DEMURO:  That is correct, absolutely.  This is a

11   pretty narrow class.

12           THE COURT:  They're not dangerous; right?

13           MR. DEMURO:  Well, they could be dangerous in other

14   settings.  There are persons requiring treatment under Title 43

15   who don't necessarily -- they're not overlapping always Venn

16   diagrams.  There's persons who are requiring treatment who may

17   or may not be incompetent and there are incompetent people who

18   may or may not be a harm -- a risk of harm to the public.  Each

19   case is a case-by-case determination.

20           THE COURT:  But your concern in this class action is

21   people who are being held in jail currently.  They're not being

22   released by these judges.  So --

23           MR. DEMURO:  Correct.

24           THE COURT:  -- they are, as a practical matter,

25   dangerous.  They've been determined to be dangerous because
```

```
 1    they're in custody; right?

 2            MR. DEMURO:  No.

 3            THE COURT:  So you're talking about people who have

 4    been released that are in the community, they're part of your

 5    class?

 6            MR. DEMURO:  No.  What part that I disagree with

 7    Your Honor, is -- let's take it a step at a time.

 8            Pretrial detainees are not as a status declared

 9    dangerous.  I mean, there's a whole host of reasons why

10    pretrial detainees are in jail.  They can't make bond.  It's

11    not because they're dangerous.

12            THE COURT:  But we're only talking about those

13    who --

14            MR. DEMURO:  Who are declared incompetent.

15            THE COURT:  Correct.

16            MR. DEMURO:  Right.  I'm just taking it a step at a

17    time.  You become a pretrial detainee not because you're

18    dangerous, but because in general you can't make bond or you've

19    got a no-bond condition, and then somebody files a motion and

20    says that we think this individual is incompetent, can't

21    understand the nature of the proceedings and assist with the

22    defense.

23            There's no requirement in these court orders -- the

24    courts aren't asked to find that incompetent people are also

25    dangerous.  The reason they're being held is because they're
```

1    not -- because under the statute once a person is declared

2    incompetent, the statute requires -- and so does due process --

3    the criminal case ceases because an incompetent person is not

4    competent to make decisions about the criminal case.

5         So the cessation of the criminal proceedings is not

6    contingent on a finding of dangerous.  It's contingent upon a

7    finding of incompetency which is a different concept.  The

8    statute as it's written in this way that has caused Your Honor

9    concern is ambiguous in that regard, but the practice is not

10   ambiguous and it's been done, as I've described, in state

11   courts.

12        So when you look at the commitment orders from the

13   state court to the department, they don't make a finding that

14   -- it doesn't require a finding that the person is dangerous.

15   It just -- and from a practical standpoint, Judge, the

16   department -- when someone's committed to the department's care

17   because they're incompetent, the department is not asked to

18   treat them to become not dangerous, to treat them medically so

19   that they no longer are a risk to themself or others.  That's

20   not part of competency restoration treatment.  Competency

21   restoration treatment is very narrow.

22        So it would be, in my view, an impractical, unworkable

23   reading of the statute to suggest that the department has to

24   treat people who are declared incompetent as if they were

25   dangerous because they're not providing -- the statute doesn't

1    require them to -- the department to provide such treatment.

2    All the department is required to do is provide competency

3    restoration treatment, which is not geared towards restoring a

4    person who is unsafe or a threat to themselves or others.

5            Does that make sense?

6            **THE COURT:**  Well, once again, I'm looking at

7    43A-1-103 and the five categories of persons requiring

8    treatment, which all of your class satisfy; correct?  All of

9    your class are persons requiring treatment; right?

10           **MR. DEMURO:**  All of -- no, not as -- not as you've

11   just structured the statutes.  All of our class members are not

12   people that have been declared unfit or unsafe or --

13           **THE COURT:**  No, no, no, no.  My question is, under

14   1175.6a, the first sentence again, if a person is found to be

15   incompetent prior to conviction because he or she is a person

16   requiring treatment as defined in Section 1-103 of Title 43A,

17   then you look at the definition of person requiring treatment

18   under 43A-1-103 and it talks about people who pose a

19   substantial risk of immediate physical harm to another person

20   or persons as manifested by evidence of violent behavior

21   directed toward another person or persons.

22           **MR. DEMURO:**  Right.

23           **THE COURT:**  Has placed another person or persons in

24   a reasonable fear of violent behavior directed towards such

25   person or persons or serious physical harm to them as

```
 1    manifested by serious and immediate threats.  And then there's

 2    self-harm described in subsection (1), subsection (4), and

 3    subsection (5).

 4          MR. DEMURO:  So may I direct your attention to the

 5    competency restoration statute that we started out with,

 6    1175.6a?

 7          THE COURT:  Right.  That's what I was looking at.

 8          MR. DEMURO:  And so I understand that it has that

 9    reference but let's follow this through.

10       The statute also says in the second paragraph that the

11    person shall remain in the custody of the county jail until

12    such time as the department has a bed available unless

13    competency restoration services are provided by a designee.

14    Goes on to say that if found competent by the court, the

15    criminal proceedings shall be --

16          THE COURT:  Where are you now?

17          MR. DEMURO:  I am in subsection --

18          THE COURT:  (c)(2)?

19          MR. DEMURO:  Yes.

20          THE COURT:  Or --

21          MR. DEMURO:  Yes.  Subsection (c).

22          THE COURT:  All right.

23          MR. DEMURO:  So if the person is determined by the

24    Department of Mental Health or Substance Abuse Services or

25    designee to have regained competency -- are you following me,
```

```
 1      Your Honor?

 2                  THE COURT:  Yeah.

 3                  MR. DEMURO:  Okay.

 4                  THE COURT:  Then a hearing shall be scheduled within

 5      20 days.

 6                  MR. DEMURO:  No.  Or is no longer incompetent

 7      because the person is a person requiring treatment as defined

 8      by Title 43A, a hearing shall be scheduled within 20 days.

 9           So this statute itself makes a distinction between

10      incompetent people, people who are incompetent but restored to

11      competency, and folks who are people requiring treatment.

12                  THE COURT:  I understand.  But under (c), that's the

13      procedural mechanism to get that person back in front of the

14      court so that the court can determine whether the person is

15      competent.

16                  MR. DEMURO:  Exactly.

17                  THE COURT:  So it says that a hearing shall be

18      scheduled within 20 days, that doesn't say that within those 20

19      days you're entitled to outpatient treatment.  In fact, the

20      premise is that DMH or the designee has decided that the person

21      has regained competency.  So maybe let's move on to another

22      subject and you can discuss this and we'll come back to it.

