**Court Consultants**

*Briggs v Friesen, No 4:23-cv-00081-GKF-JFJ*

June 13, 2025

Honorable Gregory K. Frizzell
Federal Building (Boulder Courthouse) – Courtroom 3
224 S. Boulder Ave.
Tulsa, OK 74103

Dear Judge Frizzell,

We submit this Interim Report on the current status of Briggs v Friesen, No 4:23-cv -00081-GKF-JFJ. We will submit our first bi-annual full report in July, but because of various circumstances (changes in leadership, focus on the Briggs Consent Decree in the most recent Oklahoma legislative session, the number of pending cases in Oklahoma state courts regarding competency evaluations and restoration), we thought it appropriate to submit an interim report now.

As the report suggests, progress in complying with the Decree's provisions has been slow. The June 8, 2025, deadlines went largely unmet, though we hope over the next few weeks the Oklahoma Department of Mental Health and Substance Abuse Services will come into compliance with those deadlines. We also hope that new leadership, under the interim direction of Retired Rear Admiral Gregory Slavonic, will accelerate progress in reducing the prolonged wait times that individuals requiring competency restoration services continue to experience in Oklahoma jails.

We are happy to answer any questions or provide additional information. This report is being made available to Class Counsel, ODMHSAS leadership, and the Oklahoma Attorney General, as an ex-officio signatory on the Decree.

Respectfully submitted,

John Petrila, JD, LLM
Neil Gowensmith, PhD
Darren Lish, MD

**Introduction**

This is an interim report to the Court from the Court Consultants (hereafter, Consultants) in the case Briggs v. Friesen and Moran, Case No: 23-cv-81-GKF-JFJ, in the United States District Court for the Northern District of Oklahoma. The Consultants are Neil Gowensmith, Ph.D., Darren Lish, M.D., and John Petrila, J.D., LL.M., who were appointed by the Court and agreed to by the parties (paragraphs 29, 37, Consent Decree, hereafter, Decree). In addition to the Honorable Gregory K. Frizzell, this report is being made available to the signatories on the consent decree.

Consultants' duties (paragraph 38) are to:
- Investigate, monitor, and make findings with respect to Defendants' compliance with the terms of the Decree;
- Report the status of Defendants' compliance or progress (or lack thereof) to the Court and Parties;
- Advise, recommend, and facilitate methods to the Oklahoma Department of Mental Health and Substance Abuse Services (hereafter, Department or ODMHSAS) regarding plans and practices for improving the delivery of competency evaluations and Restoration Treatment to Class Members, including the short-term and long-term compliance with the Restoration Treatment timeframes (in the Decree); and
- Serve as mediators for disputes between the Parties regarding any aspect of the Decree.

Consultants are charged with the submission of "Bi-Annual Reports" to the Parties twice every calendar year (paragraphs 32, 45). We will submit the first of those Bi-Annual Reports in July 2025.

Consultants also "may, in their sole discretion, submit additional reports to the Parties regarding the Defendants' compliance, or lack thereof, with the provisions of this Consent Decree, or on any other matter the Consultants deem helpful to achieve the purposes" of the Decree (paragraph 46). We are submitting this interim report at this time because of multiple events affecting the implementation of the Decree that have occurred over the last few weeks. These include:
- The dismissal of Commissioner Allie Friesen and the resultant vacancy in her position, which has been recently filled by Interim Commissioner Retired Rear Admiral Gregory Slavonic;
- Legislation enacted in the recently ended Oklahoma legislative session, including HB 2785, which creates fiscal controls over ODMHSAS, and HB 2513, which requires ODMHSAS to designate an individual "specifically to implement the requirements" of the Decree;

