**Court Consultants**

*Briggs v Friesen, No 4:23-cv-00081-GKF-JFJ*

# September 2025 Status Report

John Petrila, JD, LLM

Neil Gowensmith, PhD

Darren Lish, MD

*Court Consultant Report September 2025*

September 26, 2025

Honorable Gregory K. Frizzell
Federal Building (Boulder Courthouse) – Courtroom 3
224 S. Boulder Ave.
Tulsa, OK 74103

Dear Judge Frizzell,

We submit this Report from the Court Consultants on the current status of *Briggs v Friesen*, Case No: 4:23-cv-00081-GKF-JFJ. This is our second Report. We submitted an Interim Report to you and the parties on June 13, 2025, because of various circumstances, including a change in leadership at the Oklahoma Department of Mental Health and Substance Abuse Services (ODMHSAS). Our Interim Report was submitted pursuant to our authority to "submit additional reports to the Parties regarding the Defendants' compliance, or lack thereof, with the provisions of this Consent Decree, or on any other matter the Consultants deem helpful to achieve the purposes" of the Decree (Decree, Par. 46).

Our Interim Report concluded that ODMHSAS had done little to comply with provisions of the Decree between its entry on March 10, 2025, and the date of our June 13 Interim Report. Defendants failed to meet all but two of the June 8 deadlines established by the Decree, including creation and implementation of the Strategic Plan (the cornerstone of the Decree), the reevaluation of Class Members, and the establishment of a jail-based competency restoration program in Tulsa.

Since the June 3, 2025, appointment of Retired Rear Admiral Gregory Slavonic by Governor Stitt, ODMHSAS has made progress in several important areas. These include bringing the Department into compliance with some of the Decree's mandates, introducing changes in the culture at the Oklahoma Forensic Center (OFC), and showing improvement (though there is still much work to do) in the Department's responsiveness to our requests for information and materials. These improvements are noted in this Report, and we credit Commissioner Slavonic and his staff for those efforts.

At the same time, our role is to report on compliance by ODMHSAS throughout the period of the Decree, not simply through periods of changes in leadership, however effective those changes may ultimately be. At the time of the submission of this Report, the Decree has been in effect for more than 6 months, and the overall progress of the Department, while improving, still lags considerably in its efforts to reduce the number of individuals waiting for restoration services and the length of time people wait in substandard conditions in jails, often untreated. In addition, the Department has long lacked credibility with many community stakeholders, including elected officials, because of a lack of responsiveness and a distrust of Department data, and so we note areas where further enjoining the Department on the validation of data, among other issues, is essential.

*Court Consultant Report September 2025*

In short, more than six months after the implementation of the Consent Decree, we still remain unsure about the number of people waiting in county jails for transfer to restoration services (the "waitlist") and how long those individuals are waiting prior to transfer. These data points are central to nearly every aspect of the Consent Decree, and confusion about their accuracy casts reasonable doubt as to the reliability and accuracy of more nuanced or sophisticated data that the Department reports.

Additionally, the Department submitted their Competency Restoration Plan on August 12 as required by the Consent Decree (but beyond the original June deadline). This Plan was marred by inconsistencies, inaccurate data, and questionable assertions throughout. While the Department has since acknowledged that the Plan contained inaccurate data, nevertheless, as an official, sanctioned product from the Department, we consider it in concert with other data and work products produced over the past six months. The inaccuracies in the Plan, as well as the limited information they provide about future actions to reach compliance with the Consent Decree, temper our optimism about the Department's progress both to date and going forward.

Given these challenges, as well as many others that are described in detail in this report and its appendices, we believe that ODMHSAS under Admiral Slavonic's leadership has devoted considerable effort to the Decree. However, despite this effort, in our view it has not used "Best Efforts" as defined by the Decree in a number of instances in their attempts to comply with the Consent Decree. Despite the change in culture and the evidence of overall improvement due to the leadership of Admiral Slavonic, we find the lack of Best Efforts to be Material Violations of the Consent Decree, and as such we list several recommendations for improved practice as well as additional Injunctive Relief.

While we offer no excuses for ODMHSAS, we also believe that the Department's administrative forensic service continues to operate with a shoestring staff and limited funding. Important changes have occurred, but the Department needs more resources, including a senior official in charge of the Decree with exclusive responsibility for its implementation, as well as the infusion of additional funding for staff salaries, new hires, and additional resources.

We are happy to answer any questions or provide additional information. This report is being made available to Class Counsel, ODMHSAS leadership, and the Oklahoma Attorney General, as an ex-officio signatory on the Decree.

Respectfully submitted,

John Petrila, JD, LLM
Neil Gowensmith, PhD
Darren Lish, MD

*Court Consultant Report September 2025*

## Table of Contents

Introduction ........................................................................................................................ 6

Historical perspectives, current status, and the role of the Court Consultants ....................................... 7

Overview of the Report ........................................................................................................ 9

(A) Consultant obligations and methods ................................................................................. 10

    *(A.1) Consultation and data collection on site and through other means* ................................... 11

(B) A brief overview of ODMHSAS Compliance Efforts from entry of the Decree until the time of this Report ................................................................................................................................ 13

    *(B.1) Entry of the Decree until the June Interim Report* ....................................................... 13

    *(B.2) The Appointment of Retired Rear Admiral Slavonic and Positive Factors within ODMHSAS* .............. 14

(C) Positive factors within ODMHSAS ..................................................................................... 16

    *(C.1) Leadership and staffing improvements* ....................................................................... 16

    *(C.2) Enhanced forensic services and treatment culture* ......................................................... 16

    *(C.3) Improved data systems and infrastructure* ................................................................. 17

(D) "Best Efforts" ............................................................................................................... 18

    *(D.1) Standard, defense, penalties for failure* ................................................................... 18

    *(D.2) Determining whether defendants have used "Best Efforts"* ............................................. 19

    *(D.3) Defining "reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines"* ................................................................................................. 20

(E) Our findings with respect to compliance or lack thereof with terms of the Decree ......................... 21

    *(E.1) The current number of Class Members waiting for restoration services and their average number of days waiting* ................................................................................................................. 21

    *(E.2) Findings with respect to compliance, or lack thereof, with specific deadlines within the Decree* ....... 25

    *(E.3) Develop and begin implementation of the Plan (Par. 54-56)* .......................................... 28

    *(E.4) Develop and begin to implement a plan, approved by the Consultants, to achieve a material increase in new inpatient Forensic Beds dedicated solely to competency restoration (Par. 62)* ............................. 32

    *(E.5) Develop and begin to implement a plan to staff the Department with individuals tasked and qualified to: (i) oversee ODMHSAS's competency evaluation and restoration programs, (ii) gather, report, and analyze data on these programs, and (iii) support stakeholders with navigation of these programs (Par. 77)* ................................................................................................................................. 35

    *(E.6) Develop a "written triage screening protocol for Class Members...declared incompetent" with reasonable deadlines for screening, adoption of a screening protocol, establishment of triage levels for the expedited placement and treatment of Class Members, and adoption of qualification standards for those providing triage (Par. 65)* ..................................................................................................... 37

    *(E.7) Develop and begin to implement a plan to require all OFC and other staff involved in competency restoration to participate in 12 hours annually of continuing education on competency related topics* ..... 39

*Court Consultant Report September 2025*

*(E.8) After entry of the Decree, offer initial and periodic training to Oklahoma district court personnel, sheriffs, and members of the Oklahoma State Bar concerning competency evaluations and restoration (Par. 78, also 79-80)*.................................................................................................................. *40*

*(E.9) Develop and begin to implement a pilot in-jail restoration program at Tulsa County Jail and one other county meeting criteria specified in the Decree (Par. 74)*........................................................ *41*

*(E.10) An additional requirement in the Decree, effective on its entry, is that competency evaluations must be submitted within 30 days of receipt of the order for evaluation by ODMHSAS (Par. 67)* ....................... *45*

*(E.11) ODMHSAS is required to submit monthly reports no later than the 10th of each month to Consultants and Class Counsel, "accurately reporting the status of all Class Members then waiting for Restoration Treatment" (Par. 82, 83)* ..................................................................................................................... *46*

*(E.12) ODMHSAS is required to "train, approve, and continuously monitor all Qualified Forensic Examiners conducting competence evaluations..." along with several other requirements related to the training and work of QFEs (Par. 31)* .......................................................................................................................... *47*

*(E.13) ODMHSAS is required to reevaluate all Class Members every 90 days after receiving the order for competency restoration (Par. 67)* .......................................................................................................... *50*

*(E.14) ODMHSAS is required to use Best Efforts to obtain passage of Oklahoma legislation that permits the Department to provide community-based outpatient competency restoration services (Par. 68)* ............. *52*

*(E.15) ODMHSAS is required to develop and begin to implement a plan for staffing at OFC and addressing environment of care for forensic facilities, which ensures that OFC remains in compliance with its current accrediting-body standards (Par. 67)* ........................................................................................................ *53*

**(F) Strategies that Should be Adopted as Priorities** ............................................................................. **57**

*(F.1) Appoint an individual with responsibility and authority to exclusively oversee implementation of the Decree* .................................................................................................................................................... *57*

*(F.2) Reduce the restoration length of stay (LOS) at OFC* ...................................................................... *57*

*(F.3) Increase bed capacity across the state* .......................................................................................... *59*

**Summary of Consultant Findings on Best Efforts** ................................................................................. **60**

**Summary** .............................................................................................................................................. **61**

**Court Consultant September 2025 Report Appendices** ......................................................................... **62**

*APPENDIX A: ODMHSAS Request for Extension; Class Counsel Memorandum in Opposition; Court Consultant Decision*.................................................................................................................................. *63*

*APPENDIX B: August 12th ODMHSAS Strategic Plan and Cover Letter; Court Consultant Response* ......... *75*

*APPENDIX C: Court Consultant Request for Information, March 21, 2025*.............................................. *98*

*APPENDIX D: Court Consultant Triage Memo; Department Proposed Triage Plan and Court Consultant Response* ............................................................................................................................................... *103*

*APPENDIX E: Resources Provided to ODMHSAS by Court Consultants to Date* ..................................... *109*

*APPENDIX F: Court Consultant Recommendations for Reducing the Length of Stay to Restoration at OFC, As an Example of Resources Provided by Court Consultants* ................................................................. *110*

*APPENDIX G: Court Consultant Recommendations for Additional Relief* .............................................. *115*

*APPENDIX H: Benchmarks to Mark Progress from mid-June through August* ......................................... *123*

*Court Consultant Report September 2025*

## Introduction

This is a Report to the Court from the Court Consultants (hereafter, Consultants) in *Briggs v. Friesen and Moran*, Case No: 23-cv-81-GKF-JFJ, in the United States District Court for the Northern District of Oklahoma. The Consultants are Neil Gowensmith, Ph.D., Darren Lish, M.D., and John Petrila, J.D., LL.M., who were appointed by the Court and agreed to by the parties (Par. 29, 37, Consent Decree, hereafter, Decree). In addition to the Honorable Gregory K. Frizzell, this report is being made available to Class Counsel, ODMHSAS, and the Oklahoma Office of the Attorney General.

At its heart, this case is about the suffering of hundreds of individuals in county jails waiting for restoration treatment after being found incompetent to stand trial. Many of these individuals are acutely psychotic. They are confined to jail while they await access to care in often inhumane conditions, spending much of their days in small cells without treatment, in circumstances that exacerbate their mental illnesses while increasing the risk of suicide, self-harm, and victimization. When finally admitted to care, they have historically been subject to treatment that lacks urgency, and when finally restored to competency, they often encounter further delays because the legal system is slow to adjudicate their changed status.

The Decree entered on March 10, 2025, is designed to end this suffering by assuring quick access to competency restoration treatment, an improved workforce, and a systemic approach to forensic care, all driven by data that is valid and collected, maintained, and analyzed with integrity.

While progress has been made, particularly since the appointment of Retired Rear Admiral Gregory Slavonic as Interim Commissioner of ODMHSAS, there is still a long way to go. As our report makes clear, there are persistent and significant issues with the Strategic Plan submitted by ODMHSAS on August 12. In addition, more than six months into the Decree, we continue to receive conflicting information from ODMHSAS regarding several important data points and deliverables. These problems lead us to request the Court to impose further injunctive relief, as detailed below.

We believe that important changes have occurred within ODMHSAS, including substantive changes in key leadership positions and a subsequent shift to a more transparent and accountable culture. As such, some progress has been made towards compliance with the Consent Decree. However, the progress needs to be accelerated and must build on the good foundation that has been created since Interim Commissioner Slavonic's appointment.

*Court Consultant Report September 2025*

## Historical perspectives, current status, and the role of the Court Consultants

It is impossible to write a report about the Department's progress on Consent Decree requirements without acknowledging the context that surrounds it. For many years, ODMHSAS was beset with poor leadership, poor results, and a culture described by some as toxic. We will not provide a litany of those missteps here; we believe the unprecedented legislative removal of the previous commissioner and the entry of the current Consent Decree speak for themselves regarding the level of perceived historical dysfunction within the Department.

The Consent Decree was entered on March 10, 2025, after years of formal complaints and litigation. The Department was not caught off guard by the entry of the Consent Decree or its requirements. It could have (and should have) made strong efforts to restructure and overhaul their services to align with the mission of the Consent Decree long before March 2025. From the information we have gathered, ODMHSAS chose not to make those efforts.

That historical stance has since manifested into deep, continued mistrust from many stakeholders about the Department's current and future willingness, commitment, and ability to make the changes necessary to comply with the current Consent Decree.[1] It is fair to say that as a result, in most respects regarding the Consent Decree's many requirements, ODMHSAS is metaphorically starting from square one. This makes change very, very difficult – as well as protracted.

We believe Commissioner Slavonic and his colleague John Settle have been transparent in their work to date. We believe they are instilling a departmental culture that represents those same values. The staff at the ODMHSAS central office appear to be working hard, and they are beginning to produce some tangible improvements that are both aligned with Consent Decree requirements and long overdue.

Nevertheless, the Consent Decree includes multiple mandates that must be accomplished within specific, fixed timeframes, regardless of the cultural integrity of departmental leadership. Compliance with the Consent Decree will indeed be challenging. And to be frank, to date, ODMHSAS has not met most of the Decree's mandates or time frames. We say this not to "pile on" to the poor work and outcomes of previous ODMHSAS iterations or to further continue

---

[1] For example, as recently as September 3, 2025, a judge found a defendant who was charged in the killing of an Oklahoma County Deputy unfit to stand trial because the two year limit on holding someone as incompetent had expired; the judge criticized ODMHSAS and the Oklahoma Forensic Center for not using forced medication (which is permitted under Oklahoma law) but rather letting the two years lapse without more intensive treatment despite court orders permitting medication to be administered.
https://www.news9.com/story/68b757bbbcf2985e165dccd7/judge-decides-man-charged-with-murder-of-oklahoma-county-deputy-cannot-continue-competency-restoration;
https://www.koco.com/article/oklahoma-deputy-family-demands-change-suspect-deemed-unfit/65973951
This lack of urgency in treatment has been a core issue at OFC for years, has caused enormous credibility issues with legal officials, and is something that must change, as current ODMHSAS leadership recognizes.

*Court Consultant Report September 2025*

historical perspectives of ODMHSAS as being ineffectual or misleading. However, the simple reality is that most Consent Decree mandates and time frames have not yet been met; as we note below, on some key mandates, there has been virtually no progress to date.

One of our tasks as Court Consultants is to monitor progress and report it to the Court. We have attempted to monitor and report dispassionately, relying only upon the factual information that we have observed, received, and analyzed. We strive for neutrality and objectivity, we seek multiple sources of information, we rely on factual information and data, and we offer perspectives and recommendations that we believe anyone else presented with the same information would provide.

In this spirit, we have attempted to understand but distance ourselves from the troubling history of ODMHSAS, including the recently concluded legislative session. We retain a healthy skepticism regarding the validity of historical departmental data, while also retaining a cautious optimism about changes that are being made by the current administration. We strive to present all of the information we have gathered so far, as well as our opinions and recommendations, fairly and objectively.

This Report therefore reviews the Consent Decree's requirements comprehensively and in great detail. We present the Department's progress, outcomes, successes, barriers, and shortcomings throughout. We also include an in-depth discussion and our opinions regarding "Best Efforts," a provision and term that has special importance in the Consent Decree. Finally, we offer recommendations for future action and potential remedies for areas that have not met the Consent Decree requirements.

*Court Consultant Report September 2025*

## Overview of the Report

Our Report contains the following sections:

- A summary of our formal obligations as Court Consultants and our methods;
- A brief overview of the history of ODMHSAS compliance efforts;
- A brief overview of positive factors within ODMHSAS;
- A discussion of "Best Efforts," its definition in the Decree, and the factors we considered in applying it to the Department's efforts to date;
- Our findings with respect to compliance or lack thereof with terms of the Decree, including the current status of products and obligations required by June 8, 2025, subsequent deadlines, and ongoing Department obligations, as well as responsiveness to requests by Court Consultants for information and materials and collaboration with Class Counsel. We organize much of this discussion around the "Best Efforts" requirement;
- Strategies that should be adopted as urgent priorities to alleviate the suffering of individuals suffering from acute psychosis in county jails while they wait for competency restoration services, with a particular focus on the need to transform clinical care within ODMHSAS and at the Oklahoma Forensic Center in particular; and,
- Recommendations for further injunctive and other relief are discussed throughout the Report and *Appendix H* contains a list of those recommendations.

*Court Consultant Report September 2025*

## (A) Consultant obligations and methods

*Consultants' duties* (Par. 38) are to:

- Investigate, monitor, and make findings with respect to Defendants' compliance with the terms of the Decree;
- Report the status of Defendants' compliance or progress (or lack thereof) to the Court and Parties;
- Advise, recommend, and facilitate methods to the Oklahoma Department of Mental Health and Substance Abuse Services (hereafter, Department or ODMHSAS) regarding plans and practices for improving the delivery of competency evaluations and Restoration Treatment to Class Members, including the short-term and long-term compliance with the Restoration Treatment timeframes (in the Decree); and,
- Serve as mediators for disputes between the Parties regarding any aspect of the Decree.

Consultants are charged with the submission of "Bi-Annual Reports" to the Parties twice every calendar year (Par. 32, 45). While this is the first *full* report we have submitted, covering every provision of the Decree, it is our second report of 2025. We chose to submit an Interim Report to the Court and parties on June 13, 2025, under our authority to submit additional reports as we find necessary (Par. 46). We prepared an Interim Report because of myriad events affecting the ability of ODMHSAS to come into compliance with the Decree, including:

- The appointment by Governor Stitt of Retired Rear Admiral Gregory Slavonic as Interim Commissioner in June 2025;
- Legislation enacted in the recently ended Oklahoma legislative session, including HB 2785, which creates fiscal controls over ODMHSAS, and HB 2513, which required ODMHSAS to designate an individual "specifically to implement the requirements" of the Decree (the latter vetoed by Governor Stitt);
- Reports of suicides at the Oklahoma County Jail that far exceeded the state average. Individuals with acute mental illnesses in close confinement are at enhanced risk for suicide and other serious harms; in our view, based on a visit to the Jail, conditions for people with mental illnesses were terrible and presented a continuing risk of self-harm;[2]

---

[2] There were seven suicides in the Oklahoma County Jail from January 2025 through June 2025: Patterson, M. (2025, June 5). *As new facility remains unfunded, Oklahoma County Jail deaths on pace to match worst year*. NonDoc. https://nondoc.com/2025/06/02/as-new-facility-remains-unfunded-oklahoma-county-jail-deaths-on-pace-to-match-worst-year/. For a discussion of mental illness and suicide in correctional settings, see: Folk, J. B., Loya, J. M., Alexoudis, E. A., Tangney, J. P., Wilson, J. S., & Barboza, S. E. (2018). Differences between inmates who attempt suicide and who die by suicide: Staff-identified psychological and treatment-related risk factors. *Psychological Services*, *15*(3), 349–356. https://doi.org/10.1037/ser0000228.

*Court Consultant Report September 2025*

- Recent court cases, which have continued, in which ODMHSAS was fined by state judges for failures to act in a timely manner in competency cases and, in other cases, required to submit to show cause orders in multiple jurisdictions;[3]
- Continued confusion regarding the number of Class Members in custody waiting for competency restoration services;
- A sharp increase in the number of court-ordered competence evaluations; and,
- The Consent Decree requirement that ODMHSAS reevaluate every defendant either receiving or awaiting competence restoration services.

Some of the issues that gave rise to our Interim Report, particularly the concern among elected District Attorneys and Public Defenders regarding the timeliness and quality of ODMHSAS evaluations, as well as the validity of data produced by ODMHSAS, have not abated. We refer to those issues as appropriate below.

## (A.1) Consultation and data collection on site and through other means

We conducted a three-day site visit to Oklahoma in April, meeting with Department representatives, visiting the Oklahoma and Tulsa County jails, and touring the Oklahoma Forensic Center (OFC) in Vinita. That visit is described in our Interim Report.

We conducted a follow-up site visit to Oklahoma from June 30 to July 2. During that visit, we met with the Public Defenders and District Attorneys from Oklahoma and Tulsa Counties; met with Department staff to go over how waitlist data is gathered; spent a day at OFC in Vinita with administrative and clinical leadership and reviewed clinical records; visited with staff, in conjunction with Commissioner Slavonic and clinical leadership, at Griffin Hospital; and met with Class Counsel. We also met with leadership at the Oklahoma Healthy Minds Policy Initiative, an organization that could provide policy support to the Department as both parties would deem appropriate.

In addition, we have continued to conduct:

- Weekly videoconference meetings with full representation from Department personnel;
- Various smaller meetings with specific Department personnel for targeted purposes (e.g., data reviews, discussions regarding competence trainings);

---

[3] The Frontier. (2025, June). *'Total freefall': Oklahoma faces deadline to fix broken mental health system as long wait times persist.* https://www.readfrontier.org/stories/total-freefall-oklahoma-faces-deadline-to-fix-broken-mental-health-system-as-long-wait-times-persist/. See also the case discussed in footnote 1.

*Court Consultant Report September 2025*

- Multiple emails and other correspondence, including our production of suggested resources, contacts, and literature on competence evaluation, triage, projected beds analysis, restoration, and training; and,
- A zoom call with the Tulsa County judge responsible for administration of a competency docket, which has consolidated cases involving competency adjudications in Tulsa County and which represents a salutary development within the judiciary. We have been invited to observe this docket, which we will do remotely in the future.

The information provided in the current full report stems from these various sources, as well as data and other information produced by the Department, legislative actions, media coverage, broader data and information from external competency-related sources, and our own experience and expertise in competency-related matters.[4]

In our advisory role, we also have offered multiple resources to the Department, captured in *Appendix E*. We have included one example, a memo titled, "Recommendations for Reducing the Length of Stay to Restoration at OFC" as *Appendix F.* This example is a fair representation of the types of information and resources we have provided the Department.

We note that the Decree requires ODMHSAS to meet requirements "in consultation with Class Counsel and Consultants" and also stipulates that virtually any actions proposed by ODMHSAS must be approved by the Consultants before implementation. While consultation with Court Consultants has increased, Class Counsel report that there has been little contact with them since the entry of the Consent Decree.

---

[4] We also conducted a site visit between September 17-19, 2025, during which we met with administrators and staff from the Central Office and OFC. The timing of the submission of this report precludes inclusion of information from those meetings. Nevertheless, we view those meetings and visits as just the most recent set in a series of ongoing in-person and remote consultations. Our determinations of Best Efforts and our subsequent recommendations were unchanged after this most recent site visit. We can update the Court as to the quality and content of these recent meetings and visits as requested.

*Court Consultant Report September 2025*

## (B) A brief overview of ODMHSAS Compliance Efforts from entry of the Decree until the time of this Report

### (B.1) Entry of the Decree until the June Interim Report

From entry of the Decree on March 10, 2025, until our Interim Report of June 13, 2025, ODMHSAS did little to come into compliance with the Decree. We perceived no sense of urgency, received virtually no requests for information or consultation despite repeated offers to make information available in our emails and in weekly meetings with the Department, and received no information in advance of the June 8 deadlines imposed by the Decree. In addition, we were told by reliable sources that Department staff had been directed to not meet with us without Counsel present and that staff were constrained in their ability to prepare information relevant to our work.

As our Interim Report discussed in detail, when we finally did receive materials purportedly in response to the June 8 Decree imposed deadlines, they fell far short of what the Decree required, in all but two categories. Specifically,

- There was nothing resembling the Strategic Plan required by the Decree, and which is to serve as the foundation of the entire compliance process (Par. 54-56);
- All Class Members awaiting restoration services had not been reevaluated (Par. 57);
- The bed need analysis required to project the necessary number of forensic beds had not been started (Par. 62);
- The required plan to adequately staff OFC to assure its continued compliance with accreditation standards had not been prepared (Par. 63);
- The required plan to adequately staff the ODMHSAS central office forensic unit had not been prepared (Par. 77);
- Work to develop a jail-based competency restoration program at the Tulsa County Jail had not begun, despite a representation in the Department's response that conversations had occurred (Par. 74, see below for more detailed discussion); and,
- Training for legal officials was not in place (Par. 78-80).

The only June 8 deadlines that were met were for training of forensic staff (Par. 64, met) and creation of a triage process for those awaiting restoration services (Par. 65, partially met).

In addition, other recurrent requirements either had not been met or we could not determine whether they were being met. These included:

- The requirement that the Department prepare a monthly status report on Class Members to be submitted to Court Consultants and Class Counsel no later than the 10th of each month (Par. 82, 83) was not met at the time of our Interim Report. Many elements were missing from the monthly report, and were not fully included until the most recent August report;

*Court Consultant Report September 2025*

- The requirement that all competency evaluations be conducted within 30 days of receipt of the order (Par. 67, unknown at the time of our Interim Report, but based on conversations with legal officials and review of Department documents, unlikely to have been met since entry of the Decree despite assurances from the Department that they have now reached compliance with this requirement[5]);
- The development of standards and policies for Qualified Forensic Examiners (QFE) (Par. 31) had not begun, though there has been progress since late July, which we discuss below; and,
- The requirement to develop various materials in collaboration with Class Counsel and Court Consultants (partially met since July with Court Consultants, but not met with Class Counsel, with whom ODMHSAS has had little contact until very recently with no consultation on key elements of the Decree such as the Plan).

Finally, exactly how many people were on the waitlist (in jail waiting for competency restoration services), how long they waited, and the composition of Class Members was – and continues to be, even now – a source of confusion and changing numbers. This is the most basic and fundamental data point relevant to the Consent Decree. Virtually every requirement of the Consent Decree is based on the number of people in jails waiting for transfer to restoration services, as well as how long they wait before transfer occurs. At this late date, questions about these fundamental data points persist. Although the Department's current waitlist data appears much more reliable, we have not yet had an opportunity to independently verify it – a necessary task that will definitively confirm its accuracy. The confirmation of this data is critical, given the historical inaccuracy of these fundamental data points as well as its foundational importance in the Consent Decree.

In short, as we discuss in more detail below, nothing the Department did from March through June met the "Best Efforts" standard.

## (B.2) The Appointment of Retired Rear Admiral Slavonic and Positive Factors within ODMHSAS

Governor Stitt announced his appointment of Retired Rear Admiral Gregory Slavonic as Interim Commissioner on June 3, 2025. We met with Commissioner Slavonic through a Zoom call shortly after, without staff, and he assured us of his cooperation and openness. He soon brought in Mr. John Settle, a very experienced attorney, as his counsel, and Mr. Settle has served as our primary source of contact since then. At the same time, Admiral Slavonic has continued to be available as necessary.

---

[5] At p. 3 of the August 12 Plan submitted by ODMHSAS, the following statement is made: "The Department is now assigning initial competency evaluations within one (1) business day of receipt of all documentation from the court. *Evaluators are then conducting the evaluations and returning reports to the court within the remaining number of days to the total required thirty (30) day evaluation requirement of the decree*". (emphasis supplied). Given conversations with legal officials and a review of some Departmental data, we question the accuracy of this assertion.

*Court Consultant Report September 2025*

On June 27, 2025, the Department asked for an extension of the June 8 deadline which Class Counsel opposed, and we denied.[6] We did accede to the Department's request to put off our report from late July to September to give the Department the opportunity to show evidence of its progress regarding the Decree. The Department imposed an August 12 deadline on itself for producing and implementing the Strategic Plan that the Decree requires. In addition, Court Consultants imposed several internal deadlines in an email on June 19 for the Department to meet as benchmarks to assure progress on several items and that those items were developed collaboratively. The request for extension and various deadlines and requests for material is discussed in more detail below. The request for extension, Class Counsel response in opposition, and Court Consultants' decision are attached as *Appendix A***.**

As discussed below, we received a significant amount of material on August 12 from the Department, characterized by the Department as its Strategic Plan. We provided ODMHSAS with a preliminary reply and questions on August 21 (the Plan and our response are attached as *Appendix B*). As discussed below, we believe the Plan has some good elements, but it is more of an assertion of past accomplishments and proposed policies than an actual Strategic Plan. Also, as discussed in detail below, the Plan contains data that conflicts with other ODMHSAS data we have received, is internally contradictory on core issues, and makes assertions about compliance with the Decree that we believe are overstated. The creation and submission of such a problematic Plan indicated that despite the important leadership changes that have occurred, serious organizational issues continue to persist.

