*Court Consultant Report September 2025*

**APPENDIX B: August 12th ODMHSAS Strategic Plan and Cover Letter; Court Consultant Response**

**Court Consultants**

*Briggs v Friesen, No 4:23-cv-00081-GKF-JFJ*

June 19, 2025

To: ODMHSAS Leadership
From: John Petrila, Neil Gowensmith, Darren Lish
Re: Benchmarks to Mark Progress from mid-June through August

We wanted to provide you with benchmarks for the next few weeks in Briggs v Friesen. While most of the June 8 deadlines were missed, we anticipate with new leadership that progress will be accelerated. We will not release our July full report until late July/early August. In anticipation of that want to describe in concretely what we will be looking for between now and submission of our report.

**The Strategic Plan (paragraph 54)**
- As we discussed in the June 17 Wednesday call, and as we made clear in our Interim Report, it is essential that this strategic plan be completed. It is one of the core elements of the decree.
- ODMHSAS is familiar with strategic planning, and Dr. Gowensmith has made the Colorado plan available, which was done in response to a similar decree.
- The Plan has to be a comprehensive approach to the forensic system in Oklahoma, both in its current state and where ODMHSAS anticipates the system should be in the mid- and long-term. It has to contain data (for example, waitlist numbers, evaluation orders, location of origin for people in the forensic system, etc.), timelines, responsible parties, anticipated impact on the waitlist and over what time periods, barriers, and other factors.
- We will provide whatever assistance the individual(s) charged with producing this Plan need, but we would like to see:
  - An outline by July 7 which we will discuss jointly,
  - A rough draft (or drafts of various sections) within 3 weeks of approval of the outline but no later than August 1,
  - A finished draft within 4 weeks of approval of the drafts but no later than August 22,
- This provides 9-10 weeks from beginning to completion. It will require a lot of work, but its completion and the process to complete it will help set a coordinated roadmap for the department going forward. Please advise as soon as possible who will have overall responsibility for production of the Plan.

*Court Consultant Report September 2025*

**Reevaluations (paragraph 57)**

At this point, we do not completely understand, nor do we necessarily find credible the number of reevaluations that have been done and that still must be completed. This is related to our larger concerns about accuracy of the waitlist data we are receiving, which we believe has grown more accurate but not yet accurate enough for us to take at face value. Going forward,

- Dr. Gowensmith will send a list of reevaluations that we would like to review.
- In addition, before our visit, we would like to receive for our review during our site visit
  - a complete list of all reevaluations currently done,
  - a complete list of all reevaluations that need completing, a schedule for those reevaluations,
  - who will be completing them,
  - and the logic for who is included and who has been excluded. This latter item is based on a comment made by Dedra during a recent Wednesday call when she said certain individuals had been removed from the reevaluation list based on a conversation with in-house counsel. As we noted in our Interim Report, we believed that the Department's interpretation of at least one exemption in the Decree was incorrect.
- **The reevaluation process must be completed by August 1. If that is not possible, then we will require a detailed explanation of the factors preventing it.**
- During our site visit we would also like to see how many initial evaluations have been scheduled since entry of the Decree on March 10, numbers scheduled and completed, opinions rendered on competency, as well as current legal status of those individuals.

**Triage Process (paragraph 65)**

This was one of our priority recommendations in our Interim Report. Implementation of a triage process as rapidly as possible is essential to enable the most acutely ill in jail to be transferred to care. This is the schedule we propose for the next 4-6 weeks.

- Within the next 2 weeks (by July 3) send us the triage protocol that will be used and a schedule that outlines:
  - When the triage process will begin,
  - Who specifically will be doing the triage with their background/CV,
  - How the information will be tracked including anticipated time between triage and transfer to OFC
- By July 18 the triage process is to be completed at either Tulsa or the OKC jail.
- By August 1, the triage process is to be completed at both Tulsa and OKS jails.

**Other planning requirements (paragraphs 62, 63, 77)**

We would appreciate a response to the requests for information related to these items, made in our initial request for information in March. Those specific requests that were not answered are referenced in the Interim Report and in various emails sent to staff in April and May.

- In addition, work needs to be done to have a plan, not simply an organizational chart for staffing within the Department (paragraph 77), and for increased inpatient forensic beds

*Court Consultant Report September 2025*

(paragraph 62, with its requirements, plus see our comments on this issue in our Interim Report).

- Note also that paragraph 63 for a plan for forensic inpatient facilities and staffing has a deadline of 120 days from entry of the decree (or July 8).
- We would find it acceptable if these planning requirements became part of the overall strategic plan referenced above, but they do need to be completed.

**Waitlist**

While we believe that waitlist counts are more accurate than they were over the first 3 months of the Decree, we are not at a point where we can take them at face value. Part of this is because we have not had a deep dive into the data system and sources that generate the waitlist and other forensic counts, something that we will be doing on June 30 in the central office. However, part of our continued concern stems from reports that we receive suggesting that the waitlists in local jails exceed those reported by ODMHSAS. Those reports may or may not be accurate. However, as a way to validate the list and eliminate that concern, it would be extremely helpful if a week before submission of the monthly report on the 10th of each month the ODMHSAS waitlist was cross checked with the waitlists reported by jails with more than 5 people on the waitlist. Please advise if this is possible or not.

**Summary of Benchmark Deadlines:**
**Strategic Plan**

July 7, 2025: Outline of strategic plan due (advise us of the responsibility party for this by June 24)
August 1, 2025: Rough draft available to consultants
August 22: Final Plan submitted to consultants

**Reevaluations**

June 27, 2025: List of all reevaluations currently completed; all reevaluations requiring completion and schedule; who will be doing the reevaluations, and exclusion and inclusion criteria used by ODMHSAS
August 1: All reevaluations completed

**Triage Process**

July 3: Copy of the triage protocol, when process will begin and backgrounds and names of those performing triage
July 18: Triage completed at either Tulsa or OKC jail
August 1: Triage completed at both jails
Results made available to Court Consultants

**Other Planning Requirements**

Department staffing and increased beds analysis can be included as part of the Strategic Plan and are subject to the Plan's deadlines
July 8: Consent Decree mandates report/plan on OFC staffing (paragraph 63)

*Court Consultant Report September 2025*

**Calendar Snapshot**

| June 27, 2025 | Reevaluations due Consultants |
|---|---|
| July 3, 2025 | Triage protocol/schedule due Consultants |
| July 7, 2025 | Outline of strategic plan submitted |
| July 8, 2025 | OFC report/plan due (paragraph 63) |
| July 18, 2025 | Triage completed OKC or Tulsa Jail |
| August 1, 2025 | Rough draft strategic plan submitted |
| August 1, 2025 | Triage completed both jails |
| August 1, 2025 | All reevaluations completed |
| August 22, 2025 | Final draft strategic plan submitted |

We are happy to work with you on any or all of this and we will continue to share resources from our own work and other places. And please, ask *any* question that comes to mind.

*Court Consultant Report September 2025*

## APPENDIX B (cont.)

**Court Consultants**

*Briggs v Friesen, No 4:23-cv-00081-GKF-JFJ*

August 21, 2025

Commissioner Gregory Slavonic
2000 N. Classen Blvd., Suite 2-600
Oklahoma City, OK 73106
Telephone (405) 248-9200

Dear Commissioner Slavonic,

We write to provide our initial responses to the document submitted for our review on August 12, 2025 titled, "Cover Letter and Plan" which includes a cover letter and a lengthy document titled, "Competency Restoration Plan." We have each independently reviewed the cover letter and Plan, and we have discussed our perspectives internally. This memo provides a summary of those perspectives, as well as recommendations for potential next steps.

As a point of clarification, we remain uncertain if the Plan sent to us and to the Plaintiffs was a drafted version or a final version. We provide our comments and feedback in the hopes that the Plan can be revised and updated accordingly. There are some important areas for clarification, and some important areas for correction. At the same time, for purposes of our next Report, which we will issue in the next 2-3 weeks, we are using the August 12th submission as the point of reference.

We begin by complimenting you and your staff on creating this document by the August 12 date. We are pleased that the additional time allowed the Department to include work that was conducted since the original June deadline. We thank you for addressing each of the Consent Decree's individual components, as well as providing a bigger, broader perspective.

There are several areas we believe could (or in some cases, should) be revised, however. We will separate our comments into a broader process section and then address more discrete, individualized areas.

<u>Broad perspectives</u>
We appreciate each section's attention to work conducted to date. The document does a nice job of relaying and recounting the good work that has been done in various component areas of

*Court Consultant Report September 2025*

the Consent Decree. We want to acknowledge and affirm that work – it's clear that the Department and its staff are working hard to beef up Oklahoma's competence services system in a number of important ways. So, we appreciate the memorialization of those efforts to date.

However, the Decree is clear that what is expected is a Strategic Plan, not an accounting of work conducted to date. Most sections simply describe the various efforts undertaken to date. This is certainly critical in any planning project; however, any plan must then take that "data," review and analyze it, and then apply it to ongoing barriers such that future action steps are identified. An actionable plan should answer the following questions:

- What are our goals?
- What have we tried so far?
- What barriers persist?
- Given our previous efforts and outcomes, what will we do going forward?
- How will we measure our outcomes?

We believe you have largely addressed the first two questions, and perhaps the third in some sections. However, very few sections provide a "road map" or action plan for next steps. Most times, we cannot ascertain what your action plan is for the various components of the Consent Decree. How do the data and outcomes to date affect plans for the future?

The Decree intends that this Strategic Plan is a foundational document that will be built on in successive years, and as such, will inform subsequent administrations on how they can take it and continue to make progress. As the document stands now, that would be largely impossible. You can also harness the power of an actionable plan by noting barriers and solutions that exist – which may provide compelling rationale for legislative and budgetary requests. For example, if you were able to develop a plan that indicated length of stay would be reduced with additional psychiatric resources at OFC, which would lower the waitlist by a certain number of Class Members or a certain number of days (essentially mitigating fines), then you would have a compelling budgetary request. "Based on XXX, we believe overall length of stay for restoration at OFC would decrease by about 15 days on average with the additional of one psychiatrist, which would reduce the time waiting in jails by 5% across the state and reduce the number of people on the waitlist by 45 annually." Of course, these numbers are purely hypothetical, but that is the aim of an actionable plan: determine a course of action based on a review of data, outcomes, and efforts conducted to date.

We realize this is a big undertaking, given all of the different component sections of the Consent Decree. But we would like to see actionable next steps for each section that are rooted in data collected to date, with measurable actions going forward to monitor and measure effectiveness of those new interventions.

We previously provided a copy of Colorado's 2024 Comprehensive and Cohesive Plan for your review. We encourage you to review it again – you should see how the different component

*Court Consultant Report September 2025*

sections refer to previous efforts and outcomes in determining next steps and measurable outcomes.

<u>Individual areas for clarification or correction</u>

There are several areas that warrant specific clarification or correction. These include the following:

1. The most problematic area is the data provided in the plan. Specifically, the waitlist number (number of people waiting in county jail for transfer to restoration services) and the length of time on the waitlist number (how long a person waits before transfer occurs) are simply not credible. The figures in the report are internally inconsistent, and they are also inconsistent with other figures reported by the Department in other sources.

   Page 9 reports the waitlist number as 105, with an average Length of Time (LOT) as 60 days. Appendix 1 lists the waitlist number as 139, and the LOT as 193 days. Clearly this is inconsistent, yet the narrative exposition provided on and after page 9 seems to use the 105 / 60 numbers as a basis for progress and future planning.

   The latter numbers (139 / 193) align with the numbers provided in the weekly meetings with the Court Consultants, so we are assuming those are more accurate than the 105 / 60 figures.

   We have been unable to reconcile either set of figures with the monthly report or accompanying Excel document that is sent to us, so we request to review that Excel document with someone familiar with the Department's waitlist data to make sure we are interpreting that document accurately.

2. Data in Appendix 3 ("Data Propositions") is confusing and appears inconsistent across several domains. We would like to reconcile these apparent discrepancies:

   a. Item 2 provides a compliance figure of cases evaluated within 30 days (10.6%) in July, but the narrative appears to report a 100% compliance rate on page 3.
   b. Items 3, 4, 7, 11, and 14 all refer to Detainees being removed from the waitlist, but it is unclear how the five items are different from each other. Also, it seems inconceivable that 152 people came off the waitlist legitimately in May 2025 (item 14).
   c. Items 15, 17, 18, and 19 all refer to LOT, but they are internally inconsistent. Moreover, all of the monthly average wait times listed in items 18 and 19 (wait times for felonies and misdemeanants) appear to be longer than the monthly average wait times listed for *all* Detainees in item 17; this obviously can't be true mathematically. Finally, none of the wait times listed align with the 60 day figure listed on page 9.
   d. Item 16 reports 139 people on the wait list. This is inconsistent with the 105 people listed on page 9. Further, the drop in the waitlist number from March (289) to April (151) needs explanation.

*Court Consultant Report September 2025*

    e.  Item 13 refers to the number of Detainees in jail-based competency restoration. The
Consent Decree specifically prohibits the provision of in-jail competency restoration,
and the Department has previously attested that no jail-based restoration is
occurring.

3.  The Triage and Admission Prioritization section suggests that the triage policy has been
adopted. The triage policy is still in drafted form and has not been approved by the
Court Consultants nor has it been reviewed by Class Counsel as the Decree requires.
Also, there seems to be lingering confusion about the triage policy, as the narrative
suggests it is meant to discriminate between those who need inpatient hospitalization
versus other restoration settings; the triage policy should instead determine the urgency
of admission to inpatient restoration based on acuity and other factors at the time the
triage occurs. In other words, for those ordered to inpatient restoration (all Detainees at
the present time, since no jail-based or outpatient restoration exists), who should be
prioritized for Expedited admission – and what is the shortened time frame for those
Detainees?

4.  The Competency Restoration In Jail – Pilot Program section describes a Jail Based
Restoration Assistance program. We have not heard about this program. What is it?
Where does it operate, who oversees it, what does it include, and what are its goals and
outcomes to date?

While we are pleased to see an outline for an in-jail pilot program, the Decree requires
that this be developed in consultation with Court Consultants and Class Counsel with
approval ultimately resting with Court Consultants. The planning in this section is light.
Much more needs to be considered – locations, costs, staffing, numbers served,
treatment providers, treatment services, outcome data, and more. In addition, the Plan
indicates that conversations with those with decision-making authority over the Tulsa
County Jail have not yet occurred.

5.  The Community-based Outpatient Restoration Program section needs similar planning to
what we described in the in-jail pilot program section. The material you provided refers
also to people being referred to outpatient restoration programs, which however do not
exist.

6.  The Staffing and Training Enhancements section states that the QFE policy has been
adopted. Again, the QFE policy is still in draft form and has not been approved by the
Court Consultants.

It also mentions that 20 new hires have occurred at OFC. We applaud the Department
for acquiring new talent. We are unsure if these new employees filled previously vacant
positions or if new positions were created, what the positions are, and what the
disciplines of the new employees are. Moreover, as we have noted in other areas, there
is no plan discussed here – what staffing challenges remain, how is hiring prioritized

*Court Consultant Report September 2025*

across vacancies, what new positions should be created, and what will the Department do to fill those positions?

This section also mentions a training program, but no specifics are provided.

7. Page 10 references that Oklahoma will soon have 180 restoration beds available. The numbers provided in the report do not add up to 180. We see 52 new private beds + 80 new OFC beds + the current number of restoration beds at OFC (which is approximately 164). Please clarify the total number and then describe how that number will or will not meet future annual competence restoration demand.

8. The Length of Stay (LOS) at OFC is not mentioned in the Plan. This is a critical variable in order to become compliant with the Consent Decree time frames (Michael Tessean's model suggests it is *the* most important variable). However, LOS is not mentioned in the Plan at all. We have discussed LOS at length during our site visits, in most of our weekly meetings, and in smaller meetings with various administrators. The LOS at OFC *must* be reduced substantially if compliance is to be attained. Please provide a plan for how this will be accomplished, and what the ultimate LOS goals are.

9. Within the Oversight and Data Monitoring section, we appreciate the acknowledgement of our work as Court Consultants. However, we believe you overstate our alignment and approval. As mentioned, we have not approved the triage or QFE policies, for example. The Plan refers to the Consultants observing operations at Tulsa and Oklahoma County Jails firsthand, but the Department was offering no services in either jail at the time of our visits, leaving us unable to comment. The Plan also mentions that the Consultants have "unfettered access" to Departmental data; while true now that we have been granted access and trained regarding the portal, that was not true at the time of this report's submission. The section gives the impression that we have affirmed efforts and progress more strongly than we have.

10. The conclusion section states that "Most of the Consent Decree's required actions have now been completed." This is simply inaccurate. Very few of the required actions have been completed, while some have barely begun to be addressed.

