IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LESLIE BRIGGS, as next friend of T.W. and B.S.; EVAN WATSON, as next friend of C.R.; and, HENRY A. MEYER, III, as next friend of A.M., for themselves and for others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY SLAVONIC, in his official capacity as Interim Commissioner of the Oklahoma Department of Mental Health and Substance Abuse Services; and HOLLY WEBB, in her official capacity as Interim Executive Director of the Oklahoma Forensic Center, <br><br> Defendants. | Case No: 23-cv-81-GKF-JFJ |

**PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF
AND REQUEST FOR EXPEDITED CONSIDERATION**

Plaintiffs move this Court to grant emergency injunctive relief arising from Defendants' prolonged disobedience of numerous provisions of the Consent Decree that has created an emergency situation for Class Members. (*See* Doc. 116, ¶ 99). Given the nature of the relief sought herein, Plaintiffs request the Court expedite Defendants' response to this Motion and grant an expedited evidentiary hearing.

**I.
Introduction**

More than seven months after the Court entered the Consent Decree, the Department's competency restoration program is still in disarray. The proximate cause of this ongoing calamity is Defendants' failure to comply with the Consent Decree's core obligation to "develop and begin

to implement" a Consultants-approved Plan within 90 days after the Consent Decree's entry. (Doc. 116, ¶ 54). Defendants have not yet even drafted a coherent Plan, much less obtained the Consultants' approval and begun to implement the Plan. During the first 90 days of the Consent Decree, Defendants did virtually nothing to comply with the Consent Decree (*see, e.g.*, Doc. 119, pp. 6-7), exhibiting a shocking disrespect for this Court's authority and a deliberate indifference to the Class Members' plight.

In June 2025, the Consultants published a scathing Interim Report condemning Defendants' failure to submit even a "semblance of a Plan" by the 90-day deadline. (*Id.*) Class Counsel deferred seeking court intervention at that time because, on June 3, the Governor appointed Retired Rear Admiral Slavonic as the Interim Commissioner. It was hoped that, under new leadership, Defendants would appreciate the urgency of the situation. That hope was misplaced.

On August 12, 2025, more than 60 days after the 90-day deadline, Defendants submitted a so-called "Strategic Plan" that, as the Consultants found, "was marred by inconsistencies, inaccurate data, and questionable assertions throughout." (Doc. 124, p. 3). In their September 2025 Status Report, the Consultants correctly concluded that Defendants' August 12 "Strategic Plan" was, in fact, no Plan at all *(e.g., id*. at pp. 15, 28-31, 60). Once again, Defendants failed to use "Best Efforts across multiple domains" of the Consent Decree. (*Id*. at p. 60).

Particularly alarming, the Consultants have determined that Defendants have failed to report accurate and reliable data concerning the number of Class Members awaiting competency restoration services and the length of their wait times, which is indispensable to assess Defendants' compliance with the Consent Decree. (*Id*. at pp. 14-15, 22-23, 60). Six months after entry of the

Consent Decree, the Consultants were unable to confirm this lynchpin data. (*Id*. at p. 23). If Defendants do not report accurate and reliable data, the Consent Decree becomes a paper tiger.

Defendants' chronic failure to comply with their Consent Decree obligations has created an emergency for the Class Members that requires immediate Court intervention. (*See, e.g.,* Doc. 124, p. 9) (summarizing strategies Defendants must implement as "urgent priorities to alleviate the suffering of individuals suffering from acute psychosis in county jails while they wait for competency restoration services"). Without a Consultants-approved Plan, seven months after the Consent Decree's entry, the Class Members' mental and physical well-being continue to deteriorate and their due process rights continue to be trampled.

The Consultants correctly found that Defendants' persistent failures to use Best Efforts to comply with the Consent Decree constitute Material Violations that warrant immediate injunctive relief and sanctions. (*Id.* at pp. 3, 60, 115-121). To effectuate the Consultants' recommendations for injunctive relief, and to address the present emergency created by Defendants' persistent and pervasive failures to comply with the Consent Decree, Plaintiffs request the Court order the following relief:

- Hold an expedited evidentiary hearing on this Motion.