23           So with regard to maximum allowable wait times --

24                  MR. DEMURO:  Yes.  Yeah, Your Honor.  This is

25      something that was negotiated heavily.  We believe that the
```

1   time frames are more than reasonable for the department to

2   achieve for the following reasons.

3        First, the sheer length of time.  The final metric for

4   compliance of the 21-day ultimate target date is not for 17

5   months after final approval of the consent decree, which if all

6   things go well for us, still won't be another month or two

7   away.  So you're talking about a year and a half for the

8   department to get down to the 21 days.

9        We've worked with our experts to develop this target as

10  being a meaningful target.  The evidence that we've submitted

11  to you in the form of our experts' affidavits have opined that

12  this is an achievable goal within those time frames, and these

13  are experts who have experience in both the administration of

14  competency restoration programs as state administrators and as

15  well as federal court monitors and consultants.  Moreover, the

16  department's own consultant has also blessed these time frames

17  as being achievable.

18       The first -- I'll point out that the first time frame,

19  which is 60 days maximum allowable wait time, does not take

20  effect until seven months, Your Honor, after final approval.

21  And given what we think we know now about where the wait times

22  are now, that's not ambitious, that's not an ambitious time

23  frame, it's a very reasonable time frame.

24       So we think we've submitted enough evidence in the form

25  of expert affidavits to confirm that this is an achievable

1      metric and the time frames are very reasonable.

2              **THE COURT:**  Now, any idea why the Alabama consent

3      decree contemplated a timetable of 24 months?

4              **MR. DEMURO:**  Every system is different.  You know,

5      Alabama had its own unique challenges subject to negotiations.

6      I'm not sure if the Alabama system -- what the condition of the

7      Alabama system was compared to the Oklahoma system, how

8      egregious that was.

9              Dr. Kois is in the courtroom.  She may be able to

10     answer those questions, if Your Honor wants to dive into that.

11     We relied on our experts to tell us what was -- to inform us as

12     to what was meaningful, had the Attorney General's team's input

13     based on their consultation with the department.

14             So, you know, each system is different, has its own

15     unique issues and problems.  These are the time frames that

16     we've been advised both by the Attorney General's Office and by

17     our collective experts are very achievable.

18             **THE COURT:**  All right.  I mean, it does appear that

19     the consent decree as a practical matter contemplates more than

20     16 months to achieve the 21-day maximum allowable wait time; is

21     that right?

22             **MR. DEMURO:**  Yeah.  No later than 16, yes.  I

23     misspoke.  Not 17.  Sixteen months after final entry.

24             And I'll make a further point, Your Honor.  We

25     presented this consent decree to the department in December of

1    2023, and it's our understanding, based on our work with the

2    Attorney General's Office, that the department has already

3    begun to try to improve its systems and start to work towards

4    this plan.  These are not -- this plan is not a mystery.  It's

5    not as if the department's first seeing it today.  They've seen

6    it for months.  They are working -- hopefully working towards

7    this goal already.  So in actuality, you know, this train has

8    left the station in terms of what the department is doing for

9    months and months before this.

10          The court's going to have to hold a hearing on final

11   approval, which will be set, you know, a month, 45 days,

12   whatever the court sets, that provides additional time.  We

13   base this on the best data that our experts had available to

14   them about comparable systems and what we believe is, you know,

15   a reasonable final goal.

16          **THE COURT:**  Well, it strikes me that that satisfies

17   preliminary approval given the 16 months after the consent

18   decree has been entered.

19          I do notice that, of course, Allie Friesen is not here

20   today.  I need to ask the Attorney General.  There's been

21   chatter as to whether or not she can enter into this decree.

22   Of course, we have the contingency review board.

23          Could I talk to the attorney general about this just

24   quickly?

25          **MR. DEMURO:**  Of course.  At your pleasure, Your

```
 1    Honor.

 2              THE COURT:   The procedure -- if the court were to

 3    preliminarily approve the consent decree, would it make sense

 4    to have the final hearing, and if the court were to approve the

 5    consent decree after giving notice and allowing opponents to be

 6    heard, because of the contingency review board could this court

 7    possibly enter the judgment prior to satisfaction of Section

 8    200?  In other words, either the legislature has to approve

 9    this by joint, what, concurrent resolution or two of the three

10    members of the contingency review board have to approve it;

11    right?

12              MR. DRUMMOND:   Correct.  We do think the appropriate

13    protocol is to do the preliminary consent.  I've conferred with

14    the Speaker of the House, the Senate Pro Tempore, and the

15    Governor's office on the protocol, and the state is in

16    agreement that we would request the court to enter the

17    preliminary approval subject to legislative approval or the

18    contingency review board.

19         I think that they are seeking a threshold by this

20    court, that the court is satisfied on a threshold basis of the

21    parties' stipulated consent decree.  Then with that, with the

22    parties' agreement and the court's preliminary approval, then

23    proceed with the formal approval in the --

24              THE COURT:   So you would contemplate the approval by

25    the contingency review board prior to the court entering
```

1    judgment?

2            **MR. DRUMMOND:**  Yes.

3            **THE COURT:**  Okay.

4            **MR. DRUMMOND:**  That would be the request of the

5    parties.

6            **THE COURT:**  All right.  And with respect to the

7    fines here, having been at the Tax Commission and been around

8    these people who do state budgeting, how would the fines be

9    paid?  Apparently they're paid out of the Department of Mental

10   Health's budget, but then the Department of Mental Health has a

11   role in deciding how those fine monies are paid?

12           **MR. DRUMMOND:**  Yeah.  That would be levied against

13   the Department of Mental Health.

14           **THE COURT:**  Okay.  Out of what?  Would they have to

15   take it out of other budgets?

16           **MR. DRUMMOND:**  Well, we actually funded -- and I'm

17   sorry.  I've done so many budget numbers, but I want to say a

18   million-six specifically for interim fees and costs associated

19   with this consent decree.

20           **THE COURT:**  All right.

21           **MR. DRUMMOND:**  So the legislature is well aware that

22   it will need to effectively add an appropriation consistent

23   with the findings in the consent decree.

24           **THE COURT:**  And the consent decree has caps?

25           **MR. DRUMMOND:**  Yes.

1          **THE COURT:**  So it's not a blank check?

2          **MR. DRUMMOND:**  Correct.  If the mental health

3    department performs -- you know, this is a stick and a carrot;

4    right?

5          **THE COURT:**  Right.

6          **MR. DRUMMOND:**  I mean, the predecessor to The

7    Commissioner Friesen was a believer that nobody suffered mental

8    health and, you know, she played the shell game and she was

9    asked to retire.  Now she's gone on to some bigger and greater

10   opportunity.

11         But Commissioner Friesen understands and recognizes the

12   deficiency in the restorative services process and began in

13   earnest in February with implementation of plans to modify the

14   behavior of the mental health department so that we can get in

15   compliance.

16         **THE COURT:**  Right.  My next question is way down

17   into the weeds because the consent decree allows any monies

18   that are collected as fines to be paid for the benefit of a

19   certain class of mentally incompetent people, including the

20   members of this class.  The word "including" jumped out at me

21   because, as a lawyer, if the class members here are the

22   beneficiaries of this consent decree, why should this court

23   allow those fine monies to be paid for anyone other than class

24   members of this class?

25         **MR. DRUMMOND:**  I think the court is correct.  I

```
 1    think the "including" didn't strike me the same way as it

 2    strikes you.  That's wordsmith that we can certainly alter.

 3    The intent is that it benefits this class and future class

 4    members in the restorative services.

 5            THE COURT:  Arguably, I suppose it could benefit

 6    future class -- people who may become future class members, but

 7    I think it has to be more tethered to class members or people

 8    once they -- who are not yet class members, once they are class

 9    members, if you follow me.

10            MR. DRUMMOND:  That's the intent of that language.

11    So I see the ambiguity that you call out.

12            THE COURT:  It's not a big point.

13            MR. DRUMMOND:  Right.  But it is -- the intent is

14    and in practice those fines and fees will benefit this class

15    and future class members.