- Reports of recent suicides at the Oklahoma County Jail that far exceed the state average. Individuals with acute mental illnesses in close confinement are at enhanced risk for suicide and other serious harms;[1]
- Recent court cases in which ODMHSAS has been fined by state judges for failures to act in a timely manner in competency cases;[2]
- Continued confusion regarding the number of Class Members in custody waiting for competency restoration services, discussed in more detail below. Regardless of the actual number, much more aggressive action is required to provide timely restoration services to those individuals;
- A recent increase in the number of court-ordered competence evaluations. Our understanding, based on recent conversations with ODMHSAS staff, is that as many as one dozen new evaluation orders per day have been ordered recently. While that increase may be temporary, the Decree requires these new evaluations to be performed within 30 days of receipt of the court order (paragraph 67) and the sheer volume of orders, if maintained, can quickly add many more people to the waitlist as Class Members; and
- The Consent Decree requirement that ODMHSAS reevaluate every defendant either receiving or awaiting competence restoration services. We have monitored this requirement closely, though questions regarding the actual number of people requiring reevaluation have made that difficult. It is clear, however, that while many reevaluations have been conducted, the requirement to reevaluate all Class Members has not been met. In addition, the quality and timeliness of those evaluations have not been reviewed, as we only received detailed information regarding the reevaluation process on June 6.

As named Court Consultants, we have engaged in several methods of communication and data gathering with the Department prior to – and since the filing of – the Consent Decree. These include (but are not limited to) the following:

- A three-day site visit to Oklahoma in April, including several in-person meetings with Department representatives and site visits to the Oklahoma Forensic Center (OFC), Tulsa County Jail, and Oklahoma County Jail, with a second visit scheduled for June 30-July 2;
- Weekly videoconference meetings with full representation from Department personnel;

---

[1] There have been seven suicides in the Oklahoma County Jail since January 2025: Patterson, M. (2025, June 5). *As new facility remains unfunded, Oklahoma County Jail deaths on pace to match worst year*. NonDoc. https://nondoc.com/2025/06/02/as-new-facility-remains-unfunded-oklahoma-county-jail-deaths-on-pace-to-match-worst-year/. For a discussion of mental illness and suicide in correctional settings, see: Folk, J. B., Loya, J. M., Alexoudis, E. A., Tangney, J. P., Wilson, J. S., & Barboza, S. E. (2018). Differences between inmates who attempt suicide and who die by suicide: Staff-identified psychological and treatment-related risk factors. *Psychological Services*, *15*(3), 349–356. https://doi.org/10.1037/ser0000228

[2] The Frontier. (2025, June 6). *'Total freefall': Oklahoma faces deadline to fix broken mental health system as long wait times persist*. https://www.readfrontier.org/stories/total-freefall-oklahoma-faces-deadline-to-fix-broken-mental-health-system-as-long-wait-times-persist/

- Various smaller meetings with specific Department personnel for targeted purposes (e.g., data reviews, discussions regarding competence trainings); and
- Multiple emails and other correspondence, including our production of suggested resources, contacts, and literature on competence evaluation, restoration, and training.

The information provided in this report stems from these various sources, as well as data and other information produced by the Department, legislative actions, media coverage, broader data and information from external competency-related sources, and our own experience and expertise in competency-related matters.

## Overview of this Interim Report

This Interim Report contains the following sections:
- The current number of Class Members waiting restoration services;
- Our findings with respect to compliance or lack thereof with terms of the Decree, with a focus on specific deadlines within the Decree as well as ongoing obligations;
- Positive factors within ODMHSAS; and
- Strategies that should be adopted as urgent priorities to alleviate the suffering of individuals suffering from acute psychosis in county jails while they wait for competency restoration services.

*The Current Number of Class Members Waiting Restoration Services (Status: Still Outstanding)*

The Decree defines the Class as:

> All persons who are now, or will be in the future, charged with a crime in Oklahoma State court and are: (i) declared incompetent to stand trial by the state court; (ii) court-ordered to receive competency restoration services by the Department or its designees; (iii) incarcerated in a county jail or similar detention facility while their criminal cases are stayed; and (iv) awaiting court-ordered competency restoration services to be provided by the Department or its designees, *whether or not placed on a competency waitlist maintained by the Department or its designees* (paragraph 16, emphasis supplied).

Until this week, we have had great difficulty establishing the precise number of Class Members in custody awaiting restoration services. We have received documents with conflicting information, with numbers ranging from 140-265. Some of the difficulty appears to stem from ODMHSAS's appropriate decision to transfer data tracking regarding people in the forensic system from the Oklahoma Forensic Center (OFC) to the central office, and from the need to reconcile and integrate multiple data systems. However, this process has taken longer than it should have.