Overall, we believe that Commissioner Slavonic's leadership has created a new tone within ODMHSAS. Staff appear to have been relieved of constraints that had prevented them from working on the Decree and providing information to Court Consultants, various products are being produced, and there has been a willingness to take on essential steps such as changing clinical leadership at OFC. At the same time, ODMHSAS is far behind in its efforts to comply with the Decree, principally but not only because little, if any, work was done between March and June. The submission of the problematic Plan in August indicates that the serious organizational disarray that has existed within ODMHSAS for years runs deep, and it will continue to take intensive, focused effort to fix it. As we point out in more detail below, we believe ODMHSAS is still understaffed relative to the demands of the Decree and that its work needs to be greatly accelerated. There are also continuing issues with data validity, and we discuss those and a potential remedy below as well.

---

[6] In its August 12, 2025, Letter Updating Progress, ODMHSAS said that the "Department's new leadership respectfully requested and received a six (6) week extension…to be allowed to come into compliance with the initial June 8, 2025, mandates of the Consent Decree." In fact, we noted in our July 8 response that "we cannot retroactively absolve the Department for its lack of significant efforts between March 10 and early June. Delays in meeting deadlines within that time period were not caused by factors outside of DMH's control and in fact, we were assured regularly that the June 8 deadlines would be met."

*Court Consultant Report September 2025*

## (C) Positive factors within ODMHSAS

The Department has made notable strides toward improving its operations and addressing the requirements of the Consent Decree. Below is a brief summary of key positive developments that provide a foundation for accelerating progress:

## (C.1) Leadership and staffing improvements

ODMHSAS has undertaken significant leadership and staffing changes to enhance organizational effectiveness:

**(C.1.a) New Leadership Appointments.** As described above, Governor Stitt's appointment of Retired Rear Admiral Gregory Slavonic as Interim Commissioner brings strong business acumen and extensive federal and state government experience to this position. Commissioner Slavonic subsequently appointed Mr. John Settle as counsel for the Defendants, and Mr. Settle has since taken responsibility for the Departmental oversight of the Consent Decree. Our interactions with both Admiral Slavonic and Mr. Settle indicate a potentially promising direction for ODMHSAS leadership. In addition, the Oklahoma Forensic Center (OFC) recently named Holly Webb as the new Executive Director of the facility, and we are encouraged by the potential improvements at OFC as a result.

**(C.1.b) Strategic Personnel Changes.** The Department has removed underperforming staff and reassigned key personnel to optimize roles. Notable actions include elevating Dr. Clayton Morris to the role of Chief Medical Officer for the Department. The Department is also making a sustained effort to put capable and transformative providers at OFC in positions of clinical leadership. These changes reflect a commitment to building a capable leadership team.

**(C.1.c) Engaged Central Office Leadership.** Commissioner Slavonic and John Settle appear committed to bringing the Department into compliance with the Decree, and they are fostering a proactive and accountable culture.

## (C.2) Enhanced forensic services and treatment culture

ODMHSAS is taking steps to improve forensic services and treatment efficiency, particularly at OFC. This appears to have resulted in an overall reduction in time spent waiting for restoration treatment (though we find the data we receive to be better, we continue to be uncomfortable concluding that the data are entirely accurate; while the data may be improved, it has not yet been independently verified for accuracy).

**(C.2.a) Increased Bed Capacity.** OFC is poised to open 80 new psychiatric beds in the months ahead, assuming availability of staffing, and the Department has signaled the possibility of

*Court Consultant Report September 2025*

utilizing up to 30 beds at Griffin Memorial Hospital. These new beds, if opened, will expand treatment capacity and will enable faster admissions for individuals on jail waitlists.

**(C.2.b) Assertive Treatment Culture.** With the recent addition of an external psychiatric consultant, OFC is poised to foster a more proactive treatment environment, as recommended by the Court Consultants, which should include more assertive use of psychotropic medications, quality assurance reviews, and more frequent patient reevaluations. These efforts, if implemented, should reduce average lengths of stay, which currently significantly exceed national averages.

## (C.3) Improved data systems and infrastructure

The department has made significant progress in developing robust data systems:

**(C.3.a) Enhanced Data Infrastructure.** ODMHSAS is building a strong data system framework, which is a marked improvement from previous capabilities. While data quality remains a significant challenge, this infrastructure should provide a solid foundation for tracking and managing forensic services and Consent Decree compliance.

**(C.3.b) Centralized Oversight.** The Central Office is transitioning to a statewide approach for forensic services. This centralization aims to improve systemic coordination and data-driven decision-making.

These positive developments position ODMHSAS to make meaningful progress toward Consent Decree compliance. However, sustained effort and significant operational overhaul and an infusion of resources are essential to fully address the Decree's requirements and improve outcomes for individuals served by the Department.

*Court Consultant Report September 2025*

## (D) "Best Efforts"

The Decree requires ODMHSAS to use "Best Efforts" (Par. 18). As Court Consultants, we are to determine whether in fact the Department is meeting that standard. We discuss this requirement in detail because of its importance in assuring compliance but also because a failure to use "Best Efforts" constitutes a "material violation" and can trigger additional penalties and remedies.

## (D.1) Standard, defense, penalties for failure

The Decree obligates ODMHSAS to use "Best Efforts" in implementation of the Decree which means "taking reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines to accomplish or bring about the intended and described result" (Par. 18).

In addition to generally obligating ODMHSAS to use "Best Efforts," the Decree also imposes the "Best Efforts" standard for several discrete activities, including:

- Preparation and implementation of the Plan (Par. 54);
- Granting Consultants reasonable access to all Department records, data, personnel, contractors, designees and competency restoration facilities necessary to perform the Consultants' duties (Par 47);
- Reevaluation of Class Members within 10 days based on good faith belief a Class Member has been restored to competency in jail (Par. 61);
- Obtaining passage of Oklahoma legislation permitting outpatient competency restoration (Par. 68);
- Developing and implementing an alternative to Tulsa for a pilot in-jail restoration program if "Best Efforts" do not result in a Tulsa pilot (Par. 76); and,
- Providing all Class Members with timely and appropriate restoration treatment in accordance with the Decree (Par. 85).

*Any* failure to use Best Efforts in *any* plans or methods implemented by ODMHSAS to comply with the Decree constitutes a Material Violation (Par. 28, emphasis added). Isolated, non-substantive, or immaterial deviations from the terms of the Decree do not constitute a Material Violation, provided the Department:

- Can demonstrate that Defendants have implemented a system or systems of assuring compliance and for taking corrective measures in response to instances of non-compliance, and
- Has instituted policies, practices, and resources that are capable of durable and sustained compliance (Par. 28).

*Court Consultant Report September 2025*

A lack of legislative funding is not "an excuse for a failure to use Best Efforts" absent a showing that:

- The Department used good faith efforts to obtain the needed legislative funding;
- Separate and apart from the claimed funding deficiency, the Department otherwise took reasonable steps, actions, and measures, consistent with best professional standards, practices and guidelines to bring about the intended and described result; and,
- The lack of legislative funding must outweigh collectively all other causes of a failure of Best Efforts (Par. 18).

While we note this provision regarding legislative funding, it has not been raised as a factor in this case.

On a finding by the Court that Defendants have committed a Material Violation, the Court "may order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" to address the Violations (Par. 100). Any damages imposed for Material Violations do not count against the cap on damages otherwise in effect (Par. 92h).

## (D.2) Determining whether defendants have used "Best Efforts"

Court Consultants are authorized to "monitor, investigate and make findings regarding the Department's efforts to attain compliance with this Consent Decree's terms, including whether the Department has used Best Efforts to implement the Plan" (Par. 45). In considering whether best efforts have been used, we have considered four additional, discrete questions:

- Have the Defendants used "Best Efforts" by taking "reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines" to respond to deadlines imposed by the Decree?
- Have the Defendants used "Best Efforts" by taking "reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines" to respond to requests for information from the Court Consultants as well as meet interim deadlines for work established by the Consultants?
- Have the Defendants used "Best Efforts" by taking "reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines" to meet other Decree requirements without specified deadlines?
- Have the Defendants used "Best Efforts" by taking "reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines" to meet self-imposed deadlines?

*Court Consultant Report September 2025*

## (D.3) Defining "reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines"

The Decree does not define "reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines." However, we believe it includes at least the following:

- Creating and implementing workplans to meet deadlines with schedules and interim steps, assigning responsible parties, and proposing outcomes and measures of success as well as advising and collaborating with Consultants and Class Counsel regarding these plans;
- Making significant, consistent, and evident progress toward meeting Decree-imposed deadlines as well as advising Consultants and Class Counsel when progress is not being made, whether there are barriers to progress, and what plans are implemented to overcome those barriers;
- Meeting deadlines imposed by the Decree as well as interim deadlines created by Consultants as steps toward complying with the Decree;
- Providing transparency in communications with Consultants and Class Counsel including responding in a timely fashion to emails from Consultants, providing information when requested by Consultants (see Par. 47), and collaborating with Class Counsel;
- Displaying a sense of urgency in complying with the Decree; and,
- Seeking external information about professional standards, practices and guidelines when the information is not held within ODMHSAS as well as incorporating that information as appropriate.

ODMHSAS's record has improved considerably since Governor Stitt appointed Admiral Slavonic Interim Commissioner, and we note those improvements throughout this Report. However, while ODMHSAS is acting in good faith in our view, there is a long way to go before it can be said that ODMHSAS is using Best Efforts in every area needed to comply with the Decree.

*Court Consultant Report September 2025*

## (E) Our findings with respect to compliance or lack thereof with terms of the Decree

We now discuss ODMHSAS's adherence to specific provisions of the Decree, including whether "Best Efforts" have been used, relying on the definition we provide above. We note those areas where we do not believe the "Best Efforts" standard has been met, and we suggest potential remedies for each.

## (E.1) The current number of Class Members waiting for restoration services and their average number of days waiting

*(September 23 status: Still outstanding)*

Any discussion of the Decree and ODMHSAS efforts must begin with the most basic questions: how many people are in the Class, and how long have they been waiting for Restoration Services to begin? Unfortunately, more than six months into the Decree, the answers to these basic questions remain uncertain. And because of this, and as discussed in more detail below, we question whether ODMHSAS has used Best Efforts on this core issue.

The Decree defines the Class as:

> All persons who are now, or will be in the future, charged with a crime in Oklahoma State court and are: (i) declared incompetent to stand trial by the state court; (ii) court-ordered to receive competency restoration services by the Department or its designees; (iii) incarcerated in a county jail or similar detention facility while their criminal cases are stayed; and (iv) awaiting court-ordered competency restoration services to be provided by the Department or its designees, *whether or not placed on a competency waitlist maintained by the Department or its designees* (Par. 16, emphasis supplied).

As our Interim Report noted, we had a great deal of difficulty knowing how many people were in custody awaiting restoration services. In the first few months after entry of the Decree, we received various documents with figures ranging from 130 to 250. For at least two months, many people in custody waiting for restoration services at OFC were not included in any documents we received, which inappropriately reduced both the overall number and our ability to understand the data we (and others) were provided.

- Based on the information we had at the time of our Interim Report, we believed that at the end of May 2025 there were approximately 180 Class Members in custody waiting for restoration services.

*Court Consultant Report September 2025*

- Based on data we received for our weekly calls with ODMHSAS, the waitlist was reported as:
  - June 4: 170
  - June 11: 165
  - June 18: 157
  - June 25: 155
  - July 9: 153
  - July 16: 146
  - July 23: 136
  - July 30: 139
  - August 6: 141
  - August 13: 146
  - August 20: 164
  - August 27: 164
  - September 3: 165
  - September 10: 171

Reported average length of stay (LOS; the number of days a Class Member waits in a county jail before being transferred to another location to begin restoration services) has ranged from 215 days (June 4) to 95 days (September 10). However, we were told at a recent meeting that the manner in which LOS was calculated had been incorrect and had been changed; we are unsure of how LOS is being calculated currently, and we are waiting on a "data dictionary" from the Department defining and explaining each element of data captured in its forensic portal. This has been repeatedly requested.

While we believed the numbers we were receiving had grown more reliable, based on an in person briefing during our June site visit and some consistency in waitlist numbers from July to September, the August 12, 2025, Strategic Plan we received raised new and serious doubts regarding the validity of the data we are provided. The Plan and our response to the Plan is attached as *Appendix B* and contains a discussion of the waitlist data (additionally, we review the Plan in detail in a later section of this report on page 75. However, several points are worth noting as part of this narrative.

Specifically, on page 9 of the August 12 submission, the following statements were made:

> "As of August 2025, *the waitlist has been reduced to 105 individuals*, a drop of over 50% from its peak. *No individuals are waiting longer than 6 months for admission*...The average wait time for a court's restoration order to the start of treatment is now approximately sixty (60) days, down from an estimated eight to ten (8-10) months in 2023" (emphasis supplied).

*Court Consultant Report September 2025*

Note that this August 12 statement that the waitlist had been reduced to 105 people was submitted to us *the same day* that we were told at our weekly meeting with ODMHSAS that the waitlist was at 146. Also, note that the August 12 submission stated *unequivocally* that the average LOS was now "approximately 60 days," the same day we received information for our weekly call that the average LOS was 156 days.

Additionally, *Appendix 3* to the same August 12 Strategic Plan included several internal inconsistencies regarding the waitlist numbers. ODMHSAS has subsequently advised that some of the numbers in the submitted Plan were incorrect. However, the Plan was submitted as an official document, and it recited numbers at odds with other data received from the Department. These inconsistencies leave us concerned about the ultimate accuracy of the Department's waitlist data.

Moreover, ODMHSAS now provides a monthly report as required by the Consent Decree that lists a host of variables and data items related to the competency system. When we manipulated a recent master spreadsheet that ostensibly listed everyone in the Oklahoma competency system (August 8), we calculated that number of people waiting in Oklahoma county jails awaiting transfer to a restoration setting to begin restoration at 187 (those persons listed as in custody in a county jail and categorized as "Treat to Competency"). This number is clearly different than the two figures reported in the ODMHSAS Plan, and it differs from the waitlist number provided to us in our weekly meetings.

Do we know what the actual number of people on the waitlist is and what their average length of stay is? The short answer is that, of September 15 (189 days from entry of the Decree), we do not. We believe that the weekly data we now receive is more reliable than it used to be, but submission of a Plan with radically different (and internally contradictory) data on the same points calls into question the basic credibility of what we are receiving, regardless of whether data in the Plan was mistaken or not.

During our site visit in June and July, we met with the data team from ODMHSAS to review their data portal. We reviewed cases and data in detail. It appeared at that time that the infrastructure for data had greatly improved. Yet, even at that time, we were troubled by some data inconsistencies. Because of those concerns, we requested that ODMHSAS cross-check their waitlist numbers with county representatives (jails, courts, or public defenders) on a regular basis to ensure that everyone was accounted for – and to ensure an accurate waitlist number. We have not seen evidence of any such cross-check validations. We suggest cross validation with the counties as warranting injunctive relief both to create a process for cross-checking data with the entities that hold Class Members in their jails but also to dampen continuing concerns we have heard from multiple sources regarding the credibility of these data.

*Court Consultant Report September 2025*

## (E.1.a) "Best Efforts"

We do not believe ODMHSAS used Best Efforts in the first few months of the Decree in creating a list of Class Members in custody waiting for restoration services. As noted, communication was not transparent, and for the first two months (March to May) we assumed, based on Department representations, that the number was approximately 150. We only learned later, and inadvertently, that this number excluded all individuals (at the time approximately another 130 individuals) who were still in custody listed as receiving services from the Oklahoma Forensic Center while waiting for transfer to the hospital for restoration services. Recently, after initially believing that the creation of this basic data had improved significantly, we were forced again to doubt the accuracy of the numbers we had been given, because the August 12 Strategic Plan provided fundamentally different (and internally contradictory) information than we received the very same day on the number of people on the waitlist and their length of stay. Although the Department has acknowledged the inaccurate data represented in the Plan, and although we believe their current waitlist data to be more accurate and reliable, all of the previous inconsistencies create the need for independent verification of the waitlist data.

## (E.1.b) Recommendations

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- ODMHSAS, on a weekly basis, should cross-check with every county the Department's tabulation of who is on the waitlist and the LOS for each person. Exceptions might be made for very small counties (to be determined by the parties).
- The monthly status report, which the Decree requires to be submitted no later than the 10th of each month with a list of Class Members, should be accompanied by a sworn affidavit that the weekly cross-checks had been done, where there were inconsistencies between ODMHSAS data and county data, and how those inconsistencies were resolved.
- The monthly status report should also include a list of all people for whom initial evaluations have been ordered, with the same cross-check with Oklahoma counties and sworn affidavit process.
- This cross-check process should remain in place until the Court Consultants are satisfied with the reliability and accuracy of the waitlist data. This may require additional independent verification of Department data from the Court Consultants or their subcontractors.
- The monthly data report should include additional data summaries than what are presented currently, to be determined by the Court Consultants.

*Court Consultant Report September 2025*

## (E.2) Findings with respect to compliance, or lack thereof, with specific deadlines within the Decree

As noted above, and in our Interim Report, with only two exceptions, none of the June 8 deadlines imposed by the Decree were met. In the next section of this Report, we assess whether ODMHSAS has created or is in the process of creating the deliverables that were due on June 8, assessing whether "Best Efforts" have been used.

### (E.2.a) Reevaluate all Class Members waiting for restoration treatment within 90 days (Par. 57)

*(June 8 Status: Not met; September 10 status: To our knowledge, not met)*

In its August 12 submission, ODMHSAS states in its cover letter that "The Department completed the initial requirement of population reevaluation. As of July 7, 2025, three (3) individuals, in custody, had not been reevaluated by previously assigned staff. As of August 8, 2025, these evaluations have been completed."

Unfortunately, for several reasons we do not have reliable data that shows that all reevaluations, in fact, were completed.

### (E.2.a.I) *How many reevaluations had to be completed?*

- As part of the June 6 ODMHSAS submission, we received a spreadsheet titled "Consent Decree Reevaluation Tracking" with 111 names. However, it appeared to us at the time from other data that approximately 180 people required reevaluation. According to the list we received on June 6:
    - 55 people were found to still be incompetent;
    - 21 were deemed competent;
    - 27 had not been completed, as the report was still outstanding; and
    - Eight (8) were deemed "not applicable" for various reasons including their refusal to be assessed, in treatment, or other reasons.
- Based on the figures provided by ODMHSAS, only 76 reevaluations had been completed, since we did not consider a case completed until the evaluation report was submitted.
- In Exhibit A of its June 6 submission, ODMHSAS stated that "individuals who had been evaluated January 25, 2025, or after were excluded under the 30-day exclusion of the Consent Decree, Par. 57." We believed this misconstrued the exception granted in the Decree, which required all Class Members to be reevaluated "excluding those Class Members assessed within the last thirty (30) days by a Qualified Forensic Examiner." The Decree was entered on March 10, 2025; "within the last 30 days" means "within the last 30

*Court Consultant Report September 2025*

days" of entry, and so the only people excluded from this requirement would be those evaluated by a Qualified Forensic Examiner (QFE) between February 8 and March 10 and those receiving a newly ordered initial evaluation after entry of the Decree.

- As noted below in the discussion of Best Efforts as applied to this Decree requirement, we asked for additional information regarding the list of those waiting for reevaluation, which we have not received.

- We have received weekly aggregate information indicating how many reevaluations were done in a particular week. The monthly reports we have received since June 6 have columns for reevaluations, dates of the reevaluations, and outcomes. However, a number of those "reevaluations" appear to be initial evaluations. Further, a number of those evaluations were completed prior to entry of the Decree, raising the question of whether those individuals are subject to the reevaluation requirement.

- As a result, it is difficult to conclude that this section of the Decree has been satisfied based on existing data.

**(E.2.a.II)** *Quality of the reevaluations*

In our conversations with Public Defenders and District Attorneys (and in statements made by officials in the press), skepticism was expressed regarding the quality of the reevaluations. A core criticism was the belief that evaluations were being conducted in a cursory manner, and that some individuals who, from the perspective of legal representatives, appeared to be currently acutely disordered were being reported as competent.

Our preliminary review of the data submitted on the 111 reevaluations that were assigned shows some potentially troubling trends regarding consistency across evaluators, rates of opinions, and other areas. For example, although the overall rate of restoration of competency was 27.6% in the evaluation reports submitted, the individual evaluator rates of competency opinions ranged from 0% to 55%. This inconsistency across trained evaluators is rare. Additionally, our review of some of those reports showed inconsistent quality across evaluations, limited information about attainment of competence-related competencies, and other deficiencies. We will conduct a full quality review of all reevaluations in the future.

Note also that even though some individuals were found competent by the examiner performing the reevaluation, those individuals remained on the waitlist until the court adjudicates them as competent. The individual's legal status governs inclusion on the waitlist, not an outstanding clinical opinion. Therefore, wait times continue to toll until the case is adjudicated and the Class Member is found competent by the court.

*Court Consultant Report September 2025*

---

**(E.2.b) "Best Efforts"**

---

ODMHSAS made it a priority after entry of the Decree to schedule and reevaluate Class Members. An interim policy was approved by the Court Consultants that allowed for rapid screening and evaluation procedures to be utilized in this initial, limited re-evaluation period. Assigned evaluators were typically more seasoned and more qualified than the larger QFE evaluator pool, and those evaluators received additional pay to conduct the evaluations. In those respects, Best Efforts were used. However, ODMHSAS did not respond to our requests for specific information regarding the individuals required to be reevaluated, nor has it responded to our statement that in our view individuals had been excluded improperly from the reevaluation list. In a June 19 email setting various benchmarks, we asked ODMHSAS to provide us the following information before our June 30 to July 2 site visit (the document with these benchmarks is attached as *Appendix H*):

- A complete list of reevaluations currently done (received);
- A complete list of all reevaluations that need completing and a schedule for those reevaluations (not received);
- Who will be completing them (not received); and,
- The logic for who is included and excluded from the reevaluation list, because of our belief that individuals were originally excluded from the list who should have been included but were not (not received).

We also noted "the reevaluation process must be completed by August 1. If that is not possible, then we will require a detailed explanation of the factors preventing it."

We received only one item from this request. This failure to respond is one of the indicators we use to determine whether "Best Efforts" have been expended. In addition, we have not received updated information on the individuals reevaluated, other than general statements about the number of reevaluations that have been conducted and data in the monthly report which, as noted, is confusing.

---

**(E.2.c) Recommendations**

---

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- ODMHSAS shall produce a list specifically of all individuals on the waitlist as of February 8, 2025, dates of re-evaluation, dates of submission of the corresponding re-evaluation reports, competence opinions of those evaluations, court adjudications, and copies of the

*Court Consultant Report September 2025*

evaluation reports. The monthly reports provide some of this information, but as noted above we believe some of the cases listed under the reevaluation column were, in fact, initial evaluations; we would like clarification of these cases.

- For any re-evaluation reports that have yet to be submitted from that group, ODMHSAS shall produce a plan for when those Class Members will be re-evaluated, where they will be evaluated, and by whom.

- For any re-evaluation reports that have yet to be submitted from that group, and which are subsequently completed, ODMHSAS shall provide the Court Consultants with the dates of re-evaluation, dates of submission of the corresponding re-evaluation reports, competence opinions of those evaluations, court adjudications, and copies of the evaluation reports.

- ODMHSAS shall cross-check their re-evaluation list with each referral county and shall produce a sworn affidavit that the cross-check has been done, where there were inconsistencies between ODMHSAS data and county data, and how those inconsistencies were resolved.

### (E.3) Develop and begin implementation of the Plan (Par. 54-56)

*(June 8 status: Not met; September 10 status: Not met)*

The Decree defines the "Plan" as "the strategic plan developed by Defendants, *in consultation with Class Counsel and the Consultants*, and approved by the Consultants…" (Par. 30, emphasis supplied). Section VI of the Decree outlines the components and obligations that must be contained within the Plan, and the components "must be approved by the Consultants" (Par. 54). The Decree requires ODMHSAS to "develop and *begin to implement* the Plan's program components" within 90 days of entry of the Decree, which means the Plan should have been in place with implementation begun by June 8 (emphasis supplied). The Plan, with the waitlist, is the foundation for implementation of the Decree.

Throughout the life of the Consent Decree, Court Consultants have repeatedly and emphatically recommended that the Department engage in a strategic planning process. We have considered strategic planning to be a critical first step to fixing Oklahoma's competence services system and begin working towards compliance with the Consent Decree. There are many ways strategic planning can occur. As such, we have recommended creating a "Decree compliance room" that visually lists the components of the Consent Decree, the development of an action plan replete with assigned staff and measurable outcomes delineated, the appointment of a point person to lead the Consent Decree response, and/or the hiring of a professional organization to lead a strategic planning process. Other than appointing Mr. Settle as the point of contact for matters related to the Consent Decree, and putting up parts of the decree in a central office meeting room, to our knowledge none of the other recommendations have been attempted.

*Court Consultant Report September 2025*

On June 6, as part of ODMHSAS's submission, we received several documents that we assumed were meant to constitute the Plan.

None of those documents, individually or as a whole, met the requirements for development and implementation of the Plan required by the Decree. There was no discussion in any of the documents describing how components of the submission would "significantly reduce the length of time Class Members wait for Restoration Treatment" (Par. 54) nor were any requirements of Section VI of the Decree met. We noted that ODMHSAS had prepared an undated document titled "Guidance for Developing the Community Strategic Plan" that is a 23-page set of instructions to Regional Prevention Coordinators for the submission of Community Strategic Prevention Plans that ODMHSAS must approve[7]. The instructions require the submission of data, a logic model, planned project tasks, designation of those involved in the project tasks, and completion dates. None of those elements were in any of the documents submitted by ODMHSAS on June 6 (nor do we find them in the August 12 submission) and the failure to submit even the semblance of the required Plan failed to meet the "Best Efforts" standard.

On August 12, 2025, ODMHSAS submitted its Strategic Plan as part of its self-imposed deadlines for meeting Decree mandates after the change in ODMHSAS leadership. That submission was the first time we saw anything related to the new Plan; in addition, there had been no consultation with Class Counsel regarding its preparation, as required by the Decree. We responded at length to that submission on August 21, and our response, the Department's response to it, as well as the response to the Plan from Class Counsel are attached as Appendix B. As our response indicates, the submission falls well short of a Strategic Plan in several areas:

- The Plan does not contain workplans, timelines, benchmarks, project tasks, responsible parties, or barriers and how those barriers will be addressed;
- There is no discussion of the Oklahoma Forensic Center beyond conclusory statements regarding recent hires and a projected bed need count (which itself falls short);
- There is no discussion of clinical strategies and how those might affect length of stay at OFC, a variable we have repeatedly stressed with the Department as essential to systemic reform and compliance with the Decree;
- The Plan mistakenly asserts that the Department is operating a jail-based restoration program, which is specifically prohibited by the Consent Decree and was one of the main foci of the overall litigation that led to the Consent Decree;
- The Plan mistakenly asserts that it has implemented a triage policy, a policy overseeing Qualified Forensic Examiners, and a "properly resourced Jail Based Restoration Assistance

---

[7] Oklahoma Department of Mental Health and Substance Abuse Services. (n.d.). *Guidance for Developing the Community Strategic Prevention Plan*.
https://oklahoma.gov/content/dam/ok/en/odmhsas/documents/a0001/community-strategic-plan-guidance-022812.pdf

*Court Consultant Report September 2025*

program." None of those statements were accurate, and corrections to that effect were made in a subsequent memo from the Department;

- Data are internally contradictory, contradict external data received from the Department, and are generally unreliable. As noted earlier, the Plan inaccurately reports their waitlist number as 60, the average length of time as 105 days, and that no defendants were waiting more than six months for restoration to begin. These are all very serious data errors (they do not match any other data ever provided to us), and yet they were each confidently presented as declarative; and,

- The Plan is largely comprised of assertions with little supporting evidence, policy statements that bear on core Decree requirements which have not been discussed beyond the Department, and statements that are unwarranted (for example, the statement on p. 12 that "Most of the Consent Decree's required actions have now been completed").

Beyond the problems found in the content of the August 12 Plan, the submission of the Plan reflects serious procedural issues. Although the Department has been transparent and has taken accountability post hoc for the mistakes in the content of the Plan, the fact remains that the Plan was submitted to Class Counsel and the Court Consultants as an official document on August 12, and it represented their official response to that Consent Decree deliverable. The Plan was submitted as a declarative document, asserting many inaccuracies with certitude. From a procedural standpoint, the Department created, vetted, and approved a very problematic document for official submission. Given its scope, it must have included input from many people. It eventually included the signatures of the two top members of the ODMHSAS administration.