In summary, the Plan summarizes work and some outcomes, but it rarely provides any plans for future action. The section on Private Hospital Contracts and Appendix 2 provide some nod toward future planning, but most of the document does not describe any future plans. Moreover, the Plan describes accomplishments and approval of the Consultants that is simply inaccurate, while relying on data regarding the composition of Class Members on the waitlist that is conflicting and unreliable.

We wish to again affirm the hard work of the Department in creating important changes in Oklahoma's competency services system. However, the current Plan does not accurately reflect the work conducted to date, the Consultants' approval of work and plans, current data, or

*Court Consultant Report September 2025*

future action steps. Our strong recommendation is to revise the current Plan substantially to address the above problem areas.

We also provide a brief list of requests going forward, in addition to those provided above. These are not specific to the Plan document, but they are instead additional requests that the Plan prompted. We would appreciate a response about each of the following requests.

- We request that a clear itemized list of each of those 148 people removed from the waitlist between March and April is provided to us with names, portal ID number, and an explanation for the reason they were removed from the waitlist.

- We request that a list of every person that required a re-evaluation be provided to us, with their portal ID and the date that their evaluation report was submitted to the court. Page 4 reports that 12% of waitlisted Detainees were removed from the waitlist upon the 2025 re-evaluation project; we have not seen this figure reported in other places. Please provide us a list of the names, portal ID numbers, and evaluation reports and submission dates for Detainees opined CST and those removed from the waitlist for other reasons (e.g., alternative dispositions and/or civil commitment).

- Regarding "timely initial evaluations": The progress made in this area seems impressive (although as noted earlier, the data provided in Appendix 3 appears inconsistent with the claims regarding timeliness made on page 3, and as recently as our site visit, we received information from county legal officials that initial evaluations were not occurring until sometimes months after the court order). Going forward, we request a chart of initial evaluation data tracked over time from entry of the Decree on March 10, 2025 to the present. This should be provided with the monthly Departmental report. It should include a month-by-month listing of the number of *evaluations* ordered by the court for people in county jail, the number of *persons* ordered to evaluation for people in county jail, how many were completed within 30 days, how many were not, and the average time to report completion. We also need a clear chart of how many initial reports opined IST, CST, and NLA; of those opined IST, we also need a breakdown of how many were opined as Standard vs Expedited admission.

- We also need a chart that shows similar historic trends in orders for restoration services to be part of the monthly report, again beginning March 10, 2025.

- We also need a list of all sanctioned competence evaluators statewide (or any out-of-state evaluators providing competency evaluations in Oklahoma), their degrees, and their number of cases per year.

- The Plan mentions that Policy and Protocol Development is now overseeing the development of all new policies. We need to review each of these policies.

*Court Consultant Report September 2025*

Thank you for the opportunity to review the Plan. We remain optimistic that the inconsistencies and inaccuracies can be rectified, and that a solid and actionable plan to reach compliance with the Consent Decree can be created and implemented.

Respectfully,

Court Consultants No 4:23-cv-00081-GKF-JFJ

## Briggs v. Slavonic

### Class Counsel's Comments/Questions on DMH's Aug. 12, 2025 "Plan"

Our comments track the section and page numbers in DMH's "Plan" document.

1. Timely Initial Evaluations (page 3):
   a. Scheduling evaluations within 1 day and reports completed within the 30-day balance.
      i. What evidence do you have that supports this reported data? Counties are still reporting longer delays in obtaining evaluation appointments and completion of reports. Also, with the alleged speed comes continued reports of quality concerns (opinion rates that are skewed, one-size fits all short duration virtual evaluations sans all instruments).
      ii. Who are the newly hired QFEs? Who is providing training? Supervision? Quality checks?
2. Reevaluation of Waiting Individuals (page 4):
   a. Completed at 100% by "terminal degree evaluators."
      i. What are the names of the evaluators utilized with a list of cases assigned by evaluator for verification/cross-reference.
      ii. What were the opinion statistics (i.e., 50% incompetent, 50% competent)? Concerns reported regarding use of non-terminal degreed evaluators and overly "competent" finding.
      iii. How was the missing 109 remedied from the June 4th deadline? Data validity continues to pose significant concern.
   b. "Approximately 12% of the waitlisted individuals were removed from the list following these evaluations – either returned to court as competent or diverted to alternative dispositions (such as civil commitment)."
      i. How many individuals hit their statutory time while in jail without any viable treatment resulting in criminal charge dismissal?
      ii. Where is the raw data that demonstrates validity of the opinion, quality of the report, and the name of the QFE for vetting?
3. Triage and Admission Prioritization (page 4):
   a. Implementation of a Competency Restoration Triage Policy.
      i. Where are the ODMHSAS meeting minutes from the adoption of the policy? What meeting was this policy formally adopted in (i.e., executive leadership, decree compliance, directors meeting, etc.)
      ii. Where is the signed policy indicating implementation with verified date.

        iii. Who is responsible, specifically for monitoring and directing this implementation of the policy?

    b. Determination of "expedited or stand" is based on clinical acuity.

        i. What clinician is making this determination? What is their training? Where is this review of clinical presentation/crisis/functioning documented?

    c. "This system has ensured that the most acute cases (e.g. severe illness) are admitted to an appropriate placement for treatment within twenty-one (21) days, as required by the decree's phased standards, while allowing non-acute individuals to have the opportunity for restoration participation within jail-based or outpatient programming if available in the county."

        i. All persons, not just "acute" must be placed into appropriate care within the 21-day requirement.

        ii. Jail-based as it continues to be structured without dramatic change should have been phased out, yet it is still being utilized for "non-acute" per this proposal.

    d. "The Department's Forensic Services team monitors all incoming orders for evaluation as well as timeliness of submission of reports including triage data. With a standardized, statewide triage policy every individual entering or within the Oklahoma Competency System will have swift identification of acute needs and are tracked within a statewide database that is updated in real time."

        i. This Forensic Services team referenced is still the same structured team that provided flawed and continuously misleading data about the waitlist, could not provide validation of names on the list and those missing from the list, had double-booked evaluators for defendants, and failed to respond to continuous emails to the forensicservices@odmhsas.org email.

        ii. On this team, who is are the dedicated and experienced licensed clinicians reviewing cases to determine acuity?

4. "Overall, these evaluation and triage reforms mean that competency cases move much more efficiently into appropriate treatment."

    a. There have been no substantive changes to the process or system.

5. Competency Restoration in Jail – Pilot Program (page 5)

    a. "the previous "restoration-in-jail" practice has ceased, except for continued administration of medications to stabilize inmates.

        i. Please provide documentation that directs all CCBHCs and state-operated facilities to cease the practice. What meeting did this notification take place at? What is the date of cessation?

    ii. Where are the updated and signed contracts with providers outlining the change in statement of work (i.e., continued medication only)?

  b. "Properly resourced Jail Based Restoration Assistance program. "

    i. Where is the statement of work outlining what this looks like? What are the differences between the prohibited version and this approach?

    ii. Where are the signed contracts with providers?

    iii. What constitutes "properly resourced?"

    iv. Who approved this new program structure?

  c. "Oklahoma is also working toward an In-Jail Competency Restoration Pilot Program. The development of this pilot was initiated in June 2025 for the Tulsa County, David L. Moss Detention Center. The Department continues to work with the Tulsa County Sheriff."

    i. When have meetings taken place to advance this rental space?

    ii. Proof of contract negotiations?

    iii. Draft contract?

    iv. Environment of Care plan for the space?

    v. Draft budget for facility modifications?

    vi. What is the plan to recruit a psychiatrist & psychologist for the pilot?

6. Community-Based Outpatient Restoration Program

  a. "The Department acknowledges that a Community-Based Outpatient Restoration (CBOR) pilot program will only be executed when it is authorized by Oklahoma law."

    i. What about the existing community-based outpatient enrolled? How did you authorize existing and historic if outlawed?

    ii. What is the draft language for the proposed Bill for upcoming session?

    iii. At any point do you plan to coordinate with the Plaintiffs' Counsel?

7. Staffing and Training Enhancements (page 7).

  a. "The Department has substantially expanded its workforce and expertise devoted to competency services."

    i. Specific names of the added workforce, including their credentials and percentage of FTE.

    ii. Copies of employment or contracts AFTER March 10, 2025, for validation.

  b. "A formal training, mentoring and approval process for Qualified Forensic Evaluators, with defined criteria that must be met before any

evaluator (including master's-level licensed professionals) can conduct competency evaluations."

    i. Proof of training. Reports of a shortened training offered as opposed to the planned longer "rigorous" one.

    ii. Who is providing the required training now?

    iii. Who is providing the required supervision of evaluators? Proof of supervision for validation?

c. "Twenty (20) new hires at OFC, including psychiatrists, psychiatric nurses, therapists, and behavioral health aides."

    i. Names and type of staff list required for validation, including hire dates.

    ii. How many positions by type were created?

    iii. How many staff, by type were terminated or resigned?

    iv. How many on-site psychologists are at OFC? Including FTE percentage.

    v. How many on-site psychiatrists are at OFC? Including FTE percentage.

    vi. How many on-site psychiatric nurses are at OFC? Including FTE percentage.

    vii. Who is providing the medical clinic services at OFC? Copy of valid contract, including percentage of time on-site and scope of work.

    viii. How many of the 20 referenced above are aides?

d. "This influx allowed the **reopening of all available forensic beds** by providing adequate staffing for each unit."

    i. When were forensic beds closed? What date range? What number of beds. How often was this done? This reduction in beds is in violation of the decree.

e. "Notably, the direct care staff vacancy rate at the OFC has been historically very high. The Department is committed to determining the causes of the direct care staff vacancy rate and will implement processes and policies designed to remedy this vacancy rate problem."

    i. What is the historic and current vacancy rate?

    ii. What is the specific plan to address this vacancy rate?

    iii. Issues with staffing OFC have been long-standing, including root-cause analysis, what steps have been taken to meaningfully address since March 10, 2025?

8. Policy and Protocol Development: The Department has created new standard operating procedures to institutionalize these improvements. Written protocols now cover the entire competency process, from evaluation referral to discharge from restoration. (page 8)

     a. Where are the signed and finalized meeting minutes in which all referenced policies were formally adopted and evidence of true implementation?

9. Reduced Wait Times and Waitlist Backlog
   a. Strong concerns about data reported. Data flaws have been continuously pointed out by consultants, including serious concerns about accuracy reported by counties.
   b. Trends in opinion rates and quality concerns over reports.

10. Expanding Inpatient Restoration Capacity
   a. "Opening Additional Forensic Beds: The OFC in Vinita – previously the state's only restoration facility – has increased its active treatment beds by 30%. By September 2025, eighty (80) new or previously offline beds will be brought into operation, dedicated solely to competency restoration."
      i. This contradicts the "high vacancy rate" reported for the OFC campus, what is the hiring plan for these additional beds?
      ii. A list of hired staff for this expansion is required, by type.
   b. "This was accomplished by reopening shuttered units and converting other units for forensic use"
      i. What shuttered units?
      ii. What units were converted for forensic use?
   c. "The increased capacity directly enabled moving many individuals off the waitlist. For example, in April 2025, an "express admissions" initiative triaged and admitted forty (40) long-waiting inmates into newly staffed beds over a six (6) week period."
      i. Is ODMHSAS reporting that they were underutilizing their forensic beds for a period of time? And now have reopened?
      ii. Who are the 40 individuals mentioned that were admitted into "newly staffed beds?" Specific names for validation are required.
   d. "Private Hospital Contracts: In addition to expanding OFC, the Department is working to secure contracts with two private psychiatric hospitals—totaling fifty-two (52) beds— to accept appropriate forensic restoration patients. These contract beds, which should be available by November 2025, provide relief for the highest-need individuals and supplemented state-operated capacity while longer-term solutions progress." (page 10)
      i. What specific hospitals? Where is a copy of the RFPs for these services?
      ii. Where will the cost of these private hospitals come from?
      iii. Who will determine who gets admitted to these facilities vs OFC?

90

   iv. How was 52-beds determined?

   v. Highest need will now go to a non-forensic facility?

 e. "Infrastructure and Facility Upgrades: The physical environment and resources at OFC have been improved to meet modern environment-of-care standards. By September 2025, renovation projects will have updated safety features and treatment spaces in aging units, and equipment for delivering evidence-based restoration programming has been enhanced" (page 10)

   i. What specific upgrades? Validation is required.

 f. "…as reflected in a current average in-hospital treatment length of ninety (90) days, down from roughly 130 days prior to the Consent Decree."

   i. Data and validation are required.

   ii. Reports of unqualified evaluators utilized at OFC for evaluations and return to custody (i.e., Rhonda Campbell).

11. Bed List (page 14)

 a. Grand Mental Health ResCare for NGRMI consumers is an unrealistic plan, this has been a pending facility for some time. Do all 22 have court approval for move to this facility on August 25, 2025, are proposed?

 b. GMH campus-NTA should not be at OFC, so movement of them should be immediate and should not net a 30 open OFC beds. Questionable practice if OFC is holding NTA once criminal charges are dismissed.

 c. 2026 SSM-has renovations begun at this facility? Do we have projected completion and accreditation schedule?

 d. 2026 Ft. Supply buildings renovated-do we have a plan, including the funding of renovation of dilapidated buildings to code? How will they staff an additional 100 beds when the main facility struggles to staff what they have? Incredible distance.

**August 26, 2025**

# ODMHSAS Consent Decree Team's Preliminary Comments re: Court Consultants' August 21 Response to Department Plan, *"Individual areas for Clarification or Correction" section.*

*(Court Consultants' concerns are listed in numerical order – ODMHSAS comments are in blue for clarity).*

**#1 Waitlist and Length of Stay Numbers -**

This was a typographical error in the plan and has been corrected. The weekly trends reported to the Court Consultants support the accuracy of 139 for the waitlist and length of stay (LOT) as 193 as listed in Appendix 1.

For the September 2025 monthly report the monthly waitlist as well as other supporting data will be provided and can be reviewed in detail.

**#2 Data in Appendix 3 –**

Data in Appendix 3 ("Data Propositions") is confusing and appears inconsistent across several domains. We would like to reconcile these apparent discrepancies:

   a. Item 2 provides a compliance figure of cases evaluated within 30 days (10.6%) in July, but the narrative appears to report a 100% compliance rate on page 3.

     • There was no percentage of compliance given in the Plan narrative regarding initial evaluations. The Plan outlines the Department's implementation and adherence to new policy processes to ensure Consent Decree compliance.

   b. Items 3, 4, 7, 11, and 14 all refer to Detainees being removed from the waitlist, but it is unclear how the five items are different from each other. Also, it seems inconceivable that 152 people came off the waitlist legitimately in May 2025 (item 14).

     • Item 3 and Item 14 are the numbers coming off the waitlist (total number).

     • Item 4 and Item 11 are subsets of Item 3 and is Program Change only (i.e. the individual moved from Waitlist to a new status, such as Maintaining Comp or NTA).

     • Item 7 is also a subset of Item 3, and these are those individuals that left the waitlist because of a discharge.

     • Additionally, Item 5 and Item 12 are subsets of Item 3 where individuals left the waitlist due to OFC admission.

     • We will provide the excel sheet with the individuals coming off the waitlist.

   c. Items 15, 17, 18, and 19 all refer to LOT, but they are internally inconsistent. Moreover, all of the monthly average wait times listed in items 18 and 19 (wait times for felonies and

1

misdemeanants) appear to be longer than the monthly average wait times listed for all Detainees in item 17; this obviously can't be true mathematically. Finally, none of the wait times listed align with the 60-day figure listed on page 9.

- Item 15 is Average Wait Time from Date the Department receives a Court Order for Evaluation to the Date the Court Receives the Result.
- Item 17, specifically the typo as explained in #1 above.
- Items 18 and 19 are based on discharges and not comparable to the current length of stay for individuals currently on the waitlist.

d. Item 16 reports 139 people on the wait list. This is inconsistent with the 105 people listed on page 9. Further, the drop in the waitlist number from March (289) to April (151) needs explanation.

- Specifically, the typo as explained in #1.

e. Item 13 refers to the number of Detainees in jail-based competency restoration. The Consent Decree specifically prohibits the provision of in-jail competency restoration, and the Department has previously attested that no jail-based restoration is occurring.

- Item 13 is the number of individuals admitted to the waitlist by month since March that are in jail. Not jail restoration.

**#3 Triage and Admission Prioritization**

The Department recognizes that admission to an inpatient competency restoration placement must ultimately occur within 21 days under the Consent Decree. At present, the Oklahoma Forensic Center is the only available inpatient restoration facility. The triage policy (currently in draft form and pending review and approval) does not determine *whether* an individual requires inpatient restoration, but rather the *urgency* of admission once competency restoration is ordered.