- Before a hearing on this Motion, reopen discovery to permit Class Counsel to depose Defendants and other Department representatives with respect to the Department's August 12 "Strategic Plan" to discover the basis for the multiple false statements and inaccuracies therein, the root causes of the Department's data-reporting problems, and the circumstances that led to Defendants' failures to comply with the Consent Decree.

- Impose a fine of $10,000 per day for every day after the date of entry of the Court's order on this Motion for which the Department has not developed and begun to

implement a Consultants-approved Plan in accordance with the terms of the Consent Decree.[1]

- Order Defendants to designate a single representative with appropriate qualifications and forensic experience to be solely responsible for overseeing Defendants' compliance with the Consent Decree and administering the Department's competency evaluation and restoration services.

- Order Defendants to implement the remainder of the injunctive relief recommended by the Consultants in their September 2025 Status Report. (*See* Doc. 124, pp. 115-121 (Ex. G)).

## II.
## Relevant Consent Decree Provisions

The Consent Decree required Defendants, within 90 days of entry, to use "Best Efforts to develop and begin to implement a Plan" to improve Defendants' delivery of competency evaluations and restoration treatment to Class Members so as to reduce Class Members' wait times for restoration services. (Doc. 116, ¶¶ 30, 54). Defendants must develop the Plan "in consultation with" the Consultants and Class Counsel. The Plan must be approved by the Consultants. (*Id.*).

"Best Efforts" means "reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines to accomplish or bring about the intended and described result." (*Id.* at ¶ 18).

A "Material Violation" of the Consent Decree means "*any* failure to use Best Efforts to adhere to any plans or methods implemented by the Department so as to comply with the terms of this Consent Decree." (*Id.* at ¶ 28, emphasis added). If the Court finds Defendants have committed

---

[1] This fine is in addition to the Fines already imposed by the Consent Decree for failure to meet Maximum Allowable Wait Times (Doc. 124, ¶ 92).

4

a Material Violation of the Consent Decree, "the Court may order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate to address the Material Violations." (*Id.* at ¶ 100).

Notwithstanding any other Consent Decree provision, any party may file a motion seeking relief to address emergencies requiring immediate relief. (*Id.* at ¶ 99).

The Consultants are authorized to monitor, investigate and make findings regarding Defendants' efforts to attain compliance with this Consent Decree's terms, including whether Defendants have used Best Efforts to implement the Plan. (*Id.* at ¶ 38). The Consultants are empowered to recommend the Court impose injunctive relief "to achieve the purposes and goals of [the] Consent Decree." (*Id.* at ¶ 45). One of the stated "purposes and intent" of the Consent Decree is to "provide a mechanism to monitor and enforce" Defendants' compliance. (*Id.* at ¶ 14).

### III.
### The First 90 Days:
### The Department Willfully Disregards its Consent Decree Obligations

Defendants were required to "develop and implement" a Consultants-approved Plan by June 8, 2025, 90 days after entry of the Consent Decree. As documented in the Consultants' June 13, 2025, Interim Report, Defendants did virtually nothing to comply with this foundational obligation. (Doc. 119). From the entry of the Consent Decree on March 10, 2025 until the 90-day mark, Defendants: (i) had "no sense of urgency," (ii) failed to confer meaningfully with the Consultants about developing a Plan, (iii) failed to develop anything "resembling the Strategic Plan required by the Decree; and (iv) fell "far short" of the Consent Decree's requirements, except in two categories. (Doc. 124, p. 13). None of the material Defendants submitted to the Consultants by the 90-day deadline "individually or as a whole, met the requirements for development and

5

implementation of the Plan required by the Decree." (*Id*. at 29). Up to that point, Defendants had failed to "submit even a semblance of a Plan," and failed to use Best Efforts. (*Id*.).