16            THE COURT:  Okay.

17            MR. DRUMMOND:  The whole objective is to get

18    restorative services right.  Because right now we are failing

19    on the due process of these defendants and we're, frankly,

20    impugning and injuring public safety and law enforcement.  So

21    we just need to get together and do the right thing.

22            THE COURT:  So there's no question in your mind that

23    this is violative of substantive due process rights of those in

24    the class?

25            MR. DRUMMOND:  Yes.
```

1          **THE COURT:**  All right.  Thank you very much.

2          **MR. DRUMMOND:**  Certainly.

3          **THE COURT:**  Mr. DeMuro, maybe you could address that

4     "including" question that I have.  As a lawyer, I think I could

5     answer that for you but it jumped out at me for some reason.

6          **MR. DEMURO:**  Could you restate the question, Your

7     Honor?

8          **THE COURT:**  Yes, sir.  Let's see --

9          **MR. DEMURO:**  I had a hard time hearing over there.

10         **THE COURT:**  Yes, sir.  Yeah, it's a little difficult

11    to hear in this courtroom.  Let me see if I can find that.

12         **MR. DEMURO:**  Is it related to the fines provision,

13    Your Honor?

14         **THE COURT:**  Yes, sir.  Just one second.  Let me see

15    if I can find it.

16         **MR. DEMURO:**  Those start at paragraph 93.

17               *(Discussion held off the record)*

18         **THE COURT:**  Okay.  It's paragraph 94 on page 35.

19         **MR. DEMURO:**  Yes, Your Honor, I have it.

20         **THE COURT:**  And the very top line.  It says that the

21    funds in the fines account must be used for the purpose of

22    funding or supporting services for people experiencing mental

23    illness and competency issues in Oklahoma who are charged with

24    criminal charges, including the class members -- so, once

25    again, that jumps out at me as being not exclusively for the

1    class members -- in which the department is not otherwise

2    obligated to provide by law or under this consent decree.

3            So as I say, that's not a big deal but it's kind of a

4    lawyerly question.

5            **MR. DEMURO:** Well, the intent of the fine provision,

6    Your Honor, was -- obviously it's a central component of the

7    decree. It's the enforcement mechanism. It's the

8    carrot-and-stick. So it's indispensable to the consent decree,

9    the fines in general.

10           **THE COURT:** Right.

11           **MR. DEMURO:** The use of the fines, we want the fines

12   to be an incentive to the department but we don't want the --

13   we also want the fines to be used to further the department's

14   mission. But we didn't want the fines to be some circulating

15   fine where the department would willingly get a fine just to

16   recirculate the same money in things that they're already

17   otherwise obligated to do.

18           We wanted the fines to be sort of used -- not sort of

19   -- we want the fines to be used at the discretion of this fines

20   committee, which includes the department, who could see needs

21   within the department that may need additional funding and

22   address those needs. That could be the forensic competency

23   restoration system. It could be other of the department's

24   missions depending, in the discretion of this fines committee,

25   on where those funds are best needed.

```
 1              THE COURT:  So you agree it's not limited to

 2   benefiting this class?

 3              MR. DEMURO:  I agree, yes.  It is conceivable that

 4   under -- that the fines committee could dispense funds to the

 5   benefit of people who technically aren't members of the class.

 6   I think that's a fair reading.  It says including, not

 7   exclusively.

 8              THE COURT:  Sure.

 9              MR. DEMURO:  And the way that that benefits the

10   class -- because I can see Your Honor's mind at work -- is the

11   fines provision is central to this, and so the operation of the

12   fines provision benefits the class by incentivizing compliance.

13   That's how this whole fine provision works.

14              THE COURT:  All right.

15              MR. DEMURO:  Does that make sense, Your Honor?

16              THE COURT:  It does.  You could see why I asked the

17   question.  I mean, because arguably the consent decree is

18   working to benefit the class and the fines don't necessarily

19   have to go back to benefit this particular class because

20   they're benefited by the imposition of the fines themselves.

21              MR. DEMURO:  Correct.

22              THE COURT:  Right.  Let's go back here then.  I

23   touched upon the attorney fees briefly.  Once again, that's a

24   fairly technical aspect of it here.

25              As I say, Newberg on Class Actions suggests that notice
```

1    should comply with Rule 54 which requires in part that a motion

2    for attorney fees state the amount sought.  I think your

3    proposed notice just says -- and this is true -- you say the

4    consent decree requires that the department pay class counsel

5    reasonable attorney fees which class counsel has substantially

6    discounted.  I know it's your practice to do that in these

7    types of matters, ones that have come before me.

8         But I do think it's necessary to state the amount in

9    that notice because, you know, it's fair game.  If somebody

10   wants to oppose it, that's fine.  You know, a lot of -- I've

11   got a lot of attorney fee disputes here so I'm used to it.

12        **MR. DEMURO:**  Yeah.  I've been party to some of

13   those, Your Honor.  So we have no problem -- I'd have to look

14   back at the notice and see what our precise language is

15   regarding attorney fees.  But I agree with your general

16   premise, that the notice ought to tell class members with as

17   much specificity as is possible at that time what our fees are.

18        **THE COURT:**  I think so.

19        **MR. DEMURO:**  I have no problem with that at all.

20   We'd be happy to amend the notice to specifically put in the

21   amount and how the attorney fees work.

22        **THE COURT:**  All right.  Do you have a prepared

23   presentation of those things you think you need to touch upon

24   to satisfy the record here with regard to adequacy of the

25   consent decree?

1          **MR. DEMURO:**  Adequacy of the consent decree?

2          **THE COURT:**  Yes, sir.

3          **MR. DEMURO:**  In terms of the relief to the class?

4          **THE COURT:**  Well, of course, there are a number of

5    factors with regard to adequacy.  Just one second here.

6          I think the first requirement, adequacy of

7    representation, is clearly met.  You may want to touch on

8    negotiation at arm's length, adequate relief.  I think it's

9    clear here that the proposal treats class members equitably

10   relative to each other.

11         So with that, I'd be open to hear any presentation

12   you'd like to make.

13         **MR. DEMURO:**  Sure, Your Honor.  I appreciate that

14   guidance, Your Honor.

15         I was first approached to consider this case a couple

16   years ago by the Chief Public Defender of Tulsa County, and we

17   had a healthy dose of skepticism taking on something like this,

18   as you might imagine.  We reached out to our network of -- I

19   say "our" -- the network of nonprofits that work in this space

20   that we have the good fortune to work with.  And as we got into

21   this, we discovered that not only was there a terrible problem

22   in Oklahoma, but it was nationwide and Oklahoma doesn't stand

23   out as an outlier, post-COVID, increase in mental health.  We

24   also were very sensitive to some of the things that our local

25   sheriff was saying about his county jail being a de facto

 1    mental health institution.

 2          And so as we got into it, we realized this was a

 3    nationwide mental health crisis.

 4                **THE COURT:**  Exacerbated by drug use.

 5                **MR. DEMURO:**  Drug use, fentanyl, the opioid crisis,

 6    COVID, which had its impacts that I think will be studied for

 7    years which backlogged the criminal cases which caused strain

 8    on the criminal justice system in many, many ways.  It had a

 9    knock-on effect with competency restoration.  It increased

10    mental health indicators, homelessness.

11          I mean, all of the societal problems that we're hearing

12    about impact individuals who get in this situation and we see

13    it every day on our streets.  We see these people unfortunately

14    experiencing mental illness who are -- the police have no other

15    option right now.  That's the sad thing and that needs to be

16    addressed too because our fine police officers do incredible

17    work.

18          But when they confront a lot of these offenders who are

19    trespassing, who are being a nuisance to business owners, who

20    are committing misdemeanor offenses simply out of a

21    manifestation of their mental illness, they get into the system

22    and we started seeing cases where misdemeanants were declared

23    incompetent and were -- this is statewide -- were being held in

24    county jails longer than their six months' maximum sentence for

25    a misdemeanor before they even got competency restoration, in

1    some cases more than a year, because the local jails didn't

2    have the resources, the department was absolutely dysfunctional

3    and dishonest in its former iteration about what it was doing

4    in the jails.

5         So we came to this firm conviction that this is a

6    serious problem in Oklahoma and that the due process rights of

7    hundreds of people are being violated.

8         **THE COURT:**  Is it mainly in the metropolitan areas?

9         **MR. DEMURO:**  I would say that it aggregates

10   proportionate to population.  Because the drug problems are

11   rural.  The opiate problems are rural.  Your Honor, I think

12   you've probably seen it, too, if you've traveled around the

13   state.  Remarkably, hopelessness is plaguing some of our less

14   populous areas as well.  And so I would say that my perception

15   is it's generally proportionate to the population.  Counties

16   with lower populations have fewer cases.

17        **THE COURT:**  Is it your understanding that David L.

18   Moss is currently housing individuals who have been on the

19   waiting list for over a year?

20        **MR. DEMURO:**  Yes, that's my understanding.  It's my

21   understanding that there are many months and months.  The

22   sheriff -- because of the department's mismanagement of its

23   jail-based restoration program -- so-called jail-based

24   restoration program -- the sheriff's legal counsel advised the

25   department to cease and desist providing those type of