- Based on the latest information we have (received on June 11), we believe that at the end of May 2025 there were approximately 180 Class Members in custody waiting for

- restoration services. We will continue to work with ODMHSAS to assure the accuracy of this number, and that the list is updated daily.
- At the same time, there are 135 individuals listed as being in the "initial evaluation" phase. This is a large number of people, at least some of whom, depending on how the competency issue is adjudicated, will find themselves on the waitlist for services.

*Findings with Respect to Compliance, or Lack Thereof, with a Focus on Specific Deadlines within the Decree*

The Decree imposed a number of deadlines on Defendants. Eight (8) of those deadlines came on June 8, 2025 (90 days from entry of the Decree), with additional requirements due at later dates. The Decree required the following elements to be completed by June 8, 2025, "in consultation with Class Counsel and the Consultants," with all plans requiring Consultant approval. On June 6, 2025, we received an email from ODMHSAS with a number of exhibits in response to these deadlines. We describe each deliverable below, with our initial response to each submission. Because we received very little information regarding any of these deliverables before June 6, we have only conducted a preliminary review. However, it is clear that most of the June 8 deadlines have not been met and it is questionable whether ODMHSAS has met the "best efforts" standard governing compliance with the Decree (paragraph 18).

1. **Reevaluate all Class Members waiting for restoration treatment (paragraph 57) (Status: Not Met)**
    a. As part of the June 6 submission, we received a spreadsheet titled "Consent Decree Reevaluation Tracking" with 111 names. According to the list:
        i. 55 people were found to still be incompetent;
        ii. 21 were deemed competent;
        iii. 27 had not been completed, as the report was still outstanding; and
        iv. Eight (8) were deemed "not applicable" for various reasons including their refusal to be assessed, in treatment, or other reasons.
    b. Based on the figures provided by ODMHSAS, only 76 reevaluations have been completed[3].
    c. As noted, it appears that there are approximately 180 people on the waitlist. We are requesting a schedule from ODMHSAS on when and how the outstanding reevaluations will occur, as well as precisely who requires reevaluation.
    d. In addition, in Exhibit A of its June 6 submission, ODMHSAS stated that "individuals who had been evaluated January 25, 2025, or after were excluded under the 30-day exclusion of the Consent Decree, Paragraph 57." In our view, this misconstrues the exception granted in the Decree, which requires all Class Members to be reevaluated "excluding those Class Members assessed within the

---

[3] The definition of "completed re-evaluation" may need further clarity. It is clear that the Department conducted 105 re-evaluations before the required deadline, but only 76 of those included the submission of a report to the referring court. We generally consider the re-evaluation to be completed upon the submission of a report.

    last thirty (30) days by a Qualified Forensic Examiner." The Decree was entered on March 10, 2025; "within the last 30 days" means "within the last 30 days" of entry and so the only people excluded from this requirement would be those evaluated by a Qualified Forensic Examiner (QFE) between February 8 and March 10 and those receiving a newly ordered initial evaluation after entry of the Decree.

    e. A preliminary review of the data submitted on the 111 reevaluations that were assigned show some potentially troubling trends regarding consistency across evaluators, rates of opinions, and other areas, with one evaluator finding people competent at a rate disproportionate to others. We have requested to review the reports that were submitted; as of the date of this report, we have not been given copies of the reports, nor have we been provided a process by which to access them.

    f. Note also that even though some individuals were found competent by the examiner performing the reevaluation, those individuals remain on the waitlist until the court adjudicates them as competent. The individual's legal status governs inclusion on the waitlist, not an outstanding clinical opinion.