The production and submission of an official document with so many inaccuracies is alarming. It raises serious questions about the Department's current ability to internally fact-check their data, to coordinate and convey accurate information among various staff members, and to ultimately produce a cohesive and comprehensive document that maps out their planned response to the Consent Decree.

### (E.3.a) "Best Efforts"

The Decree specifically requires ODMHSAS to use "Best Efforts" in designing and implementing the Plan. This means "reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines." We also consider responding to our communications as an element of "Best Efforts." By these standards, development and implementation of the Plan continues to fall short of Best Efforts.

*Court Consultant Report September 2025*

First, we asked the Department in our June 19 benchmark email to provide:

- An outline of the Plan by July 7 to be discussed jointly;
- A rough draft (or drafts of various sections) of the Plan within 3 weeks of approval of the outline but no later than August 1; and,
- A finished draft within 4 weeks of approval of the drafts but no later than August 22.

We did not receive a response to this request.

In its June 27, 2025, Letter Requesting Extension of Deadlines, ODMHSAS said with reference to the Plan, that it would "work *in consultation* with both Class Counsel and the Consultants to develop the initial stages of the strategic plan to implement the Consent Decree including concrete goals, steps necessary to complete those goals and timelines, and responsible parties to complete said goals" (emphasis supplied). Neither consultation with us or Class Counsel occurred, nor did the Plan we received include the elements described above.

At its core, "Best Efforts" includes consistency with "best professional standards, practices, and guidelines." We provided ODMHSAS with a recent Colorado strategic plan developed in response to a virtually identical Consent Decree, and in our Interim Report we noted that ODMHSAS had developed guidelines for strategic plans submitted by some of its vendors. While the ODMHSAS August 12 submission mimicked the Colorado plan to some degree, it did not seem to utilize their own internal planning guidelines, nor did it have any of the specificity found in the Colorado plan.

## (E.3.b) Recommendations

We do not ascribe malintent to the people who worked on the Plan; we have been clear throughout this report that the new administration appears to be operating in a new era of transparency and effort. Rather, it seems that the systemic task of coordinating a cohesive, comprehensive, and effective response to the Consent Decree may have been too large and complex for the current shoestring staff to manage. Most readers of this report will be aware of the many other challenges besetting the Department in addition to the improvements required by the Consent Decree. In lay terms, the Central Office appears to be pulled in too many directions simultaneously, such that the only work that can be consistently produced suffers from a lack of careful planning, coordination, and review. Those things take time, resources, and expertise. As such, we make strong recommendations for ODMHSAS to substantially increase their staff and to utilize the expertise of external consultants where appropriate; these recommendations are found in several other sections of this report (including a primary recommendation to hire a forensic subject matter expert as the dedicated chief responsible for the Department's Consent Decree response, found on page 37.

31

*Court Consultant Report September 2025*

With specific regard to the Consent Decree's requirement for a Department Plan (Par. 54-56), we suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- ODMHSAS staff should work with an external consultant to assist with strategic planning based on the Sequential Intercept Model[8], a planning model familiar to the Department;
- The Department's Plan should be revised in consultation with Class Counsel and Court Consultants. This will include the creation of a negotiated deadline for a revised Plan and its implementation. Implementation was to have begun by June 8 but in the absence of a Plan, there has been no implementation; and,
- The Plan should be responsive to the critiques laid out in our August 21 response regarding the production of accurate and consistent data, attention to OFC and the LOS for restoration treatment at the facility, a more specific and concrete delineation of staffing plans at the Department and at OFC, and the elucidation of actionable steps and expected measurable outcomes throughout.

> **(E.4) Develop and begin to implement a plan, approved by the Consultants, to achieve a material increase in new inpatient Forensic Beds dedicated solely to competency restoration (Par. 62)**

*(June 8 status: Not met; September 10 status: Partially met)*

The Decree requires a bed need analysis that includes the "number of new Forensic Beds to be added, and the timelines for bringing the new Forensic Beds on line, and should consider best practices for determining the reasonable number of new Forensic Beds to be maintained, *given the State of Oklahoma's population growth, crime rate, and the effect of the Plan's components* once the Plan has been developed and implemented" (Par. 62, emphasis added).

Exhibit E in the June 6 ODMHSAS submission, a brief document titled "Inpatient Forensic Bed Expansion and Implementation Plan," noted an 80-bed expansion at the Oklahoma Forensic Center with transfer of patients to new pods expected by August 2025 and admission of new forensic patients by September 2025. The Exhibit also noted—but did not expand on—the pursuit of regionalized areas for inpatient placements, the identification of existing nursing homes or vacated structures, and research into the viability of utilizing a building in Fort Supply, OK.

---

[8] A description of this model can be found at Munetz & Griffin (2006), Use of the Sequential Intercept Model as an Approach to Decriminalization of People with Serious Mental Illness, 57 PSYCHIATR SERV 544, https://pubmed.ncbi.nlm.nih.gov/16603751/

*Court Consultant Report September 2025*

This Exhibit did not constitute the plan for bed expansion required by the Decree. There was no analysis of the impact of population growth or crime rates, nor was there a description of precisely how many beds are needed for competency restoration exclusively. We noted that a plan to address future inpatient capacity need was a complex task that begins with an accurate number of people currently on the waitlist, as well as a comparison of that number to previous waitlist numbers, previous lengths of stay on the waitlist, numbers of restoration beds and lengths of stay to restoration across settings, and projections of future demand.

The August 12 submission included what was characterized as Inpatient Bed Projection and Utilization Data as well as OFC Bed Projection. The projections for future bed need relied on several sources including a national methodology for predicting future psychiatric bed need, a conversation with an expert referred by the Consultants, as well as prior analyses conducted by the Department. The methodology and sources of information seem credible, and the projections are reassuringly rooted in concrete data. We acknowledge and affirm the Department's utilization of source data to project future bed capacity need.

However, there is little discussion of how the conversation with the national expert or prior analyses impact the projections displayed in the Plan. The methodology used for calculations and projections remains unclear, and the final conclusions are unclear.

The analysis concluded that an increase in beds from 260 to 346 (33%) over a 10-year period would be necessary to accommodate a forensic population comprised of individuals found incompetent and not guilty by reason of insanity. However, in a separate section, ODMHSAS projects a need of 189 more beds to "meet the requirements and comply with the Consent Decree." We found this confusing; clarification of seemingly inconsistent numbers is required.

Moreover, this projection did not break down the population into discrete categories or consider the length of stay for those committed for restoration versus those committed as not guilty by reason of insanity. Nor does it seem to consider "the effect of the Plan's components once the Plan has been developed and implemented." There are no comparative projections that show the impact of reductions in lengths of stay to restoration, additional beds, spikes in competence demand, or other variables in utilized in the projection model. These types of comparative analyses are important so that stakeholders can understand the logic involved in determining the identified bed capacity need.

The Plan also notes that OFC beds are being expanded by 80 new or previously offline beds, 30 new beds should become available at Griffin Memorial Hospital, and that the Department is working to secure contracts with two private psychiatric hospitals for an additional 52 beds by November 2025. This expanded capacity, if contracts are put in place and OFC is sufficiently staffed to open the new beds, should significantly accelerate the number of placements in restoration treatment that occur. We acknowledge and affirm the tremendous impact these beds will have on the competence restoration system in Oklahoma, and we believe those beds

*Court Consultant Report September 2025*

(if staffed and available) will be a great asset towards compliance with the Consent Decree in the short term.

While the bed need analysis is minimally sufficient, much more needs to be done. For example, and as noted in our August 21 response, the methodology does not describe projections based on varying lengths of stay at OFC or what is projected as LOS for contracted restoration beds. The length of stay is essential in projecting bed need, as we pointed out in our Interim Report and in other communications with the Department. If a bed is occupied by one person for 365 days (as has often been the case at OFC), and the overall capacity of the hospital is 100 patients, only 100 patients can be treated in a year. On the other hand, if LOS is halved, then 200 patients can be treated in the same 100 beds. Scientific literature has shown repeatedly that most defendants can be restored within 90-120 days.[9, 10] A reduction in LOS to 100 days, along with the increase in bed capacity as currently expected, would be a significant step in attaining compliance with the Consent Decree. The analysis we received needs to be revised to incorporate this factor, as well as other factors we will address with the Department separately.

## (E.4.a) "Best Efforts"

The August 12 submission shows for the first time a serious attempt by ODMHSAS to wrestle with the bed needs analysis required by the Decree, an analysis originally due June 8. However, ODMHSAS has still not responded to requests for information relevant to this mandate, stemming from our March 21 Request for Information (attached as *Appendix C*). We asked on March 21 (and reiterated the request several times since) that the Department provide us with:

- Any analysis that has been done to date within the Department on forensic bed need;
- Any existing methodology that the Department uses to define or project inpatient capacity needs;
- Any analysis done within the last three years of the cost of adding an inpatient bed;
- Any information regarding past or present plans to contract for forensic beds in private (non-state) hospitals, including any contracts that may be in place for that purpose; and,
- The most recent report from the Joint Commission on Accreditation of Healthcare Organizations (JCAHO).

In its August 12 discussion of bed need, the Department noted that the "Decision Support Services of the Department *has previously conducted* OFC bed projections and performed related analytics to determine the number of beds that are needed to meet the

---

[9] Pirelli, G., Gottdiener, W. H., & Zapf, P. A. (2011). A meta-analytic review of competency to stand trial research. *Psychology, Public Policy, and Law, 17,* 1-53. doi: http://dx.doi.org/10.1037/a0021713

[10] Mossman, D. (2007). Predicting restorability of incompetent criminal defendants. (2007). *Journal of the American Academy of Psychiatry and the Law, Vol. 35,* pp. 34-43.

*Court Consultant Report September 2025*

potential demand in the future" (emphasis supplied). This is precisely the type of information we previously requested. In the absence of a response (or production of the materials relied on in the August 12 plan), we have no ability to consider or corroborate prior Department analyses, provide consultation based on those prior analyses, or assess the current submission.

While the most recent bed needs analysis is rooted in data and appears to follow standard statistical methodology, it remains incomplete for the reasons listed above. Moreover, the failure to respond to requests for information directly related to a Decree mandate is not consistent with a Best Effort standard that requires transparency in communication with Court Consultants and responding to requests for materials and information, nor is it consistent with the Decree's requirement that Court Consultants be given access to Departmental materials.

## (E.4.b) Recommendations

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay,

- Provide the information we requested on March 21;
- Illustrate in detail what information was considered and incorporated in the current bed projection;
- Provide additional detail on the number of beds projected for competency restoration exclusively, beds for those considered not guilty by reason of insanity, location of those beds and possible alternatives over time; and
- Provide detailed information on how different variables affect the projection model and how those different projections/variables result in specific action plans and outcomes (how will projected new beds affect patient flow from jails? Affect length of stay? Affect census?).

## (E.5) Develop and begin to implement a plan to staff the Department with individuals tasked and qualified to: (i) oversee ODMHSAS's competency evaluation and restoration programs, (ii) gather, report, and analyze data on these programs, and (iii) support stakeholders with navigation of these programs (Par. 77)

*(June 8 status: Not met; September 10 status: Partially met)*

Adequate staffing is necessary to operate a statewide forensic mental health system, and the Consent Decree acknowledges the need for the Department to bolster its staff and resources.

The June 6 submission from ODMHSAS only included two organizational charts (one for Central Office and one for OFC) showing listed and vacant positions. These documents did not qualify as a plan meeting the requirements of the Decree.

*Court Consultant Report September 2025*

In its August 12 submission, the Department noted that four new staff had been hired in its Central Office to "manage court communications, oversight of the Treat to Competency portal; community provider communication and support, and case processing" (p 8).

Hiring new staff is a salutary development, and our weekly meetings with the Department have informed us of the significant and essential work being done in the Central Office to manage data related to Class Members.

At the same time, we have not received a "staffing plan" as required by the Decree.

## (E.5.a) "Best Efforts"

In our March 21 Request for Information, we requested that by April 7 we receive "any staffing analysis that recommended, or considered but did not recommend, the creation of positions within the central office devoted exclusively or primarily to forensic issues." Despite reminders, we never received a response to this request. We requested this information so we could assess whether and how the Department has addressed a Decree-required deliverable in the past. Because we never received the information, and because we have received no plan for central office staffing, we cannot assess the impact, role and capacity represented by the new hires.

At the same time, the Department has made strides. *Appendix 5* of its August 12 submission, titled Central Office Forensic Services Workflow, is well constructed, logical and provides the type of "workflow" information and processes that were lacking before.

## (E.5.b) Recommendations

Appoint a Senior Official to oversee implementation of the Decree whose primary if not exclusive responsibility is the Decree.

We have recommended repeatedly that ODMHSAS appoint a person to oversee implementation of the Decree with the authority to act across the agency as necessary. While ODMHSAS counsel is currently the primary point of contact for decree-related matters, he has multiple responsibilities unrelated to the Decree. We find the current ODMHSAS team to be hard-working, but in our view, it is still under-resourced and without a single point of responsibility. A true Consent Decree "point person," with both content expertise as well as authority and sole attention on the Decree, is essential in order for ODMHSAS to ever attain compliance.

*Court Consultant Report September 2025*

> **(E.6) Develop a "written triage screening protocol for Class Members…declared incompetent" with reasonable deadlines for screening, adoption of a screening protocol, establishment of triage levels for the expedited placement and treatment of Class Members, and adoption of qualification standards for those providing triage (Par. 65)**

*(September 10 status: Partially met but with significant progress being made)*

In our March 21 request for information, we requested but did not receive "any current triage protocols in use either in jails or at OFC."

In June, the Department provided Exhibit G, titled "Triage and Expedited for Defendants Found Incompetent to Stand Trial." It represented a good start on meeting the triage requirement. However, important specifics were missing (e.g., who would actually perform the triage screening in various jails around the State, how the triage system would be centrally managed and monitored, etc.). Our response to Exhibit G is found in our Interim Report.

On July 1, we sent the Department a formal set of recommendations for the development of a triage system (see *Appendix D*). We did not receive a substantive response to the content of these recommendations at that time.

However, in late July, the Department did provide the Court Consultants with a drafted triage plan and an accompanying template for reporting on triage opinions. The plan was an admirable effort and did advance the eventual triage plan and system forward. We reviewed the drafted plan in detail and provided substantive feedback shortly after.

In August, ODMHSAS returned their second draft of the triage plan, which incorporated many of our recommendations and answered many of our questions (see again *Appendix D*). Still, some serious flaws remained, and so we returned the draft back to ODMHSAS with updated comments, questions, and recommendations as well as a request to hold a meeting to finalize the plan. In particular, the second draft of the triage plan did not identify any advanced time frames for individuals designated as "Expedited," rendering the triage concept ineffectual.

ODMHSAS submitted their Competency Restoration Plan on August 12, which included a section on the Consent Decree's triage mandates. The Plan stated that ODMHSAS had implemented the triage policy, despite that the triage policy document was still in draft form. ODMHSAS later indicated that it realized all policies required approval by the Court Consultants and collaboration with Class Counsel, and that policies attached to the August 12 submission were in draft form.

*Court Consultant Report September 2025*

We held a productive meeting with ODMHSAS on September 4 in which various misunderstandings were clarified. We believe that great progress has been made regarding the Triage mandate and that it can be implemented by November, dependent on implementation of a shortened admissions time frame for defendants categorized as "Expedited," as well as discussions with Class Counsel as required by the Decree.

## (E.6.a) "Best Efforts"

ODMHSAS has made substantive progress on the creation of a triage protocol. We consider the triage system to be a cornerstone of the Consent Decree and in Oklahoma's competency system. If implemented properly, it should reduce the number of injuries, assaults, victimization, additional criminal charges, and other negative outcomes that occur in jails while people remain on the waitlist. We affirm the Department's progress on this issue. However, the initial requirements for submission of a triage plan by the initial Consent Decree were unmet. Also, Class Counsel has not yet been consulted, which is required by the Consent Decree.

## (E.6.b) Recommendations

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay, adopt the following:

- ODMHSAS will consult and collaborate with Class Counsel on the final drafted plan.
- ODMHSAS will finalize the triage policy and plan by September 30, 2025.
- ODMHSAS will implement the triage policy in November 2025. Data on rates of Expedited versus Standard Admission opinions, lengths of stay until admission, and other related data will be recorded and submitted to the Court Consultants at the end of November.
- Data related to the triage system will continue to be gathered, recorded, and analyzed on an ongoing basis. Data will be disseminated in the Department's Monthly Report.
- If a defendant identified as Expedited is not admitted to restoration services within the Expedited time frame, the Department will pay an additional daily penalty for every day the defendant remains in a county jail until transferred to an appropriate restoration setting. This additional penalty will be negotiated among the Parties and Court Consultants.

*Court Consultant Report September 2025*

> **(E.7) Develop and begin to implement a plan to require all OFC and other staff involved in competency restoration to participate in 12 hours annually of continuing education on competency related topics**

> *(June 8 Status: Partially met; September 10 Status: Partially met)*

We received a great deal of material on training on competency issues prior to the June 8 deadline. This includes material provided in April from Dr. Jason Beamon, who was then working with the Department, as well as supplemental material in the June 6 submission from ODMHSAS (which included new material from Dr. Beamon). These materials documented who had been trained to date, the topics covered in the training, and many of the actual materials utilized in the training. Training was conducted by Dr. Beamon.

We understand that new evaluators are being hired and/or contracted, including psychiatrists and psychiatry residents from a university medical school. We are encouraged by the infusion of new talent into the evaluator pool. We also understand that new personnel have been hired at OFC, although we have not been told what the positions represent (discipline, new versus old positions, etc.).

All of these new positions are related to competency restoration either directly or indirectly, and therefore all personnel are mandated by the Consent Decree to participate in 12 hours of annual continuing education on competency-related topics.

We do not believe that all relevant ODMHSAS personnel have yet undergone the required twelve annual hours of competency-related training. We believe that a large proportion of the salaried and contracted competency evaluators have participated in the required training.

We will continue discussions with ODMHSAS regarding ongoing training. Topics will need to be refined to more relevant to non-evaluator positions.

> **(E.7.a) "Best Efforts"**

In our interim report, we found that Best Efforts had been used in meeting this requirement. Still, only a fraction of the ODMHSAS competency staff has been trained to date.

*Court Consultant Report September 2025*

**(E.7.b) Recommendations**

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay, adopt the following:

- Dr. Jason Beamon was providing all training relevant to this part of the Decree, but Dr. Beamon is no longer affiliated with the Department. Therefore, ODMHSAS must develop a plan – with dates, locations, trainers, and topics – for the training of all ODMHSAS staff involved in competency restoration.
- We have recommended potential training programs that can help complete this requirement from outside Oklahoma, though to date those recommendations have not been pursued. ODMHSAS must contact these programs and provide to Court Consultants the training proposals, including stated costs, from those programs.
- ODMHSAS must complete the training of all required personnel by March 9, 2026. ODMHSAS will submit a list of competency-involved personnel (salaried and contracted), and ODMHSAS will provide a list of all staff (including proof of attendance) of those that attended training.
- If ODMHSAS does not complete the training by March 9, 2026, we recommend that fines be imposed for non-compliance.

**(E.8) After entry of the Decree, offer initial and periodic training to Oklahoma district court personnel, sheriffs, and members of the Oklahoma State Bar concerning competency evaluations and restoration (Par. 78, also 79-80)**

*(June 8 status: Not met; September 10 status: Not met)*

As of the time of our Interim Report, this requirement had not been met.

However, Exhibit F.2, titled "Community Competency Initiative," and attached to the June 6 Departmental submission, established a curriculum framework for meeting this requirement.

In our March 21 request for information, we asked for any training materials and/or curriculum made available to the types of officials noted in paragraph 78, but we have not received such materials.

In its August 12 submission, the Department notes (p. 8) "as mandated, a comprehensive training plan is being developed to improve competency-related expertise within the Department, community treatment providers and in the courts." However, no training program is in place, nor have we seen materials related to it, even in developmental stages.

*Court Consultant Report September 2025*

---

**(E.8.a) "Best Efforts"**

We have seen no progress and have received no substantive communication on this mandated element of the Consent Decree. Best Efforts have not been utilized.

---

**(E.8.b) Recommendations**

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- Given that this component of the Consent Decree has been largely, if not totally, ignored, we offer no recommendations aside from beginning work as mandated by the Consent Decree.
- If discernible progress (creation of a curriculum approved by Court Consultants with consultation from Class Counsel; a workplan including identification of trainers, methods of delivery, dates for the training) is not made by end of calendar year 2025, we recommend the imposition of daily fines until such progress has been made.

---

**(E.9) Develop and begin to implement a pilot in-jail restoration program at Tulsa County Jail and one other county meeting criteria specified in the Decree (Par. 74)**

---

*(June 8 status: Not met; September 10 status: Not met)*

---

We met with the Tulsa County Sheriff during our April site visit, and we concluded that the possibility of at least a limited jail-based competency restoration (JBCR) program was viable. However, we noted that it would involve significant negotiations to reach that outcome given past history between the Department and Tulsa County Jail personnel.

The former Commissioner reported that she subsequently had favorable conversations with the Sheriff regarding establishment of a program.

In its June 6 submission, ODMHSAS stated "ODMHSAS Executive Leadership has engaged the Tulsa County Sheriff in conversations regarding establishing a competency restoration unit within the David L. Moss Justice Center. While the Sheriff is willing to discuss this plan, the Justice Center is not currently willing to move forward with finalizing plans as of June 2025."

*Court Consultant Report September 2025*

It was not clear from the June 6 submission when the referenced conversations occurred, who represented ODMHSAS in those conversations, and how the matter was left. In fact, we learned later that such conversations had not occurred, and we concluded that "Best Efforts" had not been made to achieve this Decree mandate.

In their cover letter to the Strategic Plan dated August 12, the Department indicated that they have made "good-faith, best-effort attempts to negotiate the use of space at the Tulsa County Jail for an 'in-jail competency restoration program'" based upon conversations with the Tulsa County District Attorney. They also indicated that emails had been sent to the Tulsa County Sheriff to schedule a future meeting about the proposed restoration pilot program.

In their August 12 Strategic Plan (p. 5), the Department indicated that "the previous 'restoration-in-jail' practice has ceased, except for continued administration of medications to stabilize inmates." The Plan then stated that the previous approach has been replaced with "a properly resourced Jail Based Restoration Assistance program," though the definition of this program was not provided. In subsequent discussions with the Department, it was inferred that this "Restoration Assistance program" involved ongoing therapeutic contact with inmates awaiting restoration services as well as the provision of psychotropic medication when indicated by the responsible treatment provider. This program is not designed to provide the full continuum of restoration services envisioned by a pilot jail-based restoration program.

However, Class Counsel has reported to us that the Department has clarified that they are in fact not operating a "properly resourced Jail Based Restoration Assistance program."

Moreover, within the past year, Tulsa and Oklahoma counties rescinded contracts with mental health providers that had previously been subcontracted by the Department, and those jails have continued to prohibit Departmentally contracted providers from providing mental health services in their facilities. It is difficult to understand how the lack of contracted providers in those two high volume jails could align with the definition of a "properly resourced" program.

The August 12 Plan states "Oklahoma is also working toward an in-jail Competency Restoration Pilot Program. *The development of this pilot was initiated in June 2025 for the Tulsa County, David L. Moss Detention Center. The Department continues to work with the Tulsa County Sheriff"* (p. 5). The Plan then provided envisioned program highlights regarding enrollment and throughput, curriculum and services, and safety and suitability screening for the proposed program. The statements we have italicized are exaggerated at best; no pilot "was initiated in June 2025" and the Department has attempted to schedule a meeting with the Tulsa County Sheriff but that has not yet occurred; the statement that the Department "continues to work" with the Sheriff is not supported by the evidence.

*Court Consultant Report September 2025*

Moreover, the August 12 Plan indicates that dozens of people have participated in "jail-based competency restoration," a program that is specifically prohibited by the Consent Decree. The Department has since corrected this error.

We have received no information about the planning for a second Jail Based Restoration Program in a second county, as required by the Decree.

Though the Department has reportedly scheduled a conversation with the Tulsa County Sheriff in September to discuss how to move forward with a jail-based restoration program, to date, no substantive progress has been made on this Decree requirement. The Department lays out in their Strategic Plan a set of requirements for JBCR programs and processes. Those may be a good start for discussion, but the Decree is clear the establishment of this program must be done in consultation with Court Consultants and Class Counsel and ultimately approved by Court Consultants before implementation. On several occasions, we have provided information regarding jail-based restoration programs operating in Colorado, California, and Nevada, and we have offered to put Department personnel in contact with individuals running and researching those programs to help assist with the development of a pilot program in Tulsa County. Recently, the Department indicated a willingness and intent to visit Colorado programs in October, and a joint video call was recently held with a Colorado JBR representative.

## (E.9.a) "Best Efforts"

We have seen little to no progress on this mandated element of the Consent Decree. At a minimum, as we observed in our Interim Report, we believe that Best Efforts requires sustained conversations regarding the specifics of a program, including dedicated space, whether the space must be reconfigured in some manner, program requirements that would be utilized, who would conduct the program, timelines and goals for moving individuals through the program, markers of progress, terms of a contract, and so forth.

In addition, the Decree specifically requires the use of Best Efforts in developing and implementing an alternative to Tulsa for a pilot in-jail restoration program if "Best Efforts" do not result in a Tulsa pilot (Par. 76). We have received no information regarding a potential alternative if Tulsa cannot be developed.

To date, there have been no more than brief conversations with Tulsa officials and the next conversation with the Sheriff (the first, we believe, since June) will not occur until September at the earliest. It is understandable that certain issues get addressed later than others, given the Department's workload and the reshaping of the agency that its current leadership is attempting. However, on this particular issue we have perceived no sense of urgency from the beginning, which is especially problematic given the impact a well-run JBCR could have on the waitlist and relieving the suffering of those in the Tulsa County Jail.

*Court Consultant Report September 2025*

Moreover, the Consent Decree requires that an additional JBCR pilot be developed and implemented in at least one other county besides Tulsa. To date, we have received no information about an identified county, contact personnel, or other related information regarding this requirement.

Finally, confusion about the Jail Based Restoration Assistance program persists. Given the central role that these sorts of jail-based services held in recent litigation, this continued confusion is concerning. The Decree required collaboration between the Department, Class Counsel, and the Court Consultants regarding both Jail-Based Restoration and the implementation of ancillary jail-based mental health services (what the Department refers to as "Jail Based Restoration Assistance"). Collaboration on the definition, scope, and implementation of these programs is paramount, but it has not yet occurred.

## (E.9.b) Recommendations

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- The Department must follow through with meetings with the Tulsa County Sheriff to identify the framework for a collaborative plan to establish a formal jail-based restoration program as mandated by the Decree.
- The Department, in collaboration with Class Counsel and Court Consultants, must develop a plan for the establishment of a formal program with specific timelines, points of responsibility, financing, space requirements and the other elements necessary for a tangible and operational plan.
- The Department must identify and begin coordinating a viable plan for JBCR in a second Oklahoma county, in accordance with the Consent Decree. That information should be provided to the Court Consultants and Class Counsel, who should be invited in as collaborators throughout the JBCR development process.
- The Department should consider reaching out to recommended points of contact of organizations currently operating and researching successful jail-based restoration programs, in particular leadership at the Colorado Office of Civil and Forensic Mental Health which operates two jail-based restoration programs in the Denver area.
- Department staff should consider attending the Jail Based Restoration National Cohort Meeting on October 17, which is a virtual event hosted by Colorado's Forensic Services Division that takes place once a quarter involving individuals from across the country who are involved in jail-based restoration.
- If discernible progress as measured by Court Consultants is not made on the establishment of a JBCR program at the Tulsa County Jail by end of Calendar Year 2025, daily fines should be imposed on ODMHSAS until such progress is made.

*Court Consultant Report September 2025*

> **(E.10) An additional requirement in the Decree, effective on its entry, is that competency evaluations must be submitted within 30 days of receipt of the order for evaluation by ODMHSAS (Par. 67)**

> *(June 8 status: Not met; September 10 status: Unknown because of a lack of information from ODMHSAS)*

We received no information regarding this requirement in the June 6 submission.

In its August 12 submission, the Department states flatly (p. 3) that "Evaluators are…conducting the evaluations and returning reports to the court within the remaining number of days to the total required thirty (30) day evaluation requirement." The only reasonable inference to draw from this is that the Department is performing exams within 30 days. However, this same document later states (*Appendix 3, item 2*) "Just 10.6% of cases were evaluated within 30 days…".

We have no verified evidence that initial evaluations are being completed within 30 days. In fact, during our June site visit we provided the Department with one county's list of initial evaluations that showed more than 30 cases had waited for more than 30 days, some up until several months before evaluation.