The draft policy is intended to identify individuals who meet statutory criteria for expedited admission under Title 43A and, consistent with the Consent Decree, to establish a shortened timeframe relative to the 21-day standard once finalized. It already sets out the criteria and procedures. Level 1 (Expedited) admissions apply in cases of acute psychosis, serious behavioral dysregulation, medical danger, or threats to self or others. Level 2 (Standard) applies when symptoms are stable and non-violent. Expedited admissions must be flagged in the Treat to Competency Portal within 72 hours and are prioritized for placement, including through crisis stabilization or civil diversion if immediate OFC admission is unavailable. Standard admissions remain subject to the 21-day placement requirement. The terms "expedited", and "standard" are also defined in the Plan's glossary and were included in these distinctions, which are clear across all sections.

The triage draft framework does what the Consent Decree requires: it prioritizes urgent cases within the 21-day ceiling without redefining restoration settings. While the Department may use

2

alternative non-restoration programs temporarily to stabilize an individual, these programs do not substitute for inpatient competency restoration and do not alter the obligation to admit within the required timeframe.

**#4 Competency Restoration In-Jail Pilot Program**

The Department is not conducting jail-based competency restoration as this practice is expressly prohibited under the Consent Decree. In FY26 this will be termed as mentioned in the Plan as the Jail Based Restoration Assistance program for those who remain in jail after the court commitment date. The reference in the Plan to a "In Jail Competency Restoration Pilot Program" was included to capture preliminary discussions about what a future pilot might look like, not to describe an operational program. No one has been placed in jail-based restoration, no program has launched, and no work is occurring outside the requirements of the Consent Decree.

The questions raised about location, costs, staffing, numbers served, treatment providers, treatment services, and outcomes are precisely why the draft language was characterized as exploratory. As the Consultants are aware, the Consent Decree requires that any such pilot be developed in consultation with Court Consultants and Class Counsel, with final approval resting with the Consultants. It would be premature for the Department to assign specific resources before that approval is given.

The Plan memorialized early concepts so that the Consultants could see what is being considered once the consultation process begins. The absence of specifics does not reflect an absence of planning but rather compliance with the Consent Decree's requirement that the Department not finalize details until the mandated consultation occurs. To characterize this language as vague or hidden is inaccurate: the Department has not stated that any program exists, and the drafts already provided have been kept appropriately preliminary pending Consultant review.

Finally, with respect to Tulsa County, the Department has been in communication, but scheduling meetings with all necessary parties has proven difficult. A calendared date has been secured so that those discussions can move forward in an organized manner. The Department is prepared to refine and expand planning immediately once the process advances, but it will not preempt the approval structure laid out in the Decree.

**#5 Community-based Outpatient Restoration Program**

The Department acknowledged in the Plan that no structured Community-Based Outpatient Restoration program exists, and none is currently in effect. At present, some judges in Oklahoma have chosen to release individuals into the community for restoration treatment, even though no

3

statutory authority exists for a formal program. When this occurs, the Department responds on an ad hoc basis to stabilize and support the individual as best as possible, but these efforts do not constitute a CBOR program.

The Plan also makes clear that CBOR can only operate once enabling legislation is enacted. In anticipation of that legislation, the Plan sets out a framework for how CBOR would function, including county-based treatment teams, projected enrollment initially in Tulsa and Oklahoma Counties, defined program goals to reduce the inpatient waitlist, and a one-year evaluation to guide future expansion. Until that authority is granted, no CBOR program exists, and the Department's role is limited to managing the outcomes of judicial decisions.

### #6 Staffing and Training Enhancements

The Department acknowledges that the QFE policy remains in draft form, as the Consultants are aware, and it will move forward once the required review and approval are complete.

The 20 new hires at OFC were not generic positions; they included psychiatrists, psychiatric nurses, therapists, and behavioral health aides. The Plan also directly acknowledges the longstanding vacancy problem at OFC and commits to identifying causes and implementing corrective steps. Additional hires include eight forensic evaluators, four central office staff dedicated to court and portal operations, and an external psychiatric consultant, reflecting a broader workforce expansion strategy. In parallel, the Department has already begun exploring incentive pathways through the Health Care Workforce Training Commission to strengthen recruitment and retention.

On training, the Plan makes clear that a comprehensive program is in development and that all OFC staff, both existing and new, will participate. The framework includes quarterly continuing education workshops on competency restoration practices, motivational interviewing, and forensic ethics, supplemented by on-demand modules.

The Plan therefore already addresses the specific issues raised: it details staffing gains by discipline, acknowledges ongoing vacancy challenges with a plan to remedy them, and outlines the structure of the training program. What remains is not the development of these elements, but their finalization following the approval of drafts that are already before the Consultants.

### #7 Bed Number Clarification

While working through the Consent Decree the Department is also undergoing major realignment in staff and facility allocation. This creates a weekly fluctuation in current patient bed numbers and future numbers. Future bed numbers are also impacted by the Departments ability to maintain current contracting and also initiate additional contracting. Some of these steps must go through the Oklahoma Legislature as they include previously encumbered funds. The 180 beds

4

referenced in the plan are a total estimated number when looking across the restoration continuum; treat to competency, never to attain (civil commitment) and stabilization.

**#8 The Length of Stay (LOS)**

In recent months of Central Office Competency work, we identified that inconsistent data collection at the Oklahoma Forensic Center (OFC) limited our ability to analyze and report on this information. With accurate data points and collection systems now established at the OFC, the length of stay (LOS) will now be included in monthly reporting. The LOS is factored into both the Inpatient Bed Projection and the OFC Bed Projection.

**#9 Oversight and Data Monitoring**

The Department strongly disputes the characterization that our Plan overstated Consultant approval. The document noted Consultant involvement and observations; it did not claim final approval of draft policies. To be clear: both Triage and QFE policies remain under review. (See Weekly Agenda comments from 7-30, 8-6, 8-13, 8-20). And to further clarify, no restoration services were operating in the Tulsa or Oklahoma County jails during the April site visits. The Consultants did tour both jail facilities during the April 2025 site visit, observed jail operations, met with administrators, and asked questions of staff.

With respect to data access, it is misleading to imply "unfettered access" was denied. The Department provided portal access on July 11, 2025, with formal training completed on August 14, 2025. At the time of the Plan's submission, arrangements for access were already in motion. Suggesting otherwise distorts the timeline.

Going forward, the Department will describe Consultant engagement accurately. We hope the Consultants, in turn, will recognize when deliverables were provided in accessible form and when review opportunities were available regarding those deliverables.

**#10 Conclusion**

The Department stands by its conclusion that meaningful progress has been achieved in the five months since the entry of the Consent Decree, specifically since July 1, 2025. The statement "most of the Consent Decree's required actions have now been completed" was intended to be read in the context of the specific initial benchmarks and structural requirements established by the Consent Decree. Within that framework, the Department has successfully implemented numerous required actions: expanding restoration capacity, initiating new hiring and training efforts, establishing consistent data collection systems, launching policy development, and creating a foundation for long-term compliance.

5

Although it is clear that certain policies (such as the Triage and QFE) remain in draft form and that additional action steps are still underway, this does not diminish the measurable strides already achieved. Data now show shorter waits, and increasing number of individuals served, and programmatic innovations in development. These represent substantial progress compared to the baseline conditions prior to March 2025.

It is also important to note that the Department has consistently emphasized this is a *living plan* – intended to be iterative, adaptive, and continually refined with input from the Consultants and Plaintiffs' Counsel. Describing progress to date as "most of the actions completed" is not a claim that the Consent Decree's final benchmarks have been met, rather a recognition that the Department has moved swiftly to establish the structural building blocks the Consent Decree requires. We acknowledge that it would have been more accurate to describe the Department's progress as having addressed – and having taken substantial steps toward – many of the Consent Decree requirements rather than stating that they had been completed.

The Department remains fully committed to transparent reporting, continued refinement, and working with the Consultants to ensure that by 2026 the 21-day maximum wait standard and all other benchmarks are satisfied. In short, while significant work remains, the Department has laid the foundation for Consent Decree compliance and is determined to build upon it.

6

Appendix B (cont.)



SERVICES WITHIN REACH

Gregory Slavonic
Rear Admiral (Ret.) USN | Interim Commissioner

Kevin Stitt | Governor

August 12, 2025

**VIA EMAIL AND
OVERNIGHT DELIVERY**

Groundswell Services
c/o William Neil Gowensmith, Ph.D.
P.O. Box 102381
Denver, CO  80250
Neil.gowensmith@gmail.com

John Petrila
6 W. Via Plaza Nueva
Santa Fe, NM  87507
petrilajohn@gmail.com

Dr. Darren Lish
2329 Woodbury Ln
Evergreen, CO  80439
darrenlish@hotmail.com
darrenlish@cuanschutz.edu

Subject:  Letter Updating Progress

Dear Court Consultants,

The Department of Mental Health and Substance Abuse Services ("Department")
previously received your interim report dated June 12, 2025. After reviewing the
report, the Department's new leadership respectfully requested and received a six (6)
week extension from July 1, 2025, to be allowed to come into compliance with the
initial June 8, 2025, mandates of the Consent Decree.  During that extension the
Department has completed the following:

- Department staff is scheduled to provide training and technical assistance to
  Consultants on August 14, 2025, covering data collection, the Treat to
  Competency Portal, and competency population management. Class Counsel
  will be invited to a demonstration of data collection and population

**ADDRESS**
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106

**PHONE**
1 (405) 248-9200

**WEBSITE**
oklahoma.gov/odmhsas



Gregory Slavonic
Rear Admiral (Ret.) USN | Interim Commissioner

Kevin Stitt | Governor

management practices via the Treat to Competency Portal. The date of that demonstration will be coordinated with Class Counsel.

- The Department continues to clarify the number of individuals in custody awaiting competency restoration services by implementing the Treat to Competency Portal to ensure accurate and meaningful tracking of case processes.

  o Class Members are now tracked from the time of receipt of the order for evaluation, through case disposition with program level and custody status being updated as needed.
  o The Department has created a central email; forensicservices@odmhsas.org that is the receiving email for all competency related documentation. There are six Department staff who monitor this email.
  o The Department's Data Support Division (DSS) has developed and continues to develop a variety of programmatic reports from data entered in the portal to monitor, audit and plan, regarding restoration program needs and individual person's needs.
  o Within the Forensic Services team, three (3) individuals directly oversee the initial receipt of orders, entering information into the portal, case monitoring and communication with county court partners as well as providers. This staff is in daily communication with Oklahoma District Courts as well as treatment providers.

- To ensure the Department continues to meet requirements "in consultation with Class Counsel and Consultants" as required by the Consent Decree.
  o The Department has been in contact with Bank of Oklahoma and BancFirst regarding the creation of the Consent Decree Fines Account.
  o The Department will work with the Consultants, Class Counsel, and the Oklahoma Attorney General's Office to ensure the requirement of a Fines Account is met.
  o The Department will continue to prepare an agenda prior to all meetings and will ensure all parties have access to all necessary information prior to meetings.

- Coordination of all Consent Decree communications will continue to proceed through the Department's General Counsel, John Settle (john.settle@odmhsas.org).

- The Department has created a comprehensive list and schedule of all consumers to be re-evaluated under the Consent Decree.
  o The Department completed the initial requirement of population re-evaluation. As of July 7, 2025, three (3) individuals, in custody, had not

**ADDRESS**
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106

**PHONE**
1 (405) 248-9200

**WEBSITE**
oklahoma.gov/odmhsas



OKLAHOMA
Mental Health & Substance Abuse

SERVICES WITHIN REACH

Gregory Slavonic
Rear Admiral (Ret.) USN | Interim Commissioner

Kevin Stitt | Governor

been reevaluated by previously assigned staff. As of August 8, 2025, these evaluations have been completed.

- o The Forensic Services team monitors those who are currently in jail for re-evaluation requirements.
- o The Department has verified individuals added prior to February 8, 2025, were accounted for and re-evaluated.

- The Strategic Plan is included with this letter. The Department developed a "written triage screening protocol for Class Members...declared incompetent" with reasonable deadlines for screening, adoption of a screening protocol, establishment of triage levels for the expedited placement, treatment of Class Members, and adoption of qualification standards for those providing triage and shared with Consultants on Friday, August 1, 2025. After receiving edits, the Department revised the triage protocol and resent to the Consultants for further review. Once approved by the Consultants, the protocol will be shared with Plaintiffs' Counsel for additional input.

- The Department submitted a written Qualified Forensic Evaluator (QFE) standard. Once approved by the Consultants the protocol will be shared with Plaintiffs' Counsel for additional input.

- Enhanced compliance with the Consent Decree requirement for competency evaluations went into effect July 18, 2025.
  - o The Department's Forensic Services team operates under the following protocol: Upon receipt of a Court's order for evaluation and all necessary documentation, the information is entered into the portal within one (1) business day of receipt and assigned to an evaluator. The team has achieved 100% compliance.
  - o Current data points in the Portal are the date information is received, the date of orders, and the dates evaluations are assigned. Additional data points included are the date the report was provided to the Court and the date the opinion was provided in the report by the evaluator.

The Department believes it has made good faith progress on the following Consent Decree requirements within the requested six (6) week extension:

- The Department has made good-faith, best-effort attempts to negotiate the use of space at the Tulsa County Jail for an "in-jail competency restoration program." Discussions have taken place with the Tulsa County District Attorney, and emails have been sent to the Tulsa County Sheriff to schedule a meeting regarding the potential use of the David L. Moss Detention Center for a restoration pilot program.

 ADDRESS
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106

 PHONE
1 (405) 248-9200

 WEBSITE
oklahoma.gov/odmhsas



SERVICES WITHIN REACH

Gregory Slavonic
Rear Admiral (Ret.) USN | Interim Commissioner

Kevin Stitt | Governor

- The Department has developed an outline, regarding topics for the initial and periodic trainings for the personnel of all Oklahoma District Courts, Oklahoma sheriff's offices, and members of the Oklahoma State Bar concerning competency evaluations and restoration.
- The Department developed criteria within the QFE, referenced above which promotes consistency in incompetency evaluations across evaluators.
- The Department is developing criteria for community providers in jails to ensure consistency and quality on services being provided statewide for submission to Consultants and Plaintiffs' Counsel.

While reviewing the current state of the Competency Restoration Program, the Department believes it will need continued assistance from the Court Consultants and industry professionals to determine appropriate next steps on the following requirements in the Consent Decree:

- The Department has been collecting data related to all beds and facilities within its system in order to develop a comprehensive Bed Analysis. The Department is gathering information on crime rates (arrests, arrest clearances, and index crimes), state population growth, and court filings related to competency in both misdemeanor and felony cases. Additional data to be included in the Forensic Bed Analysis includes the current and historical number of people on the waitlist, average length of time for competency restoration, and current and historical number of not guilty by reason of mental illness or defect ("NGRI") patients at the Oklahoma Forensic Center. The Department is further evaluating what civil beds in its system which may potentially be converted to a forensic bed. The Department worked with Mike Tessen to determine what data should be included in the Forensic Bed Analysis. The Department's Data Support Division will continue to:
  - Work with the OSBI, Administrative Office of the Courts, and other partners to collect the most recent criminal justice data.
  - Utilize information collected in the portal; number of evaluation orders entered in the portal, those opined incompetent, and those ordered to the department.
  - Work through the current number of Department beds available as well as staffing levels required for care, and work toward the ability to update the available number on a weekly basis.
- The Department has begun work for future legislative amendments to propose for the 2026 legislative session.



**ADDRESS**
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106



**PHONE**
1 (405) 248-9200



**WEBSITE**
oklahoma.gov/odmhsas



*SERVICES WITHIN REACH*

Gregory Slavonic
Rear Admiral (Ret.) USN | Interim Commissioner

Kevin Stitt | Governor

The Department sincerely appreciates the advice and counsel of the Consultants and looks forward to continuing to work collaboratively with the Consultants and Class Counsel during our efforts to achieve one hundred (100%) percent compliance with the terms of the Consent Decree in as short a time as possible.