More than two weeks <u>after</u> the Department failed to meet its 90-day obligations, on June 27, the Department's new leadership asked the Consultants for a nine-week extension until August 12 to comply with Consent Decree's requirement to "develop and implement" a Consultants-approved Plan. Class Counsel objected. But, at that point, Class Counsel deferred taking any immediate remedial action, preferring to give Interim Commissioner Slavonic an opportunity to come into compliance expeditiously with the Consent Decree. (*See* Doc. 124, pp. 68-71). The Consultants denied the Department's retroactive extension request, but agreed to defer its next Status Report until September "to give the Department the opportunity to show evidence of its progress regarding the Decree." (*Id*. at p. 15).

The Department failed to capitalize on the extra nine-week grace period. Instead, on August 12, the Department submitted a "Strategic Plan" that was "more of an assertion of past accomplishments and proposed policies than an actual Strategic Plan." (*Id*.). To add insult to injury, the Department erroneously represented in its August 12 submission that the "Department's new leadership respectfully requested *and received* a six (6) week extension to come into compliance" with the Consent Decree. (*Id*. at 15, fn. 6, emphasis added). In reality, the Consultants expressly denied the Department's extension request, stating that "we cannot retroactively absolve the Department for its lack of significant efforts between March 10 and early June. Delays in meeting deadlines within that time period were not caused by factors outside of [the Department's] control and in fact, we were assured regularly that the June 8 deadlines would be met." (*Id*.).

## IV.
## Summary of the Consultants' September 2025 Status Report

Prefaced by a letter signed by Interim Commissioner Slavonic, the Department represented that its August 12 submission was the "Strategic Plan" required by the Consent Decree. (Doc. 125, ECF pp. 24-87).[2] As explained in great detail by the Consultants, the Department's August 12 submission did not come close to meeting the Consent Decree's requirements for the Plan. (*See* Doc. 124, p. 20) ("…there's a long way to go before it can be said that [the Department] is using Best Efforts in every area needed to comply with the Decree.").

The Consultants' September 2025 Status Report is based on data and information gathered by the Consultants across numerous sources and methods, including (for example): document review, first-hand observations gleaned during in-person site visits throughout Oklahoma, in-person interviews with Department representatives and stakeholders, weekly video-conferences, and regular written communication with Department representatives. (Doc. 124, pp. 10-12). The September 2025 Status Report paints a disturbing picture of the Department's willful disobedience of multiple Consent Decree provisions as well as multiple misrepresentations. Here are highlights of the Consultants' pertinent findings regarding Defendants' August 12 submission:

- Defendants falsely represented that "[m]ost of the Consent Decree's required actions have now been completed." (Doc. 124, p. 30). Given that Defendants failed to develop, much less implement, most of the Plan's components, Defendants' misrepresentation is inexplicable.

- Defendants falsely represented that the Department replaced the pre-Consent Decree statewide jail-based restoration program "with a properly resourced Jail Based Restoration Assistance Program." (Doc. 124, pp. 29-30). This was a complete fabrication. There is no statewide jailed-based restoration program in existence, much less a "properly resourced"

---

[2] On its face, this assertion disregards the plain terms of the Consent Decree, which defines the "Plan" to be "the strategic plan developed by Defendants, *in consultation with Class Counsel*, *and approved by the Consultants*." (Doc. 116, ¶¶ 30, 54, emphasis added). Defendants had neither conferred with Class Counsel nor obtained the Consultants' approval of the Department's August 12 "Strategic Plan."

- one.³ (Doc. 125, p. 94) (Department concedes that is "not conducting jail-based competency restoration.").

- The Department asserted that it had implemented a triage policy and a policy overseeing Qualified Forensic Examiners. Both assertions were false, as the Department subsequently acknowledged.⁴ (Doc. 124, pp. 29-30).