```
 1   services --

 2              THE COURT:  And that was through Family & Children's

 3   Services; correct?

 4              MR. DEMURO:  At the time Family & Children's

 5   Services was the provider.

 6              THE COURT:  They were the latest provider, as I

 7   understand it.

 8              MR. DEMURO:  That is correct, Your Honor.

 9              THE COURT:  And they were merely providing drugs.

10   They were not providing competency restoration, as I understand

11   it; correct?

12              MR. DEMURO:  At most.  Yes, at most.  And that's a

13   fine organization, Family & Children's Services.

14              THE COURT:  Right.

15              MR. DEMURO:  We are grateful to have them in our

16   community.

17              THE COURT:  Right.

18              MR. DEMURO:  But the department was incapable of

19   putting forward both the administrative and medical

20   infrastructure to have in-jail restoration and also there were

21   financial conditions.  The bottom line is, there is no in-jail

22   restoration going on in Tulsa County as we speak.  What the

23   department claims is in-jail restoration in Oklahoma County is

24   a farce.  We've got a marriage counselor leading the program

25   who pulls down restoration -- so-called restoration curriculum
```

1   from Google and has absolutely no training.

2          So what we found was shocking.  We found under the

3   prior administration that -- literally shocking that lawyers --

4   the department's internal lawyers were manipulating the wait

5   list, not because of clinical reasons, but they were jumping --

6          **THE COURT:**  Jump-frogging?

7          **MR. DEMURO:**  Leapfrogging people over the defendants

8   who had the audacity in their criminal cases to file motions

9   for contempt because they had been sitting in county jails for

10  so long waiting competency restoration services when the state

11  court had ordered them to do it consistent with the statute.

12         What we were seeing was those people were getting

13  leapfrogged over and they somehow immediately find a bed, which

14  is, if you step back and think about it, that is an egregious,

15  callous management of a mental health problem.  It has no

16  relationship to the clinical needs, the forensic needs of these

17  defendants and was simply designed to avoid judicial scrutiny

18  of the competency restoration system.  It was a shell game, a

19  pure and simple shell game.

20         And instead of admitting the problem -- and to be fair

21  to the department, there's a problem.  This influx of mental

22  health cases into our system, the criminal justice system,

23  caused this backlog.  We don't have enough forensic beds and so

24  it caused this tremendous backlog and wait list.  That's the

25  problem.

1          **THE COURT:**  How many beds are there at Vinita?

2          **MR. DEMURO:**  I think there is 256 but they're not

3    all dedicated to the competency restoration.  And there's going

4    to be 80 more beds brought online, forensic beds, and so

5    there's some movement in that area.

6          But another key factor from our perspective, Your

7    Honor, is when we speak to the district attorneys and the

8    sheriffs, and judges, state court judges, I've not heard any

9    feedback that did not confirm that in their counties this was a

10   major problem, that they wanted this consent decree to be

11   passed, they wanted the department to be held to task on their

12   obligation, and that they saw the department as failing in

13   their obligation to provide timely competency restoration

14   services to these defendants.

15         And so when we started, you know, seeing all this,

16   getting our arms around the data, and then also recognizing it

17   was a national problem, we broadened our research, looked at

18   all of the other cases across the country that we could get our

19   hands on, hired the best experts in the country in terms of

20   their experience -- I mean, our experts, Judge, they have

21   academic experience, they're professors at prestigious

22   institution, they have administrative experience, they've been

23   administrators in state court systems, competency systems,

24   they've been in one instance a federal court monitor for

25   similar plan, consultants across the country.  We put together

1   what we believe is -- this goes to the point of adequacy -- a

2   state-of-the-art program.

3          **THE COURT:**  Have you attempted to determine the

4   number of individuals at any one time -- and I know it's a

5   dynamic or it's a moving number -- but what capacity does the

6   State of Oklahoma need for restoration of competency treatment,

7   whether it's inpatient or outpatient?

8          **MR. DEMURO:**  So that's a great point and we had a

9   the lot of discussion on that.

10         There are some studies that we've talked to our experts

11   that correlate population size to how many forensic beds you

12   would need, but that research isn't uniform and it's subject to

13   local variances and populations around the country and

14   characteristics but there is some data on that.

15         And what our plan has done -- initially we had proposed

16   a number of beds that we wanted the department to bring online.

17   We were convinced that the better approach was to -- because of

18   the characteristics I just mentioned -- was to give the

19   department a period of time, 90 days, to confer with the

20   consultants who are national experts and come up with the

21   capacity requirements once the consultants had better

22   visibility into the department's program.

23         So we did have a number to begin with.  We thought the

24   wiser course was to let the department and the consultants work

25   together and come up with those capacity numbers.

1          We also think -- I mean, it's community-based

2    restoration and Your Honor has raised some interesting

3    questions about it.  This is working in other states.  There

4    are a number of -- a profile of these defendants who are not

5    dangerous who haven't committed serious violent crimes who are

6    probably going to be better able to be restored more quickly in

7    a less restrictive environment, a community environment, where

8    they can maintain their relationships with their family and the

9    community.  So that piece is something that needs to be brought

10   online.  The department was actually considering a

11   community-based program -- rolling out a community-based

12   program, just never got it online.  So that's part of the

13   metrics as well.

14          So, Your Honor, what we tried to do is, in consultation

15   with our experts, put together those components of the plans

16   from our jurisdictions that seem to be working and modify them

17   to Oklahoma's needs.  And we're here today jointly -- the

18   parties are here jointly together so -- which is, by the way, a

19   testament to the leadership of Attorney General -- I truly

20   believe that -- to see the problem.

21          After initially taking a defensive posture in the case,

22   an aggressive posture in the case -- this goes to arm's length

23   negotiations -- he engaged his team to undertake a review of

24   what was going on at the department and came to the same

25   conclusion we did.  I think that takes guts and leadership and

1    that's why we're here now instead of at a trial, because the

2    violations are occurring and we're going to remediate them one

3    way or the other.  But our intent, Judge, was to fashion the

4    best plan we could taking pieces from other states that seem to

5    work.  It's working in Colorado.  It's working in California.

6    It's starting to work in Alabama.

7         So we believe we've crafted in sum a state-of-the-art

8    plan that's tailored to Oklahoma that gives the district

9    attorneys and the department and the courts some flexibility

10   and the consultants to work with all of the stakeholders to

11   come up with the granular ingredients of, for example, the

12   capacity of the number of beds to make a plan that works.

13        Hopefully, we can develop some of these solutions --

14   community-based restoration; pilot program in jail;

15   restoration, if that works -- that is going to alleviate this

16   serious problem.  Judge, I have every confidence that if this

17   plan is put into place, it will work and we will be a model for

18   the rest of the country, every confidence in that.

19        **THE COURT:**  So this goes back to the original

20   discussions we had, but under 1175.6a, are you suggesting that

21   currently whenever a designee is appointed by the Department of

22   Mental Health, that the Department of Mental Health itself

23   makes a determination as to whether that person is dangerous?

24        **MR. DEMURO:**  Yes.

25        **THE COURT:**  Or are you saying that a state court

1    judge then makes that determination?

2         **MR. DEMURO:**  So what occurs, Your Honor, when --

3    it's the former.  A qualified forensic examiner of the

4    department, or the department's designee, will undertake a

5    competency evaluation and make that determination and then that

6    report is submitted to the state court.  Typically, the state

7    court -- the typical route, Your Honor, is that once the

8    department's psychologist or a qualified forensic examiner

9    issues their competency report and makes those findings, the

10   report is not contested and it's generally entered as a matter

11   of agreement.

12        Now, of course, you have a right to a competency

13   restoration -- competency trial.

14             **THE COURT:**  Right.

15        **MR. DEMURO:**  Those are very rare, very, very rare.

16   And so the court will receive the report and accept the report.

17        Now, if the report makes a finding that the person is

18   in need of treatment under the title that you just -- under the

19   statute that you just cited, but the court's order committing

20   the person to the OFC, or the department's custody, typically

21   does not have that as a finding but the court does receive the

22   restoration report.

23             **THE COURT:**  But if the state court -- and during my

24   ten years as a state court judge, I never had this type of

25   docket -- but if a state court judge determines somebody to be

 1    a person requiring treatment and then, in my reading under the

 2    Oklahoma law, therefore dangerous, you're saying that a branch

 3    of the executive who has been given the custody of that person

 4    can unilaterally decide to put that person in outpatient

 5    treatment?

 6         **MR. DEMURO:**  Well, I'm not sure about the

 7    unilateral.  I think if I went back to the plan, this would

 8    have to be something that the court, the state court, approves.

 9    There are instances where folks have to be -- who are committed

10    for civil commitments under Title 43 or persons requiring

11    treatment and they're in the criminal system are moved from

12    treatment facility to treatment facility with the state court's

13    leave.  I mean, they'll go to the state court's --

14         **THE COURT:**  But, I mean, in those cases, that's

15    in-custody treatment; right?

16         **MR. DEMURO:**  Yes.

17         **THE COURT:**  I mean, it's inpatient treatment.  It's

18    not outpatient treatment.

19         **MR. DEMURO:**  It's inpatient, but it could be at a

20    private inpatient facility.

21         **THE COURT:**  Well, that's fine.  But I'm just

22    wondering, just in terms of the law, if a judge has made the

23    determination that the person is a person requiring treatment,

24    and therefore, dangerous, how can an executive agency then

25    essentially countermand that or order outpatient treatment?  I