2. **Develop and begin implementation of the Plan (paragraphs 54-56): (Status: Not Met)**

    a. The Decree defines the "Plan" as "the strategic plan developed by Defendants, in consultation with Class Counsel and the Consultants, and approved by the Consultants…" (paragraph 30). Section VI outlines the components and obligations that must be contained within the Plan, and the components "must be approved by the Consultants" (paragraph 54). The Decree requires ODMHSAS to "develop and *begin to implement* the Plan's program components" within 90 days of entry of the Decree, which means the Plan should have been in place with implementation begun by June 8. The Plan, with the waitlist, is the foundation for implementation of the Decree.

    b. On June 6, as part of ODMHSAS's submission, we received several documents that we assume are meant to constitute the Plan. These include Exhibit C.1, a two-page document labeled "Consent Decree Plan"; Exhibit C.2, a separate document titled "Community-Based Competency Restoration Program"; and Exhibit C.3, a three-page document titled "Inpatient Competency Restoration Procedure."

    c. None of these documents, individually or as a whole, meet the requirements for development and implementation of the Plan required by the Decree. There is no discussion in any of the documents describing how they will "significantly reduce the length of time Class Members wait for Restoration Treatment" (paragraph 54). The documents may create a useful policy framework for ODMHSAS going forward, but a Plan requires the articulation of concrete goals, steps necessary to achieve those goals, timelines for doing so, responsible parties, and so forth. A plan of this nature should be comprehensive and cohesive with action steps, designated authorities tasked with specific

    responsibilities, deadlines, and markers of progress. ODMHSAS seems familiar with strategic planning. As an example, an undated document titled "Guidance for Developing the Community Strategic Plan" by ODMHSAS is a 23-page set of instructions to Regional Prevention Coordinators for the submission of Community Strategic Prevention Plans that ODMHSAS must approve[4]. The instructions require the submission of data, a logic model, planned project tasks, designation of those involved in the project tasks, and completion dates. However, none of these elements are in any of the documents submitted by ODMHSAS on June 6 and the failure to submit even the semblance of the required Plan fails to meet the "best efforts" standard.

3. **Develop and begin to implement a plan, approved by the Consultants, to achieve a material increase in new inpatient Forensic Beds dedicated solely to competency restoration (paragraph 62) (Status: Not Met)**

   a. The Decree requires a bed need analysis that includes the "number of new Forensic Beds to be added, and the timelines for bringing the new Forensic Beds on line, and should consider best practices for determining the reasonable number of new Forensic Beds to be maintained, *given the State of Oklahoma's population growth, crime rate, and the effect of the Plan's components* once the Plan has been developed and implemented" (paragraph 62, emphasis added).

   b. On March 21, 2025, as part of our First Request for Information, we asked for:

      i. Any existing methodology ODMHSAS uses to define or project inpatient capacity needs.

      ii. Any analysis done within the past three years regarding the cost of adding new inpatient beds.

      iii. Any information regarding past or present plans to contract for forensic beds in non-state facilities including any contracts for that purpose.

   c. We asked that this information be made available to us by April 7th. However, we have not yet received it. This makes it very difficult to evaluate any plan by ODMHSAS to expand beds.

   d. Exhibit E in the June 6 submission, a brief document titled "Inpatient Forensic Bed Expansion and Implementation Plan", notes an 80-bed expansion at the Oklahoma Forensic Center (hereafter, OFC) with transfer of patients to new pods expected by August 2025 and admission of new forensic patients by September 2025. The Exhibit also notes—but does not expand on—the pursuit of regionalized areas for inpatient placements, the identification of existing nursing homes or vacated structures, and research into the viability of utilizing a building in Fort Supply, OK.

---

[4] Oklahoma Department of Mental Health and Substance Abuse Services. (n.d.). *Guidance for Developing the Community Strategic Prevention Plan*. https://oklahoma.gov/content/dam/ok/en/odmhsas/documents/a0001/community-strategic-plan-guidance-022812.pdf

e. While the expansion of beds at OFC is a very welcome addition, Exhibit E does not constitute the plan for bed expansion required by the Decree. There is no analysis of the impact of population growth or crime rates, nor is there a description of precisely how many beds are needed for competency restoration exclusively. In addition, a plan for bed expansion might (and likely should) include strategies for engaging community hospitals in competency restoration; whether other state facilities can be used in competency restoration; and plans over time for reconfiguring OFC beds to meet estimated future civil and forensic demand. We have also not received a plan for how the new beds will be prioritized or filled, especially in light of likely hiring shortfalls and staff shortages for the new units. A plan to address future inpatient capacity need is a complex task that begins with an accurate number of people currently on the waitlist, as well as a comparison of that number to previous waitlist numbers, lengths of stay, numbers of restoration beds across settings, and projections of future demand. Information provided to date does not reflect a consideration of those different variables.