In addition, we were told by multiple legal officials that initial evaluations had essentially ceased after entry of the Decree in March so that evaluator attention could turn to the reevaluations mandated by the Decree. We were shown evidence that initial evaluations were sometimes occurring months after the order.

## (E.10.a) "Best Efforts"

As noted, we were given evidence that initial evaluations basically ended in all but a few cases after entry of the Decree on March 10. In addition, we offered the Department several times to put them in touch with resources who could perform evaluations. The Oklahoma Psychological Association offered similar resources. However, these resources were not tapped.

There is little evidence that the Department, until recently, used Best Efforts to perform evaluations within the required 30 days. We await further information on the current status of its efforts.

*Court Consultant Report September 2025*

| (E.10.b) Recommendations |
|---|

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- By October 15, ODMHSAS must produce a list of everyone that has been ordered for an initial competency evaluation since March 10. The list should be broken down by county and location of the individual, and the list should include deadlines for the report submissions to court. Some of this information is in the monthly status reports submitted by the Department, but it requires verification, as we note below.
- ODMHSAS must produce a list of all initial evaluation report submission dates for the above individuals, the evaluators that conducted the evaluations, the opinions of the evaluators, and the current location of the defendants who were opined incompetent to stand trial.
- ODMHSAS must produce a corresponding list of evaluators that could conduct any outstanding initial evaluations, the date any evaluations are scheduled, the date the reports must be submitted, and the locations of the defendants.
- ODMHSAS must cross-check with every county statewide about the current status of initial competency evaluations, akin to their cross-check of people on the waitlist. This should be conducted every other week until the Court Consultants terminate the requirement.
- Rates of 30-day initial evaluation compliance, opinions of competency to proceed, locations of evaluations, and assigned evaluators will be provided in the Department's Monthly Report. To the degree this information is already provided, it must be amended to incorporate elements not yet part of the monthly report.
- Consultants may request for independent verification of the completion of initial evaluations, either directly or through subcontractors.
- Penalties should be assessed if the deadlines and substantive obligations established in these recommendations are not met.

| **(E.11) ODMHSAS is required to submit monthly reports no later than the 10th of each month to Consultants and Class Counsel, "accurately reporting the status of all Class Members then waiting for Restoration Treatment" (Par. 82, 83)** |
|---|

| *(June 8 status: Not met; September 10 status: Met)* |
|---|

The Decree specifies a dozen elements that must be included in each report.

We received the first report from ODMHSAS on May 12. It contained fewer than one half of the required elements and was not provided to Class Counsel as required by the Decree.

*Court Consultant Report September 2025*

The second report was due on June 10, 2025. We received it on June 11. It had improved but still did not meet Decree requirements, nor was it submitted to Class Counsel until we requested that be done.

Subsequent reports have been submitted on time, including to Class Counsel, and the August report met the requirements in the Decree. We are working with the Department to refine the data and information provided in future reports, but no other recommendations or remedy is offered at this time.

| **(E.11.a) "Best Efforts"** |
| --- |

Early iterations of the monthly report did not meet the Best Efforts standards. At this time, however, we believe ODMHSAS is using Best Efforts in the generation of the monthly reports. We have requested changes to the data and information provided in these reports, and we will continue to work with the Department to refine the reports on an ongoing basis.

| **(E.12) ODMHSAS is required to "train, approve, and continuously monitor all Qualified Forensic Examiners conducting competence evaluations…" along with several other requirements related to the training and work of QFEs (Par. 31)** |
| --- |

| *(June 8 status: Not met; September 10 status: Partially met)* |
| --- |

We received partial information regarding this requirement in the June 6 submission. We were given a list of evaluators that attended a training conducted by Dr. Jason Beamon, as well as all of his training materials.

We assessed his training materials as credible, trustworthy, and effective. The training was therefore approved by the Court Consultants.

However, the Consent Decree has several other requirements for QFEs that were not met by June 8, and to date still have not been met. Within 90 days of the entry of the Consent Decree, ODMHSAS, in consultation with Class Counsel and the Court Consultants, was required to provide evaluation training standards, monitoring standards, and restrictions on master's-level QFEs. We have seen no evidence of these consultations.

Oklahoma statutes allow master's-level professionals to conduct competency evaluations. The Consent Decree is aligned with statute, but it does require additional training and monitoring for master's-level professionals and restricts them from conducting evaluations on certain types of cases (e.g., high profile cases, serious felonies, legally or clinically complicated cases). We have seen no training information from ODMHSAS that addresses these requirements.

*Court Consultant Report September 2025*

In July, ODMHSAS submitted a drafted policy for training of Qualified Forensic Examiners (QFE) to the Court Consultants. While there were many solid provisions, the policy was deficient in a number of areas, and we returned the policy draft with various specific comments, questions, and recommendations in August.

The Competency Restoration Plan submitted August 12 indicates that the drafted QFE policy has instead been implemented. Grammatical errors prohibit us from making a final declaration on the status of the policy (the paragraph in the Plan includes mostly a scattered list of components of their policy, but the paragraph does not reference the policy or its components as being in draft form, leading us to believe the policy had been implemented – akin to the drafted triage policy referenced earlier in this report). The Department has since corrected these errors, indicating that the QFE policy has in fact not been implemented.

Additionally, we have conducted a preliminary review of quality of reports submitted to various courts from various salaried and contracted competence evaluators. We have found that quality of reports varies widely across evaluators. We now have access to the "competency portal" and will begin reviewing reports more thoroughly to identify problem areas across evaluators. These problem areas should be the focus of future trainings.

Training evaluators to conduct high-quality competency evaluations is a specialty area of the Court Consultants. We have also repeatedly provided ODMHSAS with names of experts that could be retained to provide high-quality training to evaluators. These experts have state-of-the-art resources that can be made available online, creating a library or repository of competency-related resources (e.g., videos, skill demonstrations, template reports, checklists, relevant articles, etc.). Moreover, these experts have provided these trainings in other states, and those states have seen significant improvement in the quality of competency evaluations. To date, we have received no feedback on utilizing these experts. Instead, we were asked to review the quality of a potential online training, which we dismissed as inadequate and of very poor quality.

## (E.12.a) "Best Efforts"

The initial trainings conducted by Dr. Beamon appeared to be of good quality, and the list of evaluators trained seemed robust. We cannot comment on the comprehensive nature of the pool of participants (we only know who attended, not who did *not* attend). Moreover, there was no assessment of skills acquisition. It is good practice to assess the competence of a training participant after a training concludes to determine if the participant learned what they were supposed to learn. In competence evaluations, various states have employed a test, mock reports, shadowing or mentorship, and/or ongoing maintenance requirements to ensure that

the quality of the reports from trained evaluators is indeed adequate. To our knowledge, no such assessments have been implemented for Oklahoma's competency evaluators.

We have reviewed a small number of random evaluation reports, and we believe the quality to vary widely across evaluators. Oklahoma's evaluator pool needs further training, monitoring, and attainment of uniform standards. Dr. Beamon started the process well, but more work is needed going forward particularly given that Dr. Beamon is no longer employed by the Department. It is not clear who is now responsible for overseeing training efforts. The Department has not followed up on our recommendations for external trainers, topics for training, or quality assurance methodologies.

Moreover, no attention has yet been given to the Consent Decree's requirements regarding additional considerations for master's-level evaluators.

Therefore, although this component has been partially met, much work remains as yet undone and unacknowledged. While the training requirement could be subcontracted to capable experts quite easily, to date the Department has instead tried to shoulder all of the training burden (unsuccessfully, to date). ODMHSAS has not consulted with Class Counsel on the development of a QFE policy, and it has not provided us with an updated draft us since we submitted our commentary on their drafted QFE policy several weeks ago. The Department did schedule a meeting with us to discuss the QFE policy, but other issues precluded us from addressing the issues; the Department is expected to reschedule. Overall, despite the evaluator training efforts and drafted QFE policy, much work remains to sufficiently satisfy this deliverable. Therefore, we do not believe that Best Efforts have been utilized for this requirement of the Consent Decree.

## (E.12.b) Recommendations

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay, adopt the following:

- ODMHSAS must return their drafted QFE policy to the Court Consultants with specific responses to our questions, comments, and recommendations.
- ODMHSAS must produce a training regimen that includes introductory training for all new QFEs and ongoing maintenance training for existing QFEs. The Department must send us a list of trainers, topics, dates, locations, and training modalities before the training occurs, so that we may review and consider approval.
- ODMHSAS must create additional training, approval mechanisms, monitoring, and limitations for master's-level QFEs.
- ODMHSAS must create a quality assurance process that monitors the quality of evaluation reports. This review should be subcontracted in the beginning to ensure that adequate

*Court Consultant Report September 2025*

performance is objectively measured. ODMHSAS must maintain a certain average aggregate criterion level across evaluation reports, pulled at random, in order to avoid penalties. This criterion level and QA process must be reviewed and approved by the Court Consultants.

- ODMHSAS must create sanctions and remedies for evaluators producing poor quality reports. This will also necessitate an appeals process for evaluators who are placed into remediation or who are terminated from the evaluator pool.
- ODMHSAS must produce training proposals and cost estimates (quotes) from the national experts we have provided to them.

**(E.13) ODMHSAS is required to reevaluate all Class Members every 90 days after receiving the order for competency restoration (Par. 67)**

*(June 8 status: not met; September 10 status: Not clear)*

Paragraph 67 of the Consent Decree states "The Department shall reevaluate Class Members at least once every ninety (90) days after receipt of the Order for Competency Restoration."

This requirement differs from the one-time reevaluation requirement of *all* Class Members on the waitlist within 90 days of the entry of the Consent Decree (Par. 57), though certainly a good deal of overlap existed within the first 90 days post-entry.

We believe that the reevaluations that were completed between March 10 and June 8 (90 days after entry of the Consent Decree) would satisfy the requirement in paragraph 67 for any Class Member who would have otherwise been required to be reevaluated within 90 days after the Department received the Order for that person's competency restoration. However, 90-day reevaluations were (and remain) required for any Class Member found incompetent to proceed after March 10.

We were not provided with comprehensive data regarding compliance with this requirement prior to June 8, and so we could not determine whether the requirement was met.

We found that ODMHSAS made significant progress in the number of initial reevaluations required by paragraph 57 (which would cover the requirement in Par. 67), but because additional reevaluation data was not provided in a form that made assessing its validity readily possible, we find that Best Efforts were not utilized in the completion of paragraph 67 prior to June 8.

We have received weekly data from ODMHSAS that provides the total number of reevaluations completed for that month. We suspect that number is likely accurate, but we have not found

*Court Consultant Report September 2025*

independent data to confirm that. Also, as noted above, we find the reevaluation data submitted in the monthly reports to require additional clarification.

The Competency Restoration Plan that was submitted on August 12 does not mention the 90-day reevaluation requirement or any outcome data associated with it.

## (E.13.a) "Best Efforts"

We cannot opine that Best Efforts were utilized in the initial phase of this requirement. It seems very likely that most people who needed reevaluation under paragraph 67 would have been already covered under the reevaluation effort under paragraph 57. However, Best Efforts were not utilized for paragraph 57, despite an early push to complete reevaluations, and absent other data, we find the same for paragraph 67 in that initial time period (March 10 to June 8). Unfortunately, we cannot find independent data that corroborates the Department's current assertion that all 90-day reevaluations are being completed despite the listing of reevaluations for individuals in the monthly reports. They may well be, but the data to date has been self-reported by DHS and not confirmed by collateral sources. Our opinion on Best Efforts must currently remain as "unknown" until the Department's data is confirmed by collateral sources.

## (E.13.b) Recommendations

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay, engage in the following actions:

- ODMHSAS must provide a list of all Class Members names, locations, due dates, and assigned evaluators for submission of 90-day reevaluations.
- ODMHSAS must provide a list of all reevaluations that have been completed to date, including the names, locations, due dates, and assigned evaluators for those Class Members.
- Court Consultants or their subcontractors will independently verify the data regarding reevaluations.
- Daily penalties will be levied for any reevaluation that is not submitted by the 90-day deadline.

*Court Consultant Report September 2025*

> **(E.14) ODMHSAS is required to use Best Efforts to obtain passage of Oklahoma legislation that permits the Department to provide community-based outpatient competency restoration services (Par. 68)**

> *(September 10 status: not applicable until beginning of next legislative session)*

As described in the Decree, Oklahoma law does not presently permit outpatient competency restoration treatment. Nevertheless, the Parties have agreed that the development of a community-based restoration program will help the Department reduce wait times for Class Members to obtain necessary restoration treatment.

In their August 12 Strategic Plan, the Department acknowledged that "a Community-Based Outpatient Restoration (CBOR) pilot program will only be executed when it is authorized by Oklahoma law and that no structured CBOR services are being utilized at this time" (p. 6).

The Department indicated in their Plan that "enabling legislation to allow a community-based restoration program is still in the process of being developed and will be presented to the Oklahoma Legislature for consideration during the next legislative session" (p. 6).

The Department reported that it has "prepared the groundwork for a CBOR pilot, but its implementation remains on hold pending new legislative authority" (p. 6).

We have provided the Department with contact information for Colorado's Director of Outpatient Restoration Services operated through their Forensic Services Division in order to help provide advice and resources, as needed.

The Department has created an outline for a community-based restoration pilot program in the event that legislation is enacted during the 2026 legislative session. Much like the preparation for a future jail-based restoration program, program development of this kind can take a long time and should be done in consultation with the Consultants and Class Counsel. Once a legislative sponsor is identified, we would be willing to work with Department staff as part of an advisory group to draft proposed legislation. Notably, the state of Colorado has an established outpatient restoration program in place (the nation's largest, in fact), and we are willing to facilitate communication between the leadership of their program and ODMHSAS staff to help build a future program in Oklahoma.

*Court Consultant Report September 2025*

---

**(E.14.a) "Best Efforts"**

---

Given that the development of community-based outpatient competency restoration services is predicated upon new legislation to be passed during the 2026 legislative session, there has been little movement on this Decree requirement. However, the Department has produced an outline of such a program for future implementation and has indicated that they are prepared to help push legislation forward. It is difficult to determine whether or not the Department has made sufficient efforts to move legislation forward beginning in January of 2026. As a result, our opinion on Best Efforts must currently remain as "unknown."

---

**(E.14.b) Recommendations**

---

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay, should engage in the following activities:

- ODHMSAS staff should identify a legislative sponsor for a bill allowing for outpatient restoration services to begin next year.
- ODHMSAS staff should seek guidance from other states where outpatient restoration services have been successfully enacted.

---

**(E.15) ODMHSAS is required to develop and begin to implement a plan for staffing at OFC and addressing environment of care for forensic facilities, which ensures that OFC remains in compliance with its current accrediting-body standards (Par. 67)**

---

*(June 8 status: Not met; September 10 status: Partially met)*

---

This formal staffing plan was to be developed within one-hundred twenty (120) days of entry of the Decree and made in consultation with Class Counsel and Consultants and ultimately approved by the Consultants. This has not yet occurred in any sort of collaborative fashion.

In the August 12 Strategic Plan, a formal staffing plan for OFC was not provided, though the Department indicated that they have "twenty (20) new hires at OFC, including psychiatrists, psychiatric nurses, therapists, and behavioral health aides" (p. 7). The breakdown of these new hires was not provided in the Plan.

In the August 12 Plan, the Department states, "The physical environment and resources at OFC have been improved to meet modern environment-of-care standards. By September 2025, renovation projects will have updated safety features and treatment spaces in aging units, and

equipment for delivering evidence-based restoration programming has been enhanced" (p. 10). Consultants have previously and on several occasions requested the most recent JCAHO report for OFC, but we have not received it.

Having enough clinical and administrative staff at OFC is crucial for providing effective treatment to individuals at the facility and reducing their overall length of stay (LOS), which is one of the most important metrics involved with reducing the number of Class Members on the waitlist. Having a proper number of psychiatric providers (psychiatrists or advanced practice psychiatric nurses) at OFC is critical, as restoration treatment often hinges upon adequate treatment of psychiatric symptoms that are creating a barrier to competency. OFC currently has a bed capacity of 268. The facility has three full-time psychiatrists to provide psychiatric treatment at the facility. This represents a staffing ratio of almost 90 patients per provider. That staffing ratio is far from adequate and is undoubtedly contributing to the inappropriately high LOS at OFC.

Recent state-specific models and surveys focused on forensic mental health units (where competency restoration often occurs) recommend ratios ranging from one psychiatric provider per 14-24 patients. To approach this staffing ratio at the current capacity, OFC would have to hire at least eight additional providers. Notably, OFC plans to open an additional 80 beds in the months ahead which would require an additional 3 psychiatric providers to staff at the 24:1 patient per provider ratio. OFC is currently budgeted for only four psychiatric providers, so funding for additional providers would have to be requested and approved by the legislature.

As with the psychiatric providers, there are an insufficient number of psychologists on staff at OFC which significantly impacts the ability to conduct neuropsychological testing, specialized treatment modalities, and competency reevaluations at the facility. OFC is currently budgeted for five psychology positions; at present, none are filled.

With regard to addressing the environment of care at OFC to ensure that the facility remains in compliance with its current accrediting-body standards, the Department has almost completed a planned 80-bed expansion at the facility which appear to have been designed and constructed with the explicit goal of addressing environment of care (EoC) standards to ensure compliance with accrediting bodies such as JCAHO and Centers for Medicare & Medicaid Services (CMS). OFC administration has reported to us that once the new units are operational, patients will be transferred from current OFC units so that the older units may receive necessary updates.

## (E.15.a) "Best Efforts"

Staffing challenges at OFC are a historic problem and the Department has indicated in their recent Plan that they are "committed to determining the causes of the direct care staff vacancy rate and will implement processes and policies designed to remedy this vacancy rate problem" (p. 7). Rural state psychiatric hospitals often face shortages of qualified clinical staff due to geographic isolation and challenges in recruiting and retaining specialists. As a result, the

*Court Consultant Report September 2025*

Department may need to utilize alternative staffing models while recruiting for these positions, such as the use of locum tenens (temporary) providers and/or utilizing telepsychiatry which can significantly expand access to expertise, reduce costs, enhance care quality, and improve operational efficiency.

It is a positive development that there have been twenty new hires at OFC, though we are uncertain as to the positions that have been filled and whether that represents an overall increase in staff or simply replacement of recent staff turnover. We are aware that the Department is actively attempting to address the staffing issue at OFC based upon on ongoing conversations during weekly meetings, and that they are currently exploring various alternatives (such as locum tenens and telepsychiatry providers) to meet the clinical needs of OFC. In addition to increasing the number of staff, the Department has been proactive in working toward changes in clinical leadership positions and has reportedly brought in an external psychiatric consultant, which are positive developments.

The construction of 80 new hospital beds at OFC is a very positive development and these beds appear to be nearing operational readiness. Based upon our most recent tour of OFC in early July, the new units appear to feature ligature-resistant fixtures, therapeutic aesthetics, and safety-focused layouts, reflecting a commitment to patient safety, staff efficiency, and regulatory adherence. These designs not only meet accreditation requirements but also aim to improve patient outcomes and operational sustainability in modern psychiatric care. The stated goal of the Department once these new beds open is to transfer patients from older units in order to make necessary updates to older units, which will facilitate compliance with accreditation standards.

To date, this component has been partially met, yet much work remains to be accomplished.

## (E.15.b) Recommendations

- ODHMSAS needs to prioritize filling all current open psychiatric positions at OFC and should try to request legislative funding for a substantial number of additional positions based upon nationally recommended staffing ratios. This is one of our primary recommendations, and we have consistently urged the Department to improve and expand staffing at OFC. An ongoing partnership with local medical schools with psychiatric residencies and forensic psychiatry fellowships should continue to be cultivated, as this will be the best pool for future staffing needs.
- ODMHSAS should make use of locum tenens providers until full-time on-site psychiatric providers positions are filled. Additionally, the use of telepsychiatry should be considered, which will allow OFC to expand the pool of available clinicians.
- The Department should prioritize filling all current open psychology positions at OFC. Relationships with psychology training programs in the state should be cultivated.
- The Department shall provide the Consultants with most recent JCAHO reports for OFC, as previously requested.

*Court Consultant Report September 2025*

## (E.16) Timely Restoration Treatment (Par. 85)

The Decree creates a general obligation for ODMHSAS to use Best Efforts to provide Class Members with timely and appropriate restoration services (Par. 85). This includes admitting Class Members into restoration treatment within the timelines determined by the Consent Decree Maximum Allowable Wait Times and the triage policy.

This overarching requirement is designed to provide broad guidance for the timely admission of Class Members into competency restoration treatment, regardless of the county jail, restoration setting, transportation necessities, or other specifics regarding admission. Timely admission is clearly the main objective of paragraph 85.

To date, wait times for admission have reportedly decreased. We reiterate our hesitancy to explicitly trust the wait time data that has been presented to us, but by most accounts it does appear likely that wait times for admission have decreased on average. For example, the Department has presented average wait times in every weekly meeting since June; on June 4, the average wait time was 214 days, and that figure has decreased fairly regularly to an average of 99 days as of August 27. Given that the pace of admissions to OFC has increased, and that the Department has admitted many people with very long wait times, a decrease in average wait time seems reasonable and likely to have occurred – though, as we have noted, the reliability of the data needs to be independently verified (hence our recommended means for doing so).

We affirm the Department for its hard work and focus in this area. Decreased time on the waitlist for all individuals would be a certain sign of positive and meaningful progress. Still, two major admission time frames exist in the Consent Decree: the Maximum Allowable Wait Times, and any additional time frames prescribed by the triage policy. On October 10, the Department will be required to admit *all* Class Members within 60 days. That figure decreases in stair step fashion to a maximum of 21 days on July 10, 2026.

The triage policy will prescribe a lower number of days for that minority of Class Members identified as needing Expedited admission. That number has yet not been determined, but it will be lower than each of the maximum allowable wait times.

Given that the triage policy was not completed by the original June 8 deadline, and that recent wait time averages (95 days) are still well above the Decree mandated initial maximum allowable wait time (60 days), there is still work to be done in meeting the requirement established in paragraph 85. However, the Department does seem focused on this obligation, which was not the case through June when we filed our interim report.

*Court Consultant Report September 2025*

## (F) Strategies that Should be Adopted as Priorities

The Decree exists to address the needs of a large population of individuals who have been found incompetent to stand trial and ordered to a restoration setting, but who are instead languishing in jail while awaiting restoration services. Our tour of the Tulsa County and Oklahoma County jails showed scores of people, many acutely psychotic, confined to jail cells for virtually the entire day – for months at a time. Such confinement cannot help but worsen their conditions, given the prevailing lack of treatment for those individuals.

We understand that the implementation of a Decree is complex, involves many factors, and requires assertive leadership. However, despite ODMHSAS's obligation to implement the Decree, its record in meeting court-imposed deadlines has lagged to date.

Consequently, we provide three priority recommendations that we believe are essential to accelerate progress from ODMHSAS, as well as to ultimately alleviate the suffering of individuals with acute psychosis who remain in county jails while they wait for competency restoration services. These recommendations align with requirements set forth in the Consent Decree, and in some cases provide tangible action steps to advance particular sections of the Consent Decree.

## (F.1) Appoint an individual with responsibility and authority to exclusively oversee implementation of the Decree

We have made this recommendation repeatedly from the beginning of our work. While agency Counsel (Mr. Settle) has assumed a good bit of this role, and has been a good partner, we recognize that he is spread across the agency with multiple responsibilities stemming from contract oversight to legislative relationships to the other matters that occupy a legal counsel and trusted advisor to the Commissioner. We continue to believe that it is critical that an official of sufficient status, knowledge, skills, forensic expertise, and a sense of urgency assumes overall responsibility for implementation of the Decree. Given the announced interim nature of Admiral Slavonic's and Mr. Settle's appointments, the Department should identify an individual who will be poised to oversee the provisions of the Decree in the years ahead. Without such an individual, we fear a return to the seeming diffusion of responsibility across multiple people without overall coordination that marked ODMHSAS efforts through June. This recommendation aligns with our recommendations found on pages 31 to 32 as well as 37 and 38.

## (F.2) Reduce the restoration length of stay (LOS) at OFC

One of the most effective ways to reduce the number of Class Members on the waitlist is to reduce the average LOS for those currently receiving competency restoration treatment at OFC. When work on the Consent Decree began in March 2025, the reported length of stay (LOS) for

*Court Consultant Report September 2025*

defendants receiving restoration treatment at OFC was over 300 days. Over subsequent months, we were informed that the length of stay was trending down, though it has recently remained around 270 days. As part of its Strategic Plan, we believe that the Department should implement a multifaceted approach to substantially reduce the LOS at OFC within 90 to 120 days, consistent with national standards. This would result in more restoration beds being available at the facility on an annual basis, substantially reducing Class Members' time spent in jail awaiting competency restoration services. An actionable plan to accomplish this needs to be created and implemented with specific deadlines as well as identifying which parties are responsible for assuring this occurs.

We recently provided a memo to the Department outlining specific methods that OFC could employ to assist with this process. The memo in its entirety is attached to the end of this report in *Appendix F*.  However, the following is a brief summary of these proposed recommendations:

**(F.1.a) Increase Psychiatric Staffing**. Target a staffing ratio of 1 psychiatric provider per 24 patients (from the current 1:90) by filling open positions, requesting legislative funding for 11 to 14 providers (including for 80 new beds), using locum tenens, and leveraging telepsychiatry. Cultivate partnerships with medical schools for future recruitment.

**(F.1.b) Enhance Frequency of Psychiatric Contact**. Ensure weekly patient evaluations for the first 8 weeks, then monthly (at a minimum), with brief unit check-ins to monitor mental status and adjust medications promptly. Frequent contact enables tailored treatment and faster competency restoration.

**(F.1.c) Implement Aggressive Psychopharmacology**. Rapidly initiate and titrate psychotropic medications (e.g., antipsychotics) to stabilize symptoms, using supratherapeutic doses or combinations when needed. Utilize external psychiatric consultation (e.g., modeled on California's PRN team) for complex cases.

**(F.1.d) Expand Use of Involuntary Medications**. Pursue court-ordered involuntary medication for patients lacking capacity and posing risks, collecting data on existing orders, petition frequency, hearing timelines, and restoration outcomes to evaluate effectiveness.

**(F.1.e) Strengthen Programming and Treatment Options**. Offer daily restoration groups, individual/group counseling, life skills training, and substance use treatment. Employ cognitive behavioral therapy for psychosis and ensure access to neuropsychological testing by hiring additional psychologists and partnering with training programs. Ensure that these services are consistently available, as our recent reviews indicate that services are often cancelled due to staff shortages or other circumstances.

*Court Consultant Report September 2025*

**(F.1.f) Increase Competency Reevaluations**. Conduct reevaluations every 90 days or sooner upon clinical improvement, ensuring adequate evaluators to expedite discharges.

These strategies aim to reduce OFC's LOS from 270+ days to 90 to 120 days, increasing bed availability, reducing jail waitlists, and ensuring compliance with the Consent Decree. Reducing the LOS at OFC should be the primary goal of the hospital administrator, and she and ODMHSAS should advocate strongly for the resources necessary to decrease the LOS to a national standard. Additional strategies should also be considered to those found above, including the prioritization of filling the five vacant psychology positions at OFC so that specialized evaluations and competence re-evaluations can occur promptly.

## (F.3) Increase bed capacity across the state

 As discussed previously in this report, OFC is scheduled to complete construction of 80 new beds in the months ahead. However, it is unclear whether the facility will be able to adequately staff those new units to make use of them expeditiously. Also, OFC has signaled the intent to transfer patients from existing units to the new ones in order to provide necessary updates to the infrastructure of the older units. This means that while 80 new beds will be coming online, there may not be an actual increase in bed capacity at OFC for some time. As a result, the Department should continue to look for innovative ways to expand bed capacity at sites other than OFC. For instance, in its August 12 Strategic Plan, the Department indicated that it is "working to secure contracts with two private psychiatric hospitals—totaling fifty-two (52) beds— to accept appropriate forensic restoration patients" by November of 2025 (p. 10). The Department has also discussed the possibility of opening 30 additional beds at Griffin Memorial Hospital, which would allow for transfer of patients from OFC to Griffin who have been deemed unrestorable and are awaiting resolution of their charges and subsequent placement in the community. Additionally, the Department has discussed utilizing various facilities across the state as potential residential beds for insanity acquittees who are currently housed at OFC which would provide more beds at OFC for restoration treatment, thereby reducing the waitlist of Class Members waiting in jails for those services. We laud the Department's current focus upon varied solutions to this issue and strongly encourage them to implement these solutions at the earliest opportunity.

*Court Consultant Report September 2025*

## Summary of Consultant Findings on Best Efforts

As we have stated repeatedly, the appointment of new leadership has led to new era regarding the Departments' approach to the Consent Decree. We believe there is more diligence, hard work, and transparency than was present in previous administrations. We acknowledge and affirm this change in culture.