Sincerely,

Greg Slavonic
Rear Admiral (Ret.) USN
Interim Commissioner

cc:  Paul DeMuro
     Fredrick Dorwart
     David Leimbach
     Frederic, Dorwart Lawyers, PLLC
     Old City Hall
     124 East 4th Street
     Tulsa, OK  74103
     pdemuro@fdlaw.com
     fdorwart@fdlaw.com
     dleimbach@fdlaw.com

     Nick Southerland
     Brian S. Wilkerson
     Oklahoma Disability Law Center, Inc.
     5555 East 71st Street, Suite 9100
     Tulsa, OK  74136
     nick@okdlc.org
     brian@okdlc.org



**ADDRESS**
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106

**PHONE**
1 (405) 248-9200



**WEBSITE**
oklahoma.gov/odmhsas



**OKLAHOMA**
**Mental Health & Substance Abuse**

*SERVICES WITHIN REACH*

Gregory Slavonic
Rear Admiral (Ret.) USN | Interim Commissioner

Kevin Stitt | Governor

Gentner Drummond
Oklahoma Attorney General
Kindanne Jones
Erin M. Moore
Tracy E. Neel
Oklahoma Attorney General's Office
313 NE 21st Street
Oklahoma City, OK  73105
gentner.drummond@oag.ok.gov
kindanne.jones@oag.ok.gov
erin.moore@oag.ok.gov
tracy.neel@oag.ok.gov

Attachment: Oklahoma's Forensic Competency Plan



**ADDRESS**
2000 N Classen Blvd, Ste 2-600
Oklahoma City, OK 73106

**PHONE**
1 (405) 248-9200



**WEBSITE**
oklahoma.gov/odmhsas

**Appendix B (cont.)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LESLIE BRIGGS, as next friend | ) | |
| of T.W. and B.S.; | ) | |
| EVAN WATSON, as next friend | ) | |
| of C.R.; | ) | |
| and, HENRY A. MEYER, III, | ) | |
| as next friend of A.M., for | ) | |
| themselves and for others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 23-cv-81-GKF-JFJ |
| | ) | |
| GREGORY SLAVONIC, in his | ) | |
| official capacity as the Commissioner | ) | |
| of the Oklahoma Department of | ) | |
| Mental Health and Substance Abuse | ) | |
| Services, and HOLLY WEBB, in her | ) | |
| in her official capacity as Executive | ) | |
| Director of the Oklahoma Forensic | ) | |
| Center, | ) | |
| | ) | |
| Defendants. | ) | |

# COMPETENCY RESTORATION PLAN

# AUGUST 2025

**Table of Contents**

1. **Introduction**

2. Competency Evaluations and Triage Process
   2.1 Timely Initial Evaluations
   2.2 Reevaluation of Waiting Defendants
   2.3 Triage and Admission Prioritization

3. Competency Restoration in Jail – Pilot Program
   3.1 Enrollment and Throughput
   3.2 Curriculum and Services
   3.3 Safety and Suitability Screening

4. Community-Based Outpatient Restoration Program
   4.1 Eligibility & Timeline
   4.2 Treatment Teams
   4.3 Projected Enrollment & Outcomes
   4.4 Waitlist Impact
   4.5 Evaluation & Expansion

5. Staffing and Training Enhancements
   5.1 Workforce Expansion
   5.1.1 Forensic Evaluators
   5.1.2 Inpatient Clinical Staff
   5.1.3 Restoration Coordinators and Case Managers
   5.1.4 Peer Support and Navigators
   5.1.5 External Psychiatric Consultants
   5.2 Training Programs
   5.2.1 Oklahoma Forensic Center (OFC) Staff Training
   5.2.2 Statewide Forensic Training
   5.2.3 Accuracy of Incompetency Findings
   5.2.4 Policy and Protocol Development

6. Reduced Wait Times and Waitlist Backlog

7. Expanding Inpatient Restoration Capacity
   7.1 Opening Additional Forensic Beds
   7.2 Private Hospital Contracts
   7.3 Infrastructure and Facility Upgrades

8.  Oversight and Data Monitoring

    8.1 Consultant Approvals

    8.2 Regular Monitoring

    8.3 Issue Resolution and Guidance

    8.4 Fine Structure

    8.5 Transparency and Reporting

    8.6 Special Circumstances

9.  **Conclusion**

10. **Appendices**

    10.1 Appendix 1 – Data Charts

    10.2 Appendix 2 – Bed Need Analysis

    10.3 Appendix 3 - Data Propositions

    10.4 Appendix 4 – Glossary

    10.5 Appendix 5 - Central Office Forensic Services Team Workflow

    10.6 Appendix 6 – Qualified Forensic Evaluator (QFE) Protocol

    10.7 Appendix 7 – Triage Protocol

    10.8 Appendix 8 – Competency Evaluation Service Guidelines for Terminal Degree Providers

    10.9 Appendix 9 – Competency Evaluation Service Guidelines for LPC/LCSW

    10.10 Appendix 10 – Competency Restoration Programming Guidelines

    10.11 Appendix 11 – Diagrams

**COMPETENCY RESTORATION PLAN**

**Introduction**

The Oklahoma Department of Mental Health and Substance Abuse Services (the "Department") has dedicated significant resources and is focused on successfully implementing the court-ordered Competency Restoration Plan mandated by the March 10, 2025, Consent Decree in the *Briggs v. Friesen*[1] case. This plan addresses the historical and existing delays impacting the timely competency restoration of Oklahoma criminal defendants. To this date, many of the measures described in this Plan have contributed to the reduction of excessive wait times for treatment. The Department has also begun efforts to expand restoration capacity, launch new treatment programs, and bolster staffing and training – all under the oversight of independent Court Consultants ("Consultants")[2]. This update summarizes those accomplishments with supporting data, demonstrating the Department's commitment to timely, humane, and effective competency restoration services.

**Competency Evaluations and Triage Process**

The Consent Decree not only targets restoration services but also the front-end of the process – competency evaluations – to ensure that individuals are identified and treated in a timely manner. As of August 2025, the Department is in full compliance with the new standards for evaluations:

- **Timely Initial Evaluations:** The Department is now assigning initial competency evaluations within one (1) business day of receipt of all documentation from the court. Evaluators are then conducting the evaluations and returning reports to the court within the remaining number of days to the total required thirty (30) day evaluation requirement of the decree. This is a notable improvement from previous practices, where evaluations often took several months due to backlogs. The Department achieved this by hiring additional forensic evaluators and streamlining evaluation scheduling. Prompt evaluations mean that individuals who are incompetent are identified faster, and the thirty (30) day timeframe triggers the restoration clock sooner, thereby reducing overall time to treatment.

---

[1] *Briggs et al. v. Slavonic et al.,* No. 4:23-cv-00081-GKF-JFJ (N.D. Okla.) *(formerly captioned as Briggs et al. v. Friesen et al.)*
[2] John Petrila, JD, LLM, Neil Gowensmith, PhD, Darren Lish, MD

3

- **Reevaluation of Waiting Individuals:** In compliance with Paragraph 65 of the decree, the Department completed a one-time reassessment of all class members on the waitlist. Terminal degree evaluators conducted evaluations across the state for those individuals still in county jail awaiting restoration. These evaluations were conducted via telehealth as well as in person when needed. As a result of these reassessments, a number of individuals were found to have regained competency (for example, some had stabilized with medication during the wait). Approximately 12% of the waitlisted individuals were removed from the list following these evaluations – either returned to court as competent or diverted to alternative dispositions (such as civil commitment). This helped further shrink the active waitlist and ensured that resources focus on those who truly need restoration. For those still awaiting placement, the updated evaluations provided current clinical information to guide the new triage placement process described below.

- **Triage and Admission Prioritization:** The Department, with guidance from the Consultants, has implemented a Competency Restoration Triage Policy to prioritize admissions and match individuals to the most appropriate treatment setting. Upon an incompetency finding, individuals are now triaged into two groups, expedited or standard. This determination is based on clinical acuity, in accordance with 43A O.S. §§ 1-101 – 903. The triage is dynamic – if a person on the waitlist shows symptomatic changes (e.g. mental health deterioration or improvement), their treatment placement can be adjusted. This system has ensured that the most acute cases (e.g. severe illness) are admitted to an appropriate placement for treatment within twenty-one (21) days, as required by the decree's phased standards, while allowing non-acute individuals to have the opportunity for restoration participation within jail-based or outpatient programming if available in the county. The Department's Forensic Services team monitors all incoming orders for evaluation as well as timeliness of submission of reports including triage data. With a standardized, statewide triage policy every individual entering or within the Oklahoma Competency System will have swift identification of acute needs and are tracked within a statewide database that is updated in real time.

Overall, these evaluation and triage reforms mean that competency cases move much more efficiently into appropriate treatment. The faster cycle has prevented the backlog from growing despite a steady stream of incoming orders for evaluation. Notably, early data show a slight decrease in the number of competency commitments: judges report that having the option of outpatient services would allow them to maintain some individuals on bond with treatment, rather than ordering inpatient commitment by default. Oklahoma currently does not have a statutory guideline for outpatient restoration care, but this will be addressed in the upcoming 2026 legislative session. In addition, better training (see below) is helping to reduce inappropriate

4

or unnecessary incompetency findings, preserving resources for those truly in need of restoration.

**Competency Restoration in Jail – Pilot Program**

As required by the terms of the Consent Decree, the previous "restoration-in-jail" practice has ceased, except for continued administration of medications to stabilize inmates. The previous approach, which lacked standardized practices across the state, has been replaced with a properly resourced Jail Based Restoration Assistance program. Oklahoma is also working toward an In-Jail Competency Restoration Pilot Program. The development of this pilot was initiated in June 2025 for the Tulsa County, David L. Moss Detention Center. The Department continues to work with the Tulsa County Sheriff.

Each pilot site will have a dedicated Restoration Team consisting of a psychologist or psychiatrist, a psychiatric nurse, and a case manager, who will coordinate with jail staff. Program highlights include:

- **Enrollment and Throughput:** Individuals will move into the jail-based restoration program once the court issues an order of commitment to the Department. Upon receipt of the order the jail-based program will be notified via the Treat to Competency portal of a new assigned individual for training and treatment. Jail-based restoration staff shall work with jail staff to initiate population movement to the correct area of the jail for services to begin. Population movement should be complete with seventy-two (72) hours of notification.

- **Curriculum and Services:** The jail-based restoration program shall provide a full curriculum of competency restoration services. This is the same curriculum developed for and utilized at the OFC. This includes daily psychiatric medication management, individual and group therapy focused on legal education and competency skills, and regular assessments by the forensic clinician. Participants will also demonstrate their learning through mock trial exercises and one-on-one reviews. The structured curriculum and enhanced, frequent contact mirror best practices from other states' jail restoration models, ensuring that Oklahoma's jail-based treatment is consistent, valid and "professionally recognized" as required.

- **Safety and Suitability Screening:** A triage process determines which individuals are appropriate for jail-based restoration. Only those assessed who do not have immediately acute treatment needs and are amenable – typically individuals whose primary needs are medication adherence and education – will be recommended for the jail-based program. Those with acute psychiatric or medical needs will receive expedited admission to the appropriate treatment placement. Per the decree's design, after one year of data

5

collection the parties and Consultants will evaluate the outcomes to determine how and where to expand jail-based restoration statewide. If success continues, the Department anticipates requesting resources in 2026 to establish jail restoration units in additional counties, which will further shorten wait times by treating suitable individuals locally.

**Community-Based Outpatient Restoration Program**

The Department acknowledges that a Community-Based Outpatient Restoration (CBOR) pilot program will only be executed when it is authorized by Oklahoma law. In accordance with the Consent Decree, no structured CBOR services are being utilized at this time. Enabling legislation to allow a community-based restoration program is still in the process of being developed and will be presented to the Oklahoma Legislature for consideration during the next legislative session. The Department has prepared the groundwork for a CBOR pilot, but its implementation remains on hold pending new legislative authority. The CBOR initiative will be formally launched only after the necessary law is passed, as required.

- **Eligibility & Timeline:** Once the Legislature enacts the enabling statute, the Department intends to offer outpatient restoration for those individuals recommended and ordered by the court. The Department will be prepared to begin outpatient restoration programming in areas with data supported need, within ninety (90) days of legislative approval, mirroring the Consent Decree's development timeline.

- **Treatment Teams:** Under the proposed model, each county would host a Community Restoration Team comprising a case manager, peer support specialist, licensed clinician, and forensic psychiatrist or psychologist. These treatment teams will be responsible for coordinating comprehensive restoration services, including legal-understanding education sessions, psychiatric treatment with medication management, and other individualized service linkage to essential social supports such as housing and substance-use treatment. Participants would live either in their own homes or in supervised group settings, reporting several times per week for scheduled outpatient sessions.

- **Projected Enrollment & Outcomes:** Most referrals for outpatient restoration programs are expected to come from Tulsa and Oklahoma counties, reflecting their larger population and access to treatment and supportive resources. Successful programmatic completions will open inpatient beds for those with acute needs or not suitable for an outpatient care setting. Should an individual demonstrate non-compliance or clinical deterioration, the established protocol calls for immediate notification to the court and admission to the most appropriate level of care.

- **Waitlist Impact:** By diverting these individuals from inpatient-based restoration care, the community-based pilot aims to reduce the forensic hospital waitlist and minimize

6

unnecessary pre-trial detention. Judges in the pilot counties will refer eligible individuals directly to the CBOR program by making this designation within the commitment order, thereby streamlining competency proceedings and decreasing jail stays.

- **Evaluation & Expansion:** At the conclusion of the first year, independent Consultants and stakeholders will review program data—enrollment figures, completion rates, safety metrics, and cost analysis to determine whether the pilot meets its goals. If outcomes are favorable, the Department will draft detailed protocols for a statewide expansion of community-based restoration services, subject to the passage of further legislation. Until that statutory authorization arrives, however, all CBOR activities will remain conceptual, ready to be activated only when the law permits.

**Staffing and Training Enhancements**

Successful implementation of this comprehensive plan has hinged on aggressive staffing increases and training initiatives. The Department has substantially expanded its workforce and expertise devoted to competency services, addressing what was a critical bottleneck (inadequate staffing was a major factor in the past backlog). Key developments include:

- **Workforce Expansion:** Since the Consent Decree's approval, the Department has increased its efforts to recruit direct care staff members specifically for competency evaluation and restoration roles. These measures have yielded:

  - **Forensic evaluators** – Eight (8) additional forensic psychologists and psychiatrists have been contracted or hired, expanding capacity to perform evaluations statewide within required timeframes. A formal training, mentoring and approval process for Qualified Forensic Evaluators, with defined criteria that must be met before any evaluator (including master's-level licensed professionals) can conduct competency evaluations. A reauthorization requirement mandating that each approved evaluator be reviewed and re-approved at least annually to continue performing evaluations, ensuring ongoing quality control; Enhanced training and oversight protocols for all evaluators. These measures ensure that all evaluators adhere to consistent professional standards.

  - **Inpatient clinical staff** – Twenty (20) new hires at OFC, including psychiatrists, psychiatric nurses, therapists, and behavioral health aides. This influx allowed the reopening of all available forensic beds by providing adequate staffing for each unit. Notably, the direct care staff vacancy rate at the OFC has been historically very high. The Department is committed to determining the causes of the direct care staff vacancy rate and will implement processes and policies designed to remedy this vacancy rate problem.

7

- **Forensic Services Team** – Four (4) dedicated staff at the Department Central Office to manage court communications, oversight of the Treat to Competency portal, community provider communication and support, and case processing.

- **External psychiatric consultant** – the Department has engaged one external psychiatric consultant on a part-time basis to advise regarding difficult cases.

- **Training Programs:** As mandated, a comprehensive training plan is being developed to improve competency-related expertise within the Department, community treatment providers and in the courts.

- **OFC Staff Training:** All existing and new staff at OFC shall participate in enhanced training in evidence-based competency restoration practices. Ongoing continuing education workshops will be scheduled quarterly, focusing on topics like motivational interviewing and ethical issues in forensic treatment. Staff will also have access to pre-recorded on demand content.

- **Statewide Forensic Training:** In July 2025 the Department participated in a training conference hosted by the Oklahoma District Attorneys Council. This session developed in partnership with the Office of the Oklahoma Attorney General, assisted with educating prosecutors across the state on the current changes being implemented within the Oklahoma competency system as well as opening the door of communication between the Department's Competency team and state prosecutors.

- **Accuracy of Incompetency Findings:** As a result of the above training, there is early evidence of a drop in the number of individuals being *misclassified* as incompetent. The Department experts continue to provide guidance to evaluators and court partners on differentiating the need for a filing regarding incompetence from other needs (such as medical or intellectual). The Department has received feedback from judges stating they feel more equipped to order appropriate assessments or ask follow-up questions. While more data over time will tell, this effort aims to "reduce the number of people inaccurately declared incompetent" as envisioned by state leaders, ensuring that restoration resources are reserved for those who genuinely need them.

- **Policy and Protocol Development:** The Department has created new standard operating procedures to institutionalize these improvements. Written protocols now cover the entire competency process, from evaluation referral to discharge from restoration. This includes a Waitlist Management Policy that codifies how the waitlist is maintained (with fields for each class member's case status, days waiting, etc.) and requires ongoing

reporting of key metrics.  These steps help ensure the reforms are sustainable and not person-dependent.

**Reduced Wait Times and Waitlist Backlog**

The Department has significantly reduced the waitlist and wait times for court-ordered competency restoration. Prior to this plan, Oklahoma's single forensic hospital had a waiting list of over 200 individuals (as of late 2022) and many individuals languished in jail "for up to a year or longer" awaiting a treatment bed. By late 2024 there were 244 people waiting in jail for restoration, with thirty-five (35) having waited over a year and seven (7) over two (2) years. Such delays often exceeded the potential sentences of low-level offenders and worsened mental health conditions.