- The Department is still not able to produce reliable data on fundamental points, such as the number of Class Members waiting to receive competency restoration and the length of their wait. The Department's data continues to be a "source of confusion and changing numbers." As a result, the actual number of Class Members who exist (*i.e.*, the number of people in jail awaiting restoration services) and how long the Class Members have been waiting to receive restoration services are unverified and unknown. (*Id.* at pp. 14, 21-23). As the Consultants point out, "[t]hese data points are central to nearly every aspect of the Consent Decree, and confusion about their accuracy casts reasonable doubt as to the reliability and accuracy of more nuanced or sophisticated data that the Department reports." (*Id*. at 3).

- The Department's reporting of the number of Class Members on the waitlist has been internally inconsistent and unreliable. For example, while the Department's August 12 submission unequivocally claimed the waitlist had been reduced to 105 people and Class Members' average time on the waitlist was 60 days, *the same day*, during a site visit, the Department advised the Consultants the waitlist was at 146 and the average wait time was 156 days. Even those revised numbers are unreliable and inconsistent with other data published by the Department. (*Id*. at 22-23).

- Defendants failed to fulfill their obligation to reevaluate all Class Members waiting for restoration treatment within 90 days of Consent Decree entry. (*See* Consent Decree, ¶ 57; Doc. 124, at p. 25). The reevaluations show "potentially troubling trends" regarding quality control. (Doc. 124, at p. 26).

- Defendants failed to complete their obligation to develop and implement a Consultants-approved plan to achieve a material increase in new in-patient forensic beds dedicated solely to competency restoration. (*See* Consent Decree, ¶ 62; Doc. 124, at p. 32). The Department's repeated failure to respond to the Consultants' requests for information on this issue "is not consistent with a Best-Efforts standard…nor is it consistent with the Decree's requirement that Court Consultants be given access to Departmental materials." (Doc. 124, at p. 35).

---

³ Over the past year, Tulsa and Oklahoma Counties have rescinded contracts with mental health providers who had provided in-jail services. As the Consultants observed, "[i]t is difficult to understand how the lack of contracted providers in those two high volume jails could align with the definition of a 'properly resourced' program." (Doc. 124, p. 42).

⁴ *See* Doc. 125, pp. 93-97, for the Department's response to the Consultants' initial reaction to the August 12 Plan.

- Defendants have failed to fulfill their obligation to develop and implement a Consultants-approved in-jail restoration pilot program in Tulsa County and one other County. (Consent Decree, ¶¶ 74-76; Doc. 124, p. 41). The August 12 Plan falsely asserted that "dozens of people have participated in jail-based competency restoration," which the Department later recanted. (Doc. 124, p. 43). The Department has provided no evidence that it is currently working with the Tulsa County Sheriff to develop a pilot program, nor any evidence that the Department is working on pilot program in a second county, as required by the Decree. (*Id.*). Defendants have "made little or no progress" on this component of the Plan. There's no sense of urgency, no sustained efforts, let alone Best Efforts. (*Id.*).

- Defendants have failed to fulfill their obligation to offer periodic training to stakeholders in Oklahoma's criminal justice system concerning competency evaluations and restoration. (*See* Consent Decree, ¶ 78; Doc. 124, p. 40). Defendants have failed to use Best Efforts to comply with this requirement. (Doc. 124, at p. 41).

- Defendants have failed to use Best Efforts to offer initial and periodic training to Oklahoma district court personnel, sheriff and Oklahoma Bar members on competency evaluations and restoration. (Consent Decree, ¶ 78; Doc. 124, pp. 40-41).

- Defendants only partially complied with their obligations to: (i) develop and begin to implement a plan for staff involved in competency restoration to receive continuing education and training (Consent Decree, ¶ 64; Doc. 124, p. 39); (ii) approve and monitor Qualified Forensic Examiners conducting competency evaluations (Consent Decree, ¶ 31; Doc. 124, p. 47); and (iii) develop and begin to implement a staffing plan for OFC to ensure compliance with current accrediting-body compliance. (Consent Decree, ¶ 63; Doc. 124, pp. 53-54).