```
 1   mean, wouldn't they have to go back to the judge and make the

 2   case, hey, Judge, this person isn't dangerous, right, can't we

 3   do this by outpatient treatment?

 4           MR. DEMURO:  I see the logic.  I would have -- I'd

 5   have to revisit the terms of the consent decree specifically on

 6   this, but I wouldn't have --

 7           THE COURT:  I'm just asking under current practice,

 8   not the consent decree.  So anyway, I'll give you a chance to

 9   talk to your folks.

10           MR. DEMURO:  Well, yeah, under current practice,

11   it's not happening, at least with the incompetent -- with the

12   incompetency population.  I mean, the community-based

13   restoration program is envisioned to be a pilot program.  It's

14   something new.

15           THE COURT:  No, I understand.  But I thought you

16   said that currently the Department of Mental Health can

17   designate a third party and that third-party provider can be an

18   outpatient provider.  Is that not what you said?

19           MR. DEMURO:  If I said that, I misspoke.

20           THE COURT:  Okay.

21           MR. DEMURO:  Yeah.

22           THE COURT:  So it's all inpatient so they are truly

23   in custody of the designee?

24           MR. DEMURO:  Correct.  In my understanding, correct.

25   And, of course, there's a wide range of circumstances --
```

1          **THE COURT:**  So what you need to do is show me how

2    outpatient treatment can occur under this statute because I

3    can't amend the statute.

4          **MR. DEMURO:**  Right.

5          **THE COURT:**  So and my reading may be wrong.  So

6    you'll need to educated me as to that.

7          **MR. DEMURO:**  Certainly.  And, again, I can come back

8    to -- and I said we'd like to take a break and huddle up on

9    that and get the wisdom of my group.

10         **THE COURT:**  Right.

11         **MR. DEMURO:**  But we're talking about my view of the

12   statute being legal custody, not necessarily physical custody.

13         **THE COURT:**  Okay.  And do you know of any authority

14   for that proposition?

15         **MR. DEMURO:**  I do not.

16         **THE COURT:**  Any decisions?

17         **MR. DEMURO:**  I'm unaware of any state court

18   decisions on that point.

19         **THE COURT:**  All right.  Anything else before you

20   huddle up?

21         **MR. DEMURO:**  May I confer?

22         **THE COURT:**  Yes, sir.

23              *(Discussion held off the record)*

24         **MR. DRUMMOND:**  Will the court wish to hear from the

25   state on those adequacy issues or are you satisfied?

```
 1              THE COURT:  No, I'd be pleased.

 2              MR. DRUMMOND:  No.  Whatever the pleasure of the

 3      court.  I'm happy -- for purposes of the record, I'm happy to

 4      speak as to the process that we went through.  It might

 5      complete -- make the --

 6              THE COURT:  You're welcome to.  You've studied this

 7      far longer and wrestled with this obviously.

 8          I'd to hear about -- in terms of the arm's length

 9      negotiation, Mr. DeMuro talks about how the state initially

10      resisted this vehemently, and I'd like to hear that here for

11      the record.

12          Because, of course, you've got other consent decrees

13      that have been criticized nationwide.  There's a book called

14      "Democracy by Decree" whereby agencies essentially leverage

15      more funds through the legislature via consent decree, and I

16      want to make sure that the record is clear that that's not

17      what's going on here.  Go ahead.

18              MR. DEMURO:  Yeah.  I'll accede the floor because I

19      definitely want to hear the Attorney General's comments on

20      that.