4. **Develop and begin to implement a plan to staff the Department with individuals tasked and qualified to: (i) oversee ODMHSAS's competency evaluation and restoration programs, (ii) gather, report, and analyze data on these programs, and (iii) support stakeholders with navigation of these programs (paragraph 77) (Status: Not Met)**

    a. In our March 21 request for information, we requested that by April 7 we receive "any staffing analysis that recommended or considered but did not recommend the creation of positions within the central office devoted exclusively or primarily to forensic issues." We did not receive a reply to this request.

    b. The June 6 submission from ODMHSAS includes, with no explanation, two organizational charts (one for Central Office and one for OFC) showing listed and vacant positions, with no explanation. These documents do not qualify as a plan meeting the requirements of the Decree.

    c. As part of our weekly meetings with the Department, we have repeatedly emphasized the need for the Department to identify a point person for oversight of the Consent Decree as well as the need to create a more robust forensic division within ODMHSAS. Meeting the requirements of the Consent Decree is a large undertaking, and we believe that more resources than currently present are needed to execute those demands to fidelity. Those resources may include additional personnel, reorganization of responsibilities, creation of a forensic division within ODMHSAS, more dogged and authoritative oversight, and additional funding. To date, despite the hard work of many personnel within the Department, we have not seen substantial progress in assigning a Consent Decree point person or creating plans to create a designated forensic division.

5. **Develop a "written triage screening protocol for Class Members…declared incompetent" with reasonable deadlines for screening, adoption of a screening protocol, establishment of triage levels for the expedited placement and treatment of Class Members, and adoption of qualification standards for those providing triage (paragraph 65) (Status: Partially Met).**
   a. In our March 21 request for information, we requested but have not received "any current triage protocols in use either in jails or at OFC."
   b. Exhibit G, titled "Triage and Expedited for Defendants Found Incompetent to Stand Trial", is a good start on meeting this requirement. It will be subject to discussion with Consultants before final approval, but it is tied to the requirements of the Decree. However, some important specifics are missing and will need to be added (e.g., who will actually perform the triage screening in various jails around the State, how the triage system will be centrally managed and monitored, etc.).

6. **Develop and begin to implement a plan to require all OFC and other staff involved in competency restoration to participate in 12 hours annually of continuing education on competency related topics (Status: Met).**
   a. We received a great deal of material on training on competency issues prior to the June 8 deadline. This includes material provided in April from Dr. Jason Beamon as well as supplemental material in the June 6 submission from ODMHSAS (which included new material from Dr. Beamon). These materials document who has been trained to date, the topics covered in the training, and many of the actual materials utilized in the training. Training is largely being conducted by Dr. Beamon.
   b. We will continue discussions with ODMHSAS regarding ongoing training and expanding the number of people who can provide it.

7. **After entry of the Decree, offer initial and periodic training to Oklahoma district court personnel, sheriffs, and members of the Oklahoma State Bar concerning competency evaluations and restoration (paragraph 78, also 79-80) (Status: Not Met)**
   a. To our knowledge, this training has not yet been offered.
   b. However, Exhibit F.2, titled "Community Competency Initiative," establishes a curriculum framework for meeting this requirement.
   c. In our March 21 request for information, we asked for any training materials and/or curriculum made available to the types of officials noted in paragraph 78, but we have not received such materials.
   d. We will work with ODMHSAS on planning for and implementing this provision.