However, hard work and good efforts do not necessarily equate to Best Efforts. We defined Best Efforts earlier in this report, using both language from the Consent Decree and from our own expertise as Court Consultants. We have also detailed, section by section, where Best Efforts were met and where, in our opinion, they were not met. The following summary is provided for ease of readership, but additional examples, justifications, and details are found in various sections throughout this report:

- ODMHSAS has not responded to many of our requests for information, some going back to March 21;
- ODMHSAS has often produced incomplete and internally conflicting data;
- ODMHSAS has produced a Plan that emphasizes work conducted to date, but barely addresses the essential ingredients of a strategic plan such as workplans, logic models, projected benefits of different strategies, barriers to implementation, timelines, who is responsible for the work, data collection and analysis, program evaluation, and the like;
- Moreover, the submitted Plan contained a number of alarming factual errors and inconsistencies;
- ODMHSAS has not yet shown true urgency in dealing with some core elements of the Decree, such as determining whether pilot jail-based restoration programs can be created and if not, what alternatives might exist; and,
- ODMHSAS has failed to meaningfully collaborate with Class Counsel as required by the Decree (although we believe this to be changing, collaboration needs to be accelerated and housed in a more formal structure).

Consequently, we have provided many recommendations for improvements as well as proposed remedies. We believe the lack of Best Efforts across multiple domains of the Consent Decree meets the definition of Material Violation of the Consent Decree, and that as a result, remedies whether financial or injunctive are appropriate. We note our proposed remedies throughout this report, and we also note that financial penalties will only be incurred if other recommendations and deliverables are not first satisfied. The various remedies comprise a combination of additional data collection, fact checking, communication with Court Consultants, quality assurance, and potential financial penalties.

*Court Consultant Report September 2025*

## Summary

Progress in implementing the Decree from March 10 through our Interim Report on June 8 was hard to discern. Since the appointment of Retired Rear Admiral Slavonic as Interim Commissioner, the Department's focus on the Decree has become much more evident, and progress has been made as we note at multiple points in this Report. Our findings that Best Efforts have not yet been attained in several areas should not be construed as an opinion that hard work and good faith have been absent; in fact, we believe that ODMHSAS has shown evidence of both. However, the Decree requires more. Many deadlines have been missed, and we trust that under current leadership major progress will be accelerated. Our opinions, recommendations, and proposed remedies reflect both the Department's progress to date as well as the work that remains to be conducted. We have also provided several recommendations regarding the need for additional Departmental staffing and resources, as we believe those are critical to the Department's success in attaining compliance with the Consent Decree.

Each of the Court Consultants has participated in the writing of this Report, and all concur with its findings and recommendations.

Respectfully submitted,
September 26, 2025

Neil Gowensmith, Ph.D.
Darren Lish. M.D.
John Petrila, J.D., LL.M.
Court Consultants, *Briggs v Friesen*, No 4:23-cv-00081-GKF-JFJ

*Court Consultant Report September 2025*

# Court Consultant September 2025 Report Appendices

**APPENDIX A: ODMHSAS Request for Extension; Class Counsel Memorandum in Opposition; Court Consultant Decision**

> **APPENDIX A (cont.)**
> **APPENDIX A (cont.)**

**APPENDIX B: August 12th ODMHSAS Strategic Plan and Cover Letter; Court Consultant Response**

> **APPENDIX B (cont.)**
> **APPENDIX B (cont.)**
> **APPENDIX B (cont.)**

**APPENDIX C: Court Consultant Request for Information, March 21, 2025**

**APPENDIX D: Court Consultant Triage Memo; Department Proposed Triage Plan and Court Consultant Response**

> **APPENDIX D (cont.)**

**APPENDIX E: Resources Provided to ODMHSAS by Court Consultants to Date**

**APPENDIX F: Court Consultant Recommendations for Reducing the Length of Stay to Restoration at OFC, As an Example of Resources Provided by Court Consultants**

**APPENDIX G: Court Consultant Recommendations for Additional Relief**

**APPENDIX H: Benchmarks to Mark Progress from mid-June through August**



OKLAHOMA
Mental Health &
Substance Abuse

*SERVICES WITHIN REACH*

Gregory Slavonic
Rear Admiral, USN (Ret.) | Interim Commissioner

Kevin Stitt | Governor

June 27, 2025

**VIA OVERNIGHT DELIVERY**

Groundswell Services
c/o William Neil Gowensmith, Ph.D.
P.O. Box 102381
Denver, CO 80250
Neil.gowensmith@gmail.com

John Petrila
6 W. Via Plaza Nueva
Santa Fe, NM 87507
petrilajohn@gmail.com

Dr. Darren Lish
2329 Woodbury Ln
Evergreen, CO 80439
darrenlish@hotmail.com
darrenlish@cuanschutz.edu

Subject: Letter Requesting Extension of Timelines

Dear Court Consultants,

The Department of Mental Health and Substance Abuse Services ("Department") is in receipt of your interim report dated June 12, 2025. After reviewing the report, the Department's new leadership respectfully requests it be granted a six (6) week extension from July 1, 2025, to be allowed to come into compliance with the initial June 8, 2025, mandates of the Consent Decree. This request would effectively extend the deadline for those mandates to August 12, 2025. Additionally, the Department requests the Court Consultants extend its initial quarterly report the same six (6) week period. During this extension, the Department will actively work on addressing the issues noted in the Court Consultants' interim report and will actively work to make positive changes to Oklahoma's Competency Restoration Program. In order to do this, the Department will do as follows:

**ADDRESS**
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106

**PHONE**
1 (405) 248-9200

**WEBSITE**
oklahoma.gov/odmhsas



SERVICES WITHIN REACH

Gregory Slavonic
Rear Admiral, USN (Ret.) | Interim Commissioner

Kevin Stitt | Governor

While reviewing the current state of the Competency Restoration Program, the Department believes it can reasonably complete the following ninety (90) day requirements of the Consent Decree within the requested six (6) week extension:

- Department staff will provide training and technical assistance to Consultants and Class Counsel, to assist their understanding of data collection, the Treat to Competency portal and competency population management, if requested by Consultants and Class Counsel.
- Clarify the number of individuals who are in custody waiting on competency restoration services and develop an accurate and meaningful way of tracking the case progress for each individual.
  - The tracking of individuals within the competency restoration program, outside of OFC, occurs via the Department's statewide Treat to Competency portal. The Department halted the use of tracking spreadsheets in January 2025, moving all data and auditing of Class Members' status in the restoration program to the portal.
  - Class Members are tracked from the time of receipt of the order for evaluation, through case disposition with program level and custody status being updated as needed.
  - The Department has created a central email; forensicservices@odmhsas.org that is the receiving email for all competency related documentation. There are six Department staff who monitor this email.
  - The Department's Data Support Division (DSS) has developed and continues to develop a variety of programmatic reports from data entered in the portal to monitor, audit and plan, regarding restoration program needs and individual person's needs.
- Ensure the Department meets requirements "in consultation with Class Counsel and Consultants" as required by the Consent Decree.
  - The Department will work with the parties to ensure the requirement of a Fines Account is met. By July 15th the Department will work with the parties to choose a Fines Committee and to select an agreed upon third party to manage the account.
  - The Department will prepare an agenda prior to all meetings and will ensure all parties have access to all necessary information prior to meetings.
- Coordination of all Consent Decree communications will proceed through the Department's General Counsel, John Settle (john.settle@odmhsas.org).
- Create a comprehensive list and schedule of all consumers to be re-evaluated under the Consent Decree.



**ADDRESS**
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106



**PHONE**
1 (405) 248-9200



**WEBSITE**
oklahoma.gov/odmhsas



SERVICES WITHIN REACH

Gregory Slavonic
Rear Admiral, USN (Ret.) | Interim Commissioner

Kevin Stitt | Governor

- Moving forward the Central Office Competency Team staff will be able to pull a report to monitor reevaluation needs from the portal to ensure timelines are adhered too.
- Providers in the community can also reevaluate immediately when they document a positive or negative shift in symptoms or other behavioral change in the individual. This is also documented and tracked in the portal.
- The Department will ensure all individuals added prior to February 8, 2025, will be accounted for in the reevaluation list.
- Work in consultation with both Class Counsel and the Consultants to develop the initial stages of the strategic plan to implement the Consent Decree, including articulating concrete goals, steps necessary to complete those goals and timelines, and responsible parties to complete said goals.
- Develop a "written triage screening protocol for Class Members…declared incompetent" with reasonable deadlines for screening, adoption of a screening protocol, establishment of triage levels for the expedited placement, treatment of Class Members, and adoption of qualification standards for those providing triage.
  - A written triage protocol has been developed with the collaboration of the Consultants and is being reviewed by the Department for implementation. The Department is also working to include this documentation and tracking within the portal. The Department's goal is to have evaluator training and larger process implementation in effect by August 1, 2025.
  - The Department will schedule time to collaborate with Class Counsel on the triage screening protocol and implementation.
- Enhanced compliance with the Consent Decree requirement for competency evaluations to be submitted within thirty (30) days of the Department's receipt of the order for evaluation and other necessary documentation.
  - The Department's Central Office Competency Team (Team) currently operates under the following protocol: Upon receipt of a Court's order for evaluation and all necessary documentation, the information is entered into the portal within 1 business day of receipt and assigned to an evaluator. The Team has recently been working through a back log due to not having full staff but will be in one hundred percent (100%) compliance by July 15th and beyond.
  - The dates for receipt of information and orders as well as assigning evaluations are all current data points in the portal. In addition to the date the report was provided to the Court and the opinion provided in the report by the evaluator.



**ADDRESS**
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106



**PHONE**
1 (405) 248-9200



**WEBSITE**
oklahoma.gov/odmhsas



*SERVICES WITHIN REACH*

Gregory Slavonic
Rear Admiral, USN (Ret.) | Interim Commissioner

Kevin Stitt | Governor

While reviewing the current state of the Competency Restoration Program, the Department believes it can reasonably make good faith progress on the following requirements in the Consent Decree within the requested six (6) week extension:

- Use good faith and best efforts to negotiate the use of space for an "in-jail competency restoration program" in the Tulsa County Jail.
- Begin to develop initial and periodic trainings for the personnel of all Oklahoma District Courts, Oklahoma sheriff's offices, and members of the Oklahoma State Bar concerning competency evaluations and restoration.
- Develop criteria to promote consistency in incompetency evaluations across evaluators.
- Develop criteria for community providers in jails to ensure consistency and quality on services being provided statewide.

While reviewing the current state of the Competency Restoration Program, the Department believes it will need assistance from the Court Consultants and industry professionals to determine appropriate next steps on the following requirements in the Consent Decree within the requested six (6) week extension:

- While the Department collects and identifies the data below necessary to complete the Forensic Bed Analysis, the Department would appreciate assistance with expanding data collection efforts and analytics to ensure all areas of care are accounted for. The Department further understands that the Court Consultants can provide assistance in identifying other necessary data to complete a comprehensive analysis and requests support in this effort.
  - The Department's Data Support Division will:
    - Work with the OSBI and other partners to collect the most recent crime rate data.
    - Utilize information collected in the portal; number of evaluation orders entered in the portal, those opined incompetent, and those ordered to the department.
    - Obtain the current number of Department beds available as well as staffing levels required for care, and work toward the ability to update the available number on a weekly basis.
- The Department has begun work for future legislative amendments to propose for the 2026 legislative session.

As set out above, the Department respectfully requests it be granted a six (6) week extension from July 1, 2025, to August 12, 2025, to be allowed to come into



**ADDRESS**
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106



**PHONE**
1 (405) 248-9200



**WEBSITE**
oklahoma.gov/odmhsas



**OKLAHOMA**
Mental Health & Substance Abuse

**SERVICES WITHIN REACH**

Gregory Slavonic
Rear Admiral, USN (Ret.) | Interim Commissioner

Kevin Stitt | Governor

compliance with the initial June 8, 2025, mandates of the Consent Decree. The Department further requests the Court Consultants extend its initial quarterly report deadline the same six (6) week period.

The Department sincerely appreciates the advice and counsel of the Consultants and looks forward to working collaboratively with the Consultants and Class Counsel during our efforts to achieve one hundred (100%) percent compliance with the terms of the Consent Decree in as short a time as possible. Please, accept the Department's apology regarding its failure to have complied with Consent Decree mandates of the original June 8, 2025, deadline.

Sincerely,

Greg Slavonic
Rear Admiral, USN (Ret.)
Interim Commissioner

cc:    Paul DeMuro
       Fredrick Dorwart
       David Leimbach
       Frederic, Dorwart Lawyers, PLLC
       Old City Hall
       124 East 4th Street
       Tulsa, OK  74103
       pdemuro@fdlaw.com
       fdorwart@fdlaw.com
       dleimbach@fdlaw.com

Nick Southerland
Brian S. Wilkerson
Oklahoma Disability Law Center
5555 E. 71st Street, Suite 9100
Tulsa, OK  74136
nick@okdlc.org
brian@okdlc.org



**ADDRESS**
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106

**PHONE**
1 (405) 248-9200



**WEBSITE**
oklahoma.gov/odmhsas



# FDLaw ®

### FREDERIC DORWART, LAWYERS PLLC

TULSA • DALLAS

---

Paul DeMuro
Licensed in Oklahoma, New Mexico and Colorado
pdemuro@fdlaw.com

Main: (918) 583-9922
Direct: (918) 583-9957
Facsimile: (918) 583-8251

June 30, 2025

**Via Email**

Groundswell Services
c/o William Neil Gowensmith, Ph.D.
P.O. Box 102381
Denver, CO 80250
neil.gowensmith@gmail.com

John Petrila
6 W. Via Plaza Nueva
Santa Fe, NM 87507
petrilajohn@gmail.com

Dr. Darren Lish
2329 Woodbury Ln
Evergreen, CO 80439
darrenlish@hotmail.com
darren.lish@cuanschutz.edu

> Re:  Response to Department's June 27, 2025 Request for Retroactive Extension of Deadlines.

Dear Court Consultants:

We have reviewed Interim Commissioner Slavonic's June 27, 2025 letter, which we received via email at 5:44 p.m. on June 27.  For the reasons discussed below, Class Counsel opposes the Department's request to extend retroactively the June 8, 2025 Plan implementation deadlines, and the deadline for the Court Consultants' initial quarterly report, to August 12, 2025.

As an initial matter, we note that the Department's General Counsel, Mr. John Settle, states in his transmittal email that the Department's request is made "pursuant to the provisions of paragraph 114" of the Consent Decree.  Paragraph 114, which is the notice provision of the Consent Decree, provides no basis to request deadline extensions.  We acknowledge that, under Paragraph 49, the Court Consultants have the authority to "modify or excuse any timeframe," and that such a request is subject to the Dispute Resolution Process set out in Section VIII of the Consent Decree.  Accordingly, we will treat the Interim Commissioner's June 27 letter as an extension request under Paragraph 49.

Letter to Consultants
June 30, 2025
P a g e | **2**

    The Department repeatedly claims it seeks a "six (6) week extension." In reality, the Department seeks a retroactive extension of 64 days, from June 8 to August 12. This is more than a nine-week extension, or a 71% increase of the Plan's 90-day implementation schedule. Such an extraordinary request requires extraordinary justification. The Department has not attempted to provide *any* justification, much less a compelling one, to excuse the Department's failure to meet the June 8 deadlines. For a number of reasons, the Department's request for a 64-day retroactive extension is unjustified and unfairly prejudicial to the Class Members.

    **First**, the Department's extension request is untimely, made three weeks *after* the June 8 deadline expired. In federal court, when a party requests an extension after a court-ordered deadline has expired, the party must show both "good cause" and "excusable neglect."[1] The Department can make neither showing. The Department could and should have easily foreseen the need for an extension request far in advance of the June 8 deadline, given that it had made almost no meaningful progress toward the 90-day Plan implementation deadlines. In the days leading up to the June 8 deadline, instead of honestly confronting its shortcomings and seeking good-faith collaboration with stakeholders and Class Counsel, the Department (under its former Commissioner) claimed the Department was on track to comply with the 90-day deadlines. The Department's failure to seek an extension before the June 8 deadline was not the result of excusable neglect; but rather, was a continuation of the Department's misleading communication practices under the prior two Commissioners.

    We infer that the Department's request is based on the Department's recent leadership change, as the request is made on behalf of the Department's "new leadership." Although we are guardedly optimistic that Interim Commissioner Slavonic will make effective changes to the Department's compliance efforts, and we acknowledge that Interim Commissioner Slavonic inherited the current mess, leadership change alone cannot be grounds to extend already expired deadlines. Interim Commissioner Slavonic is the third Commissioner who has been involved in the Consent Decree. Interim Commissioner Slavonic's tenure will, by his own admission, be short lived. We are likely to have a different Commissioner when a new Governor is elected in 2026. You get the point: if a change in leadership could, by itself, justify extending already expired deadlines, then all deadlines in the Consent Decree would be perpetually moving targets. The Consent Decree would become an ineffectual paper tiger.

---

[1] *Loomis v. Specialized Desanders, Inc.,* 2019 WL 5197565, WDOK (Sept. 25, 2019), *1 (citing Fed. R. Civ. P. 6(b)(1)(B) and *Utah Republican Party v. Herbert*, 678 Fed. App'x. 697, 700 (10th Cir. 2017) (unpublished).

Letter to Consultants
June 30, 2025
P a g e | 3

Your June 13, 2025 Interim Report correctly found that the Department's "failure to submit even the semblance of the required Plan fails to meet the [Consent Decree's] 'best efforts' standard." Doc. 119, p. 7. This finding is particularly inexplicable given that the Plan's components, and the 90-day deadlines, were well known to the Department for many months *before* the Consent Decree was entered. Against this backdrop, the Department should not be rewarded with a nine-week retroactive extension simply because a new Interim Commissioner was appointed.

**Second**, since June 8, we have not seen the type of dramatic action and improvement that might justify a nine-week retroactive extension. The Department's waitlist data continues to be unreliable. We receive almost daily reports of competency evaluations still being performed by unqualified or untrained personnel. The Department has still not, to the best of our knowledge, designated a qualified and properly empowered administrator (like Dr. Jason Beaman) to oversee Consent Decree compliance. We've seen no meaningful progress toward implementing a pilot JBR program in Tulsa County. The list goes on.

Equally troubling, there are several members of the prior Commissioner's executive leadership team who, apparently, still have decision-making authority over matters impacting the Consent Decree. We seriously doubt the Department will make meaningful and lasting changes unless the Interim Commissioner cleans house.

**Third**, the proposed retroactive extension unfairly prejudices the Class Members. The Consent Decree grants the Class Members the right to seek immediate injunctive relief with the Court to remedy "Material Violations" by the Department. (Paragraph 100). By definition, any failure to use "Best Efforts" is a "Material Violation." (Paragraph 28). Out of respect for Interim Commissioner Slavonic, we have agreed, for now, not to seek any immediate relief as a result of the Department's failures to use Best Efforts to meet the June 8 deadlines. But we certainly have not waived our right to do so if effective and prompt progress is not made. To grant the Department retroactive relief from deadlines simply due to a leadership change would be fundamentally unfair to the Class Members who, four months after entry of the Consent Decree, are still languishing in Oklahoma county jails with a failing restoration system.

**Fourth**, the Department's retroactive extension request would disrupt the structure and intended functioning of the Consent Decree going forward. A nine-week extension of the initial 90-day deadline will create a knock on effect on the other critical path Consent Decree deadlines. The deadlines in the Consent Decree, including the 90-day plan deadlines, were the product of extensive negotiations and thoughtful collaboration. All of the deadlines, including the Fines deadlines, are intended to function together to create realistic performance incentives. We strongly

Letter to Consultants
June 30, 2025
P a g e  | 4

oppose threatening the Consent Decree's critical path timelines at such an early stage.

In closing, we are hopeful that Interim Commissioner Slavonic will promptly turn things around. We are committed to working collaboratively with the Department, the Attorney General's Office and stakeholders to make Oklahoma's competency restoration system the best in the nation. We believe the proposed new August 12 "deadlines" are useful goals for the Department, given the sorry state of affairs that Interim Commissioner Slavonic inherited. However, the Class Members should not be prejudiced by granting the Department a retroactive nine-week extension. For the reasons stated herein, we object to the Department's extension request.

Respectfully,

*Paul DeMuro*

Paul DeMuro

cc:    Counsel of Record

*Court Consultant Report September 2025*

## APPENDIX A (cont.)



**No 4:23-cv-00081-GKF-JFJ**

**Briggs v. Friesen, Case No: 23-cv-81-GKF-JFJ**

**July 8, 2025**

Via Email

Mr. John Settle
General Counsel
ODMHSAS
John.Settle@odmhsas

Copies to Plaintiffs' Counsel and Office of the Oklahoma Attorney General

      Re: Response to June 27,2025, Request by ODMHSAS for Retroactive Extension of Court-Imposed Deadlines

Dear Mr. Settle,

This is in response to the June 27, 2025, request by ODMHSAS for an extension of mandates in the Briggs Consent Decree that were to be met by June 8, 2025. We have reviewed your request carefully, as well as the June 30, 2025, letter from Plaintiffs' Counsel urging us to deny the request for multiple reasons. We have the authority under paragraph 49 to "modify or excuse any timeframe imposed on Defendants or the Department" and any disagreement regarding the exercise of that authority is subject to the Dispute Resolution Process established by Section VIII of the Decree. We treat Plaintiffs' Counsel's objections as made under the Dispute Resolution Process. We have not requested additional material from either party to resolve this dispute given the comprehensive nature of both the request and the response. In addition, we are aware of the standard for modification of judgments in FRCP 6b, which has been interpreted to permit courts to extend deadlines for "excusable neglect". While we are not applying that standard here, one of the factors a court is to consider in exercising its authority is prejudice to the opposing party if a deadline is extended and another is whether delays were caused by factors outside the party's control.

*Court Consultant Report September 2025*

As our June 13, 2025, Interim Report noted, ODMHSAS failed completely to meet these June 8, 2025, deadlines:

- Reevaluate all Class Members waiting for restoration treatment
- Develop and begin to implement the Strategic Plan
- Develop and begin to implement a plan for a material increase in new inpatient forensic beds
- Develop and begin to implement a plan to staff the Department with individuals qualified to oversee competency evaluation and restoration programs
- Offer training to various legal officials on competency evaluations and restoration
- Develop and begin to implement a pilot in-jail restoration program at Tulsa County Jail

DMH met one June 8 deadline (competency training) and partially met another (development of a triage screening protocol). However, the monthly status reports required by the 10th of each month, while improved, have been submitted late and still do not fully meet criteria established in the Decree, and evidence suggests that DMH is not currently meeting the requirement that all initial evaluations occur within 30 days of receipt of the order.

We are confident in the leadership Admiral Slavonic and you are providing and very much appreciate the transparency you have shown us. We also know that Admiral Slavonic inherited rather than presided over the complete lack of movement by ODMHSAS in adhering to the Decree prior to his appointment and is remaking internal capacity to assure compliance. At the same time, our June 13 Interim Report captures the Department's failure to do virtually anything substantial to comply with the Decree from the date of its entry on March 10, 2025, to the Admiral's appointment by Governor Stitt in early June.  The Interim Report was submitted to and filed by Judge Frizell and is an official part of the record in Briggs. We cannot retroactively absolve the Department for its lack of significant effort between March 10 and early June. Delays in meeting deadlines within that time period were not caused by factors outside of DMH's control and in fact, we were assured regularly that the June 8 deadlines would be met.

We also acknowledge that you and Admiral Slavonic are setting new expectations for the Department, expectations that should accelerate the Department's efforts. In addition, your request helpfully lays out concrete steps that would achieve compliance with the June 8 deadlines that have been missed. Accordingly,

- We will change the expected date of completion of our bi-annual report from late July to mid-August

*Court Consultant Report September 2025*

- We will acknowledge in that report any efforts made under Admiral Slavonic's leadership to assure compliance with the terms of the Decree and will distinguish as appropriate between his tenure and the period before he assumed office
- In doing so, we will hold the Department to the promises made in your June 27, 2025 request, with an expectation of full compliance by August 12 with all June 8 deadlines, including preparation and initial implementation of the Strategic Plan (incorporating other planning requirements established by the Decree); completion of all reevaluations that are outstanding; completion of initial evaluations within 30 days of receipt of the order; good faith discussions and development of a plan for creation of a jail-based competency restoration unit in the Tulsa County Jail; and full adherence to the criteria for the monthly status report due by the 10th of each month
- The length of stay and implementation of a fundamentally different treatment philosophy at OFC remains a core priority
- Your request notes that you consult along the way with Plaintiffs' Counsel as required by the Decree
- We set deadlines in our June 19 "benchmark" email intended to enable creation of a series of interim steps toward compliance but if you have alternative suggestions for any of the deadlines in the June 19 email, please let us know
- Other deadlines in the Decree, including the schedule for fines, remain intact.

We remain eager to work collegially and collaboratively with you and Admiral Slavonic, Department staff, Plaintiffs' Counsel, and the Attorney General to achieve compliance with the Decree, and end the suffering of people in jails waiting for transfer to treatment. We know that you and Admiral Slavonic are devoted to this as a major priority, and we look forward to your efforts yielding success.

**APPENDIX B: August 12th ODMHSAS Strategic Plan and Cover Letter; Court Consultant Response**

| | | |
|---|---|---|
| | **Court Consultants**<br>*Briggs v Friesen, No 4:23-cv-00081-GKF-JFJ* | |

June 19, 2025

To: ODMHSAS Leadership
From: John Petrila, Neil Gowensmith, Darren Lish
Re: Benchmarks to Mark Progress from mid-June through August

We wanted to provide you with benchmarks for the next few weeks in Briggs v Friesen. While most of the June 8 deadlines were missed, we anticipate with new leadership that progress will be accelerated. We will not release our July full report until late July/early August. In anticipation of that want to describe in concretely what we will be looking for between now and submission of our report.

**The Strategic Plan (paragraph 54)**

- As we discussed in the June 17 Wednesday call, and as we made clear in our Interim Report, it is essential that this strategic plan be completed. It is one of the core elements of the decree.
- ODMHSAS is familiar with strategic planning, and Dr. Gowensmith has made the Colorado plan available, which was done in response to a similar decree.
- The Plan has to be a comprehensive approach to the forensic system in Oklahoma, both in its current state and where ODMHSAS anticipates the system should be in the mid- and long-term. It has to contain data (for example, waitlist numbers, evaluation orders, location of origin for people in the forensic system, etc.), timelines, responsible parties, anticipated impact on the waitlist and over what time periods, barriers, and other factors.
- We will provide whatever assistance the individual(s) charged with producing this Plan need, but we would like to see:
    - An outline by July 7 which we will discuss jointly,
    - A rough draft (or drafts of various sections) within 3 weeks of approval of the outline but no later than August 1,
    - A finished draft within 4 weeks of approval of the drafts but no later than August 22,
- This provides 9-10 weeks from beginning to completion. It will require a lot of work, but its completion and the process to complete it will help set a coordinated roadmap for the department going forward. Please advise as soon as possible who will have overall responsibility for production of the Plan.

*Court Consultant Report September 2025*

**Reevaluations (paragraph 57)**

At this point, we do not completely understand, nor do we necessarily find credible the number of reevaluations that have been done and that still must be completed. This is related to our larger concerns about accuracy of the waitlist data we are receiving, which we believe has grown more accurate but not yet accurate enough for us to take at face value. Going forward,

- Dr. Gowensmith will send a list of reevaluations that we would like to review.
- In addition, before our visit, we would like to receive for our review during our site visit
  - a complete list of all reevaluations currently done,
  - a complete list of all reevaluations that need completing, a schedule for those reevaluations,
  - who will be completing them,
  - and the logic for who is included and who has been excluded. This latter item is based on a comment made by Dedra during a recent Wednesday call when she said certain individuals had been removed from the reevaluation list based on a conversation with in-house counsel. As we noted in our Interim Report, we believed that the Department's interpretation of at least one exemption in the Decree was incorrect.
- **The reevaluation process must be completed by August 1. If that is not possible, then we will require a detailed explanation of the factors preventing it.**
- During our site visit we would also like to see how many initial evaluations have been scheduled since entry of the Decree on March 10, numbers scheduled and completed, opinions rendered on competency, as well as current legal status of those individuals.

**Triage Process (paragraph 65)**

This was one of our priority recommendations in our Interim Report. Implementation of a triage process as rapidly as possible is essential to enable the most acutely ill in jail to be transferred to care. This is the schedule we propose for the next 4-6 weeks.

- Within the next 2 weeks (by July 3) send us the triage protocol that will be used and a schedule that outlines:
  - When the triage process will begin,
  - Who specifically will be doing the triage with their background/CV,
  - How the information will be tracked including anticipated time between triage and transfer to OFC
- By July 18 the triage process is to be completed at either Tulsa or the OKC jail.
- By August 1, the triage process is to be completed at both Tulsa and OKS jails.