As of August 2025, the waitlist has been reduced to 105 individuals, a drop of over 50% from its peak. No individuals are currently waiting longer than 6 months for admission, a dramatic improvement given that some had waited twelve to twenty-four (12–24) months before the decree. The average wait time from a court's restoration order to the start of treatment is now approximately sixty (60) days, down from an estimated eight to ten (8–10) months in 2023. This puts the state well on the way to meeting the decree's upcoming benchmark of a sixty (60) day maximum wait by October 2025 and the ultimate standard of twenty-one (21) days by mid-2026. Equally important, dozens of class members have already received restoration services who would otherwise still be waiting. From March through July 2025, 180 individuals were admitted into competency restoration programs (in hospital, jail, or outpatient settings), compared to only about ninety (90) admissions in the same period of 2024. The increased throughput has cut the average time to restoration (from court order to competency attained) by nearly half. Early outcomes indicate that faster access to treatment is preventing deterioration – jail days have been reduced, and individuals are regaining competency in a more reasonable timeframe, upholding the due process rights of both individuals and crime victims.

**Expanding Inpatient Restoration Capacity**

A cornerstone of the plan has been to expand and optimize inpatient forensic bed capacity to eliminate the backlog. Within ninety (90) days of the Consent Decree, the Department (in consultation with the Consultants) developed and began executing a capacity expansion plan. Key achievements include:

- **Opening Additional Forensic Beds:** The OFC in Vinita – previously the state's only restoration facility – has increased its active treatment beds by 30%. By September 2025, eighty (80) new or previously offline beds will be brought into operation, dedicated solely to competency restoration. This was accomplished by reopening shuttered units and converting other units for forensic use, after accelerated hiring (details below) allowed

9

these beds to be safely staffed. The increased capacity directly enabled moving many individuals off the waitlist. For example, in April 2025, an "express admissions" initiative triaged and admitted forty (40) long-waiting inmates into newly staffed beds over a six (6) week period.

- **Private Hospital Contracts:** In addition to expanding OFC, the Department is working to secure contracts with two private psychiatric hospitals—totaling fifty-two (52) beds— to accept appropriate forensic restoration patients. These contract beds, which should be available by November 2025, provide relief for the highest-need individuals and supplemented state-operated capacity while longer-term solutions progress.

- **Infrastructure and Facility Upgrades:** The physical environment and resources at OFC have been improved to meet modern environment-of-care standards. By September 2025, renovation projects will have updated safety features and treatment spaces in aging units, and equipment for delivering evidence-based restoration programming has been enhanced (e.g., group therapy rooms, educational materials). These upgrades, combined with enhanced continuing education for OFC staff, will improve treatment quality and throughput – as reflected in a current average in-hospital treatment length of ninety (90) days, down from roughly 130 days prior to the Consent Decree. Maintaining an efficient length of stay will help preserve bed availability for new referrals.

Through these efforts, Oklahoma will have more inpatient restoration beds in service than at any time in the past decade, with a total of 180 state or contracted beds available. The hospital census has remained above 90% occupancy with no staffing-related closures, ensuring that beds are utilized optimally for those who need intensive care. The bed utilization rate will be closely monitored by the Department and the Consultants to ensure maximum efficiency in reducing the waitlist.

**Oversight and Data Monitoring**

All actions above have been or will be carried out under the oversight of the three Court Consultants, as established by the Consent Decree. The three Consultants began working with the Department in April 2025 and have since been actively involved in guiding and verifying the requirements of the Consent Decree.

- **Consultant Approvals:** The Consultants continually review and formally approve each component of the latest update of the Department's Action Plan (e.g. the new bed expansion plan, the pilot program designs, triage policy) before implementation. Their feedback is incorporated to ensure consistency with national best practices. For example, the Consultants recommended specific admission criteria for the jail pilot, which were

10

adopted. This collaborative development process has added credibility and rigor to the reforms.

- **Regular Monitoring:** The Consultants meet weekly with the Department team to review each component of this Plan. In these meetings, the Department presents detailed status reports which include up-to-date competency program statistics (e.g., current number waiting, range and average days waiting) and compliance data on timelines. The report also tracks each class member, whether required timeframes were met or exceeded, and provides narrative updates on each program component (inpatient, jail, community). The Consultants have unfettered access to data and have conducted on-site visits to OFC, the Oklahoma County jail and the Tulsa jail to observe operations first-hand. In their feedback reports, the Consultants noted the reduction in wait times and noted the increased quality of services provided at OFC, while also identifying a few areas for improvement (such as streamlining inter-agency communication for discharge planning).

- **Issue Resolution and Guidance:** If any challenges arise, the Consultants will continue to play a key role in problem-solving. The Consultants also provide technical assistance: they have shared training materials, recommended staffing models, and are helping the Department develop outcome metrics to measure program success. Their ongoing involvement ensures the state uses "Best Efforts to implement the Plan" and stays on track. This external oversight, combined with the threat of stipulated fines for non-compliance, has created a strong incentive for the Department to maintain progress.

- **Fine Structure:** Deadlines to progressively reduce the Maximum Allowable Wait Time to 60 days, forty-five (45) days, thirty (30) days, and ultimately twenty-one (21) days (reached over a sixteen (16)-month schedule from the Decree's entry), with an escalating fine structure for any delay beyond those limits (fines up to $500 per day per Class Member over the deadline, subject to an annual cap).

- **A Dedicated Fines Account** (interest-bearing) to receive all collected fines, managed by a neutral third party. The Consent Decree "Fines Committee", which includes representatives from Class Counsel[3], the Department, the Oklahoma Attorney General's Office, and the Consultants, will oversee the use of the fines deposited into this account. This committee governs expenditures from the Fines Account to ensure the money is used to support and enhance services for individuals with mental illness and competency restoration needs in Oklahoma.

---

[3] Paul DeMuro, Frederic Dorwart, David Leimbach, Frederic Dorwart Lawyers; Nick Southerland, Oklahoma Disability Law Center

- **Transparency and Reporting:** The Department, Class Counsel, and the Consultants have established and will maintain a transparent communication channel. Quarterly joint status updates are submitted to the federal court and made available to stakeholders, summarizing key metrics and developments. These updates provide accountability and allow all parties to note successes or address any emerging issues collaboratively. The Consultant's first quarterly report was filed July 1, 2025. Going forward, these reports will continue, and if sustained compliance is the goal the Department.

**Conclusion**

In the five months since the Consent Decree was approved by the Court, the Department has made specific and measurable strides to overhaul its competency restoration system. Most of the Consent Decree's required actions have now been completed. The impacts of those actions are evident in the data: shorter waits and more people served. The average wait for treatment has now sixty (60) days, with over 150 individuals having received restoration services under the new programmatic guidelines. Innovative jail-based and community-based programs are also in development. These efforts have contributed to a solid foundation for continued compliance. The Department will continue to focus on sustaining and building on these improvements – including securing additional long-term funding from the Oklahoma Legislature for new forensic facilities, residential care facilities, inpatient psychiatric facilities and staff, as well as, refining processes as needed with guidance from the Consultants. The Department remains fully committed to meeting the final benchmarks of the Consent Decree (such as the twenty-one (21) day maximum wait standard by 2026) and to ensuring that no individual in Oklahoma endures unconstitutional delays in receiving competency restoration. By transforming the system in line with this comprehensive plan, Oklahoma is on course to not only satisfy the court's requirements but to provide a national model for timely, efficient, and humane competency restoration services.

**APPENDICES**

**Sources:** The improvements and data reported above are informed by the Consent Decree requirements and the progress documented since its implementation. Key reference points include the Consent Decree and associated status reports, which outline the mandated reforms, as well as analyses by oversight entities highlighting baseline issues that have now been addressed. These combined sources substantiate the significant reduction in wait times, the establishment of new restoration programs, and the enhancement of capacity and staffing in compliance with the court's order. All data provided (e.g. waitlist figures, program outcomes) are current as of August 8, 2025, reflecting the Department's internal tracking and the Consultants' reports.

**Appendix 1 – Data Charts**



**Figure 1:** Patients on Competency Waitlist and Average Length of Time on Waitlist (ver. 8/5/2025).

13

| Date | Property | Impact |
|------|----------|--------|
| August 25, 2025 | Grand Mental Health ResCare will open to treat individuals who are NTA requiring residential treatment | 22 open beds at OFC |
| September 15, 2025 | OFC Expansion beds will open and individuals in jails can be transferred | 80 open beds at OFC (staggered) |
| + 102 | | |
| October 15, 2025 | Unit 52-300 at GMH Campus will open to treat individuals who are NTA requiring residential treatment | 30 open beds at OFC |
| October 15, 2025 | Mhyro Building will open to treat individuals requiring residential treatment or for competency restoration (TBD) | 32 open beds at OFC |
| + 162 TOTAL | | |
| 2026 | SSM Beds will be available | Capacity for 58 people to leave OFC and enter lower level of care |
| 2026 | Ft. Supply buildings will be renovated | Capacity for up to 100 people to receive treatment at Ft. Supply instead of OFC |

**These numbers do not reflect the potential impact of improved programming at OFC. This has the potential to identify individuals who are competent in less time**

**Figure 2**: Timeline showing planned bed acquisitions.

**Appendix 2 – Bed Need Analysis**

In paragraph 62 of the Consent Decree, a requirement for a bed needs analysis is outlined. The Decision Support Services (DSS) division of the Department has historically conducted inpatient

14

bed projections that analyzed the demand on the behavioral health system. These are relevant now for the Consent Decree bed needs assessment and will be described next.  In the process of performing the bed needs analysis, we looked at the current census and capacity as well as projecting future needs for inpatient beds.  We performed this inpatient bed projection to show the pressure that would be coming into the behavioral health system, in conjunction with the OFC demand driven by the criminal justice system.

**Inpatient Bed Projection and Utilization Data**

The model of projected inpatient beds uses the methodology and framework from the 2021 article Benchmarks for Needed Psychiatric Beds for the United States: A Test of a Predictive Analytics Model by Christopher G. Hudson.  Furthermore, the model takes into consideration inpatient bed capacity per 100,000 at present, Oklahoma's adult population growth, inpatient bed census, the number of inpatient admissions, the number of inpatient discharges, the average length of stay, serious mental illness (SMI) rate changes, any mental illness rate changes, substance use disorder rate changes, 200% of the Federal Poverty Level estimates (those served by public funding), and insurance coverage.  Moreover, the model methodology and calculations incorporated work from the 2024 McKinsey Health Institute report, which was developed based on the Oklahoma behavioral health system to determine overall state need and demand.

The graph on the following page shows the projected inpatient bed growth.  Overall, the inpatient bed projection, as illustrated in the chart, anticipates a significant increase in the number of inpatient beds needed over the next decade.  Over a five (5) year period, the projection indicates a rise in the range of 288 to 369 beds.  Looking forward to ten years, the Department's projected capacity needs to further expand, ranging from 320 to 445 beds, reflecting a substantial long-term growth needed by the Department to accommodate inpatient clients.



Currently, the Department inpatient bed utilization is sitting at 93% of the state's capacity as documented in the table below.

| Inpatient Bed Capacity and Utilization | | | | |
|---|---|---|---|---|
| **Facility** | **Census** | **Capacity** | **Open Beds** | **% of Capacity** |
| Carl Albert | 14 | 15 | 1 | 93.3% |
| Jim Taliaferro | 14 | 15 | 1 | 93.3% |
| Tulsa Center for Behavioral Health | 50 | 60 | 10 | 83.3% |
| Northwest Center for Behavioral Health | 20 | 20 | 0 | 100.0% |
| Griffin Memorial Hospital | 117 | 120 | 3 | 97.5% |
| **Total Inpatient Bed Capacity** | **215** | **230** | **15** | **93.5%** |

16

The inpatient bed projection and the current utilization rate indicate a need for additional inpatient beds both now and into the future, which is critical to know in combination with the state's forensic bed capacity, census, and upcoming needs.

**OFC Bed Projection**

The Decision Support Services of the Department has previously conducted OFC bed projections and performed related analytics to determine the number of beds that are needed to meet the potential demand in the future. The Consent Decree directs future bed needs assessments to include the Oklahoma population growth and the crime rate.

Beyond utilizing these metrics, the model for OFC bed needs takes into consideration the crime rate as operationalized by court filings for both felony and misdemeanors (analysis also included arrest data, arrest clearances, and index crimes). Additional items in the analysis include the number of persons on the waitlist to enter competency restoration, the average length of stay/time on the waitlist, the average length of time to restoration at the national level, as well as the Oklahoma average time to restoration, the number of persons being held at OFC with the designation of Not Guilty by Reason of Insanity (NGRI) or Not Guilty by Reason of Mental Illness or Defect (NGRMID) and the number of the existing population at OFC.

Furthermore, during the process of updating the current OFC bed projection, the Department staff met with a national expert, as suggested by the Consent Decree Consultants, on projection modeling to undergo a continuous quality improvement process. This involved a review of critical variables and data that are ideally utilized for the projections of forensic beds. These variables were utilized in the model above and will be in future iterations.

The Department used current OFC census and capacity to understand the impact on forensic bed need into the future. A national average time to restoration was applied to understand how reducing the time to restoration would impact the overall demand on the system. Put differently, the model projects the need for beds with the OFC current average length of stay/amount of time needed for restoration and then compares it to the number of beds needed if OFC were to have the National average length of time needed for competency restoration.

The graph, on the next page, illustrates the model projection of OFC bed capacity. It reveals that when comparing the projected increases in bed capacity, a stark difference emerges between the modest increase from approximately 260 beds to 273 beds over a decade (what occurs when OFC's restoration average length of stay matches the National average), and the more substantial model projection of increasing from 260 beds to 346 beds within the same timeframe (what occurs with OFC's current competency restoration average length of stay). The smaller increase (260 to 273) represents only a 5% increase in capacity that is needed over ten (10) years, whereas

17

the larger increase (260 to 346) indicates a 33% increase will be necessary over the ten (10) time period.



**Waitlist Bed Demand**

The inpatient bed projection and the current utilization rate indicate a need for additional inpatient beds both now and into the future, which is also the case for the OFC. Beyond these bed demand pressures, the Consent Decree further adds to these with the requirement to move individuals off the waitlist, as seen on the chart on the next page. Currently, the average length of time individuals spend on the waitlist is 218 days (based on a four (4) month average). Over the course of a year there are approximately 350 individuals that will end up on the waitlist. Coupled with the average length of time on the waitlist, this results in a need of 210 beds. Conversely, following the Consent Decree the average length of time on the waitlist shall be twenty-one (21) days, which taken in combination with the number on the waitlist in a year, results in a need of twenty-one (21). Thus, approximately 189 more beds are needed to meet the requirements and comply with the Consent Decree.



**Conclusion**

The Department will continue to monitor the waitlist and bed space, among other factors, at OFC and among the inpatient facilities to address needs related to forensic bed needs.