- Defendants have provided insufficient information to allow Consultants to determine whether Defendants have complied with the Consent Decree's requirements to: (i) perform competency evaluations within 30 days of receipt of the order for evaluation;[5] (Consent Decree, ¶ 67; Doc. 124, p. 45); and (ii) reevaluate Class Members at least once every 90 days after receipt of a competency restoration order (Consent Decree ¶ 67; Doc. 124, pp. 50-51).

- **Overall, the Department has failed to use Best Efforts to develop and implement the Plan**. (Doc. 124, pp. 30-31, 60).

- **Defendants' failure to use Best Efforts across "multiple domains of the Consent Decree" meets the definition of Material Violations, which justifies additional injunctive remedies, including financial remedies**. (*Id*. at p. 60).

---

[5] This is a charitable interpretation of the Department's poor performance on this requirement, as the Consultants found "little evidence that the Department, until recently, used Best Efforts to perform evaluations within the required 30 days." (Doc. 124, p. 45).

In addition to their findings about the Departments' lack of Best Efforts across multiple domains, the Consultants are justifiably concerned about "serious procedural issues" that cast doubt on the Department's accountability and credibility regarding Consent Decree compliance:

> The Plan was submitted as a declarant document, asserting many inaccuracies with certitude. From a procedural standpoint, the Department created, vetted, and approved a very problematic document for official submission. Given its scope, it must have included input from many people. It eventually included the signatures of the two top members of the [Department's] administration.
>
> The production and submission of an official document with so many inaccuracies is alarming. It raises serious questions about the Department's current ability to internally fact-check their data, to coordinate and convey accurate information among various staff members, and to ultimately produce a cohesive and comprehensive document that maps out their planned response to the Consent Decree.

(Doc. 124, p. 30).

Relatedly, Defendants have continually ignored the Consultants' "critical" recommendation that the Department designate a single administrator, ***with proper forensic expertise***, whose sole function is to oversee Consent Decree implementation. (Doc. 124, p. 57). The Consultants correctly observe that, given the interim status of the current Commissioner and his general counsel, a qualified point-person to oversee Consent Decree compliance in future years is crucial to avoid a collapse of leadership and coordination within the various relevant departmental channels. (*Id.*).

## **Argument & Authorities**

Defendants' failure to develop and begin to implement the Court-ordered Plan has created mental health, physical health, and due process emergencies for the Class Members. The Consultants' findings of Material Violations are unimpeachable and warrant immediate injunctive relief, which is expressly authorized by the Consent Decree. (Doc. 116, ¶¶ 99, 100).

### A. An Emergency Exists for Class Members.

When this lawsuit was filed in March 2023, the Class Members were already suffering and in crisis due to unconstitutionally prolonged wait times for restoration services while languishing in county jails. (*See, e.g.*, Doc. 1, ¶¶ 1-42). More than two and one-half years later, due to Defendants' willful failure to develop and implement the Court-ordered Plan, Class Members' suffering persists with no relief in sight. The Consultants, nationally recognized experts in forensic mental health, vividly portray the Class Members' current plight:

> At its heart, this case is about the suffering of hundreds of individuals in county jails waiting for restoration treatment after being found incompetent to stand trial. Many of these individuals are acutely psychotic. They are confined to jail while they await access to care in often inhumane conditions spending much of their days in small cells without treatment, in circumstances that exacerbate their mental illnesses while increasing the risk of suicide, self-harm, and victimization….
>
> The Decree entered on March 10, 2025, is designed to end this suffering by assuring quick access to competency restoration treatment, an improved workforce, and a systemic approach to forensic care, all driven by data that is valid and collected, maintained, and analyzed with integrity.