21          But Mr. Leimbach reminded me to point the court to

22      paragraph 68 that the community-based restoration treatment

23      pilot program is only applicable to class members who have been

24      judicially determined not to be a substantial risk of harm to

25      themselves and others.
```

1          **THE COURT:**  Determined by whom?

2          **MR. DEMURO:**  Judicially determined.  And so I would

3    -- I would -- the intent of that is clearly the state court

4    determine that they not be a substantial risk of harm, which

5    obviously implies that we would -- in the instance of a

6    community-based restoration treatment placement, you would be

7    back in front of the state court judge saying, Your Honor,

8    we're getting ready to -- we have -- of course, the district

9    attorney has to approve, first and foremost, that this person

10   is eligible.  You'd be back in front of the judge saying,

11   Judge, the district attorney and the defense counsel believe

12   this person is a candidate for this pilot program.  We need to

13   ask you, Your Honor, to make this judicial determination.

14         **THE COURT:**  All right.  Well, that's wise.  My

15   question, though, is, by this decree, are we amending the law?

16         **MR. DEMURO:**  And we'll huddle up.  My final point of

17   that is, if you read the statute, the 1175.6a, it has these

18   waterfalls of if a person is declared incompetent for reasons

19   other than being a person in need of treatment, and then it

20   goes on.

21         So there, it's clear that the statute contemplates that

22   folks that are declared incompetent are not necessarily people

23   who are in need of persons requiring treatment because there's

24   a classification -- there's several classifications further on

25   in the statute of if people are declared incompetent who are

1    not persons in need of treatment.

2            **THE COURT:**  Well, but then that rolls you over to

3    different statutes.

4            **MR. DEMURO:**  Sure.

5            **THE COURT:**  1175.6b and 1175.6c, and all we're

6    dealing with here is 1175.6a.

7            **MR. DEMURO:**  The point I'm making, Your Honor, is,

8    it can't be the case that the definition of an incompetent

9    person is a person who is requiring treatment if the statute

10   says if an incompetent person is found to be incompetent but

11   not a person needing -- requiring treatment.

12           **THE COURT:**  Well, except that what you're quoting

13   from says -- and I'm looking at (C)(4) and (C)(5) -- it says

14   that if the person is found to be incompetent for reasons other

15   than the person is a person requiring treatment as defined in

16   Title 43A.  And then subsection (5) again says that if the

17   person is found to be incompetent for reasons other than the

18   person is a person requiring treatment as defined by Title 43A.

19           What we're dealing with is very different.  It's the

20   person found to be incompetent prior to conviction because he

21   or she is a person requiring treatment.

22           **MR. DEMURO:**  That's where I have a little bit of an

23   intellectual disagreement.  That's the ambiguity I'm speaking

24   of.  The first sentence says that an incompetent person is a

25   person requiring treatment.  And then further on in the

1   statute, it says that an incompetent -- it basically says if

2   the person is incompetent but for reasons other than a person

3   requiring treatment.  Those are -- they can't be read to mean

4   that a person -- that all persons who are incompetent are

5   people requiring treatment defined to be dangerous.

6        What that subsection is that we've been talking about

7   points to is that if the person is declared -- if the reason --

8   if the impediment to the person's competency is that he's not a

9   dangerous person under Title 43 or not intellectually disabled

10  under the other title, then he must be released and the case

11  must be dismissed.  So I think there is an ambiguity in the

12  statute with respect to what the initial sentence means.

13       **THE COURT:**  Well, with due respect, it seems to me

14  that this statute contemplates the wide range of

15  incompetencies.  You know, for instance, (C)(3) talks about

16  incompetency because of intellectual disability.  (C)(4) talks

17  about people found incompetent for reasons other than being a

18  person requiring treatment and is also found to be not

19  dangerous.  So that's a different category.  It specifically

20  says then the court shall issue the appropriate order as set

21  forth in Section 1175.6b, which is another statute which is not

22  encompassed in this class action.

23       You go on to the next subsection.  If a person is found

24  to be incompetent for reasons other than the person is a person

25  requiring treatment as defined by Title 43 but is also found to

```
 1   be dangerous, another category.  Then the court shall issue the

 2   appropriate order under Section 1175.6c, which is not what

 3   we're dealing with here.  We're dealing with 1175.6a, as I

 4   understand it.  So there are a wide range of incompetencies and

 5   we're dealing with this narrow subset, I think --

 6            MR. DEMURO:  We are.

 7            THE COURT:  -- defined in 1175.6a(A).

 8            MR. DEMURO:  I agree.  What I'm suggesting is, how

 9   can a person be defined as incompetent by reference to the

10   Title 43 factors but then later on in the statute say if you're

11   declared incompetent for reasons other than the Title 43

12   statutes?  Well, we've already determined you're incompetent.

13   So those two things are intentioned, I believe.

14        But I also think, Judge --

15            THE COURT:  Have you tried to go to the legislature

16   to get it amended?

17            MR. DEMURO:  And I will certainly sit down because

18   I'm trespassing on the Attorney General's time.  But my final

19   comment, Your Honor, on that before we huddle up is, as applied

20   with the judicial -- the requirement that these candidates for

21   community-based restoration must be judicially approved or

22   judicially vetted once again to not be dangerous, I think as

23   applied it doesn't violate state law.