8. **Develop and begin to implement a pilot in-jail restoration program at Tulsa County Jail meeting criteria specified in the Decree (paragraph 74) (Status: Not Met)**

   a. We met with the County Sheriff in Tulsa County during our April site visit and in our view, the possibility of at least a limited JBCR program is viable. However, it will involve significant negotiations to reach that outcome given past history between the Department and Tulsa County Jail personnel.

   b. Former Commissioner Allie Friesen reported that she subsequently had favorable conversations with the Sheriff regarding establishment of a program.

   c. In its June 6 submission, ODMHSAS stated "ODMHSAS Executive Leadership has engaged the Tulsa County Sheriff in conversations regarding establishing a competency restoration unit within the David L. Moss Justice Center. While the Sheriff is willing to discuss this plan, the Justice Center is not currently willing to move forward with finalizing plans as of June 2025."

   d. It is not clear from the June 6 submission when the referenced conversations occurred, who represented ODMHSAS in those conversations, and how the matter was left. However, the Decree is specific in its requirement that "best efforts" must have been used to have developed and begun implementation of a JBCR program by June 8, 2025. At a minimum, we believe that this requires sustained conversations regarding the specifics of a program, including dedicated space, whether the space must be reconfigured in some manner, program requirements that would be utilized, who would conduct the program, timelines and goals for moving individuals through the program, markers of progress, terms of a contract, and so forth. To date, this has not occurred.

9. **An additional requirement in the Decree, effective on its entry, is that competency evaluations must be submitted within 30 days of receipt of the order for evaluation by ODMHSAS (paragraph 67) (Status: Unknown)**

   a. We will be requesting information on compliance and/or lack of compliance with this provision.

   b. We will also be requesting information about plans for revising the definition of "Qualified Forensic Examiners," as required by the Consent Decree. Exhibit B.1., part of the June 6 ODMHSAS submission, is titled Approval and Oversight of Qualified Forensic Evaluators for Competency to Stand Trial and appears on its face to address the substantive criteria specified in Paragraph 31. This exhibit is subject to continuing discussions with Consultants.

10. **ODMHSAS is required to submit monthly reports no later than the 10th of each month to Consultants and Class Counsel, "accurately reporting the status of all Class Members then waiting for Restoration Treatment" (paragraph 82, 83). The Decree specifies a dozen elements that must be included in each report (Status: Not Met)**

    a. We received the first report from ODMHSAS on May 12. It contained fewer than one half of the required elements.

b. The second report was due on June 10, 2025. We received it on June 11 and it appears on first glance to incorporate most of the elements required by the Decree. We will review it in more detail shortly.

*Positive Factors within ODMHSAS*

While implementation of specific provisions of the Decree has been halting to date, there are several positive developments that can provide a foundation for accelerating progress. These include:

1. Governor Stitt has appointed Retired Rear Admiral Gregory Slavonic as Interim Commissioner, emphasizing Admiral Slavonic's business acumen. Admiral Slavonic also has vast experience in federal and state government and our initial discussions with him have been very good.

2. The new beds at OFC should provide new capacity enabling more rapid admissions of people on jail waitlists (see Recommendations below).

3. The Department, through Dr. Jason Beamon, is taking concrete steps to create a more assertive and engaged treatment culture at OFC so that patients are treated more efficiently with psychotropic medication and reevaluated more frequently. As noted in the section on recommendations below, it is essential that treatment move more quickly at OFC given that its currently reported length of stay is much higher than national averages.

4. The central office at ODMHSAS is assuming the responsibility for a statewide approach to forensic services, including data associated with implementing the Decree. This transition is not without difficulties, but should result in a systemic approach to forensic issues rather than a facility-driven approach. OFC will be an essential service provider, but administrative oversight of the forensic system will—as it should—be centralized.

5. Many people across ODMHSAS are talented and hard working. These include people who provide direct service as well as those in more hidden roles, such as administration, training, or data analysis. The critiques we raise in this interim report should not be confused with criticisms of specific people or their good intentions. However, as we have consistently stated, the Consent Decree calls for an overhaul of "business as usual," and it will require substantial change and expansion of the Department. No matter how talented and dedicated their current workforce may be, it is very unlikely that ODMHSAS will meet the conditions of the Consent Decree without significant changes.

*Strategies that Should be Adopted as Priorities*

The Decree exists to address the needs of a large population of individuals who have been found incompetent to stand trial, but who are instead languishing in jail while awaiting restoration services. Our tour of the Tulsa County and Oklahoma County jails showed scores of people, many apparently acutely psychotic, confined to jail cells for virtually the entire day. Such confinement cannot help but worsen their conditions, given the prevailing lack of treatment for those individuals.