**Other planning requirements (paragraphs 62, 63, 77)**

We would appreciate a response to the requests for information related to these items, made in our initial request for information in March. Those specific requests that were not answered are referenced in the Interim Report and in various emails sent to staff in April and May.

- In addition, work needs to be done to have a plan, not simply an organizational chart for staffing within the Department (paragraph 77), and for increased inpatient forensic beds

(paragraph 62, with its requirements, plus see our comments on this issue in our Interim Report).

- Note also that paragraph 63 for a plan for forensic inpatient facilities and staffing has a deadline of 120 days from entry of the decree (or July 8).
- We would find it acceptable if these planning requirements became part of the overall strategic plan referenced above, but they do need to be completed.

**Waitlist**

While we believe that waitlist counts are more accurate than they were over the first 3 months of the Decree, we are not at a point where we can take them at face value. Part of this is because we have not had a deep dive into the data system and sources that generate the waitlist and other forensic counts, something that we will be doing on June 30 in the central office. However, part of our continued concern stems from reports that we receive suggesting that the waitlists in local jails exceed those reported by ODMHSAS. Those reports may or may not be accurate. However, as a way to validate the list and eliminate that concern, it would be extremely helpful if a week before submission of the monthly report on the 10th of each month the ODMHSAS waitlist was cross checked with the waitlists reported by jails with more than 5 people on the waitlist. Please advise if this is possible or not.

**Summary of Benchmark Deadlines:**

**Strategic Plan**

July 7, 2025: Outline of strategic plan due (advise us of the responsibility party for this by June 24)

August 1, 2025: Rough draft available to consultants

August 22: Final Plan submitted to consultants

**Reevaluations**

June 27, 2025: List of all reevaluations currently completed; all reevaluations requiring completion and schedule; who will be doing the reevaluations, and exclusion and inclusion criteria used by ODMHSAS

August 1: All reevaluations completed

**Triage Process**

July 3: Copy of the triage protocol, when process will begin and backgrounds and names of those performing triage

July 18: Triage completed at either Tulsa or OKC jail

August 1: Triage completed at both jails

Results made available to Court Consultants

**Other Planning Requirements**

Department staffing and increased beds analysis can be included as part of the Strategic Plan and are subject to the Plan's deadlines

July 8: Consent Decree mandates report/plan on OFC staffing (paragraph 63)

*Court Consultant Report September 2025*

**Calendar Snapshot**

| | |
|---|---|
| **June 27, 2025** | **Reevaluations due Consultants** |
| **July 3, 2025** | **Triage protocol/schedule due Consultants** |
| **July 7, 2025** | **Outline of strategic plan submitted** |
| **July 8, 2025** | **OFC report/plan due (paragraph 63)** |
| **July 18, 2025** | **Triage completed OKC or Tulsa Jail** |
| **August 1, 2025** | **Rough draft strategic plan submitted** |
| **August 1, 2025** | **Triage completed both jails** |
| **August 1, 2025** | **All reevaluations completed** |
| **August 22, 2025** | **Final draft strategic plan submitted** |

We are happy to work with you on any or all of this and we will continue to share resources from our own work and other places. And please, ask *any* question that comes to mind.

*Court Consultant Report September 2025*

## APPENDIX B (cont.)

**Court Consultants**

*Briggs v Friesen, No 4:23-cv-00081-GKF-JFJ*

August 21, 2025

Commissioner Gregory Slavonic
2000 N. Classen Blvd., Suite 2-600
Oklahoma City, OK 73106
Telephone (405) 248-9200

Dear Commissioner Slavonic,

We write to provide our initial responses to the document submitted for our review on August 12, 2025 titled, "Cover Letter and Plan" which includes a cover letter and a lengthy document titled, "Competency Restoration Plan." We have each independently reviewed the cover letter and Plan, and we have discussed our perspectives internally. This memo provides a summary of those perspectives, as well as recommendations for potential next steps.

As a point of clarification, we remain uncertain if the Plan sent to us and to the Plaintiffs was a drafted version or a final version. We provide our comments and feedback in the hopes that the Plan can be revised and updated accordingly. There are some important areas for clarification, and some important areas for correction. At the same time, for purposes of our next Report, which we will issue in the next 2-3 weeks, we are using the August 12th submission as the point of reference.

We begin by complimenting you and your staff on creating this document by the August 12 date. We are pleased that the additional time allowed the Department to include work that was conducted since the original June deadline. We thank you for addressing each of the Consent Decree's individual components, as well as providing a bigger, broader perspective.

There are several areas we believe could (or in some cases, should) be revised, however. We will separate our comments into a broader process section and then address more discrete, individualized areas.

<u>Broad perspectives</u>
We appreciate each section's attention to work conducted to date. The document does a nice job of relaying and recounting the good work that has been done in various component areas of

*Court Consultant Report September 2025*

the Consent Decree. We want to acknowledge and affirm that work – it's clear that the Department and its staff are working hard to beef up Oklahoma's competence services system in a number of important ways. So, we appreciate the memorialization of those efforts to date.

However, the Decree is clear that what is expected is a Strategic Plan, not an accounting of work conducted to date. Most sections simply describe the various efforts undertaken to date. This is certainly critical in any planning project; however, any plan must then take that "data," review and analyze it, and then apply it to ongoing barriers such that future action steps are identified. An actionable plan should answer the following questions:

- What are our goals?
- What have we tried so far?
- What barriers persist?
- Given our previous efforts and outcomes, what will we do going forward?
- How will we measure our outcomes?

We believe you have largely addressed the first two questions, and perhaps the third in some sections. However, very few sections provide a "road map" or action plan for next steps. Most times, we cannot ascertain what your action plan is for the various components of the Consent Decree. How do the data and outcomes to date affect plans for the future?

The Decree intends that this Strategic Plan is a foundational document that will be built on in successive years, and as such, will inform subsequent administrations on how they can take it and continue to make progress. As the document stands now, that would be largely impossible. You can also harness the power of an actionable plan by noting barriers and solutions that exist – which may provide compelling rationale for legislative and budgetary requests. For example, if you were able to develop a plan that indicated length of stay would be reduced with additional psychiatric resources at OFC, which would lower the waitlist by a certain number of Class Members or a certain number of days (essentially mitigating fines), then you would have a compelling budgetary request. "Based on XXX, we believe overall length of stay for restoration at OFC would decrease by about 15 days on average with the additional of one psychiatrist, which would reduce the time waiting in jails by 5% across the state and reduce the number of people on the waitlist by 45 annually." Of course, these numbers are purely hypothetical, but that is the aim of an actionable plan: determine a course of action based on a review of data, outcomes, and efforts conducted to date.

We realize this is a big undertaking, given all of the different component sections of the Consent Decree. But we would like to see actionable next steps for each section that are rooted in data collected to date, with measurable actions going forward to monitor and measure effectiveness of those new interventions.

We previously provided a copy of Colorado's 2024 Comprehensive and Cohesive Plan for your review. We encourage you to review it again – you should see how the different component

*Court Consultant Report September 2025*

sections refer to previous efforts and outcomes in determining next steps and measurable outcomes.

<u>Individual areas for clarification or correction</u>

There are several areas that warrant specific clarification or correction. These include the following:

1. The most problematic area is the data provided in the plan. Specifically, the waitlist number (number of people waiting in county jail for transfer to restoration services) and the length of time on the waitlist number (how long a person waits before transfer occurs) are simply not credible. The figures in the report are internally inconsistent, and they are also inconsistent with other figures reported by the Department in other sources.

   Page 9 reports the waitlist number as 105, with an average Length of Time (LOT) as 60 days. Appendix 1 lists the waitlist number as 139, and the LOT as 193 days. Clearly this is inconsistent, yet the narrative exposition provided on and after page 9 seems to use the 105 / 60 numbers as a basis for progress and future planning.

   The latter numbers (139 / 193) align with the numbers provided in the weekly meetings with the Court Consultants, so we are assuming those are more accurate than the 105 / 60 figures.

   We have been unable to reconcile either set of figures with the monthly report or accompanying Excel document that is sent to us, so we request to review that Excel document with someone familiar with the Department's waitlist data to make sure we are interpreting that document accurately.

2. Data in Appendix 3 ("Data Propositions") is confusing and appears inconsistent across several domains. We would like to reconcile these apparent discrepancies:

   a. Item 2 provides a compliance figure of cases evaluated within 30 days (10.6%) in July, but the narrative appears to report a 100% compliance rate on page 3.
   b. Items 3, 4, 7, 11, and 14 all refer to Detainees being removed from the waitlist, but it is unclear how the five items are different from each other. Also, it seems inconceivable that 152 people came off the waitlist legitimately in May 2025 (item 14).
   c. Items 15, 17, 18, and 19 all refer to LOT, but they are internally inconsistent. Moreover, all of the monthly average wait times listed in items 18 and 19 (wait times for felonies and misdemeanants) appear to be longer than the monthly average wait times listed for *all* Detainees in item 17; this obviously can't be true mathematically. Finally, none of the wait times listed align with the 60 day figure listed on page 9.
   d. Item 16 reports 139 people on the wait list. This is inconsistent with the 105 people listed on page 9. Further, the drop in the waitlist number from March (289) to April (151) needs explanation.

*Court Consultant Report September 2025*

    e.  Item 13 refers to the number of Detainees in jail-based competency restoration. The Consent Decree specifically prohibits the provision of in-jail competency restoration, and the Department has previously attested that no jail-based restoration is occurring.

3.  The Triage and Admission Prioritization section suggests that the triage policy has been adopted. The triage policy is still in drafted form and has not been approved by the Court Consultants nor has it been reviewed by Class Counsel as the Decree requires. Also, there seems to be lingering confusion about the triage policy, as the narrative suggests it is meant to discriminate between those who need inpatient hospitalization versus other restoration settings; the triage policy should instead determine the urgency of admission to inpatient restoration based on acuity and other factors at the time the triage occurs. In other words, for those ordered to inpatient restoration (all Detainees at the present time, since no jail-based or outpatient restoration exists), who should be prioritized for Expedited admission – and what is the shortened time frame for those Detainees?

4.  The Competency Restoration In Jail – Pilot Program section describes a Jail Based Restoration Assistance program. We have not heard about this program. What is it? Where does it operate, who oversees it, what does it include, and what are its goals and outcomes to date?

    While we are pleased to see an outline for an in-jail pilot program, the Decree requires that this be developed in consultation with Court Consultants and Class Counsel with approval ultimately resting with Court Consultants. The planning in this section is light. Much more needs to be considered – locations, costs, staffing, numbers served, treatment providers, treatment services, outcome data, and more. In addition, the Plan indicates that conversations with those with decision-making authority over the Tulsa County Jail have not yet occurred.

5.  The Community-based Outpatient Restoration Program section needs similar planning to what we described in the in-jail pilot program section. The material you provided refers also to people being referred to outpatient restoration programs, which however do not exist.

6.  The Staffing and Training Enhancements section states that the QFE policy has been adopted. Again, the QFE policy is still in draft form and has not been approved by the Court Consultants.

    It also mentions that 20 new hires have occurred at OFC. We applaud the Department for acquiring new talent. We are unsure if these new employees filled previously vacant positions or if new positions were created, what the positions are, and what the disciplines of the new employees are. Moreover, as we have noted in other areas, there is no plan discussed here – what staffing challenges remain, how is hiring prioritized

*Court Consultant Report September 2025*

across vacancies, what new positions should be created, and what will the Department do to fill those positions?

This section also mentions a training program, but no specifics are provided.

7. Page 10 references that Oklahoma will soon have 180 restoration beds available. The numbers provided in the report do not add up to 180. We see 52 new private beds + 80 new OFC beds + the current number of restoration beds at OFC (which is approximately 164). Please clarify the total number and then describe how that number will or will not meet future annual competence restoration demand.

8. The Length of Stay (LOS) at OFC is not mentioned in the Plan. This is a critical variable in order to become compliant with the Consent Decree time frames (Michael Tessean's model suggests it is *the* most important variable). However, LOS is not mentioned in the Plan at all. We have discussed LOS at length during our site visits, in most of our weekly meetings, and in smaller meetings with various administrators. The LOS at OFC *must* be reduced substantially if compliance is to be attained. Please provide a plan for how this will be accomplished, and what the ultimate LOS goals are.

9. Within the Oversight and Data Monitoring section, we appreciate the acknowledgement of our work as Court Consultants. However, we believe you overstate our alignment and approval. As mentioned, we have not approved the triage or QFE policies, for example. The Plan refers to the Consultants observing operations at Tulsa and Oklahoma County Jails firsthand, but the Department was offering no services in either jail at the time of our visits, leaving us unable to comment. The Plan also mentions that the Consultants have "unfettered access" to Departmental data; while true now that we have been granted access and trained regarding the portal, that was not true at the time of this report's submission. The section gives the impression that we have affirmed efforts and progress more strongly than we have.

10. The conclusion section states that "Most of the Consent Decree's required actions have now been completed." This is simply inaccurate. Very few of the required actions have been completed, while some have barely begun to be addressed.

In summary, the Plan summarizes work and some outcomes, but it rarely provides any plans for future action. The section on Private Hospital Contracts and Appendix 2 provide some nod toward future planning, but most of the document does not describe any future plans. Moreover, the Plan describes accomplishments and approval of the Consultants that is simply inaccurate, while relying on data regarding the composition of Class Members on the waitlist that is conflicting and unreliable.

We wish to again affirm the hard work of the Department in creating important changes in Oklahoma's competency services system. However, the current Plan does not accurately reflect the work conducted to date, the Consultants' approval of work and plans, current data, or

*Court Consultant Report September 2025*

future action steps. Our strong recommendation is to revise the current Plan substantially to address the above problem areas.

We also provide a brief list of requests going forward, in addition to those provided above. These are not specific to the Plan document, but they are instead additional requests that the Plan prompted. We would appreciate a response about each of the following requests.

- We request that a clear itemized list of each of those 148 people removed from the waitlist between March and April is provided to us with names, portal ID number, and an explanation for the reason they were removed from the waitlist.

- We request that a list of every person that required a re-evaluation be provided to us, with their portal ID and the date that their evaluation report was submitted to the court. Page 4 reports that 12% of waitlisted Detainees were removed from the waitlist upon the 2025 re-evaluation project; we have not seen this figure reported in other places. Please provide us a list of the names, portal ID numbers, and evaluation reports and submission dates for Detainees opined CST and those removed from the waitlist for other reasons (e.g., alternative dispositions and/or civil commitment).

- Regarding "timely initial evaluations": The progress made in this area seems impressive (although as noted earlier, the data provided in Appendix 3 appears inconsistent with the claims regarding timeliness made on page 3, and as recently as our site visit, we received information from county legal officials that initial evaluations were not occurring until sometimes months after the court order). Going forward, we request a chart of initial evaluation data tracked over time from entry of the Decree on March 10, 2025 to the present. This should be provided with the monthly Departmental report. It should include a month-by-month listing of the number of *evaluations* ordered by the court for people in county jail, the number of *persons* ordered to evaluation for people in county jail, how many were completed within 30 days, how many were not, and the average time to report completion. We also need a clear chart of how many initial reports opined IST, CST, and NLA; of those opined IST, we also need a breakdown of how many were opined as Standard vs Expedited admission.

- We also need a chart that shows similar historic trends in orders for restoration services to be part of the monthly report, again beginning March 10, 2025.

- We also need a list of all sanctioned competence evaluators statewide (or any out-of-state evaluators providing competency evaluations in Oklahoma), their degrees, and their number of cases per year.

- The Plan mentions that Policy and Protocol Development is now overseeing the development of all new policies. We need to review each of these policies.

*Court Consultant Report September 2025*

Thank you for the opportunity to review the Plan. We remain optimistic that the inconsistencies and inaccuracies can be rectified, and that a solid and actionable plan to reach compliance with the Consent Decree can be created and implemented.

Respectfully,

Court Consultants No 4:23-cv-00081-GKF-JFJ

## Briggs v. Slavonic

### Class Counsel's Comments/Questions on DMH's Aug. 12, 2025 "Plan"

Our comments track the section and page numbers in DMH's "Plan" document.

1. Timely Initial Evaluations (page 3):
   a. Scheduling evaluations within 1 day and reports completed within the 30-day balance.
      i. What evidence do you have that supports this reported data? Counties are still reporting longer delays in obtaining evaluation appointments and completion of reports. Also, with the alleged speed comes continued reports of quality concerns (opinion rates that are skewed, one-size fits all short duration virtual evaluations sans all instruments).
      ii. Who are the newly hired QFEs? Who is providing training? Supervision? Quality checks?

2. Reevaluation of Waiting Individuals (page 4):
   a. Completed at 100% by "terminal degree evaluators."
      i. What are the names of the evaluators utilized with a list of cases assigned by evaluator for verification/cross-reference.
      ii. What were the opinion statistics (i.e., 50% incompetent, 50% competent)? Concerns reported regarding use of non-terminal degreed evaluators and overly "competent" finding.
      iii. How was the missing 109 remedied from the June 4th deadline? Data validity continues to pose significant concern.
   b. "Approximately 12% of the waitlisted individuals were removed from the list following these evaluations – either returned to court as competent or diverted to alternative dispositions (such as civil commitment)."
      i. How many individuals hit their statutory time while in jail without any viable treatment resulting in criminal charge dismissal?
      ii. Where is the raw data that demonstrates validity of the opinion, quality of the report, and the name of the QFE for vetting?

3. Triage and Admission Prioritization (page 4):
   a. Implementation of a Competency Restoration Triage Policy.
      i. Where are the ODMHSAS meeting minutes from the adoption of the policy? What meeting was this policy formally adopted in (i.e., executive leadership, decree compliance, directors meeting, etc.)
      ii. Where is the signed policy indicating implementation with verified date.

        iii. Who is responsible, specifically for monitoring and directing this implementation of the policy?

    b. Determination of "expedited or stand" is based on clinical acuity.

        i. What clinician is making this determination? What is their training? Where is this review of clinical presentation/crisis/functioning documented?

    c. "This system has ensured that the most acute cases (e.g. severe illness) are admitted to an appropriate placement for treatment within twenty-one (21) days, as required by the decree's phased standards, while allowing non-acute individuals to have the opportunity for restoration participation within jail-based or outpatient programming if available in the county."

        i. All persons, not just "acute" must be placed into appropriate care within the 21-day requirement.

        ii. Jail-based as it continues to be structured without dramatic change should have been phased out, yet it is still being utilized for "non-acute" per this proposal.

    d. "The Department's Forensic Services team monitors all incoming orders for evaluation as well as timeliness of submission of reports including triage data. With a standardized, statewide triage policy every individual entering or within the Oklahoma Competency System will have swift identification of acute needs and are tracked within a statewide database that is updated in real time."

        i. This Forensic Services team referenced is still the same structured team that provided flawed and continuously misleading data about the waitlist, could not provide validation of names on the list and those missing from the list, had double-booked evaluators for defendants, and failed to respond to continuous emails to the forensicservices@odmhsas.org email.

        ii. On this team, who is are the dedicated and experienced licensed clinicians reviewing cases to determine acuity?

4. "Overall, these evaluation and triage reforms mean that competency cases move much more efficiently into appropriate treatment."

    a. There have been no substantive changes to the process or system.

5. Competency Restoration in Jail – Pilot Program (page 5)

    a. "the previous "restoration-in-jail" practice has ceased, except for continued administration of medications to stabilize inmates.

        i. Please provide documentation that directs all CCBHCs and state-operated facilities to cease the practice. What meeting did this notification take place at? What is the date of cessation?

  ii. Where are the updated and signed contracts with providers outlining the change in statement of work (i.e., continued medication only)?

 b. "Properly resourced Jail Based Restoration Assistance program. "

  i. Where is the statement of work outlining what this looks like? What are the differences between the prohibited version and this approach?

  ii. Where are the signed contracts with providers?

  iii. What constitutes "properly resourced?"

  iv. Who approved this new program structure?

 c. "Oklahoma is also working toward an In-Jail Competency Restoration Pilot Program. The development of this pilot was initiated in June 2025 for the Tulsa County, David L. Moss Detention Center. The Department continues to work with the Tulsa County Sheriff."

  i. When have meetings taken place to advance this rental space?

  ii. Proof of contract negotiations?

  iii. Draft contract?

  iv. Environment of Care plan for the space?

  v. Draft budget for facility modifications?

  vi. What is the plan to recruit a psychiatrist & psychologist for the pilot?

6. Community-Based Outpatient Restoration Program

 a. "The Department acknowledges that a Community-Based Outpatient Restoration (CBOR) pilot program will only be executed when it is authorized by Oklahoma law."

  i. What about the existing community-based outpatient enrolled? How did you authorize existing and historic if outlawed?

  ii. What is the draft language for the proposed Bill for upcoming session?

  iii. At any point do you plan to coordinate with the Plaintiffs' Counsel?

7. Staffing and Training Enhancements (page 7).

 a. "The Department has substantially expanded its workforce and expertise devoted to competency services."

  i. Specific names of the added workforce, including their credentials and percentage of FTE.

  ii. Copies of employment or contracts AFTER March 10, 2025, for validation.

 b. "A formal training, mentoring and approval process for Qualified Forensic Evaluators, with defined criteria that must be met before any

evaluator (including master's-level licensed professionals) can conduct competency evaluations."

    i. Proof of training. Reports of a shortened training offered as opposed to the planned longer "rigorous" one.

    ii. Who is providing the required training now?

    iii. Who is providing the required supervision of evaluators? Proof of supervision for validation?

c. "Twenty (20) new hires at OFC, including psychiatrists, psychiatric nurses, therapists, and behavioral health aides."

    i. Names and type of staff list required for validation, including hire dates.

    ii. How many positions by type were created?

    iii. How many staff, by type were terminated or resigned?

    iv. How many on-site psychologists are at OFC? Including FTE percentage.

    v. How many on-site psychiatrists are at OFC? Including FTE percentage.

    vi. How many on-site psychiatric nurses are at OFC? Including FTE percentage.

    vii. Who is providing the medical clinic services at OFC? Copy of valid contract, including percentage of time on-site and scope of work.

    viii. How many of the 20 referenced above are aides?

d. "This influx allowed the **reopening of all available forensic beds** by providing adequate staffing for each unit."

    i. When were forensic beds closed? What date range? What number of beds. How often was this done? This reduction in beds is in violation of the decree.

e. "Notably, the direct care staff vacancy rate at the OFC has been historically very high. The Department is committed to determining the causes of the direct care staff vacancy rate and will implement processes and policies designed to remedy this vacancy rate problem."

    i. What is the historic and current vacancy rate?

    ii. What is the specific plan to address this vacancy rate?

    iii. Issues with staffing OFC have been long-standing, including root-cause analysis, what steps have been taken to meaningfully address since March 10, 2025?

8. Policy and Protocol Development: The Department has created new standard operating procedures to institutionalize these improvements. Written protocols now cover the entire competency process, from evaluation referral to discharge from restoration. (page 8)

    a. Where are the signed and finalized meeting minutes in which all referenced policies were formally adopted and evidence of true implementation?

9. Reduced Wait Times and Waitlist Backlog
    a. Strong concerns about data reported. Data flaws have been continuously pointed out by consultants, including serious concerns about accuracy reported by counties.
    b. Trends in opinion rates and quality concerns over reports.

10. Expanding Inpatient Restoration Capacity
    a. "Opening Additional Forensic Beds: The OFC in Vinita – previously the state's only restoration facility – has increased its active treatment beds by 30%. By September 2025, eighty (80) new or previously offline beds will be brought into operation, dedicated solely to competency restoration."
        i. This contradicts the "high vacancy rate" reported for the OFC campus, what is the hiring plan for these additional beds?
        ii. A list of hired staff for this expansion is required, by type.
    b. "This was accomplished by reopening shuttered units and converting other units for forensic use"
        i. What shuttered units?
        ii. What units were converted for forensic use?
    c. "The increased capacity directly enabled moving many individuals off the waitlist. For example, in April 2025, an "express admissions" initiative triaged and admitted forty (40) long-waiting inmates into newly staffed beds over a six (6) week period."
        i. Is ODMHSAS reporting that they were underutilizing their forensic beds for a period of time? And now have reopened?
        ii. Who are the 40 individuals mentioned that were admitted into "newly staffed beds?" Specific names for validation are required.
    d. "Private Hospital Contracts: In addition to expanding OFC, the Department is working to secure contracts with two private psychiatric hospitals—totaling fifty-two (52) beds— to accept appropriate forensic restoration patients. These contract beds, which should be available by November 2025, provide relief for the highest-need individuals and supplemented state-operated capacity while longer-term solutions progress." (page 10)
        i. What specific hospitals? Where is a copy of the RFPs for these services?
        ii. Where will the cost of these private hospitals come from?
        iii. Who will determine who gets admitted to these facilities vs OFC?

        iv.  How was 52-beds determined?

        v.  Highest need will now go to a non-forensic facility?

  e.  "Infrastructure and Facility Upgrades: The physical environment and resources at OFC have been improved to meet modern environment-of-care standards. By September 2025, renovation projects will have updated safety features and treatment spaces in aging units, and equipment for delivering evidence-based restoration programming has been enhanced" (page 10)

        i.  What specific upgrades? Validation is required.

  f.  "…as reflected in a current average in-hospital treatment length of ninety (90) days, down from roughly 130 days prior to the Consent Decree."

        i.  Data and validation are required.

        ii.  Reports of unqualified evaluators utilized at OFC for evaluations and return to custody (i.e., Rhonda Campbell).

11. Bed List (page 14)

  a.  Grand Mental Health ResCare for NGRMI consumers is an unrealistic plan, this has been a pending facility for some time. Do all 22 have court approval for move to this facility on August 25, 2025, are proposed?

  b.  GMH campus-NTA should not be at OFC, so movement of them should be immediate and should not net a 30 open OFC beds. Questionable practice if OFC is holding NTA once criminal charges are dismissed.

  c.  2026 SSM-has renovations begun at this facility? Do we have projected completion and accreditation schedule?

  d.  2026 Ft. Supply buildings renovated-do we have a plan, including the funding of renovation of dilapidated buildings to code? How will they staff an additional 100 beds when the main facility struggles to staff what they have? Incredible distance.

**August 26, 2025**

## ODMHSAS Consent Decree Team's Preliminary Comments re: Court Consultants' August 21 Response to Department Plan, *"Individual areas for Clarification or Correction" section.*
*(Court Consultants' concerns are listed in numerical order – ODMHSAS comments are in blue for clarity).*

**#1 Waitlist and Length of Stay Numbers -**
This was a typographical error in the plan and has been corrected. The weekly trends reported to the Court Consultants support the accuracy of 139 for the waitlist and length of stay (LOT) as 193 as listed in Appendix 1.

For the September 2025 monthly report the monthly waitlist as well as other supporting data will be provided and can be reviewed in detail.

**#2 Data in Appendix 3 –**
Data in Appendix 3 ("Data Propositions") is confusing and appears inconsistent across several domains. We would like to reconcile these apparent discrepancies:
   a. Item 2 provides a compliance figure of cases evaluated within 30 days (10.6%) in July, but the narrative appears to report a 100% compliance rate on page 3.
      • There was no percentage of compliance given in the Plan narrative regarding initial evaluations. The Plan outlines the Department's implementation and adherence to new policy processes to ensure Consent Decree compliance.
   b. Items 3, 4, 7, 11, and 14 all refer to Detainees being removed from the waitlist, but it is unclear how the five items are different from each other. Also, it seems inconceivable that 152 people came off the waitlist legitimately in May 2025 (item 14).
      • Item 3 and Item 14 are the numbers coming off the waitlist (total number).
      • Item 4 and Item 11 are subsets of Item 3 and is Program Change only (i.e. the individual moved from Waitlist to a new status, such as Maintaining Comp or NTA).
      • Item 7 is also a subset of Item 3, and these are those individuals that left the waitlist because of a discharge.
      • Additionally, Item 5 and Item 12 are subsets of Item 3 where individuals left the waitlist due to OFC admission.
      • We will provide the excel sheet with the individuals coming off the waitlist.
   c. Items 15, 17, 18, and 19 all refer to LOT, but they are internally inconsistent. Moreover, all of the monthly average wait times listed in items 18 and 19 (wait times for felonies and

1

misdemeanants) appear to be longer than the monthly average wait times listed for all Detainees in item 17; this obviously can't be true mathematically. Finally, none of the wait times listed align with the 60-day figure listed on page 9.

- Item 15 is Average Wait Time from Date the Department receives a Court Order for Evaluation to the Date the Court Receives the Result.
- Item 17, specifically the typo as explained in #1 above.
- Items 18 and 19 are based on discharges and not comparable to the current length of stay for individuals currently on the waitlist.

d. Item 16 reports 139 people on the wait list. This is inconsistent with the 105 people listed on page 9. Further, the drop in the waitlist number from March (289) to April (151) needs explanation.