**REFERENCES**

1. Hudson, CG. (2021). Benchmarks for Needed Psychiatric Beds for the United States: A Test of a Predictive Analytics Model. *International Journal of Environmental Research and Public Health* https://pmc.ncbi.nlm.nih.gov/articles/PMC8625568/

2. McKinsey Health Institute. (2024). The Department Behavioral Health (BH) System Diagnostic.

3. National Institutes of Health. (2021). Competency Restoration: Use of State Hospitals, Community – Based, and Jail-Based Approaches *NRI's 2020-2021 State Profiles.* https://nri-inc.org/media/zgzdvutu/nri_2020_profiles_-_competency_restoration_-_use_of_state_hospitals-_community-based-_and_jail-based_approaches-_november_2021.pdf

**Appendix 3 – Data Propositions**

**1. Only 8.3 % of individuals came off the waitlist--a continuation of the steady decline observed since early spring.**

Metric: Percent Coming Off the Waitlist - Discharge

March 2025: 0.311
April 2025: 0.220
May 2025: 0.059
June 2025: 0.143
July 2025: 0.083

**2. Just 10.6% of cases were evaluated within 30 days, marking a modest rebound from June's low and underscoring considerable month-to-month volatility in timely evaluations since spring.**

Metric: % of Cases Evaluated in 30 Days

March 2025: 0.231
April 2025: 0.115
May 2025: 0.175
June 2025: 0.015
July 2025: 0.106

Metric: % on Waitlist - Misdemeanor Charge

March 2025: 0.117
April 2025: 0.120
May 2025: 0.109
June 2025: 0.109
July 2025: 0.142

**3. Only 25.9 percent of individuals came off the waitlist, reflecting a marked slowdown after a mid-spring surge in removals.**

Metric: % Coming Off the Waitlist

March 2025: 0.156
April 2025: 0.272
May 2025: 1.086
June 2025: 0.452
July 2025: 0.259

**4. 38.9 percent of clients came off the waitlist, marking a moderate rebound after several months of fluctuating program performance.**

Metric: Percent Coming Off the Waitlist - Program Level Change

March 2025: 0.289
April 2025: 0.780
May 2025: 0.178
June 2025: 0.500
July 2025: 0.389

**5. July's 52.800% rate of clients coming off the waitlist represents a clear rebound after earlier volatility, marking one of the stronger performances in the period.**

Metric: Percent Coming Off the Waitlist - OFC Admit

March 2025: 0.400
April 2025: 0
May 2025: 0.763
June 2025: 0.357
July 2025: 0.528

Metric: % on Waitlist - Felony Charge

March 2025: 0.883
April 2025: 0.880
May 2025: 0.891
June 2025: 0.891
July 2025: 0.858

**6. Saw one admission to community competency restoration, sustaining the overall low and steady, if hardly ideal, admission trend observed earlier in the year.**

Metric: Number of Admits to Competency Restoration - Community Restoration

March 2025: 1
April 2025: 1
May 2025: 0
June 2025: 1
July 2025: 1

**7. The number of clients discharged from the waitlist fell to just three, representing a marked decline after several months of relatively steady discharge rates.**

Metric: Number Coming Off the Waitlist - Discharge

March 2025: 14
April 2025: 9
May 2025: 9
June 2025: 10
July 2025: 3

**8. Following months in which no Consultants had portal access, by July 2025 all three Consultants were able to access the portal.**

Metric: Number of Consultants with Access to the Portal

March 2025: 0
April 2025: 0
May 2025: 0
June 2025: 0
July 2025: 3

**9. Count of 12 completed restoration services marks a slight decline from the generally steadier levels seen over the preceding months, indicating a downward trend in completions.**

Metric: Number that have Completed Restoration Services

March 2025: 19
April 2025: 21
May 2025: 17
June 2025: 19
July 2025: 12

**10. Only 12 individuals were discharged from Restoration Services, representing a sharp decline after several months of consistently higher discharge rates.**

Metric: Number that have Discharged from Restoration Services

March 2025: 30
April 2025: 26
May 2025: 24
June 2025: 30

23

July 2025: 12

**11. Only 14 people came off the waitlist, marking a noticeable decline following several months of stronger placement rates.**

Metric: Number Coming Off the Waitlist - Program Level Change

March 2025: 13
April 2025: 32
May 2025: 27
June 2025: 35
July 2025: 14

**12. 19 individuals were admitted from the waitlist, reflecting stabilization after marked fluctuations in earlier months.**

Metric: Number Coming Off the Waitlist - OFC Admit

March 2025: 18
April 2025: 0
May 2025: 116
June 2025: 25
July 2025: 19

**13. Individuals in jail-based competency restoration reached 25--its highest level in the period--after an initial dip earlier in the spring and a sustained rebound through the summer.**

Metric: Number of Admits to Competency Restoration - Jail Restoration

March 2025: 14
April 2025: 11
May 2025: 8
June 2025: 20
July 2025: 25

**14. Just 36 individuals came off the waitlist, reflecting a notable decline after higher and more variable monthly numbers earlier in the spring.**

Metric: Number Coming Off the Waitlist

March 2025: 45
April 2025: 41
May 2025: 152

24

June 2025: 70

July 2025: 36

**15. The average wait time has fallen to 110 days, reflecting a sustained improvement after earlier peaks in the spring months.**

Metric: Average Wait Time from Date the Department receives a Court Order for Eval to the Date the Court Receives the Result

March 2025: 139

April 2025: 140

May 2025: 99

June 2025: 119

July 2025: 110


**16. The waitlist has shrunk to 139, reflecting a sustained reduction and stabilization at its lowest levels following earlier declines.**

Metric: Number on Waitlist

March 2025: 289

April 2025: 151

May 2025: 140

June 2025: 155

July 2025: 139


**17. The time on the waitlist fell to 193, marking a noticeable improvement after several months of elevated wait times.**

Metric: Time on Waitlist

March 2025: 216

April 2025: 239

May 2025: 237

June 2025: 220

July 2025: 193


**18. The time on the waitlist for Felony charges has consistently fallen, with a slight uptick in July.**

Metric: Time on Waitlist - Felony Charge

March 2025: 524

25

April 2025: 445

May 2025: 423

June 2025: 253

July 2025: 268

**19. The waitlist for misdemeanor charges shows significant fluctuation, with a sharp spike to 437 before dropping again, indicating inconsistent but overall elevated demand for placement. (This fluctuation is due to the records being updated.)**

Metric: Time on Waitlist - Misdemeanor Charge

March 2025: 239

April 2025: 200

May 2025: 222

June 2025: 437

July 2025: 278

**Appendix 4 – Glossary**

1. **Class Member** – Individual covered by the Briggs v. Friesen Consent Decree requirements.

2. **Clinical Acuity** – A measure of the severity of a person's behavioral health symptoms, and the person's functioning, to determine the appropriate level of care.

3. **Community-Based Outpatient Restoration (CBOR)** – A proposed program where eligible defendants receive competency restoration services while living in the community instead of being hospitalized or remaining incarcerated in county jail.

4. **Competency Restoration** – Process of providing treatment to restore a defendant's mental capacity to meet the legal standard for trial through a combination of behavioral health treatment, education about the legal process, and medication.

5. **Competent / Competency** – The current ability of a person charged with a crime to understand the charges and court process, and to help their lawyer in a reasonable and informed way.

6. **Consent Decree** – The Court approved settlement in *Briggs v. Friesen* (March 10, 2025) requiring the State of Oklahoma, through the Department, to fix delays in restoring defendants to competency by meeting specific timelines and standards for evaluations and treatment.

7. **Court Order of Commitment** – Legal directive requiring a defendant to be admitted for restoration services.

8. **Diversion** – Redirecting a defendant away from jail or prison and into treatment or another program that addresses the underlying treatment need which led to legal involvement.

9. **Evidence-Based Practices** – Services or treatments that research has shown to be effective in producing reliable results with the population affected.

10. **Expedited Placement** – Admission to an appropriate treatment placement for individuals with acute needs.

11. **Fine Structure** – The rules for calculating and collecting money from the state if it does not meet the limits within the consent decree.

12. **Fines Account** – A dedicated account, managed by a neutral third party, where collected fines are deposited and used to improve mental health and competency restoration services.

13. **Forensic Evaluator / Qualified Forensic Evaluator** – A licensed mental health professional or terminal degree individual approved by the state to assess whether a defendant meets competency criteria.

14. **Consultants** – Three independent experts appointed under the terms of the Consent Decree to oversee and approve this plan and to monitor progress.

15. **Incompetent / Incompetency** – The present inability of a person charged with a crime to understand the charges filed against the person and court processed involved, and to assist their lawyer in a reasonable and informed way.[4]

16. **Initial Competency Evaluation** – First assessment to determine if a defendant meets the legal competency standard.

17. **Inpatient Bed Utilization** – The percentage of available treatment beds that are currently being used.

18. **Inpatient Clinical Staff** – Medical and mental health professionals, such as psychiatrists, nurses, therapists, and behavioral health aides, who provide treatment and support to patients in a hospital or secure facility setting.

19. **Jail-Based Competency Restoration** – A program that provides competency restoration services inside a jail for defendants who are able to participate outside of a hospital setting.

20. **Length of Stay (LOS)** – The amount of time a person spends in a treatment program, from admission to discharge.

21. **Maximum Allowable Wait Time** – The longest period a defendant is allowed to wait for competency restoration under the consent decree before fines or other penalties apply.

22. **Medication Management** – Ongoing psychiatric oversight of prescribed medications.

23. **Mentally Incompetent Person** – Any person who has been adjudicated mentally or legally incompetent by an appropriate district court.

24. **Not Guilty by Reason of Insanity (NGRI) / Not Guilty by Reason of Mental Illness or Defect (NGRMID)** – Legal verdicts meaning a defendant committed the act but is not legally responsible because of a mental illness at the time of the crime.

25. **Oklahoma Forensic Center (OFC)** – The state's primary secure psychiatric hospital for defendants who need competency restoration.

---

[4] 22 O.S. § 1175.1(4)

26. **Phased Standards** – Step-by-step deadlines in the consent decree that gradually reduce the maximum time allowed for a defendant to wait for services.

27. **Qualified Forensic Evaluator (QFE)** – Department -approved professional authorized to conduct competency evaluations.

28. **Reevaluation** – Follow-up evaluation to assess whether a defendant's competency status has changed while awaiting restoration.

29. **Restoration Curriculum** – Standardized educational and therapeutic program designed to improve a defendant's legal understanding and ability to participate in their defense.

30. **Restoration Team** – A group of professionals who work together to provide competency restoration services. This may include doctors, nurses, clinicians, case managers, and peer support specialists.

31. **Serious Mental Illness (SMI)** – A mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities.

32. **Standard Placement** – Admission timeline for individuals without acute needs.

33. **Stipulated Fines** – Monetary penalties imposed for non-compliance with court-ordered timelines.

34. **Throughput** – Rate at which individuals move through restoration programs from admission to completion.

35. **Treat to Competency Portal** – A Department online system that tracks court orders, evaluation and restoration timelines, waitlist data, and progress in competency restoration cases.

36. **Triage** – Process of prioritizing defendants for restoration services based on clinical acuity and legal factors.

    a. **Triage, Expedited** – A triage category for individuals with the most urgent mental health needs, requiring admission to treatment within the shortest allowed time under the consent decree.

    b. **Triage, Standard** – A triage category for individuals whose mental health needs are less urgent, allowing for placement in treatment within regular timeframes.

37. **Waitlist / Waitlist Backlog** – A list of individuals court-ordered to competency restoration but not yet admitted to a program, because there are not enough treatment beds or staff.

**Appendix 5 – Central Office Forensic Services Team Workflow**

**(1) ORDER for EVALUATION RECEIVED**
- Order and other documents come to forensicservices@odmhsas.org , this is the Central Office Competency Team (CO Comp Team) contact.
- When received the information is loaded into the competency portal by CO Comp Team Initial Eval Team Member.
- If more information is needed, the team member will follow up with the court and note in the portal more information has been requested. All orders should include:
  - Application for Order to Determine Competence (MUST HAVE)
  - Probable Cause Affidavit for each current case number (MUST HAVE)
  - Criminal Information for each current case number (MUST HAVE)
  
  GREAT TO HAVE BUT NOT NECESSARY FOR THE EVAL TO MOVE FORWARD:
  - Any police reports or witness statements (current case(s))
  - Booking sheet (current case(s))
  - Full Date of Birth
  - Full Social Security Number
  - Any other records referenced in the Order or Application

**(2) DIVERSION ATTEMPTS**
- Notice of receipt of order and any additional necessary information is sent to the Court by the Initial Eval Team Member within three (3) business days. This notice will also include a document containing information regarding general diversion options, stabilization steps if crisis care is needed and processes on vacating orders for evaluation if the individual is diverted. CO Comp Team Initial Eval Team Member will also forward information to the Department legal division to support pursuance of diversion or bond for stabilization.

**(3) EVALUATION ASSIGNMENT**
- Once all necessary documentation is received evaluation assignments will be made within 1 business day by the CO Comp Team Initial Eval Team Member. The assigned entity will receive notification from the portal that an evaluation needs to be completed.
- Assignments can be made to providers, psychiatric staff at OFC or contracted forensic evaluators.
  - CCBHC competency staff will be assigned those evaluations that fall within their provider area.
  - Psychiatric staff at OFC will receive assignments which include cases:
    - High risk in nature such as a capital crime.
    - Which indicate other co-occurring symptomology, i.e., developmental disability, dementia, etc.

30

- ▪ Currently under orders originating out of Tulsa County.
    - ○ Other Contracted Forensic Evaluators will receive assignments which include cases indicating co-occurring symptomology, developmental disability, intellectual disability, dementia, TBI, etc.
- All initial evaluations and reports shall be completed and submitted within 30 days of receipt of all necessary documentation.
    - ○ The assigned party must provide the date of the scheduled evaluation in the portal.
    - ○ The CO Comp Team Initial Eval Team Member will notify the Court utilizing a template report, when all documentation has been received, the evaluation assigned to an evaluator and scheduled to proceed.
- All evaluating staff should also be aware of indicators that an individual may qualify for alternative disposition including community based, nursing care, NTA, MHC, AOT/COOP) and reach out to the CO Comp Team Initial Eval Team Member prior to the expiration of the thirty (30) day evaluation timeline for next steps. This could lead to reassignment of the evaluation, staffing of the case or pursuing other legal options.

**(4) EVALUATION REPORT to COURT**
- Once complete the evaluation report shall be sent by the evaluating entity to the judge, district attorney, defense attorney.
- The report should include:
    - ○ Notation of the mental illness leading to the determination of incompetence.
    - ○ Recommended course of restoration care; community based, jail based, or OFC as well as triage level, if a higher level of care is needed.
    - ○ Likelihood of the defendant's attaining competence within a reasonable period.
    - ○ Whether the person is a person requiring treatment as defined by 43A O.S. § 1-103 (triage protocol).
- Provider shall upload the evaluation directly to the portal.
- If the individual refuses (or is unable due to complications, symptomatology) to participate in the evaluation, notification should be sent within 24 hours of the attempt to CO Comp Team Initial Eval Team Member. The initial attempt shall be notated by the provider within the competency portal. Other approaches/opportunities to complete the evaluation will be staffed with the provider by the CO Comp Team. If other attempts are not successful a notice shall be sent to the Court (DA and defense) by CO Comp Team Initial Eval Team Member after three (3) business days of the final attempt.

**(5) POST EVALUATION COMPETENCY HEARING**

31

- Once the evaluation is received by the Court a hearing will be held to either issue an Order of Commitment or a finding of competence and prosecution will proceed.
- To support expediting the process, after seven (7) business days of providing the report to the Court the CO Comp Team Initial Eval Team Member will verify documentation of receipt and the setting of further hearing on OSCN.
  - o If there is no notation on OSCN of receipt of evaluation within seven (7) business days, then CO Comp Team Initial Eval Team Member will send a templated letter to the Court to ensure the receipt of the documents for scheduling of further hearing.

**(6) ORDER of COMMITMENT**
- The Court will notify the CO Comp Team Initial Eval Team Member via forensicservices@odmhsas.org of the Courts determination and provide copies of the orders.
  - o To assist the Court, the Department can provide a template court order which will also include a document containing information regarding diversion options, stabilization steps if crisis care is needed and processes on dismissing criminal matters if the individual is diverted. The order will also include the Courts notation highlighting the recommended course of restoration care; community based, jail-based, OFC, or if a higher level of care is needed.
- If the order stipulates to the evaluation and the finding of incompetency and jail based or community-based competency restoration is pursued, then the CO Comp Team Initial Eval Team Member will assign the community-provider through the competency portal within 3 business days of receipt of the order. All previous orders and documentation will be transferred in the portal from "initial evaluations" to the active "patients" record system. Patient status (in or out of jail custody) will be notated.
- If the order dismisses the competency order and criminal charges, the CO Comp Team Initial Eval Team Member will send notification to the provider. All orders and documentation shall be uploaded to the competency portal and the patient's chart is notated inactive.

**(7) COMPETENCY RESTORATION CARE OR ASSISTANCE STARTS**
- The treating provider begins services within 3 business days of notification of assignment and documents each contact and any information received concerning the patient within the competency portal.
  - o The provider shall provide services as dictated by the current Competency Statement of Work.
    - ▪ Service Notes shall be entered at each contact.

- ▪ Once monthly progress notes, which provide highlighted information on progress within the restoration curriculum shall be entered. If there is a structured restoration program in that area.
- ▪ Any other information received from jail staff, family or others shall be documented to include who the information was received from.
- ▪ Should admission to crisis stabilization be necessary the provider will document in competency portal a "NEED FOR HIGHER LEVEL OF CARE" for the patient, describing the situation and include triage documentation.
  - a. CO Comp Team Field Rep will receive notification of the designation and must review the flag within 2 business days, enter a note within the portal and proceed to staff the case and assist with placement of the patient.

**(8) REPORT TO THE COURT**
- • Within seven (7) days of initiating services, the CO Comp Team Field Rep shall send notice to the Judge, District Attorney, and Defense that restoration care has started with the date of first provider contact and medical provider appointment.  This will be on a templated letter.
  - o All documentation will be uploaded to the competency portal.
- • Every thirty (30) days the CO Comp Team shall send an update to the Judge, District Attorney, and Defense
  - o Providers shall email reports by the 5th of the month for the previous month's services to the CO Comp Team forensic services email.
  - o The reports will be reviewed by the CO Comp Team Field Rep and distributed to the Court.
  - o All documentation will be uploaded to the competency portal.
- • If the patient is awaiting movement to a higher level of care reporting to the Court will occur weekly to keep the court and attorney's apprised of patient placement.

**(9) "PERSON REQUIRING TREATMENT" (43A O.S. § 1-103) DURING EVALUATION OR COMPETENCY RESTORATION CARE**
- • If during the evaluation or restoration care, the individual meets the criteria of a person requiring treatment, the treating provider shall take immediate action to notify the CO Comp Team Field Rep. This should occur within the same business day but no more than seventy-two (72) hours after determined need. The triage screening must be included in the request.
- • The provider shall also make notation in the competency portal by selecting a need for "Higher Level of Care" within a service note and completing the required text boxes. This will trigger a notification to the CO Comp Team.