(Doc. 124, p. 6). The Consultants correctly assert that Defendants' non-compliance has created an urgent need to compel the Department to adopt remedial measures "to alleviate the suffering of individuals suffering from acute psychosis in county jails while they wait for competency restoration services." (*Id*. at p. 9).

In addition to the increased risks of mental health deterioration and physical harm, Defendants remain deliberately indifferent to Class Members' due process right to be free from prolonged pre-trial incarceration awaiting mental health services while their criminal cases are indefinitely suspended. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (When a state detains a criminal defendant based on his or her incapacity to proceed to trial, the state may not detain the

11

defendant "more than the reasonable period of time necessary to determine whether there is a substantial probability that he [or she] will attain that capacity in the foreseeable future.").[6]

Defendants' failure to provide reliable data on *the* foundational metrics of the Consent Decree – *i.e.*, the number of Class Members and their wait times – by itself creates an emergency because Defendants' compliance cannot be accurately monitored without reliable data. The Fines provisions of the Consent Decree kick in this month (October). (Doc. 116, ¶ 92). The Fines are the Consent Decree's primary compliance-incentive mechanism. But the Fines cannot be accurately assessed if the number of Class Members and their lengths of wait time cannot reliably be determined.

After six months working with Defendants, Consultants have this to say about Defendants' data reporting:

> **Do we know what the actual number of people on the waitlist is and what their average length of stay is? The short answer is that, as of September 15 (189 days from entry of the Decree), <u>we do not</u>.** We believe that the weekly data we now receive is more reliable than it used to be, but submission of a Plan with radically different (and internally contradictory) data on the same points calls into question the basic credibility of what we are receiving, regardless of whether data in the Plan was mistaken or not.

(Doc. 124, p. 23) (emphasis added). Defendants' failure, at this stage, to produce reliable data on the Consent Decree's foundation points is alarming. Not only does it suggest deep flaws in the Department's data-management systems, and a reckless indifference to Consent Decree compliance, unreliable data hobbles the Consent Decree's ability to incentivize Defendants' compliance, which thereby harms the Class Members.

---

[6] *See Supplement to Joint Motion for Preliminary Approval*, Doc. 48, pp. 2-10 (discussing due process basis of Plaintiffs' claims).

The core purpose and intent of the Consent Decree is to compel Defendants to develop and implement a Plan to significantly improve the Department's delivery of competency evaluations and restoration services and thereby remedy the Departments' historic violation of Class Members' due process rights. (Doc. 116, ¶¶ 14, 30). More than seven months after the Consent Decree was entered, and more than four months after Defendants were obligated to "develop and begin to implement" a Plan, no such Plan exists. No Plan is on the foreseeable horizon. This is an emergency for Class Members' due process rights and for public safety, which justifies immediate injunctive relief. (Doc. 116, ¶ 99) ("Any Party may file a motion with the Court seeking emergency relief to address emergencies requiring immediate relief.") (*Id.* at ¶ 99).

> **B. Defendants' Failures to Use Best Efforts Constitutes Material Violations Warranting Injunctive Relief**.

Consent decrees are construed as contracts, *U.S. v. ITT Continental Baking Co.,* 420 U.S. 223, 236-8 (1975); *Joseph A. v. N.M. Department of Human Services*, 69 F.3d 1081, 1085 (10th Cir. 1995), and are enforced as any other judgment of the court. *Frew v. Hawkins*, 540 U.S. 431, 437 (2004); *Paycom Payroll, LLC v. Richelson*, 758 Fed. Appx. 1198, 1202 (10th Cir. 2014). Consent decrees can, therefore, be enforced through the court's contempt power. *Lackey v. Tsinnie*, 604 U.S. 192, 207 (2025).

Based on the plain terms of the Consent Decree, the Court is authorized to enter immediate injunctive relief. Defendants' failures to use Best Efforts across multiple domains constitute Material Violations of the Consent Decree. (Doc. 116, ¶ 28). To remedy Defendants' Material Violations, the Consent Decree empowers the Court "to order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate to address the Material Violations." (*Id.* at ¶ 100).