24            THE COURT:  Well, it's clearly rational.  But we may

25   need to give you time to brief this narrow issue that we've
```

1    been discussing.

2         General.

3              **MR. DEMURO:**  Thank you.

4              **MR. DRUMMOND:**  May it please the court, some

5    preliminary comments and then I want to address the three

6    points that you raised in the adequacy factors.

7         But my office did, as counsel identified, we approached

8    this complaint from a traditional defense posture.  As a matter

9    of fact, we filed a motion to dismiss even.  But as we began

10   the preliminary investigation into the complaint's core

11   allegations, we became concerned that the plaintiffs' due

12   process claims had merit and that the state's competency

13   restoration system was constitutionally deficient.  That's the

14   conclusion independent of plaintiffs' allegations but based on

15   our own independent research.

16        Over the course of the next 18 months, as explained in

17   our joint papers, my office conducted extensive due diligence

18   jointly with the plaintiffs and independently with our own

19   team.  We met with stakeholders all across the state and this

20   led to our strong conviction that the state's competency

21   restoration system is chronically and seriously broken and that

22   the plaintiffs were very likely to succeed on their due process

23   claims.

24        Once we realized the magnitude of this problem and the

25   likelihood that the state was violating the constitutional

1    rights of the class members, we began to focus on crafting a

2    solution internal to the mental health department with great

3    resistance and subsequently with more cooperation with the

4    change of leadership and the awareness of the deficiencies.

5         **THE COURT:**  So you started this lawsuit with the

6    previous head?

7         **MR. DRUMMOND:**  Yes.  And met with great resistance

8    and, frankly, misrepresentations and deceit that drove my

9    recommendation that she be terminated or retire.  Now, what

10   impact that had, I can't speak.  But she ultimately did resign

11   her position and then opened the path through which we could in

12   good faith negotiate with the mental health department.

13        And I don't want to understate the initial acrimony

14   between my office and the mental health department.  It was

15   very difficult in convincing the mental health department that

16   there's a substantive due process standard and that they were

17   well below it.  But we have been successful in this process.

18        The plan in the consent decree has broad support of law

19   enforcement, judges, and prosecutors across the state.  In

20   addition to providing the relief of the class members, the

21   consent decree will enhance public safety by expediting

22   criminal cases and relieving the burden of county jails who are

23   currently, frankly, de facto mental health facilities.

24        The plan was developed with consultants and in support

25   with national subject-matter experts, including experts

1    selected by the Department of Mental Health, and these are the

2    consultants that are referenced in the consent decree.  The

3    plan's components have proven to be effective in reducing wait

4    times in other jurisdictions and we believe steadfastly that

5    the plan will work.

6         We believe that the plan as presented to the court is

7    the best solution for Oklahoma and the department and it will

8    save the state the agony and financial burden of adversarial

9    litigation that will only delay a likely inevitable result of

10   an adverse judgment against the state.  In other words, we are

11   guilty and it is my objective to control the crash.

12        This has been vetted with state legislators who have

13   anxiety about any consent decree, that it might go into

14   perpetuity.  But with that as a backdrop, we negotiated at

15   arm's length with --

16             **THE COURT:**  And this has a five-year termination?

17             **MR. DRUMMOND:**  Yes, it does.

18        To see the evolution of the plan would be enlightening

19   to this court in that we began on polar-opposite sides, and we

20   have now fashioned a solution that I believe -- that I

21   steadfastly believe is in the best interest of the state.

22        I do want to address your 1175.6a concern.  As a

23   predicate matter, all of these individuals in the class have

24   committed a crime, allegedly committed a crime; therefore, they

25   are criminal defendants and then they have been determined by

1    the state court that they are incompetent.

2        And beginning with the premise that the court is at

3    with they're dangerous, we know that on the continuum of

4    restorative services they go from incompetent and dangerous to

5    either never restored, in which case they go to the forensic

6    center, or restored, meaning not dangerous.  So there's a

7    continuum.

8        It is my reading of the consent decree that all are

9    arrested and confined and then determined incompetent even

10   using your definition of "dangerous" --

11       **THE COURT:**  Well, but it's not mine.  It's not my

12   definition.  It's the statutory definition.

13       **MR. DRUMMOND:**  As you have indicated in the

14   language.

15       But in the process of the restoration services that

16   begin in the jail, we believe there will not be an occasion

17   where a dangerous individual is released to outpatient

18   services.  So they begin --

19       **THE COURT:**  Because there's a protection within the

20   consent decree?

21       **MR. DRUMMOND:**  Right.

22       **THE COURT:**  I'm just asking:  Is outpatient

23   restoration permissible under the statute?

24       **MR. DRUMMOND:**  I believe that it is consistent with

25   the statute, in that beginning with the premise that they're

```
 1   incompetent and dangerous.  They are in custody --

 2         THE COURT:  Mr. DeMuro has just admitted that it is

 3   not occurring under the current statute, that people are not

 4   being referred to outpatient services by designees under the

 5   current statute.

 6         So am I by this -- or we by this consent decree, if I

 7   were to grant it, effectively amending the statute, which I

 8   cannot do as a judge.  I'm not an elected legislator.  I can't

 9   do that.

10         MR. DRUMMOND:  I can appreciate the fact that the

11   court needs additional briefing on this, and I think we will

12   work in joint effort to assuage that issue and make the record

13   clear.  But it is my observation that we are consistent with

14   the statute, in that beginning with the criminal defendant, who

15   is deemed incompetent and by definition of the statute

16   dangerous, begins the process toward restorative services and

17   will not be put in an outpatient facility until they are no

18   longer dangerous, incompetent but not dangerous.  Because the

19   continuum works them toward the position through which we can

20   then adjudicate them.

21         THE COURT:  As you know, I see it every day.

22         MR. DRUMMOND:  Surely.

23         THE COURT:  Especially with methamphetamine.  And

24   once you get somebody off methamphetamine, the mental health

25   situation is better addressed.  We have what we call
```

```
 1   "dual-diagnosis programs" where we can send somebody, and it's

 2   very important we get them off the methamphetamine or the

 3   fentanyl.  And as I say, every day, particularly in the wake of

 4   McGirt, I am awash in these types of cases.

 5        So I understand the continuum.  I'm just wondering

 6   whether the statute is flexible enough to recognize it because

 7   it takes time for a statute to come in line with reality.  I

 8   mean, the proliferation of drugs in our community is just -- is

 9   staggering.

10        MR. DRUMMOND:  It is.  And I think that we need to

11   supplement -- to the extent the court suggests or requires,

12   we'll supplement the brief.  And if, in fact, we cannot meet

13   the court's threshold, then I will seek amendment of the

14   legislation.  Because I do believe --

15        THE COURT:  Or this consent decree needs to be

16   purely -- I mean, if my reading is right, then the consent

17   decree needs to mandate inpatient treatment; right?  I know it

18   would be more costly; right?

19        MR. DRUMMOND:  Right.  Financially it is not the

20   objective of the state to do that.  We do see the value in the

21   outpatient.  But, of course, the threshold for the state is, we

22   do not wish to release anybody into an outpatient facility that

23   is not in custody that is dangerous.

24        THE COURT:  Right.

25        MR. DRUMMOND:  We don't want that; right?
```

1         **THE COURT:**  Right.

2         **MR. DRUMMOND:**  So I think you have the state actor

3   as the protector of the community, but we do believe -- we will

4   address it.  I think that we should and will address it to this

5   court's satisfaction.

6         **THE COURT:**  I mean, clearly nobody here wants

7   someone released who's dangerous and then commits an act while

8   in an outpatient treatment.

9         **MR. DRUMMOND:**  Correct.

10         **THE COURT:**  Right.

11         **MR. DRUMMOND:**  That would be horrible.

12         Under the 23(b), effectiveness of the relief, we do

13   feel that the time frame -- we have the built-in 16 months to

14   get to the 21 days but we have already begun the process.  So

15   mental health began with the threshold of we need at least 24

16   months.  Well, in fact, they have now had six months.

17         And so as we -- as this process is grinded to a

18   dissolution, they have begun in good faith that effort.  So the

19   plan is being implemented with the current input of the

20   consultants and the current input of the plaintiffs' counsel

21   class.  So we have already begun.  What we need to do is

22   ultimately memorialize this.

23         And under the class notice and the attorney fees, we

24   believe that the attorney fees expended by the plaintiffs'

25   class counsel is reasonable and -- frankly, I would love

```
 1    comments from the court -- ultimately that it saves the state

 2    millions and millions of dollars.

 3              THE COURT:  Right.  And it's clearly discounted?

 4              MR. DRUMMOND:  And it's discounted on top of that.

 5              THE COURT:  Right.

 6              MR. DRUMMOND:  With regard to the adequacy factors,

 7    we do believe that not all plaintiffs' class counsels are made

 8    the same.  In this particular instance, what piqued my genuine

 9    interest in diving deeper into the complaint was the fact that

10    Fred Dorwart and Paul DeMuro were lead counsel.  I know that

11    these men are men of integrity and only champion that, in fact,

12    have deficiencies.  So after the initial defensive posture,

13    this Attorney General pivoted toward diving deeper into the

14    allegations that they made.  So we believe the adequacy of

15    representation is at the top of the list.