We understand that the implementation of a Decree is complex, involves many factors, and requires assertive leadership. However, despite ODMHSAS's obligation to implement the Decree, its record in meeting court-imposed deadlines has lagged to date.

Consequently, we provide three priority recommendations that we believe are essential to accelerate progress from ODMHSAS, as well as to ultimately alleviate the suffering of individuals with acute psychosis who remain in county jails while they wait for competency restoration services. These recommendations align with requirements set forth in the Consent Decree, and in some cases provide tangible action steps to advance particular sections of the Consent Decree. We believe they should be adopted expeditiously, even as work continues on meeting the June 8 obligations.

1. *Appoint an individual with the responsibility and authority to oversee implementation of the Decree.* This recommendation aligns well with recently proposed Oklahoma legislation in which the Oklahoma Legislature specified the appointment of such an individual. Regardless of the eventual fate of that legislation, it is critical that an official of sufficient status, knowledge, skills, and a sense of urgency assumes overall responsibility for implementation of the Decree. To date, this has not happened, and the result is a seeming diffusion of responsibility across multiple people without overall coordination.

2. *Implement a triage process consistent with the Decree on an accelerated basis*. As noted, the triage process framework we received on June 6 appears to meet many of the Decree's requirements. However, ODMHSAS should identify as quickly as possible those Class Members who need immediate treatment and take steps to assure that they are prioritized for admission to OFC. Patients should be prioritized by utilizing a combination of clinical acuity and length of current wait times. The triage process should be tracked by individual, with the person(s) conducting triage identified, and with tracking of the recommendations from that process as well as outcomes and when those outcomes occurred. We will have additional recommendations in our full report in July, including a more aggressive use of involuntary medication, but immediately admitting the most acutely ill individuals is critical.

3. *Reduce the restoration length of stay at OFC.* A plan must be created and implemented in which the length of stay for competency restoration at OFC is reduced from its current 300+ days (the figure we have been given) to a length of stay of 90-110 days, consistent with national standards. We were recently informed that a reduction in the overall length of stay at OFC has occurred; we will investigate. However, an unnecessarily protracted length of stay takes beds offline that should be used for people with the most acute needs who are currently languishing in jail cells across Oklahoma. Unless length of stay at OFC is dramatically reduced, it is difficult to imagine the time Class Members spend on the waitlist being reduced significantly. An actionable plan to accomplish this needs to be created and implemented with specific deadlines as well as identifying which parties are responsible for assuring this occurs. We understand that the legal system is often reluctant to process cases in which a change of legal status is

recommended. However, that reluctance should not interfere with more assertive treatment.

## A Note on Process

The Decree requires ODMHSAS to meet requirements "in consultation with Class Counsel and Consultants" and also stipulates that virtually any actions proposed by ODMHSAS must be approved by the Consultants before implementation. It appears that there has been little consultation to date, particularly with Class Counsel. In response to our inquiry regarding how often Class Counsel had been in discussion with ODMHSAS regarding the various requirements of the Decree, we were told that there had only been one meeting, on June 5, with materials sent by ODMHSAS late on June 4. In addition, the materials we received on June 6 were—with few exceptions (primarily in the area of training)—the first time we saw anything associated with Decree requirements. ODMHSAS has been under immense pressure during the recently concluded legislative session, but we will provide suggestions on how the "consultation" requirement of the Decree can be made real.

## Summary

Progress in implementing the Decree to date has been halting to date. The policy statements submitted by ODMHSAS in response to various June 8 deadlines provide a good start for implementation of the Decree. However, those statements do not constitute a true Plan, and ODMHSAS needs to move rapidly and with urgency to create and implement the various plans required by the Decree. In our view, there is little evidence that steps taken to date have had a direct impact on the waitlist, though the triage process, new beds at OFC, and better tracking of data by the ODMHSAS Central Office should have a positive impact over time.

We will submit a full report in July 2025, expanding on this Interim Report and discussing the progress made between now and then under new ODMHSAS leadership.

Respectfully submitted
June 13, 2025