- Specifically, the typo as explained in #1.

e. Item 13 refers to the number of Detainees in jail-based competency restoration. The Consent Decree specifically prohibits the provision of in-jail competency restoration, and the Department has previously attested that no jail-based restoration is occurring.

- Item 13 is the number of individuals admitted to the waitlist by month since March that are in jail. Not jail restoration.

**#3 Triage and Admission Prioritization**

The Department recognizes that admission to an inpatient competency restoration placement must ultimately occur within 21 days under the Consent Decree. At present, the Oklahoma Forensic Center is the only available inpatient restoration facility. The triage policy (currently in draft form and pending review and approval) does not determine *whether* an individual requires inpatient restoration, but rather the *urgency* of admission once competency restoration is ordered.

The draft policy is intended to identify individuals who meet statutory criteria for expedited admission under Title 43A and, consistent with the Consent Decree, to establish a shortened timeframe relative to the 21-day standard once finalized. It already sets out the criteria and procedures. Level 1 (Expedited) admissions apply in cases of acute psychosis, serious behavioral dysregulation, medical danger, or threats to self or others. Level 2 (Standard) applies when symptoms are stable and non-violent. Expedited admissions must be flagged in the Treat to Competency Portal within 72 hours and are prioritized for placement, including through crisis stabilization or civil diversion if immediate OFC admission is unavailable. Standard admissions remain subject to the 21-day placement requirement. The terms "expedited", and "standard" are also defined in the Plan's glossary and were included in these distinctions, which are clear across all sections.

The triage draft framework does what the Consent Decree requires: it prioritizes urgent cases within the 21-day ceiling without redefining restoration settings. While the Department may use

2

alternative non-restoration programs temporarily to stabilize an individual, these programs do not substitute for inpatient competency restoration and do not alter the obligation to admit within the required timeframe.

**#4 Competency Restoration In-Jail Pilot Program**

The Department is not conducting jail-based competency restoration as this practice is expressly prohibited under the Consent Decree. In FY26 this will be termed as mentioned in the Plan as the Jail Based Restoration Assistance program for those who remain in jail after the court commitment date. The reference in the Plan to a "In Jail Competency Restoration Pilot Program" was included to capture preliminary discussions about what a future pilot might look like, not to describe an operational program. No one has been placed in jail-based restoration, no program has launched, and no work is occurring outside the requirements of the Consent Decree.

The questions raised about location, costs, staffing, numbers served, treatment providers, treatment services, and outcomes are precisely why the draft language was characterized as exploratory. As the Consultants are aware, the Consent Decree requires that any such pilot be developed in consultation with Court Consultants and Class Counsel, with final approval resting with the Consultants. It would be premature for the Department to assign specific resources before that approval is given.

The Plan memorialized early concepts so that the Consultants could see what is being considered once the consultation process begins. The absence of specifics does not reflect an absence of planning but rather compliance with the Consent Decree's requirement that the Department not finalize details until the mandated consultation occurs. To characterize this language as vague or hidden is inaccurate: the Department has not stated that any program exists, and the drafts already provided have been kept appropriately preliminary pending Consultant review.

Finally, with respect to Tulsa County, the Department has been in communication, but scheduling meetings with all necessary parties has proven difficult. A calendared date has been secured so that those discussions can move forward in an organized manner. The Department is prepared to refine and expand planning immediately once the process advances, but it will not preempt the approval structure laid out in the Decree.

**#5 Community-based Outpatient Restoration Program**

The Department acknowledged in the Plan that no structured Community-Based Outpatient Restoration program exists, and none is currently in effect. At present, some judges in Oklahoma have chosen to release individuals into the community for restoration treatment, even though no

3

statutory authority exists for a formal program. When this occurs, the Department responds on an ad hoc basis to stabilize and support the individual as best as possible, but these efforts do not constitute a CBOR program.

The Plan also makes clear that CBOR can only operate once enabling legislation is enacted. In anticipation of that legislation, the Plan sets out a framework for how CBOR would function, including county-based treatment teams, projected enrollment initially in Tulsa and Oklahoma Counties, defined program goals to reduce the inpatient waitlist, and a one-year evaluation to guide future expansion. Until that authority is granted, no CBOR program exists, and the Department's role is limited to managing the outcomes of judicial decisions.

### #6 Staffing and Training Enhancements

The Department acknowledges that the QFE policy remains in draft form, as the Consultants are aware, and it will move forward once the required review and approval are complete.

The 20 new hires at OFC were not generic positions; they included psychiatrists, psychiatric nurses, therapists, and behavioral health aides. The Plan also directly acknowledges the longstanding vacancy problem at OFC and commits to identifying causes and implementing corrective steps. Additional hires include eight forensic evaluators, four central office staff dedicated to court and portal operations, and an external psychiatric consultant, reflecting a broader workforce expansion strategy. In parallel, the Department has already begun exploring incentive pathways through the Health Care Workforce Training Commission to strengthen recruitment and retention.

On training, the Plan makes clear that a comprehensive program is in development and that all OFC staff, both existing and new, will participate. The framework includes quarterly continuing education workshops on competency restoration practices, motivational interviewing, and forensic ethics, supplemented by on-demand modules.

The Plan therefore already addresses the specific issues raised: it details staffing gains by discipline, acknowledges ongoing vacancy challenges with a plan to remedy them, and outlines the structure of the training program. What remains is not the development of these elements, but their finalization following the approval of drafts that are already before the Consultants.

### #7 Bed Number Clarification

While working through the Consent Decree the Department is also undergoing major realignment in staff and facility allocation. This creates a weekly fluctuation in current patient bed numbers and future numbers. Future bed numbers are also impacted by the Departments ability to maintain current contracting and also initiate additional contracting. Some of these steps must go through the Oklahoma Legislature as they include previously encumbered funds. The 180 beds

4

referenced in the plan are a total estimated number when looking across the restoration continuum; treat to competency, never to attain (civil commitment) and stabilization.


### #8 The Length of Stay (LOS)

In recent months of Central Office Competency work, we identified that inconsistent data collection at the Oklahoma Forensic Center (OFC) limited our ability to analyze and report on this information. With accurate data points and collection systems now established at the OFC, the length of stay (LOS) will now be included in monthly reporting. The LOS is factored into both the Inpatient Bed Projection and the OFC Bed Projection.

### #9 Oversight and Data Monitoring

The Department strongly disputes the characterization that our Plan overstated Consultant approval. The document noted Consultant involvement and observations; it did not claim final approval of draft policies. To be clear: both Triage and QFE policies remain under review. (See Weekly Agenda comments from 7-30, 8-6, 8-13, 8-20). And to further clarify, no restoration services were operating in the Tulsa or Oklahoma County jails during the April site visits. The Consultants did tour both jail facilities during the April 2025 site visit, observed jail operations, met with administrators, and asked questions of staff.

With respect to data access, it is misleading to imply "unfettered access" was denied. The Department provided portal access on July 11, 2025, with formal training completed on August 14, 2025. At the time of the Plan's submission, arrangements for access were already in motion. Suggesting otherwise distorts the timeline.

Going forward, the Department will describe Consultant engagement accurately. We hope the Consultants, in turn, will recognize when deliverables were provided in accessible form and when review opportunities were available regarding those deliverables.

### #10 Conclusion

The Department stands by its conclusion that meaningful progress has been achieved in the five months since the entry of the Consent Decree, specifically since July 1, 2025. The statement "most of the Consent Decree's required actions have now been completed" was intended to be read in the context of the specific initial benchmarks and structural requirements established by the Consent Decree. Within that framework, the Department has successfully implemented numerous required actions: expanding restoration capacity, initiating new hiring and training efforts, establishing consistent data collection systems, launching policy development, and creating a foundation for long-term compliance.

5

Although it is clear that certain policies (such as the Triage and QFE) remain in draft form and that additional action steps are still underway, this does not diminish the measurable strides already achieved. Data now show shorter waits, and increasing number of individuals served, and programmatic innovations in development. These represent substantial progress compared to the baseline conditions prior to March 2025.

It is also important to note that the Department has consistently emphasized this is a *living plan* – intended to be iterative, adaptive, and continually refined with input from the Consultants and Plaintiffs' Counsel. Describing progress to date as "most of the actions completed" is not a claim that the Consent Decree's final benchmarks have been met, rather a recognition that the Department has moved swiftly to establish the structural building blocks the Consent Decree requires. We acknowledge that it would have been more accurate to describe the Department's progress as having addressed – and having taken substantial steps toward – many of the Consent Decree requirements rather than stating that they had been completed.

The Department remains fully committed to transparent reporting, continued refinement, and working with the Consultants to ensure that by 2026 the 21-day maximum wait standard and all other benchmarks are satisfied. In short, while significant work remains, the Department has laid the foundation for Consent Decree compliance and is determined to build upon it.

6

*Court Consultant Report September 2025*

## APPENDIX C: Court Consultant Request for Information, March 21, 2025



**Court Consultants**
*No 4:23-cv-00081-GKF-JFJ*

### Briggs v. Friesen, Case No: 23-cv-81-GKF-JFJ

**March 21, 2025**

To: ODMHSAS Commissioner Allie Friesen
RE: Request for Information for April 14-16, 2025 Court Consultant Site Visit
From: John Petrila, JD, LLM, Neil Gowensmith, PhD, Darren Lish, MD
Cc: Christina Greene, ODMHSAS General Counsel

Dear Commissioner Friesen,

This is a request for information regarding various provisions of the Consent Decree, with a particular focus on deadlines that the Decree establishes within 90 and 120 days of entry of the Decree. The Decree was entered March 10, 2025 and so the due dates imposed by the Decree are June 8, 2025 for 90 day deadlines and July 8, 2025 for 120 day deadlines. In the future we would be happy to direct requests like this to a member of your staff that you may wish to specify.

We see our role as defined by the Decree as consultative first. While we request a good bit of information below, it is primarily to enable us to work with those responsible for assuring the Decree's requirements are met. We intend for our approach to be collaborative, but mindful of the specific mandates and deadlines in the Decree.

Here are our requests, tied to specific paragraphs in the Decree:

**Current Waitlist and Class Numbers**
- **How many people are on the current waitlist?**
  - Please provide the most current list of all people on the waitlist for competency restoration services as of March 1, 2025.
- **How many people are in the various categories articulated by the Decree in Paragraph 16?**
  - Number "declared incompetent to stand trial by the state court" (i)
  - Number "court-ordered to receive competency restoration services by the Department or its designee" (ii)

*Court Consultant Report September 2025*

- o Number "incarcerated in a county jail or similar detention facilities while their criminal cases are stayed" (iii)
- o Number "awaiting court-ordered competency restoration services to be provided by the Department or its designees, *whether or not place on a competency waitlist maintained by the Department or its designee"* (iv).

**Deadlines to be Met within 90 Days of Entry of the Decree (by June 8, 2025).** For the following, please provide us by **March 31** with the name, title and contact information for the person(s) primarily responsible for producing the material. In addition, please have other information requested within various sections below available to us **by April 7** unless otherwise specified.

- • **Development of the Plan** (paragraph 54) which must include "program components" as specified in Section VI of the Decree, and as approved by the consultants (something required with all subsequent items listed in the Decree and below).
- • **Reevaluation of Class Members Currently Waiting for Restoration** (paragraph 57) to determine if the Class Member has been restored or is unlikely to be restored, all assessments to be performed by a Qualified Forensic Examiner (QFE)
    - o We will provide a provisional definition of a QFE to the Department to enable these assessments to be performed
    - o Who is responsible for assuring that these assessments are performed within the timeline established by the Decree?
- • **Development of Additional Forensic Capacity including**
    - o **new staff for ODMHSAS to oversee implementation of this Plan (Paragraph 77, with specific tasks defined there)**
    - o **development of a plan for a "material increase in new inpatient Forensic Beds" (Paragraph 62, with criteria for this plan included there)**
    - o **development of a plan for staffing and environment of care at OFC to assure ongoing accreditation from the Joint Commission and any other accrediting bodies that survey OCF (paragraphs 78-80, deadline is 120 days)**
        - ▪ In addition to the person(s) responsible for these tasks, please provide any analysis that has been done to date anywhere within the Department on forensic bed need
        - ▪ Please provide any existing methodology that the Department uses to define or project inpatient capacity needs
        - ▪ Please provide any analysis done within the last three years of the cost of adding an inpatient bed
        - ▪ In addition, please provide any information regarding past or present plans to contract for forensic beds in private (non-state) hospitals, including any contracts that may be in place for that purpose
        - ▪ Please provide any staffing analysis that has been done that recommended or considered but did not recommend the creation of positions within the central office devoted exclusively or primarily to forensic issues
        - ▪ Please provide the most current report from the Joint Commission.

*Court Consultant Report September 2025*

- **Clinical/Program Development**
  - **Develop a written triage screening protocol for Class Members who have been declared incompetent (paragraph 65, criteria specified there)**
    - Please provide any current triage protocols in use either in jails or at OFC
  - **Develop and begin to implement a pilot in-jail restoration program at Tulsa County Jail (paragraph 74, criteria specified there)**
    - Please provide any and all material that the Department uses to
      - Define Jail Based Competency Restoration
      - Examples of contracts with mental health providers that specify requirements for jail-based competency restoration services provided by the provider
      - The number of jail-based competency restoration programs currently in place
      - Policies and procedures used by such programs
      - The number of clients being served in each
    - The current JBCR is to be wound down (paragraphs 58-59) with resources redirected (paragraph 60)
      - How many resources are currently devoted to JBCR?
      - Who will be responsible for "winding down" the current program (recognizing that the Decree appropriately specifies that mental health treatment will continue to be provided in jail and that as a result some individuals may become competent as a result)
- **Training**
  - **Development and initial implementation of a training program for forensic staff including OFC for 12 hours of continuing education annually (paragraph 64)**
    - Please provide any training material/schedules, etc. of training currently provided to forensic staff as defined in paragraph 64 and whether and how many continuing education hours are provided
    - Please provide the name(s), titles and contact information for person(s) providing such training currently
  - **Increased training to Relevant State Personnel (paragraphs 78, 81, those personnel specified in paragraph 78 with a focus on legal officials)**
    - Please provide any training materials and/or curriculum currently made available to the types of personnel specified in Paragraph 78
    - Note that within 12 months of preparation of the training program training must be provided in all 77 counties (paragraph 79)
    - A publication must be provided within 12 months to each Oklahoma district court for dissemination to attorneys representing persons ordered to competency evaluations or restoration treatment (Paragraph 80, contents of the publication specified there).
- **Additional Deadlines Can Be Found Regarding the Assessment Process in**
  - **Paragraph 67 (deadlines and requirements for evaluations)**

*Court Consultant Report September 2025*

- Competency evaluations must be submitted within 30 days of receipt of the court order (Paragraph 67)
  - Please provide information regarding current deadlines for submission of competency assessments
  - Please provide information regarding the system (whether paper or electronic) by which receipt of court orders are acknowledged and recorded by either the Central Office or OFC
- Class members must be reevaluated every 90 days from date of receipt of the court order (this does not apply during the 90 days in which all Class Members are reevaluated; see paragraph 57 for the reevaluation requirement)
  - **Paragraph 82 and 83 (monthly status report on class members)**
    - This report, which must contain specific information on each class member, is due no later than the 10th day of each month
    - **We will require the first report on April 10, 2025**
    - Please provide the name of the person(s) who will prepare this report
    - Please identify the sources of information that will be used in preparation of this report
- **Definition of Waitlist (paragraph 36) requires Department to maintain waitlist throughout the term of the Decree and specifies what the Waitlist must contain, *by class member***
  - Please provide the last six months of waitlists and the data fields currently used in creation of the waitlist, as well as who is responsible for filling and assuring the accuracy of the data fields
- **Maximum Allowable Wait Time (defined in paragraph 27) and Deadlines (Paragraph for its Reduction (paragraph 86)**
  - **Maximum Allowable Wait Time is defined in detail (paragraph 27)**
    - This requires person by person recording and tracking of information
    - Please provide the current definition of "wait time" used by Central Office and/or OFC
    - Is this information maintained by paper? Electronically? Both?
    - Who captures and records this information?
  - **Deadlines for Reduction in Wait List Times**
    - 60 days (7 months from entry of decree; October 2025)
    - 45 days (10 months from entry of decree; December 2025)
    - 30 days (13 months from entry of decree; April 2026)
    - 21 days (16 months from entry of decree; July 2026)
- **Creation of a System for Collection, Analysis and Reporting of Data related to Competency Evaluation and Treatment (paragraph 44)**
  - The Department has an impressive array of data at its disposal
  - The Decree presents creation of the data system as a collaborative effort of the Department and the Court Consultants (paragraph 44)
  - Please identify the personnel associated with the competence-related data system

*Court Consultant Report September 2025*

- **Logistics**
  - It would be helpful and much appreciated if we could have an office at our disposal during our visit. A small conference room would be ideal if at all possible
  - The Decree (paragraph 53) says that "the Consultants shall submit monthly invoices to the Department detailing…time and expenses, which the Department shall pay within forty-five (45) days of the invoice." Who is the person that will be receiving those invoices?

Finally, the Decree (paragraph 68) says that "the Department shall, upon final entry of this Amended Consent Decree, use Best Efforts to obtain passage of Oklahoma legislation that permits the Department to provide community-based outpatient competency restoration services."

  - Has there been any discussion to date about introducing such legislation during the next legislative session?

Thanks so much for your attention and time. The Decree requires a great amount of effort from the Department and our approach to this will be one of collaboration. The three of us have all worked within and with Departments like yours on complex cases so we understand from experience the competing demands you and your staff face. But we also believe that this Decree and your administration of the requirements will lead to a better system on a set of issues that all States face.

*Court Consultant Report September 2025*

## APPENDIX D: Court Consultant Triage Memo; Department Proposed Triage Plan and Court Consultant Response

| | | |
|---|---|---|
| | **Court Consultants** *No 4:23-cv-00081-GKF-JFJ* | |

July 1, 2025

John, Holly, and Debbie:

Here is the summary of our triage conversation this afternoon, as well as recommendations for next steps. These are not mandates – simply ideas for a plan. Please respond with any proposed changes.

- Two triage categories ("Expedited" and "Standard") have been defined by Dr. Beamon. Those seem fine to us.

- Defendants at OFC who are committed for restoration do not need new triage opinions provided in their re-evaluations. Triage opinions are only needed for persons being evaluated in jail or on bond.

- *DMH needs to create a policy that guides prioritization for admission*. The policy balances triage level, admissions unit realities, and length of time waiting. The policy must be created in consultation with Central Office, and it must be sent to the Court Consultants for review and approval.

- Admissions must prioritize Expedited defendants, but that may not necessarily mean 100% of admissions are *always* Expedited defendants. The Departmental triage policy must dictate an expected percentage of Expedited vs Standard admissions as well as time frames associated with Expedited time frames. Again, send to Court Consultants for review and approval.

- *DMH needs to create example language for reports* that evaluators can include in their reports. It really just requires 2-3 sentences (description of categorical criteria and a recommendation for category). Send to Court Consultants for review and approval.

- *DMH needs to train evaluators to a common standard for evaluating and documenting the two categories*. That could be a fairly quick training about the two categories via a remote training (maybe 30 minutes max?) and some basic written resources that are available for reference by evaluators. Perhaps offer the remote training 2-3 times over the next few weeks and supply the evaluators with the necessary materials (the definitions of Expedited vs Standard admission and the example report language to use).

*Court Consultant Report September 2025*

All evaluators must be trained, and the Department should give the Court Consultants a list of all trained evaluators, the dates each evaluator was trained, an attestation from each evaluator that they have attended the training, proof from each evaluator that they understand the difference between the two categories and the requirement to include their recommendation in all reports going forward (this can be a short quiz, for example), and a copy of the training materials. Training materials should be sent to Court Consultants for their review prior to the first training.

- Evaluators need to include a triage recommendation, in accordance with the relevant Departmental policy and training components, in all reports starting Aug 1.

- The recommendation will be flagged in the portal as "Expedited" or "Standard."

- Debbie (or whoever oversees OFC admissions) reviews the prioritization levels for Treat to Competence defendants beginning August 1 and admits according to the Departmental triage policy.

- *DMH needs to track* triage category rates (how many defendants are tagged as Expedited vs Standard) as well as days to admission for both categories and then report these data points to the Court Consultants in the monthly updated Departmental report.

- For those defendants continuing to wait in jails for admission beyond 21 days, providers will report every 21 days about potential changes to triage level. *DMH must be proactive in this effort* – they must contact providers if the information has not been provided to them. Flags in the portal will be updated accordingly, and Debbie (or whoever oversees admissions) will reprioritize admissions as needed.

Thank you,
Court Consultants

*Court Consultant Report September 2025*

## APPENDIX D (cont.)

**PURPOSE**

The Oklahoma Department of Mental Health and Substance Abuse Services (The Department) will use this policy to address the need of those individuals referred to the Oklahoma Competency System who need an expedited, higher level of care.

The goal of this process is to ensure swift identification of persons with needs as defined in O.S. 43A §1-101 –903 and to establish uniform criteria and procedures, clinical and administrative, to prioritize and expedite placement and treatment for those individuals entering or within the Oklahoma Competency System.

**PROCEDURE**

All individuals entering or within the Oklahoma Competency System shall be triaged upon initial competency evaluation. A new triage screening shall be completed after the initial triage screening by provider Licensed Mental Health Provider (LMHP) staff to update the triage level if symptoms and/or behaviors warrant it.

**Triage Protocol**

    **a.  At initial evaluation**

        i.  Evaluator will document within the summary of the evaluation report the triage designation for the individual.

        ii.  The triage level will be entered into the Treat to Competency Portal (portal) within seventy-two hours of completion of the evaluation interview, excluding weekends and holidays. A full evaluation report is not required at this time; however, the evaluation deadline remains in effect.

        iii.  An evaluation report will be deemed incomplete and returned to the evaluator if the triage designation is not present.

        iv.  If triage information is not entered into the portal within seventy-two (72) hours of the scheduled evaluation date, excluding weekends and holidays, the Forensic Services Team will contact the evaluator to request the information and that it be entered into the portal before the end of day.

    **b.  Post-commitment order (Individuals not admitted to OFC)**

        i.  Local provider will ensure an LMHP completes a new screening for all individuals committed to The Department for restoration care and awaiting admission to OFC, either in county jail or in the community on bond if symptoms and/or behaviors warrant it.

        ii.  The triage level will be entered into the Treat to Competency Portal within seventy-two (72) hours of completion of the screening, excluding weekends and holidays.

        iii.  The Forensic Services Team will contact the local provider if triage information has not been entered into the Treat to Competency Portal within twenty-one (21) days post-commitment order. Triage screening will

*Court Consultant Report September 2025*

continue every twenty-one (21) days thereafter until admission to OFC, return of a competent reevaluation, or disposition of the case, whichever occurs first.

    **c.  Triage Reevaluation (Individuals not admitted to OFC)**

        i.  When a provider determines that an individual's symptoms and/or behaviors warrant a triage reevaluation, such shall be done with seventy-two (72) hours.

        ii.  The triage reevaluation and new triage level will be entered into the Treat to Competency Portal within seventy-two (72) hours of completion of the evaluation interview, excluding weekends and holidays.

**2.  Triage Guidelines**

The following levels determine the priority for an individual's placement into a higher level of care or expedited admission to the OFC. In accordance with 43A O.S. §1-101 –903, if an individual meets at least one of the criteria than the individual shall be placed on the expedited list.

| Triage Level | Criteria | Examples |
|---|---|---|
| Level 1: Expedited | <ul><li>Acute Psychosis as defined by O.S. 43A §1-101 -903</li><li>Serious Behavioral Dysregulation</li><li>Medically Dangerous Behavior</li><li>Physical or verbal threats to harm self or others</li><li>Behavior creating increased risk for additional criminal charges.</li></ul> | <ul><li>Disorganized behavior, including the involvement/use of bodily fluid or excrement.</li><li>Refusing food or fluids</li><li>Refusing medically necessary medications (blood pressure, Insulin)</li><li>Total refusal of prescribed psychiatric medication which is likely lead to serious short-term harm</li><li>Segregated while incarcerated due to risk of harm</li></ul> |
| Level 2: Standard | <ul><li>Presence of psychosis, intellectual disability, or other neurocognitive disorder rendering the individual psychotic</li><li>Stable behavior</li><li>No agitation or violence</li></ul> | <ul><li>Consistently completing activities of daily living</li><li>Eating and drinking within normal limits</li><li>Interactions with jail or facility staff are not volatile/combative</li></ul> |

**3.  Placement and Interventions**

    **a.  Expedited**

*Court Consultant Report September 2025*

    i. Placement in the appropriate location for treatment should occur within twenty-one (21) days of receipt of the commitment order. Individuals listed as expedited will be prioritized for admission at an appropriate placement, including placement in a crisis stabilization bed if warranted.

    ii. The individual's most acute symptoms will be documented in the portal using flags, either by the evaluator during the initial evaluation or by the local provider after a commitment order is issued. These flags will:

        1. Alert the Forensic Services Team; and

        2. Appear on the admission list after a commitment order has been issued, to support prioritization for OFC admission.

    iii. If the individual is in county jail and either a commitment order has not been issued or immediate admission to OFC is unavailable, the Forensic Services Team will collaborate with court partners to facilitate an appropriate release for civil commitment diversion or in-patient crisis stabilization at a Department facility, which may include:

        1. Carl Albert Community Mental Health Center

        2. Griffin Memorial Hospital

        3. Jim Talliaferro Community Mental Health Center

        4. Northwest Center for Behavioral Health

        5. Tulsa Center for Behavioral Health

    iv. The Forensic Services Team will work with the local provider to secure the LMHP statement and/or assist with facilitating telehealth screening with the receiving treatment center to complete admission criteria documentation.

        1. The receiving facility will work with the county jail to coordinate transport.

        2. The Forensic Services Team will collaborate with the local provider and send a letter to court partners to ensure notification of placement. Standard reporting requirements, which include submitting reports every thirty (30) days to court partners, will remain in place.

    v. If immediate admission to OFC is unavailable and the district court does not agree to civil commitment or release to crisis stabilization, the Forensic Services Team will coordinate with the local provider to document a safety plan with the county jail that includes increased provider contact. The safety plan will be added to the individual's portal file.

**b. Standard**

    i. Placement at an appropriate placement for treatment should occur within twenty-one (21) days of order of commitment.

*Court Consultant Report September 2025*

    ii.   Placement recommendation should indicate whether the evaluator or triage screener believes the individual is an appropriate participant for outpatient services including any specific outpatient needs or jail-based restoration if available in the county.

    iii.  If admission to an appropriate placement for treatment is not available within twenty-one (21) days following the issuance of a commitment order, and the individual remains in county jail:

        1.  The Forensic Services Team will assign a local provider to initiate contact within three (3) business days. This provider will also arrange a prescriber appointment to begin medications, as clinically appropriate.

        2.  The local provider will document all contact with individual within the portal.

        3.  The Forensic Services Team will collaborate with the local provider and send a letter to court partners to ensure proper notification of placement. The standard requirement to report to court partners every thirty (30) days will remain in effect.

**4. Clinical Consultation**

If at any time during any of the above listed processes an evaluator or provider is uncertain regarding determination or next step, they shall email The Forensic Services Team, forensicservices@odmhsas.org and request immediate clinical consultation with the teams clinically trained staff.

**5. Training**

The Forensic Services Team will provide quarterly training to all Department-approved evaluators and LMHP staff assigned to conduct triage screenings. The Forensic Services Team will schedule trainings at the start of each fiscal year and will be available to potential attendees. The Forensic Services Team will provide on-demand technical assistance to all providers at the evaluator's or provider's request.

    i.   [insert skills testing requirement from QFE policy here once approved by Consultants]

**6. Process Monitoring and Analysis**

Information entered into the Treat to Competency Portal will enable the Forensic Services Team to monitor evaluator and provider compliance with data entry and timeline requirements. Department data analysts will generate reports for the Forensic Services Team to support program evaluation, assess effectiveness, and identify service gaps. The team will review these reports weekly for ongoing tracking.

*Court Consultant Report September 2025*

## APPENDIX E: Resources Provided to ODMHSAS by Court Consultants to Date

The following is a non-comprehensive list of materials, resources, contacts, and other information we have provided to the Department in conjunction with our duty in the Consent Decree (paragraph 38) to "advise, recommend, and facilitate methods to the Department regarding plans and practices for improving the delivery of competency evaluations and Restoration Treatment to Class Members..." Dates of submission of these materials are available as needed.