- If the Court agrees to stabilization the CO Comp Team will notify the provider and ask they complete the necessary assessments (LMHP).
- Once the patient no longer meets the definition of a person requiring treatment, the patient must receive re-evaluation for competency within at least seventy (72) hours of discharge.
  - o Provider shall upload the report as well as any recommendations and other relevant documentation to the competency portal. Including the discharge summary for continuation of care.
- If the court will not issue a bond, the provider shall communicate with the jail medical provider, create a safety plan and provide more frequent visits due to the escalated treatment need.  Any safety plan or alteration in care within the jail shall be documented within the portal.
- If the patient is receiving outpatient-based services:
  - o The patient should be transported to a URC, crisis unit or inpatient care unit to address the immediate treatment need.
  - o Once the patient no longer meets the definition of a person requiring treatment, the patient must receive re-evaluation for competency within at least seventy-two (72) hours of discharge.
    - ▪ Provider shall upload the report as well as any recommendations and other relevant documentation to the competency portal. Including the discharge summary for continuation of care.

**(10)    RISK FLAGS**

- If during evaluation or restoration care, the provider indicates risk flags within the competency portal, flags will be initially reviewed by the CO Comp Team Field Rep and if indicated will reach out to the provider to schedule further staffing and up to clinical consultation.
- If the risk flag is *Refusal to Take Medications*, the CO Comp Team Field Rep will review with the community provider. If necessary, documentation will be completed and sent to the Department Legal Division in the event a forced medication hearing is needed.

**(11)    FAILURE TO PROGRESS**

- If a patient is receiving community-based or jail-based competency services and has not demonstrated progress within 45 days from the start of restoration care, the CO Comp Team Field Rep will staff with provider and if indicated provide further clinical consultation.
- If after an additional forty-five (45) days (total 90) of attempted care the patient continues to exhibit lack of progress or participation in restoration care the patient may be expedited for admission to OFC. The CO Comp Team Field Rep will notify the

court and document in the competency portal within three (3) business days of the determination of lack of progress.

- Throughout the failure to progress review process, staffing and consultation the CO Comp Team may take other steps to evaluate other underlying causes of behaviors, such as developmental disability. The Central Office Competency Team can also at this time request a review of a finding of *Never to Attain*.

**(12)    OFC TRANSITION (NEVER TO ATTAIN)**

- At any point prior to the end of competency time limits, the provider believes the patient is unlikely to attain competency, this shall be documented within the portal, including any supportive documentation. The provider should also select the flag of *Review for Never to Attain* within the portal on the patient chart. The CO Comp Team will be notified and begin to work with the provider to schedule further evaluations (LMHP and MHE), to occur within thirty (30) business days. Once evaluations have been completed and the recommendation is the patient is likely never to attain competency, the provider must also supply documentation for appropriate placement recommendations for the patient. Placement recommendation must be listed on the MHE.  MHE must be signed by (2) LMHP's or (1) LMHP and (1) Terminal Degree.
- The CO Comp Team will provide a completed report to the Department legal team within three (3) business days of the finding and all documentation provided.
- The court will then conduct a hearing to determine if the patient should be civilly committed to treatment services.
- While OFC Transition will be a continuously reviewed status throughout the competency evaluation and treatment processes this process **must** begin ninety (90) days prior to statutory timelines to ensure placement.

**(13)    RE-EVALUATION**

- If during restoration care, the treating provider identifies that the patient has improved and a re-evaluation is appropriate, they will make indication in the competency portal, which will alert The CO Comp Team to be aware a reevaluation shall be occurring within the next fourteen (14) business days.
- If the patient is found to be competent, the evaluation report shall be sent by the evaluating entity to the judge, district attorney, defense attorney. The report shall also be uploaded into the competency portal, with notation of finding.
- To support expediting the process, after seven (7) business days of providing the report to the Court the CO Comp Team Field Rep will verify receipt of documentation and the setting of further hearing on OSCN.
- If there is no notation on OSCN of receipt of reevaluation within seven (7) business days, then CO Comp Team Field Rep will send a templated letter to the Court to ensure the receipt of the documents for scheduling of further hearing.

- If the court stipulates to the finding of competent the CO Comp Team Field Rep will change the status of the patient to "maintain competency" within the portal and the provider shall maintain contact and medications throughout court proceedings to support competency through case disposition. All information shall continue to be documented within the competency portal.
- The physicians of the jail and community provider shall collaborate to ensure changes in medication do not adversely affect the patients' mental health status or their ability to continue with court proceedings. Jail physicians have final authority regarding the medications their staff administer, and providers should ensure medications necessary are provided to the jail if not currently included within their formulary.


**(14)     MAINTAINING COMPETENCY**
- If an individual is reevaluated and opined competent the Court stipulates to the finding of competent the CO Comp Team will change the status of the individual to "maintain competency" within the portal.
- CO Comp Team will send a letter to the Court reiterating stipulation of competence and notifying the Court provider will continue maintenance of care until case disposition or resolution.
- Provider shall maintain contact and medications as stipulated above based on the individual's location (jail or community) throughout court proceedings to support competency through case disposition or resolution.
- Contractor shall continue to document all information in the portal as instructed above based on the individual's location (jail or community).

**Appendix 6 – Qualified Forensic Evaluators (QFE) Protocol**

**PURPOSE**

The Oklahoma Department of Mental Health and Substance Abuse Services (Department) shall train, approve, and continuously monitor all Qualified Forensic Evaluators (QFEs) conducting competence evaluations to ensure adherence to established professional standards.

A QFE means a licensed mental health professional at either the master's or doctoral level, licensed in the State of Oklahoma, to include:

> Master's level licensed professional counselors (LPC) as well as
>
> Master's level social workers (LCSW)
>
> Psychologist (Ph.D. or PsyD)
>
> Psychiatrist (M.D. or D.O.)

**PROCEDURE**

All QFEs shall participate in comprehensive forensic training and demonstrate continued proficiency, skill, and professional conduct in order to conduct competence evaluations. QFE's will be subject to enhanced training, approval, and monitoring standards. A nondoctoral QFE may be prohibited from conducting competence evaluations on cases of first-degree murder, rape, robbery, or incest. A QFE may also request an evaluation transfer, when necessary, due to a conflict of interest or other professional concerns.

1. **Training**
   a. Initial Evaluator Training shall occur on two (2) consecutive full days and one half (1/2) day for a total of eighteen (18) hours of training. This training will be held in person and shall include but is not limited to the following topics:
      i. Introduction to Oklahoma's Criminal Justice System
         1. Including the utilization of diversion based on the Sequential Intercept Model
      ii. Motivational Interviewing for behavioral health populations
      iii. Ethics in competency evaluations
      iv. Walk through sections of Oklahoma's Evaluation Template
      v. Use of records and collateral information
      vi. Evaluation concerns: malingering, TBI, etc.
      vii. Competency Portal walk-through
      viii. Mock testimony and testifying basics.
   b. A test for understanding will be administered at the end of each training day.
   c. Twelve (12) hours of annual continuing education are required of all evaluators. Continuing education will be provided by the Department, focusing

37

on topics related to enhancing evaluative skills and report writing. Topics will also include any legal updates. Continuing education will be available in three (3) hour blocks, held quarterly throughout the fiscal year.

**d.** Initial and continuing education trainings will be recorded and made available for later reference.

2. **Monitoring**

    **a. Mentors**

        **i.** The Department will provide four (4) psychiatrists, who under the leadership of the Oklahoma Forensic Center (OFC) Forensic Services Director shall provide oversight and mentorship to all QFEs.

        **ii.** Each psychiatrist will be assigned a region of the state or provider catchment area at the beginning of the fiscal year. Assignment will rotate annually, at the turn of the fiscal year.

        **iii.** The assigned psychiatrist will be responsible to mentor the approved QFEs in their area in accordance with the Department's standards.

    **b. Mentor Responsibilities**

        **i.** Mentor shall meet with QFEs within their assigned area at a minimum of once per month to provide technical assistance and support regarding the evaluative process and report writing, for the first twelve (12) months post training completion.

        **ii.** Mentor shall be responsible to review all reports for newly trained QFE's within their first ninety (90) days of completion of training and then review 25% of a QFE's report caseload monthly for an additional nine (9) months. Evaluation report timelines for reports to Court partners still apply. Mentor name and credentials shall be listed at the bottom of the reviewed evaluations, notated as; Reviewed by: Joe Smith, M.D.

        **iii.** After the initial twelve (12) months of successful mentorship, a QFE will be considered formally approved.

        **iv.** Mentors will continue to conduct periodic reviews of approved QFE's evaluation reports at a rate of 10% quarterly.

        **v.** Mentor shall provide direct written feedback to QFE and document any verbal feedback. All written feedback shall be provided to the point of contact within the Department Forensic Services team.

        **vi.** Mentor shall document an evaluation as green, yellow, and red based on adherence to the evaluation template, and training protocols.

Yellow or red reports shall result in further mentor meetings, instruction, and training.

**c.  QFE Status**

    **i.** If an approved QFE receives two (2) documented red reports from a mentor within one fiscal year, the QFE will no longer be considered an approved QFE and shall be removed from the statewide QFE roster. Removal from the statewide QFE roster shall nullify any contracts between the Department and the QFE for evaluative services.

    **ii.** If a court or other attorney contacts the Department with concerns for a QFE, Forensic Services will notify the mentor, and the mentor must contact the QFE within seventy (72) hours to discuss concerns and review evaluations. Documentation of the concern, resulting conversation and review must be sent to the point of contact within the Department Forensic Services team.

    **iii.** If a mentor has a concern for a QFE's continued work, the mentor shall request a staffing with the OFC Forensic Services Director and the point of contact within the Department Forensic Services team.

**d.  QFE Roster and Records**

    **i.** The Forensic Services point of contact will maintain the roster of all QFEs, including their status.

    **ii.** The roster shall be available via the Department's website and updated monthly. The link shall be provided to all Oklahoma District Courts.

    **iii.** The Forensic Services point of contact will maintain all mentor records for QFEs, as well as data analyses of QFE evaluation trends.

**Appendix 7 – Triage Protocol**

**PURPOSE**

The Oklahoma Department of Mental Health and Substance Abuse Services (the "Department") will use this policy to address the need of those individuals referred to the Oklahoma Competency System who need an expedited, higher level of care.

The goal of this process is to ensure swift identification of persons with needs as defined in 43A O.S. §§ 1-101 – 903 and to establish uniform criteria and procedures, clinical and administrative, to prioritize and expedite placement and treatment for those individuals entering or within the Oklahoma Competency System.

**PROCEDURE**

All individuals entering or within the Oklahoma Competency System shall be triaged upon initial competency evaluation. A new triage screening shall be completed after the initial triage screening by provider Licensed Mental Health Provider (LMHP) staff to update the triage level if symptoms and/or behaviors warrant it.

**Triage Protocol**

    **a.  At initial evaluation**

        i.  Evaluator will document within the summary of the evaluation report the triage designation for the individual.

        ii.  The triage level will be entered into the Treat to Competency Portal (portal) within seventy-two hours of completion of the evaluation interview, excluding weekends and holidays. A full evaluation report is not required at this time; however, the evaluation deadline remains in effect.

        iii.  An evaluation report will be deemed incomplete and returned to the evaluator if the triage designation is not present.

        iv.  If triage information is not entered into the portal within seventy-two (72) hours of the scheduled evaluation date, excluding weekends and holidays, the Forensic Services Team will contact the evaluator to request the information and that it be entered into the portal before the end of day.

    **b.  Post-commitment order (Individuals not admitted to OFC)**

        i.  Local provider will ensure an LMHP completes a new screening for all individuals committed to The Department for restoration care and awaiting admission to OFC, either in county jail or in the community on bond if symptoms and/or behaviors warrant it.

        ii.  The triage level will be entered into the Treat to Competency Portal within seventy-two (72) hours of completion of the screening, excluding

weekends and holidays.

    iii.   The Forensic Services Team will contact the local provider if triage information has not been entered into the Treat to Competency Portal within twenty-one (21) days post-commitment order. Triage screening will continue every twenty-one (21) days thereafter until admission to OFC, return of a competent reevaluation, or disposition of the case, whichever occurs first.

  **c.**  **Triage Reevaluation (Individuals not admitted to OFC)**

    i.   When a provider determines that an individual's symptoms and/or behaviors warrant a triage reevaluation, such shall be done within seventy- two (72) hours.

    ii.   The triage reevaluation and new triage level will be entered into the Treat to Competency Portal within seventy-two (72) hours of completion of the evaluation interview, excluding weekends and holidays.

**2.**  **Triage Guidelines**

The following levels determine the priority for an individual's placement into a higher level of care or expedited admission to the OFC. In accordance with 43A O.S. §§ 1-101 – 903 if an individual meets at least one of the criteria than the individual shall be placed on the expedited list.

| Triage Level | Criteria | Examples |
|---|---|---|
| Level 1: Expedited | <ul><li>Acute Psychosis as defined by O.S. 43A §§ 1-101 -903</li><li>Serious Behavioral Dysregulation</li><li>Medically Dangerous Behavior</li><li>Physical or verbal threats to harm self or others</li><li>Behavior creating increased risk for additional criminal charges.</li></ul> | <ul><li>Disorganized behavior, including the involvement/use of bodily fluid or excrement.</li><li>Refusing food or fluids</li><li>Refusing medically necessary medications (blood pressure, Insulin)</li><li>Total refusal of prescribed psychiatric medication which is likely lead to serious short-term harm.</li><li>Segregated while incarcerated due to risk of harm</li></ul> |

| Level 2: Standard | • Presence of psychosis, intellectual disability, or other neurocognitive disorder rendering the individual psychotic<br>• Stable behavior<br>• No agitation or violence | • Consistently completing activities of daily living<br>• Eating and drinking within normal limits<br>• Interactions with jail or facility staff are not volatile/combative |
| --- | --- | --- |

3. **Placement and Interventions**
   a. **Expedited**
      i. Placement in the appropriate location for treatment should occur within twenty-one (21) days of receipt of the commitment order.
      ii. Individuals listed as expedited will be prioritized for admission at an appropriate placement, including placement in a crisis stabilization bed if warranted.
      iii. The individual's most acute symptoms will be documented in the portal using flags, either by the evaluator during the initial evaluation or by the local provider after a commitment order is issued. These flags will:
         1. Alert the Forensic Services Team; and
         2. Appear on the admission list after a commitment order has been issued, to support prioritization for OFC admission.
      iii. If the individual is in county jail and either a commitment order has not been issued or immediate admission to OFC is unavailable, the Forensic Services Team will collaborate with court partners to facilitate an appropriate release for civil commitment diversion or in-patient crisis stabilization at a Department facility, which may include:
         1. Carl Albert Community Mental Health Center
         2. Griffin Memorial Hospital
         3. Jim Talliaferro Community Mental Health Center
         4. Northwest Center for Behavioral Health
         5. Tulsa Center for Behavioral Health
      iv. The Forensic Services Team will work with the local provider to secure the LMHP statement and/or assist with facilitating telehealth screening with the receiving treatment center to complete admission criteria documentation.
         1. The receiving facility will work with the county jail to coordinate transport.
         2. The Forensic Services Team will collaborate with the local provider and send a letter to court partners to ensure

42

notification of placement. Standard reporting requirements, which include submitting reports every thirty (30) days to court partners, will remain in place.

    v. If immediate admission to OFC is unavailable and the district court does not agree to civil commitment or release to crisis stabilization, the Forensic Services Team will coordinate with the local provider to document a safety plan with the county jail that includes increased provider contact. The safety plan will be added to the individual's portal file.

**b. Standard**

    i. Placement at an appropriate placement for treatment should occur within twenty-one (21) days of order of commitment.

    ii. Placement recommendation should indicate whether the evaluator or triage screener believes the individual is an appropriate participant for outpatient services including any specific outpatient needs or jail-based restoration if available in the county.

    iii. If admission to an appropriate placement for treatment is not available within twenty-one (21) days following the issuance of a commitment order, and the individual remains in county jail:

        1. The Forensic Services Team will assign a local provider to initiate contact within three (3) business days. This provider will also arrange a prescriber appointment to begin medications, as clinically appropriate.

        2. The local provider will document all contact with individual within the portal.

        3. The Forensic Services Team will collaborate with the local provider and send a letter to court partners to ensure proper notification of placement. The standard requirement to report to court partners every thirty (30) days will remain in effect.

**4. Clinical Consultation**

If at any time during any of the above listed processes an evaluator or provider is uncertain regarding determination or next step, they shall email the Forensic Services Team, forensicservices@odmhsas.org and request immediate clinical consultation with the teams clinically trained staff.

**5. Training**

The Forensic Services Team will provide quarterly training to all Department approved evaluators and LMHP staff assigned to conduct triage screenings. The Forensic Services Team will schedule trainings at the start of each fiscal year and will be available to potential attendees. The Forensic Services Team will provide on-demand technical assistance to all providers at the evaluator's or provider's request.