Although the Court need look no further than the Consent Decree's terms to authorize the requested relief, the Consent Decree's enforcement provisions are harmonious with this Court's statutory and inherent powers to impose contempt sanctions, including fines for "[d]isobedience or resistance to [the court's] lawful writ, process, order, rule, decree or command." 18 U.S.C. § 401(3); *see also Oklahoma v. U.S.*, 2012 Wl 5845057, *4 (N.D. Okla., Nov. 19, 2021) (invoking § 401(3)); *Shillitani v. U.S.*, 384 U.S. 364, 370 (1966) (trial courts have the inherent authority to impose civil contempt sanctions). To enforce provisions of a consent decree through a coercive contempt, a court may either impose per diem fines for each day of failure to comply, or fixed fines imposed and suspended pending future compliance. *International Union, UMW v. Bagwell*, 512 U.S. 821, 829 (1994); *A.B. v. Washington State Department of Social and Health Services*, 681 F. Supp. 1149, 1174 (W.D. Wash. 2023).

### **Requested Relief**

Based on the foregoing, Plaintiffs request the Court grant the following relief:

- Expedite Defendants' response to this Motion.

- Hold an expedited evidentiary hearing on this Motion.[7]

- Before a hearing on this Motion, reopen discovery to permit Class Counsel to depose Defendants and other Department representatives with respect to the Department's August 12 "Strategic Plan" to discover the basis for the multiple false statements and inaccuracies therein, the root causes of the Department's data-reporting problems, and the circumstances that led to Defendants' failures to comply with the Consent Decree.

---

[7] Class Counsel estimates that counsel will be able to conduct the depositions requested hereunder within 30 days after the Court reopens discovery. Plaintiffs respectfully requests a hearing be set as soon thereafter as possible.

- Impose a fine of $10,000 per day for every day after the date of entry of the Court's order on this Motion for which the Department has not developed and begun to implement a Consultants-approved Plan in accordance with the terms of the Consent Decree.[8]

- Order Defendants to designate a single representative with appropriate qualifications and forensic experience to be solely responsible for overseeing Defendants' compliance with the Consent Decree and administering the Department's competency evaluation and restoration services.

- Order Defendants to implement the remainder of the injunctive relief recommended by the Consultants in their September 2025 Status Report. (*See* Doc. 124, pp. 115-121 (Ex. G)).

- Order any other relief deemed appropriate based on the evidence developed at the hearing on this Motion or submitted as a result of the additional discovery requested herein.

*[Signature block on following page.]*

---

[8] This fine is in addition to the Fines already imposed by the Consent Decree for failure to meet Maximum Allowable Wait Times (Doc. 124, ¶ 92).

Respectfully submitted,

*/s/ Paul DeMuro*
Paul DeMuro, OBA No. 17605
Frederic Dorwart, OBA No. 2436
David W. Leimbach, OBA No. 33310
Frederic Dorwart, Lawyers PLLC
Old City Hall
124 East 4th Street
Tulsa, OK 74103
(918) 583-9922 – telephone
(918) 583-8251 – facsimile
pdemuro@fdlaw.com
fdorwart@fdlaw.com
dleimbach@fdlaw.com

Nick Southerland, OBA No. 31234
Brian S. Wilkerson, OBA No. 17165
Oklahoma Disability Law Center, Inc.
2816 E. 51st Street, Suite 300
Tulsa, OK 74105
(918) 743-6220 – telephone
(918) 743-7157 – facsimile
nick@okdlc.org
brian@okdlc.org

***Class Counsel for Plaintiffs***

**CERTIFICATE OF SERVICE**

The undersigned does hereby certify that on the 13th day of October, 2025, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the applicable ECF registrants.

*/s/ Paul DeMuro*