16          We did arm's-length negotiate throughout this process

17    with my litigation team.  But it was really a three-way -- the

18    arm was three ways long.  I mean, we had mental health pushing

19    back against my office.  My office pushing back against

20    plaintiffs' counsel.  I did at times almost feel as though I'm

21    sitting in the seat of the arbiter, taking input that is meant

22    in good faith from the mental health department, and then

23    helping them see the legal standard and the deficiency of their

24    performance and ultimately their internal acknowledgment that

25    they needed to change.  To change, they needed political cover,
```

1    and the political cover is in the form of this elected official

2    who is not listed in some of these matters.

3          So if mental health were left at its own design, I

4    think we would have five-year litigation and the crash when

5    this court determined that we had violated substantive due

6    process rights.  The state's interests are best served through

7    this consent decree.

8          And then with regard to the relief to the class, as

9    Mr. DeMuro represented, we have defrauded the class as a state.

10   We have played games, a shell game, with these defendants that

11   were put in a jail system with the key locked and maybe they're

12   viewed through the keyhole, or with an open window at best, for

13   a few minutes a day.  And not until the defense counsel for

14   that respective defendant would file an application with the

15   court for contempt, did the mental health department then play

16   a shell game and move them into the restorative services which

17   I found offensive, the behavior of the mental health

18   department.

19         And then we do believe that the class members are

20   treated equally as to each other because we are not

21   discriminating among and between the class members.  They have

22   all been charged with a crime, they've all been judicially

23   determined to be incompetent and needing restorative services,

24   and we will fashion a plan that remedies those deficiencies.

25             **THE COURT:**  And I take it the date upon which the

1    individual has been determined by the state court judge to be

2    incompetent determines the priority of placement?

3            MR. DRUMMOND:  Yes.  It will be in order as they are

4    determined.  And there is -- presently now that's being

5    enforced inside the mental health department per county.  So in

6    Oklahoma County, there is a list, chronological list, with the

7    objective of we treat those that have been there the longest

8    immediately.

9            THE COURT:  You say per county?

10           MR. DRUMMOND:  Because that's how we're -- we have a

11   database statewide, but we're ameliorating the issue on a

12   county-by-county basis.  It is challenging.

13           THE COURT:  Why wouldn't it be statewide?

14           MR. DRUMMOND:  That's part of the plan.  I'm

15   confessing how it is today.

16           THE COURT:  All right.

17           MR. DRUMMOND:  Today we know.  We didn't know six

18   months ago.  But today we know how many are in Oklahoma County

19   and the order in which and who is overseeing and where are they

20   on this path of restoration.  Tulsa County similarly and other

21   counties.  The plan will dictate a statewide list and the

22   priorities will be based on chronological statewide defendants.

23           So I do believe it is the request of the state that

24   this court consider the joint motion for preliminary approval

25   of the consent decree, class certification, and the plan of

1   notice to be adequate, in that we be given the opportunity to

2   present this to the contingency review board for approval and

3   then come back to this court for final approval.

4           **THE COURT:**  Thank you, sir.

5                    *(Discussion held off the record)*

6           **THE COURT:**  For the record, let me say that subject

7   to the modification with regard to the notice on attorney fees,

8   I would be prepared to preliminarily approve this consent

9   decree but you need to satisfy my concern under the statute.

10  I'll give you some time.  I think it would be best, if you

11  could, because this maras of statutes, I think, requires

12  briefing because as you said here on the record, you had not

13  been aware of my concern in this regard and it's taken some

14  studying here.  There's quite a lot of material here and that's

15  what has drawn my attention.

16          So if you would file a brief in a reasonable time.  How

17  much time do you need?

18          **MR. DEMURO:**  Two weeks?  Is that --

19          **THE COURT:**  Two weeks is great.  Let's see.  Today

20  is --

21          **MR. DRUMMOND:**  And, Your Honor, we'll join the

22  plaintiff in that brief.  It will be a joint presentation.

23          **THE COURT:**  Please.  Today is the 15th.  Two weeks

24  is the 29th, August 29th.  And I will review the brief and

25  notify you as to my conclusion as to this issue that has caused

1    me to question the ability under the law to adopt the consent

2    decree.  Obviously, if I agree with you all, I can

3    preliminarily approve the consent decree and I don't think we

4    need another hearing; correct?

5              **MR. DEMURO:**  I think that's correct.  I also think

6    that if Your Honor sees a problem, we can amend the consent

7    decree.  We shouldn't let the tail wag the dog.  It's one

8    provision of the consent decree that's tripping Your Honor up.

9              **THE COURT:**  Correct.

10             **MR. DEMURO:**  And we understand Your Honor's concern

11   to be the custody issue, inpatient verdicts outpatient for

12   people who might be dangerous, obviously a very important

13   concern.  But that's one component of a big plan.

14        So we would also -- if the court is not convinced by

15   our submission, that should not prevent final preliminary --

16   excuse me -- that should not prohibit the court or prevent the

17   court to enter preliminary approval of the --

18             **THE COURT:**  Of course, what it does is increase the

19   cost of the implementation of the consent decree.  I'm just

20   talking practically.  But if that's what's necessary under the

21   current law, that's what's necessary; right?

22             **MR. DEMURO:**  Yes.  And my point is, if Your Honor

23   says in your ruling, you haven't fully persuaded me and my

24   concern is X, I would ask the court to -- we'd be willing to

25   modify the consent decree to meet the court's concern so the

1    overall goal is reached.

2              **THE COURT:**  Yeah.  I mean, please understand me.  As

3    the Attorney General has suggested, I see individuals here all

4    the time.  I had an individual standing where you are yesterday

5    who I initially questioned his competency to be before the

6    court yesterday.  I was satisfied.

7          But there is -- there is a spectrum -- and I think our

8    expert would agree; correct?  There are various -- there are a

9    lot of different types of incompetency and my concern here is

10    really only as to the statute.

11          So if you'll get me that brief by the 29th, I'm

12    otherwise in preliminary approval of the proposed consent

13    decree with that one concern.

14              **MR. DEMURO:**  Okay.  So as I understand, the court's

15    current thinking is, except for that one concern, Your Honor is

16    prepared to grant preliminary approval to the consent decree

17    and appointment of class counsel and notice as modified by our

18    discussion today, except for your one caveat?

19              **THE COURT:**  Yes, sir.  The attorney fee and then the

20    additional notice to the OBA criminal law section -- or members

21    of the OBA criminal law section.  I think you could do that

22    just by going through the OBA.

23              **MR. DEMURO:**  No problem, yes.  I think we

24    understand, Your Honor.

25              **THE COURT:**  All right.  Is there anything else we

1    need to discuss here today?

2              **MR. DRUMMOND:**  Nothing further from the state.

3              **MR. DEMURO:**  Nothing from the plaintiffs, Your

4    Honor.

5              **THE COURT:**  All right.  Thank you all very much.  We

6    are adjourned.

7                   *(The proceedings were concluded)*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      *C E R T I F I C A T E*

2

3

4          I, Brian P. Neil, a Certified Court Reporter for the

5    Northern District of Oklahoma, do hereby certify that the

6    foregoing is a true and accurate transcription of my

7    stenographic notes and is a true record of the proceedings held

8    in above-captioned case.

9

10          I further certify that I am not employed by or related

11   to any party to this action by blood or marriage and that I am

12   in no way interested in the outcome of this matter.

13

14          In witness whereof, I have hereunto set my hand this

15   16th day of August 2024.

16

17
                                    s/ Brian P. Neil
18                       _____
                                  *Brian P. Neil, RMR-CRR*
19                                *United States Court Reporter*

20

21

22

23

24

25