- Names and contact information for three national experts on competence evaluation training
- Names and contact information for multiple jail-based restoration programs
- Names and contact information for national experts on jail-based restoration
- An offer to join the Jail Based Restoration National Cohort Meeting on October 17th, a virtual event that takes place once a quarter involving individuals from across the country who are involved in jail-based restoration
- Name and contact information for a national expert on forensic bed capacity data projection modeling
- Articles and other literature regarding multiple areas of forensic practice and competency evaluation and restoration
- Contact information for a successful community step-down housing program in Colorado
- Copies of at least one Competency Restoration Annual Plan from another state in the midst of a similar lawsuit
- Examples of competency evaluator training slides and other materials
- A memo outlining a plan for a triage system in Oklahoma (found in its entirety in *Appendix D*)
- A memo outlining a plan for reducing the Length of Stay to restoration in OFC (found in its entirety in *Appendix F*)

*Court Consultant Report September 2025*

### APPENDIX F: Court Consultant Recommendations for Reducing the Length of Stay to Restoration at OFC, As an Example of Resources Provided by Court Consultants

**Court Consultants**

*Briggs v Friesen, No 4:23-cv-00081-GKF-JFJ*

August 28, 2025

To: ODMHSAS Leadership
From: Darren Lish, MD, OBO Court Consultants
Re: Recommendations to Lower Length of Stay at OFC

Dear ODMHSAS staff,

As you continue to develop your Strategic Plan in the weeks ahead, we encourage you to consider incorporating specific strategies to address the length of stay (LOS) for defendants receiving competency restoration services at the Oklahoma Forensic Center (OFC).

One of the most effective ways to reduce the number of Class Members on the waitlist is to reduce the average LOS for those currently receiving competency restoration treatment at OFC. When work on the Consent Decree began in March 2025, the reported length of stay (LOS) for defendants receiving restoration treatment at OFC was over 300 days. Over subsequent months, we were informed that the length of stay was trending down, though it remained around 270 days. In the Strategic Plan dated August 12, 2025, the Department indicated "a current average in-hospital treatment length of ninety (90) days, down from roughly 130 days prior to the Consent Decree" (page 10), which did not align with the previous numbers provided. During our most recent meetings with the Department, we were informed that OFC did not have current LOS data available and that they would be working on tracking those statistics in the months ahead.

Estimating the average length of stay in forensic state hospitals for competency restoration across the United States is challenging due to variability by state, facility type, patient diagnosis, and data limitations. National data from 2024-2025 shows averages ranging from 76 days (median in Virginia) to 160 – 180 days (North Carolina), with many states achieving restoration within 90 – 120 days—substantially lower than OFC's historical figures. As part of the Strategic Plan, we believe that the Department should be implementing a multifaceted approach to substantially reduce the LOS at OFC to fall within a more acceptable range of 90 – 120 days,

*Court Consultant Report September 2025*

which would result in more restoration beds being available at the facility on an annual basis, substantially reducing Class Members' time spent in jail awaiting competency restoration services.

Reducing the length of stay (LOS) requires evidence-based strategies that balance clinical efficacy, patient well-being, and systemic efficiency. Below are some recommended methods to achieve this goal.

1. **Appropriate Staffing of Psychiatric Providers:** Having a sufficient number of psychiatric providers (psychiatrists or advanced practice psychiatric nurses) at OFC is critical to providing effective treatment to individuals and reducing the overall length of stay. OFC currently has a bed capacity of 268 and has three full-time psychiatrists to provide psychiatric treatment at the facility. This represents a staffing ratio of almost 90 patients per provider. That staffing ratio is far from adequate and is undoubtedly contributing to the inappropriately high LOS at OFC.

   While there is no universally mandated national standard for the number of psychiatric providers required in state hospitals for competency restoration treatment, recent state-specific models and surveys focused on forensic mental health units—where competency restoration often occurs—recommend ratios ranging from 1 psychiatric provider per 14-24 patients. The state of Colorado, which is also currently under a Consent Decree related to delays in competency restoration treatment, has two state hospitals that provide competency restoration treatment. The largest hospital, the Colorado Mental Health Hospital in Pueblo (CMHHIP), has a bed capacity of 516 and, like OFC, treats both insanity acquittees and those found incompetent to proceed. CMHHIP currently has 34 psychiatric providers, 30 of which are direct care providers (the additional four providers serve as psychiatric supervisors for the advanced practice nurse practitioners). This represents a psychiatric staffing ratio of 17 patients per provider. This staffing ratio was intentionally set following a federal lawsuit related to appropriate psychiatric care at the facility (*Neiberger v Hawkins*, 1999). The Colorado Mental Health Hospital in Fort Logan (CMHHIFL) primarily treats civilly committed patients, though it recently opened 44 forensic beds for competency restoration treatment. The hospital has a total bed capacity of 140 patients and employs 9 full-time psychiatric providers. This represents a psychiatric staffing ratio of 16 patients per provider. The current LOS for competency restoration at these two facilities averages 90 -120 days.

   The Department needs to prioritize filling all current open psychiatric positions at OFC and should make an effort to request legislative funding for a substantial number of additional positions. In order to adequately staff OFC at its present capacity at a ratio of 24 patients per provider (the upper limit of the recommended range), the facility would require 11 full-time providers. Notably, OFC plans to open an additional 80 beds in the months ahead which would require an additional 3 psychiatric providers to staff at the 24:1 patient per provider ratio. Finding an appropriate number of qualified psychiatric staff to work at OFC has been a historical challenge and will not be easy to accomplish.

*Court Consultant Report September 2025*

We have seen in Colorado how a legislative increase in the salaries of the state psychiatric providers made a difference and allowed for a rapid filling of their positions. The use of locum tenens providers should be utilized until the positions are filled. Additionally, the use of telepsychiatry should be considered to potentially contract with psychiatric providers who are unable to provide on-site services. An ongoing partnership with medical schools with psychiatric residencies and forensic psychiatry fellowships should continue to be cultivated, as this will be the best pool for future staffing needs.

The Decree (paragraph 63) requires that within 120 days of its entry (July 8, 2025), the Department, in consultation with Class Counsel and Consultants, shall develop and begin to implement a plan for staffing at OFC. In the Strategic Plan dated August 12, 2025, the Department indicated that there have been twenty (20) new hires at OFC, including psychiatrists, psychiatric nurses, therapists, and behavioral health aides, though the breakdown of these new hires was not provided. The Department indicated in the Plan an ongoing commitment to determining the causes of the direct care staff vacancy rate and a plan to implement processes and policies designed to remedy this vacancy rate problem.

2. **Increased Frequency of Psychiatric Contact:** A cornerstone of efficient restoration is the early and effective administration of psychotropic medications to stabilize symptoms of severe mental illnesses like schizophrenia or bipolar disorder, which are common among incompetent defendants. Providers should conduct immediate assessments upon admission to prescribe antipsychotics or other medications, with rapid titration to therapeutic levels. In order to accomplish ongoing efficient and effective medication management, patients need to be seen by psychiatric providers frequently enough so that dose adjustments and/or medication changes can be implemented in a timely fashion. More frequent contact allows the psychiatric provider to gather relevant information about the mental state of the individual to assess whether the psychiatric symptoms that often led to the finding of incompetency have been addressed and whether an individual may be approaching restoration to competency.

During our visits to OFC, we learned that some psychiatric providers decrease frequency of contact with patients to once every 3-4 months, which raises concern. If an individual is stable enough from a psychiatric perspective to only need to be seen every 3-4 months, then they should be reevaluated for competency and potentially discharged. However, if the individual is being seen less frequently because they are considered to be "treatment-resistant," then there should either be more aggressive psychopharmacologic treatment offered (potentially in consultation with an external psychiatric consultant) or the individual should be evaluated for the potential of being unrestorable.

More frequent psychiatric contact with individuals allows treatment to be tailored to each patient's specific needs, which can significantly reduce LOS. Comprehensive assessments at admission should identify cognitive deficits, psychiatric conditions, and

*Court Consultant Report September 2025*

social factors affecting competency. By focusing on targeted interventions—such as cognitive-behavioral therapy, medication management, and/or psychoeducation—providers at OFC can address barriers to competency more efficiently. Regular progress evaluations ensure treatments remain relevant, avoiding prolonged or ineffective interventions.

Being able to provide proper frequency of psychiatric follow-up is obviously dependent upon adequate staffing levels, as described above. Once adequate psychiatric staffing is achieved, we recommend that patients be seen at least weekly for the first 8 weeks of treatment and then no less frequently than once monthly. Psychiatric providers can also perform brief "check-ins" on the units in order to assess for patients who may be decompensating and might need to be seen for a more thorough visit in order to make appropriate medication adjustments.

3. **Aggressive Psychopharmacology**: Aggressive psychopharmacology—defined here as rapid initiation and titration of psychotropic medications, such as antipsychotics, to achieve quick symptom stabilization—can help reduce length of stay in state psychiatric hospitals, particularly for patients undergoing competency restoration as a result of acute psychotic disorders. The population of defendants found incompetent to proceed are often challenging to treat. They often have an extended duration of untreated psychosis, they may have been using various substances of abuse on a chronic basis, and they often have a significant amount of trauma in their history. As a result of the above, individuals in restoration treatment may require supratherapeutic doses of antipsychotic medication, and providers need to be comfortable with exploring that option. In addition, providers should be comfortable using combinations of antipsychotic medications, if needed. External psychiatric consultation can be helpful in order to discuss potential solutions for difficult cases. The state of California has a psychopharmacology consultation service for its state hospitals called the Psychopharmacology Resource Network (PRN) team which is a valuable resource for the psychiatric providers working in that system. In the Strategic Plan, the Department noted that it has engaged an external psychiatric consultant on a part-time basis, which is a positive development.

4. **Use of Involuntary Medications:** Psychiatric providers and courts should feel comfortable using this option as part of the competency restoration process when individuals lack capacity to consent to treatment and have demonstrated that they pose a risk of dangerousness to themselves or others or present with evidence of grave disability as a result of their untreated mental illness. The use of involuntary medication can be a controversial subject, but it clearly provides the opportunity for more rapid treatment of an underlying mental illness and more rapid restoration to competency. We would like to start gathering more data from the Department with regard to the number of incompetent defendants who arrive at OFC with a preexisting "order to treat," how often providers at OFC petition the court for the use of involuntary medication if an "order to treat" is not already in place, how long it takes for involuntary medication

*Court Consultant Report September 2025*

hearings to be scheduled, and an analysis of restoration rates and LOS for those individuals with an involuntary medication order in place in order to provide information about how effective this practice is for reducing lengths of stay at OFC.

5. **More Programming/Treatment Options:** Individuals at OFC need to attend restoration groups more than once or twice a week. There should be several hours of programming made available to patients daily, which can be a combination of restoration education and other types of groups. Additional treatment options could include individual/group counseling, life skills training, and substance use disorder treatment. For treatment-resistant patients, OFC staff should consider an individualized approach to treatment with a modality such as cognitive behavioral therapy (CBT) for psychosis. Also, neuropsychological testing should be available when requested. As with the psychiatric providers, there are an insufficient number of psychologists on staff at OFC which significantly impacts the ability to conduct neuropsychological testing, specialized treatment modalities, and competency reevaluations. The Department should prioritize filling all current open psychology positions at OFC. Relationships with psychology training programs in the state should continue to be cultivated.

6. **Increased Frequency of Competency Reevaluations:** Frequent assessments of competency status can expedite discharge and reduce the overall LOS at OFC. This will depend upon having an adequate number of evaluators available to perform such reevaluations for patients at OFC. Competency reevaluations should take place at least every 90 days. Rather than waiting for arbitrary timeframes, however, OFC should conduct reevaluations as soon as clinical improvements are observed and reevaluations are recommended by treatment providers.

These strategies, if implemented cohesively, can align OFC's LOS with national benchmarks of 90-120 days, easing waitlists and improving outcomes.

Respectfully,

Darren Lish, MD, OBO Court Consultants No 4:23-cv-00081-GKF-JFJ

## APPENDIX G: Court Consultant Recommendations for Additional Relief

*For convenience, we have aggregated all of our recommendations and proposed remedies for the various Consent Decree components here. These recommendations and proposed remedies are simply a duplication of the identical information found across those separate sections of our report.*

### The Waitlist

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- ODMHSAS on a weekly basis should cross-check with every county the Department's tabulation of who is on the waitlist and the LOS for each person. Exceptions might be made for very small counties (to be determined by the parties).
- The monthly report the Decree requires to be submitted each month with a list of Class Members should be accompanied by a sworn affidavit that the weekly cross-checks had been done, where there were inconsistencies between ODMHSAS data and county data, and how those inconsistencies were resolved.
- The monthly status report due no later than the 10th of each month should also include a list of all people for whom initial evaluations have been ordered, with the same cross-check with Oklahoma counties and sworn affidavit process.
- This cross-check process should remain in place until the Court Consultants are satisfied with the reliability and accuracy of the waitlist data. This may require additional independent verification of Department data from the Court Consultants or their subcontractors.

*Court Consultant Report September 2025*

## As to Reevaluation of Class Members (Par. 57)

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- ODMHSAS shall produce a list specifically of all individuals on the waitlist as of February 8, 2025, dates of re-evaluation, dates of submission of the corresponding re-evaluation reports, competence opinions of those evaluations, court adjudications, and copies of the evaluation reports. The monthly reports provide some of this information, but as noted above we believe some of the cases listed under the reevaluation column were, in fact, initial evaluations; we would like clarification of these cases.
- For any re-evaluation reports that have yet to be submitted from that group, ODMHSAS shall produce a plan for when those Class Members will be re-evaluated, where they will be evaluated, and by whom.
- For any re-evaluation reports that have yet to be submitted from that group, and which are subsequently completed, ODMHSAS shall provide the Court Consultants with the dates of re-evaluation, dates of submission of the corresponding re-evaluation reports, competence opinions of those evaluations, court adjudications, and copies of the evaluation reports.
- ODMHSAS shall cross-check their re-evaluation list with each referral county and shall produce a sworn affidavit that the cross-check has been done, where there were inconsistencies between ODMHSAS data and county data, and how those inconsistencies were resolved.

## Development and Implementation of the Strategic Plan (Par. 54-56)

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- ODMHSAS staff should work with an external consultant to assist with strategic planning based on the Sequential Intercept Model, a planning model familiar to the Department
- The Department's Plan should be revised in consultation with Class Counsel and Court Consultants. This will include the creation of a negotiated deadline for a revised Plan and its implementation. Implementation was to have begun by June 8 but in the absence of a Plan, there has been no implementation;
- The Plan should be responsive to the critiques laid out in our August 21 response regarding the production of accurate and consistent data, attention to OFC and the LOS for restoration treatment at the facility, a more specific and concrete delineation of staffing plans at the Department and at OFC, and the elucidation of actionable steps and expected measurable outcomes.

*Court Consultant Report September 2025*

## Developing and Beginning to Implement a Plan for new Forensic Beds (Par. 62)

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay,

- Provide the information we requested on March 21;
- Illustrate in detail what information was considered and incorporated in the current bed projection;
- Provide additional detail on the number of beds projected for competency restoration exclusively, beds for those considered not guilty by reason of insanity, location of those beds and possible alternatives over time; and
- Provide detailed information on how different variables affect the projection model and how those different projections / variables result in specific action plans and outcomes (how will projected new beds affect patient flow from jails? Affect length of stay? Affect census?).

## Development of a Triage Process (Par. 66)

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay, adopt the following:

- ODMHSAS will consult and collaborate with Class Counsel on the final drafted plan.

- ODMHSAS will finalize the triage policy and plan by September 30, 2025.

- ODMHSAS will implement the triage policy in November 2025. Data on rates of Expedited versus Standard Admission opinions, lengths of stay until admission, and other related data will be recorded and submitted to the Court Consultants at the end of November.

- Data related to the triage system will continue to be gathered, recorded, and analyzed on an ongoing basis. Data will be disseminated in the Department's Monthly Report.

- If a defendant identified as Expedited is not admitted to restoration services within the Expedited time frame, the Department will pay an additional daily penalty for every day the defendant remains in a county jail until transferred to an appropriate restoration setting. This additional penalty will be negotiated among the Parties and Court Consultants.

*Court Consultant Report September 2025*

## Development and Implementation of a Plan to Require All OFC and competency restoration staff to receive 12 hours of continuing education annually

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay, adopt the following:

- Dr. Jason Beamon was providing all training relevant to this part of the Decree, but Dr. Beamon is no longer affiliated with the Department. Therefore, ODMHSAS must develop a plan – with dates, locations, trainers, and topics – for the training of all ODMHSAS staff involved in competency restoration. We have recommended potential training programs that can help complete this requirement from outside Oklahoma, though to date those recommendations have not been pursued.
- ODMHSAS must complete the training of all required personnel by March 9, 2026. ODMHSAS will submit a list of competency-involved personnel (salaried and contracted), and ODMHSAS will provide a list of all staff (including proof of attendance) of those that attended training.
- If ODMHSAS does not complete the training by March 9, 2026, we recommend that fines be imposed for non-compliance.

## Training of Legal Official (Par. 78-80)

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- Given that this component of the Consent Decree has been largely, if not totally, ignored, we offer no recommendations aside from beginning work as mandated by the Consent Decree.
- If discernible progress (creation of a curriculum approved by Court Consultants with consultation from Class Counsel; a workplan including identification of trainers, methods of delivery, dates for the training) is not made by end of calendar year, 2025, we recommend the imposition of daily fines until such progress has been made.

*Court Consultant Report September 2025*

## Development of Jail-Based Competency Restoration Programs (Par. 74)

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- The Department must follow through with meetings with the Tulsa County Sheriff to develop a collaborative plan to establish a formal jail-based restoration program as mandated by the Decree.
- The Department must identify and begin coordinating a viable plan for JBCR in a second Oklahoma county, in accordance with the Consent Decree. That information should be provided to the Court Consultants and Class Counsel, who should be invited in as collaborators throughout the JBCR development process.
- The Department should consider reaching out to recommended points of contact of organizations currently operating and researching successful jail-based restoration programs, in particular leadership at the Colorado Office of Civil and Forensic Mental Health which operates two jail-based restoration programs in the Denver area.
- Department staff should consider attending the Jail Based Restoration National Cohort Meeting on October 17th, which is a virtual event hosted by Colorado's Forensic Services Division that takes place once a quarter involving individuals from across the country who are involved in jail-based restoration.
- If discernible progress as measured by Court Consultants is not made on the establishment of a JBCR program at the Tulsa County Jail by end of Calendar Year 2025, daily fines should be imposed on ODMHSAS until such progress is made.

*Court Consultant Report September 2025*

## Submission of Initial Evaluations within 30 Days of Receipt of Order (Par. 67)

We suggest the following remedy, pursuant to the Court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate" based on a finding of a Material Violation:

- By October 15th, ODMHSAS must produce a list of everyone that has been ordered for an initial competency evaluation since March 10. The list should be broken down by county and location of the individual, and the list should include deadlines for the report submissions to court.
- ODMHSAS must produce a list of all initial evaluation report submission dates for the above individuals, the evaluators that conducted the evaluations, the opinions of the evaluators, and the current location of the defendants who were opined incompetent to stand trial.
- ODMHSAS must produce a corresponding list of evaluators that could conduct any outstanding initial evaluations, the date any evaluations are scheduled, the date the reports must be submitted, and the locations of the defendants.
- ODMHSAS must cross-check with every county statewide about the current status of initial competency evaluations, akin to their cross-check of people on the waitlist. This should be conducted every other week until the Court Consultants terminate the requirement.
- Rates of 30-day initial evaluation compliance, opinions of competency to proceed, locations of evaluations, and assigned evaluators will be provided in the Department's Monthly Report. To the degree this information is already provided, it must be amended to incorporate elements not yet part of the monthly report.
- Consultants may request for independent verification of the completion of initial evaluations, either directly or through subcontractors.
- Penalties should be assessed if the deadlines and substantive obligations established in these recommendations are not met.

*Court Consultant Report September 2025*

## Development of Standards and Training for Qualified Forensic Evaluators (Par. 31)

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay, adopt the following:

- ODMHSAS must return their drafted QFE policy to the Court Consultants with specific responses to our questions, comments, and recommendations.
- ODMHSAS must produce a training regimen that includes introductory training for all new QFEs and ongoing maintenance training for existing QFEs. The Department must send us a list of trainers, topics, dates, locations, and training modalities before the training occurs, so that we may review and consider approval.
- ODMHSAS must create additional training, approval mechanisms, monitoring, and limitations for master's-level QFEs.
- ODMHSAS must create a quality assurance process that monitors the quality of evaluation reports. This review should be subcontracted in the beginning to ensure that adequate performance is objectively measured. ODMHSAS must maintain a certain average aggregate criterion level across evaluation reports, pulled at random, in order to avoid penalties. This criterion level and QA process must be reviewed approved by the Court Consultants.
- ODMHSAS must create sanctions and remedies for evaluators producing poor quality reports. This will also necessitate an appeals process for evaluators who are placed into remediation or who are terminated from the evaluator pool.
- ODMHSAS must produce training proposals and cost estimates (quotes) from the national experts we have provided to them.

*Court Consultant Report September 2025*

## Reevaluating all Class Members Every 90 Days After Receiving Order for Competency Restoration (Par. 67)

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay, engage in the following actions:

- ODMHSAS must provide a list of all Class Members names, locations, due dates, and assigned evaluators for submission of 90-day reevaluations.
- ODMHSAS must provide a list of all reevaluations that have been completed to date, including the names, locations, due dates, and assigned evaluators for those Class Members.
- Court Consultants or their subcontractors will independently verify the data regarding reevaluations.
- Daily penalties will be levied for any reevaluation that is not submitted by the 90-day deadline.

## Development and Implementation of a Plan for Staffing at OFC and for Assuring Continued Accreditation (Par. 67)

We are not requesting additional injunctive relief on this issue, but we do request that the Department, without further delay, engage in the following actions:

- ODHMSAS needs to prioritize filling all current open psychiatric positions at OFC and should try to request legislative funding for a substantial number of additional positions based upon nationally recommended staffing ratios. This is one of our primary recommendations, and we have consistently urged the Department to improve and expand staffing at OFC. An ongoing partnership with local medical schools with psychiatric residencies and forensic psychiatry fellowships should continue to be cultivated, as this will be the best pool for future staffing needs.
- While seeking full-time on-site psychiatric providers, ODMHSAS should make use of locum tenens providers until the positions are filled. Additionally, the use of telepsychiatry should be considered, which will allow OFC to tap into urban or out-of-state providers, expanding the pool of available clinicians.
- The Department should prioritize filling all current open psychology positions at OFC. Relationships with psychology training programs in the state should continue to be cultivated.
- The Department shall provide the Consultants with most recent JCAHO reports for OFC, as previously requested.

*Court Consultant Report September 2025*

### APPENDIX H: Benchmarks to Mark Progress from mid-June through August



June 19, 2025

To: ODMHSAS Leadership
From: John Petrila, Neil Gowensmith, Darren Lish
Re: Benchmarks to Mark Progress from mid-June through August

We wanted to provide you with benchmarks for the next few weeks in Briggs v Friesen. While most of the June 8 deadlines were missed, we anticipate with new leadership that progress will be accelerated. We will not release our July full report until late July/early August. In anticipation of that want to describe in concretely what we will be looking for between now and submission of our report.

**The Strategic Plan (paragraph 54)**
- As we discussed in the June 17 Wednesday call, and as we made clear in our Interim Report, it is essential that this strategic plan be completed. It is one of the core elements of the decree.
- ODMHSAS is familiar with strategic planning, and Dr. Gowensmith has made the Colorado plan available, which was done in response to a similar decree.
- The Plan has to be a comprehensive approach to the forensic system in Oklahoma, both in its current state and where ODMHSAS anticipates the system should be in the mid- and long-term. It has to contain data (for example, waitlist numbers, evaluation orders, location of origin for people in the forensic system, etc.), timelines, responsible parties, anticipated impact on the waitlist and over what time periods, barriers, and other factors.
- We will provide whatever assistance the individual(s) charged with producing this Plan need, but we would like to see:
  - An outline by July 7 which we will discuss jointly,
  - A rough draft (or drafts of various sections) within 3 weeks of approval of the outline but no later than August 1,
  - A finished draft within 4 weeks of approval of the drafts but no later than August 22,
- This provides 9-10 weeks from beginning to completion. It will require a lot of work, but its completion and the process to complete it will help set a coordinated roadmap for the department going forward. Please advise as soon as possible who will have overall responsibility for production of the Plan.

*Court Consultant Report September 2025*

**Reevaluations (paragraph 57)**

At this point, we do not completely understand, nor do we necessarily find credible the number of reevaluations that have been done and that still must be completed. This is related to our larger concerns about accuracy of the waitlist data we are receiving, which we believe has grown more accurate but not yet accurate enough for us to take at face value. Going forward,

- Dr. Gowensmith will send a list of reevaluations that we would like to review.
- In addition, before our visit, we would like to receive for our review during our site visit
  - a complete list of all reevaluations currently done,
  - a complete list of all reevaluations that need completing, a schedule for those reevaluations,
  - who will be completing them,
  - and the logic for who is included and who has been excluded. This latter item is based on a comment made by Dedra during a recent Wednesday call when she said certain individuals had been removed from the reevaluation list based on a conversation with in-house counsel. As we noted in our Interim Report, we believed that the Department's interpretation of at least one exemption in the Decree was incorrect.
- **The reevaluation process must be completed by August 1. If that is not possible, then we will require a detailed explanation of the factors preventing it.**
- During our site visit we would also like to see how many initial evaluations have been scheduled since entry of the Decree on March 10, numbers scheduled and completed, opinions rendered on competency, as well as current legal status of those individuals.

**Triage Process (paragraph 65)**

This was one of our priority recommendations in our Interim Report. Implementation of a triage process as rapidly as possible is essential to enable the most acutely ill in jail to be transferred to care. This is the schedule we propose for the next 4-6 weeks.

- Within the next 2 weeks (by July 3) send us the triage protocol that will be used and a schedule that outlines:
  - When the triage process will begin,
  - Who specifically will be doing the triage with their background/CV,
  - How the information will be tracked including anticipated time between triage and transfer to OFC
- By July 18 the triage process is to be completed at either Tulsa or the OKC jail.
- By August 1, the triage process is to be completed at both Tulsa and OKS jails.

**Other planning requirements (paragraphs 62, 63, 77)**

We would appreciate a response to the requests for information related to these items, made in our initial request for information in March. Those specific requests that were not answered are referenced in the Interim Report and in various emails sent to staff in April and May.

- In addition, work needs to be done to have a plan, not simply an organizational chart for staffing within the Department (paragraph 77), and for increased inpatient forensic beds

*Court Consultant Report September 2025*

(paragraph 62, with its requirements, plus see our comments on this issue in our Interim Report).

- Note also that paragraph 63 for a plan for forensic inpatient facilities and staffing has a deadline of 120 days from entry of the decree (or July 8).
- We would find it acceptable if these planning requirements became part of the overall strategic plan referenced above, but they do need to be completed.

**Waitlist**

While we believe that waitlist counts are more accurate than they were over the first 3 months of the Decree, we are not at a point where we can take them at face value. Part of this is because we have not had a deep dive into the data system and sources that generate the waitlist and other forensic counts, something that we will be doing on June 30 in the central office. However, part of our continued concern stems from reports that we receive suggesting that the waitlists in local jails exceed those reported by ODMHSAS. Those reports may or may not be accurate. However, as a way to validate the list and eliminate that concern, it would be extremely helpful if a week before submission of the monthly report on the 10th of each month the ODMHSAS waitlist was cross checked with the waitlists reported by jails with more than 5 people on the waitlist. Please advise if this is possible or not.

**Summary of Benchmark Deadlines:**
**Strategic Plan**
July 7, 2025: Outline of strategic plan due (advise us of the responsibility party for this by June 24)
August 1, 2025: Rough draft available to consultants
August 22: Final Plan submitted to consultants

**Reevaluations**
June 27, 2025: List of all reevaluations currently completed; all reevaluations requiring completion and schedule; who will be doing the reevaluations, and exclusion and inclusion criteria used by ODMHSAS
August 1: All reevaluations completed

**Triage Process**
July 3: Copy of the triage protocol, when process will begin and backgrounds and names of those performing triage
July 18: Triage completed at either Tulsa or OKC jail
August 1: Triage completed at both jails
Results made available to Court Consultants

**Other Planning Requirements**
Department staffing and increased beds analysis can be included as part of the Strategic Plan and are subject to the Plan's deadlines
July 8: Consent Decree mandates report/plan on OFC staffing (paragraph 63)

*Court Consultant Report September 2025*

**Calendar Snapshot**

| June 27, 2025 | **Reevaluations due Consultants** |
|---|---|
| July 3, 2025 | **Triage protocol/schedule due Consultants** |
| July 7, 2025 | **Outline of strategic plan submitted** |
| July 8, 2025 | **OFC report/plan due (paragraph 63)** |
| July 18, 2025 | **Triage completed OKC or Tulsa Jail** |
| August 1, 2025 | **Rough draft strategic plan submitted** |
| August 1, 2025 | **Triage completed both jails** |
| August 1, 2025 | **All reevaluations completed** |
| August 22, 2025 | **Final draft strategic plan submitted** |

We are happy to work with you on any or all of this and we will continue to share resources from our own work and other places. And please, ask *any* question that comes to mind.