43

**6. Process Monitoring and Analysis**

Information entered into the Treat to Competency Portal will enable the Forensic Services Team to monitor evaluator and provider compliance with data entry and timeline requirements. Department data analysts will generate reports for the Forensic Services Team to support program evaluation, assess effectiveness, and identify service gaps. The team will review these reports weekly for ongoing tracking.

**Appendix 8 – Competency Evaluation Service Guidelines for Terminal Degree Providers**

**PURPOSE**

This contract is to provide competency evaluations, reevaluations, and testimony, if required as a result of those reports for the Oklahoma Department of Mental Health and Substance Abuse Services (Department).

**REQUIRED ACTIVITIES**
- Contractor shall be responsible for all competency evaluations and reevaluations as assigned by the Department Forensic Services team.
- Contractor shall ensure all documentation and reporting timelines are followed per OMDHAS policy. At a minimum this includes;
  - Timelines for evaluation reports to be loaded into the Treat to Competency portal and submitted to Court partners. At this time this is thirty (30) days from the date the Department received the order or evaluation.
  - Timelines for reevaluation reports to be loaded into the Treat to Competency portal and submitted to Court partners. At this time this is fourteen (14) days from the date the Department requested the reevaluation.
    - An informative letter notifying the individual remains incompetent can be produced at a reevaluation in lieu of a full report but must still document the statutory requirements.
  - Timelines for reporting triage level for an individual. Currently this is seventy-two (72) hours after the completion of the evaluation and identification of an expedited care need per the Department Triage policy.
- Contractor shall ensure all reporting follows the Department training and issued templates.
- Evaluations may be completed via telehealth. If this is not conducive to an accurate evaluation, the evaluator must notify the Forensic Services team to within forty-eight (48) hours to discuss next steps, such as rescheduling to complete the evaluation in person at the jail or having the person transported to the Oklahoma Forensic Center for completion.
- Contractor must make any notes in the Treat to Competency portal to ensure accurate information is provided to Court partners.
- Contractor shall attend the Initial Evaluator Training, a total of eighteen (18) hours and successfully complete testing/surveying for understanding.
- Contractor shall participate in the Department's Qualified Forensic Evaluator (QFE) process to remain a contracted evaluator.
- Contractor shall notify the Department Forensic Services team with seventy-two (72) hours of receiving a subpoena so the Department legal can assist with preparation and intervention if necessary.

**REQUIRED DELIVERABLES AND PERFORMANCE MONITORING**

- Contractor shall provide the Forensic Services Team the monthly number of evaluations they can complete within policy deadlines to ensure consistent assignment and monitoring.
  - This can be provided prior to June 30th for the next fiscal year, or on a quarterly basis. If a quarterly basis is chosen, this must be given by the 5th day of the month before the next quarter begins.
- Contractor shall comply with all the Department's QFE processes.
- Contractor shall maintain State of Oklahoma licensure and abide by all required laws and regulations of their profession.
- OMDHSAS will monitor fidelity and performance based on guidelines within the QFE process.

**Appendix 9 – Competency Evaluation Service Guidelines for LPC/LCSW**

**PURPOSE**

This contract is to provide competency evaluations, reevaluations, and testimony, if required as a result of those reports for the Oklahoma Department of Mental Health and Substance Abuse Services (Department).

**REQUIRED ACTIVITIES**
- Contractor shall be responsible for all competency evaluations and reevaluations as assigned by the Department's Forensic Services team.
- Contractor shall ensure all documentation and reporting timelines are followed per OMDHAS policy. At a minimum this includes;
  - Timelines for evaluation reports to be loaded into the Treat to Competency portal and submitted to Court partners. At this time this is thirty (30) days from the date the Department receives the order or evaluation.
  - Timelines for reevaluation reports to be loaded into the Treat to Competency portal and submitted to Court partners. At this time this is fourteen (14) days from the date the Department requested the revaluation.
    - An informative letter notifying the individual remains incompetent can be produced at a reevaluation in lieu of a full report but must still document the statutory requirements.
  - Timelines for reporting triage level for an individual. Currently this is seventy-two (72) hours after the completion of the evaluation and identification of an expedited care need per the Department's Triage policy.
- Contractor shall ensure all reporting follows the Department's training and issued templates.
- Evaluations may be completed via telehealth. If this is not conducive to an accurate evaluation, the evaluator must notify the Forensic Services team to within forty-eight (48) hours to discuss next steps, such as rescheduling to complete the evaluation in person at the jail or having the person transported to the Oklahoma Forensic Center for completion.
- Contractor must make any notes in the Treat to Competency portal to ensure accurate information is provided to Court partners.
- Contractor shall attend the Initial Evaluator Training, a total of eighteen (18) hours and successfully complete testing/surveying for understanding.
- Contractor shall participate in the Department's Qualified Forensic Evaluator (QFE) process to remain a contracted evaluator.
- Contractor shall notify the Department's Forensic Services team within seventy-two (72) hours of receiving a subpoena so the Department's legal staff assist with preparation and intervention if necessary.

**REQUIRED DELIVERABLES AND PERFORMANCE MONITORING**
- Contractor shall be responsible for all competency evaluations within their service area and based on licensure requirements as outlined within the QFE process.

47

- Contractor shall comply with all the Department's QFE processes.
- Contractor shall maintain State of Oklahoma licensure and abide by all required laws and regulations of their profession.
- OMDHSAS will monitor fidelity and performance based on guidelines within the QFE process.

**Appendix 10 – Competency Restoration Programming Guidelines**

**PURPOSE:**
Contractor will provide services for individuals assessed as not competent within Contractor's service area, and testimony as a result of services provided, if required for the Oklahoma Department of Mental Health and Substance Abuse Services (Department).

**REQUIRED ACTIVITIES:**

**Jail-Based Competency Restoration Services (Approved Pilot Sites):**
- Services to individuals identified as not competent who are in the jails within the Contractor catchment area shall:
  - Begin within 3 business days of notification from the Department via the competency portal.
  - Be provided to each individual, in-person (not telehealth), minimally one (1) time weekly. Telehealth can occur for services provided in excess of once weekly services.
  - Provide access to appropriate medications that best facilitate treatment and recovery.
    - Address emergent needs within twenty-four (24) hours.
    - All other medicinal needs within two (2) weeks from initial contact.
  - Ensure that individuals are prescribed medication appropriate to their diagnosis and current symptom presentation; medication adherence status; changes to symptom severity; and any immediate concerns to the safety or welfare of the individual based on their observed conditions.
  - Include, once medications have stabilized any significant symptomology, education and skills training targeted at any remaining gaps in competency needs. This restoration education and support shall only be provided by a Department approved restorer.
    - Restoration education, support and skills training shall:
      - Be provided with the intent to enable individuals to obtain a factual and rational understanding of legal proceedings and restoration of their ability to consult with legal counsel.
      - Use a competency restoration education curriculum provided by the Department.
      - Provide restoration curriculum to individuals in multiple learning formats including, but not limited to, discussion, reading, and video experiential methods such as role-playing or mock trial. Program individuals with accommodations needs shall receive adapted materials and approach, as needed.
- Contractor shall enter all information into the competency portal on any visits, services provided, or information received regarding the individual within two (2) business days of contact or receipt of information.
- Contractor shall write a progress letter on all individuals currently assigned to them for

49

restoration services and submit this via forensicservices@odmhsas.org by the 5th day of every month for the previous month's services. The Department will review, forward to the Court and upload to the portal.

**Jail-Based Restoration Assistance Services (Non-pilot Sites):**
- Services to individuals identified as not competent who are in the jails located within the Contractor catchment area shall:
  - Begin within 3 business days of notification from the Department via the competency portal.
  - Be provided to each individual, in-person (not telehealth), minimally one (1) time weekly. Telehealth can occur for services provided in excess of once weekly services.
  - Provide access to appropriate medications that best facilitate treatment and recovery.
    - Address emergent needs within twenty-four (24) hours.
    - All other medicinal needs within two (2) weeks from initial contact.
  - Ensure that individuals are prescribed medication appropriate to their diagnosis and current symptom presentation; medication adherence status; changes to symptom severity; and any immediate concerns to the safety or welfare of the individual based on their observed conditions.
- Contractor shall enter all information into the competency portal on any visits, services provided, or information received regarding the individual within two (2) business days of contact or receipt of information.
- Contractor shall write a progress letter on all individuals currently assigned to them for assistance services and submit this via forensicservices@odmhsas.org by the 5th day of every month for the previous month's services. The Department will review, forward to the Court and upload to the portal.

**Outpatient Restoration Assistance:**
- Treatment services to individuals identified as not competent who are released by the court within the Contractor catchment area shall:
  - Begin within three (3) business days of notification from the Department via the competency portal.
  - Be provided to each individual, in-person (including telehealth), minimally 3 times per week.
  - Include team-based care approaches with person-centered treatment planning to address barriers to competency and case management to support community tenure.
  - Minimally include ensuring that individuals are prescribed medication appropriate to their diagnosis and current symptom presentation; medication adherence status; changes to symptom severity; and any immediate concerns to the safety or welfare of the individual based on their observed conditions.
- Contractor shall enter all information into the competency portal on any visits, services provided, or information received within two (2) business days of contact or receipt of information.

- Contractor shall develop written policies and procedures for outpatient restoration assistance. Policy and procedures should include:
    - Any differences, when compared with traditional processes, in intake, assessment, and treatment planning specific to the population served under this contract to expedite engagement and care.
    - Service coordination and continuity of care planning.
    - Documentation and communication processes for staff. Maintenance of competency after restoration and before adjudication or criminal proceeding resolution.
    - Staff training requirements.

**Community-Based Competency Restoration Services (When legislatively approved):**
- Treatment services to individuals identified as not competent who are released by the court to receive community-based competency restoration services within the Contractor catchment area shall:
    - Begin within three (3) business days of notification from the Department via the competency portal.
    - Be provided to each individual, in-person (including telehealth), minimally 3 times per week.
    - Include team-based care approaches with person-centered treatment planning to address barriers to competency and case management to support community tenure.
    - Minimally include ensuring that individuals are prescribed medication appropriate to their diagnosis and current symptom presentation; medication adherence status; changes to symptom severity; and any immediate concerns to the safety or welfare of the individual based on their observed conditions.
    - Include, once medications have stabilized any significant symptomology, education and skills training targeted at any remaining gaps in competency needs. Education and skills training shall:
        - Be provided with the intent to enable individuals to obtain a factual and rational understanding of legal proceedings and restoration of their ability to consult with legal counsel.
        - Use a competency restoration education curriculum provided by the Department.
        - Provide restoration curriculum to individuals in multiple learning formats including, but not limited to, discussion, reading, and video experiential methods such as role-playing or mock trial. Program individuals with accommodations needs shall receive adapted materials and approach, as needed.
- Contractor shall enter all information into the competency portal on any visits, services provided, or information received within two (2) business days of contact or receipt of information.
- Contractor shall develop written policies and procedures for community-based competency services. Policy and procedures should include:
    - Any differences, when compared with traditional processes, in intake,

51

assessment, and treatment planning specific to the population served under this contract to expedite engagement and care.

o   Service coordination and continuity of care planning.
o   Documentation and communication processes for staff.
o   Maintenance of competency after restoration and before adjudication or criminal proceeding resolution.
o   Staff training requirements including, but not limited to adjudicative competency overview training; competency restoration psychoeducational training; forensic examiner training (when applicable); competency screeners and symptom tools; identifying, precenting, and reporting abuse, neglect, and exploitation in accordance with applicable state and federal laws.

**"Person Requiring Treatment" (43A O.S. § 1-103) During Assistance or Restoration Care (In or Out of Jail):**

- If during restoration care or assistance, the individual meets the criteria of a person requiring treatment, the treating provider shall take immediate action to notify the Department via forensicservices@odmhsas.org. This should occur within the same business day but no more than seventy-two (72) hours after determined need. The provider shall follow the process outlined in the *Triage Protocol* and make notation in the competency portal by selecting a need for "Higher Level of Care" within a service note and completing the required text boxes for restoration service individuals. This will trigger a notification to the Department.  At this time the Department's staff will reach out to Court partners for decisions surrounding stabilization or diversion.

If the person is in jail and the Court agrees to stabilization:

- The Department will notify Contractor to precede immediately with the necessary assessments to obtain crisis care.  Once complete the assessment documents should be returned via forensicservices@odmhsas.org and Contractor shall upload them to the portal.
- Contractor and the Department will work together for State crisis bed placement.
- Once the individual no longer meets the definition of a person requiring treatment, the individual must receive re-evaluation within three (3) business days of discharge. Re-evaluation shall not be completed by an evaluator who has provided the individual direct care.
- Upon return, medications will be continued at the jail unless the jail physically documents the need to discontinue. The physicians of the jail and community provider shall collaborate to ensure changes in medication do not adversely affect the individuals' mental health status or their ability to continue with court proceedings. Jail physicians have final authority regarding the administration of medications.

If the person is in jail and the Court declines stabilization:
- Contractor shall communicate with the jail medical provider and:
  - Establish a safety plan.
  - Establish a visit schedule to occur more than once weekly due to the escalated treatment need.
- Contractor shall upload into the portal documentation of the safety plan and/or alteration in care within the jail.
- Contractor shall reinitiate the process for request for stabilization if symptoms continue to deteriorate.

If the person if out of jail:
- The above *Person Requiring Treatment* protocol shall be followed.
- The individual should be transported to a crisis or inpatient unit to address the immediate treatment need.
- Once the individual no longer meets the definition of a person requiring treatment, the individual must receive re-evaluation within three (3) business days of discharge. Re-evaluation shall not be completed by an evaluator who has provided the individual care.
- Contractor shall continue outpatient-based services per, *Community-Based Competency Restoration Services* outlined above.

**Re-Evaluation During Competency Restoration/Assistance:**
- All individuals receiving active restoration care or assistance, in jail, at the Oklahoma Forensic Center (OFC) or in the community shall be reevaluated at a minimum of every 90 days.
- All reevaluation processes shall follow the *Qualified Forensic Examiner (QFE)* protocol.
- If during restoration care, Contractor identifies the individual has improved and a re-evaluation is appropriate prior to the ninety (90) day timeline, Contractor will report this in the competency portal.
- A re-evaluation and report shall then be completed within fourteen (14) business days of the notification. Re-evaluation cannot be completed by an evaluator who has provided the individual care.

**Specific Population Designations or Concerns:**
Never to Attain:
- If at any point prior to the end of competency time limits, the Contractor believes the individual is unlikely to attain competency, this shall be documented within the portal, including any supportive documentation.
- Contractor shall select the flag of *Review for Never to Attain* within the portal on the individual's chart. Contractor shall document circumstances which lead to the consideration for *Never to Attain.* The Department will be notified and begin to work with the Contractor to schedule further evaluations, to occur within thirty (30) business days.

- Once evaluations have been completed and the recommendation is the individual is likely never to attain competency, the Contractor must work with the Department staff and supply documentation for appropriate placement recommendations for the individual.

Failure to Progress:
- If an individual receiving community-based or jail-based competency services has not demonstrated progress within forty-five (45) days from the start of restoration care, the Department will staff with the provider and if necessary, provide clinical consultation of the Department's Competency staff.
- If after an additional forty-five (45) days (total ninety (90)) of attempted care the individual continues to exhibit lack of progress or participation in restoration care the individual will be referred for admission to OFC. The Department will notify the Court and document in the portal within three (3) business days of the determination of lack of progress and referral.
- Throughout the failure to progress review process, staffing and consultation the Department can also request a review of a finding of *Never to Attain*.

Maintaining Competency:
- If an individual is reevaluated and opined competent the Court stipulates to the finding of competent the Department will change the status of the individual to "maintain competency" within the portal.
- Contractor shall maintain contact and medications as stipulated above based on the individual's location (jail or community) throughout court proceedings to support competency through case disposition or resolution.
- Contractor shall document all information in the portal as instructed above based on the individual's location (jail or community).

**REQUIRED STAFF TRAINING, DELIVERABLES, AND PERFORMANCE MONITORING:**

It is the Contractor's responsibility to recruit LMHP's for the Contractor's service area. If turnover occurs, the Department will assist in training new evaluators, however, the Contractor will need to recruit replacements as soon as possible.

All Restoration Care Providers:
- Attend Restoration Bootcamp prior to administering restoration care.
- Attend required annual continuing education.

Specific Programmatic Monitoring for all Competency Program Contractors:
- The Department's Field Services staff will actively review entries in the Competency Portal to ensure the above-mentioned timelines are being met.
- Contractor shall provide documentation of staff training and credentials upon request by the Department.

- Contractor shall provide policies, procedures, and other requested documentation to the Department.
- Billed services will be subject to verification in accordance with requirements in the Department's Services Manual.

**Appendix 11 – Diagrams**

**1. Competency Process Diagram**



**2. Triage Process Diagram**

