# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

LESLIE BRIGGS, as next friend )
of T.W. and B.S.; )
EVAN WATSON, as next friend )
of C.R.; )
and, HENRY A. MEYER, III, )
as next friend of A.M., for )
themselves and for others )
similarly situated, )
        )
      Plaintiffs, )
        )
v. )     Case No. 23-cv-81-GKF-JFJ
        )
GREGORY SLAVONIC, in his )
official Capacity as the Commissioner )
of the Oklahoma Department of )
Mental Health and Substance Abuse )
Services, and HOLLY WEBB, in her )
in her official Capacity as Executive )
Director of the Oklahoma Forensic )
Center, )
        )
      Defendants. )

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF AND REQUEST FOR EXPEDITED RELIEF (DOC. 126)

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENTS AND AUTHORITIES ....................................................................................... 2

I.   PLAINTIFFS FAILED TO COMPLY WITH THE DECREE'S MANDATORY
     DISPUTE RESOLUTION PROCESS AND THE MOTION MUST BE DISMISSED. ... 2

II.  SUMMARY OF THE DEPARTMENTS' BEST EFFORTS AND ACHIEVEMENTS. .... 4

III. PLAINTIFFS CANNOT MEET THE HIGH BURDEN FOR INJUNCTIVE RELIEF. .. 7

     A.   Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success on the Merits.... 8

     B.   Plaintiffs Have Not Demonstrated Imminent or Irreparable Harm............................ 9

     C.   The Balance of Equities and Public Interest Weigh Strongly Against Injunctive
          Relief.................................................................................................................... 10

IV.  PLAINTIFFS' REQUEST TO REOPEN DISCOVERY IS NOT AUTHORIZED UNDER
     THE FEDERAL RULES OF CIVIL PROCEDURE, IS MERITLESS, AND
     UNWARRANTED.....................................................................................................11

V.   DEFENDANTS HAVE EXERCISED BEST EFFORTS, DEMONSTRATED DURABLE
     COMPLIANCE, AND HAVE NOT COMMITTED MATERIAL VIOLATIONS. ......... 14

     A.   The Record Demonstrates Sustained, Transparent Compliance. .............................. 15

     B.   No Willful Disregard or Material Violation Exists. ................................................. 16

     C.   Plaintiffs and the Consultants Attempt to Rewrite the Consent Decree Without
          Authority or Process. ............................................................................................ 21

CONCLUSION........................................................................................................................ 22

# TABLE OF AUTHORITIES

## Cases

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004) ......... 9

*Frew v. Hawkins*, 540 U.S. 431 (2004) ...............................................................................8, 11, 14

*GTE Corp. v. Williams*, 731 F.2d 676 (10th Cir. 1984) .................................................................. 9

*Horne v. Flores*, 557 U.S. 433 (2009) ................................................. 8, 9, 10, 15, 18, 21

*Jackson v. Los Lunas Community Program*, 880 F.3d 1176 (10th Circuit) ........................... 10, 21

*McClendon v. City of Albuquerque*, 79 F.3d 1014 (10th Cir. 1996)............................................... 22

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) .................................................... 12, 13

*Prairie Band Potawatomi Nation v. Wagnon,* 476 F.3d 818 (10th Cir. 2007) ............................... 8

*Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992) ........................................ 8, 10, 15, 21

*Shakman v. Pritzker,* 43 F.4th 723 (7th Cir. 2022) ................................................................ 15, 18

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................ 8

## Rules

FED. R. CIV. P. 26(b)(1) .......................................................................................................... 12, 13

FED. R. CIV. P. 60(b)(5) ................................................................................................................ 21

FED. R. CIV. P. 69(a) .................................................................................................................... 13

# INTRODUCTION

The Governor, Legislature and the personnel of the Oklahoma Department of Mental Health and Substance Abuse Services (the "Department") have respected this Court's *Briggs* Consent Decree and moved mountains to improve the Department's delivery of competency evaluations and restoration treatment to Class members. Collectively, as recognized by the *Briggs* Consent Decree, they have had to overcome decades of underprioritizing and underfunding competence restoration services. Because of these conditions, the *Briggs* Consent Decree measures Departmental performance in "best efforts" toward measurable results.

The government has moved with rare lightning speed:

| | |
|---|---|
| March 10, 2025: | The Consent Decree was entered; |
| May 31: | The Legislature, in an unprecedented move, removed the Commissioner of the Department; |
| June 3: | The Governor appointed Rear Admiral Gregory J. Slavonic, U.S. Navy (Ret.), to lead the Department; |
| June 9: | Admiral Slavonic came on board as Commissioner; |
| June 23: | The Admiral recruited his colleague in the ODVA turnaround, ODVA general counsel John Settle, to the Department; and |
| June 12 - Present | The Admiral and legislative budget leaders have met at least 16 times to solicit funding in the 2026 State Budget for the Department's compliance efforts. |

Admiral Slavonic successfully led the turnaround of the Oklahoma Department of Veterans Affairs in 15 months. Since he arrived at the Department, he has created a new leadership team

by promoted from within and recruiting external talent. The resumes of the team leaders are attached as Exhibit 1.

The team's commitment is deeper than the *Briggs* Consent Decree, though the team is grateful for the Decree. The mission of the team at the Department includes providing the highest quality of care for those suffering mental illness and substance use disorders. This includes caring for those accused of committing crimes.

The past cannot be used as an excuse. It must be accepted as an accurate assessment of the systemic deficiencies at the Department which led to the *Briggs* Consent Decree. This is the environment Admiral Slavonic and the team inherited in June of 2025. This is also the starting point for the team's course corrections.

The Court, through the *Briggs* Consent Decree, appropriately refocused the Department's attention on the fulfillment of this aspect of its mission. Due to the magnitude of the problems and the need, recognized in the Decree, for systems to make the changes effective, durable and monitorable, the Department had to start with infrastructure. The Departmental has made significant progress toward the goals of the Consent Decree, as noted in this Response and charted in the attached Exhibit 2.

Plaintiffs' Motion for Injunctive Relief (Doc. 126) ignores the structural reforms undertaken and the measurable progress achieved by the Department since the appointment of Admiral Slavonic.

## ARGUMENTS AND AUTHORITIES

### I. PLAINTIFFS FAILED TO COMPLY WITH THE DECREE'S MANDATORY DISPUTE RESOLUTION PROCESS AND THE MOTION MUST BE DISMISSED.

Plaintiffs' Motion for Injunctive Relief (Doc. 126) mocks the dispute resolution process the Court included in Article VIII of the Consent Decree. (*See id*., ¶¶ 96-99). Ignoring the existence of facts that support the Department's sense of urgency and its accomplishments since June 2025, the Plaintiffs' attorneys' have claimed an emergency exists, in a tortured and unsupported effort to bypass the Decree's rational dispute resolution process.

No effort was made by Plaintiffs to initiate the Dispute Resolution Process of the Decree, which applies "when: (i) a Party believes another Party has not complied with a provision of this Consent Decree;". (*Id*., ¶ 96). No Notice of Dispute was given by Plaintiffs to the Department so that clarifications could be made and misunderstandings cleared. Consequently, no mandatory "meet and confer in good faith to attempt to resolve the noticed issues" occurred. (*Id*. ¶ 96). Because of Plaintiffs' failure to initiate dispute resolution, no "Consultants-led mediation" occurred and no "Consultants' Decision" was rendered.

Plaintiffs' attorneys' disregard of this process violated the Consent Decree's explicit terms and stunts the parties' need, promoted in the Consent Decree, to work together to resolve miscommunications and misunderstandings, solve common problems, and accomplish common goals in a multi-year process. The Court should not reward Plaintiffs' conduct and should send this matter to the Parties to comply with the dispute resolution process.[1]

---

[1]    This dispute is grounded in a misconception that an initial August 12 working draft of the Competency Restoration Plan which the Department emailed to the Court Consultants was intended to be a final Plan. The Consultants commented on the Plan on August 21 and the Department promptly responded in detail to their comments on August 26. *See* attached Exhibit 3: email correspondence dated August 21 from the Consultants and August 26 from the Department referencing the meeting set for August 27 with the Consultants at which the Consultants and the Department could "continue our work toward the eventual completion of the [Competency Restoration Plan]." For some reason, the Court Consultants omitted references to the Department's August 26 detailed response a month later in their September 26, 2025, Report. In their Motion attacking the August 12 draft and claiming an emergency six and a half weeks later, Plaintiffs' ...[see next page]...

The dispute resolution process is <u>mandatory</u> except for "emergencies requiring immediate relief." (*Id*. ¶ 97). An "emergency requiring immediate relief" is not defined in the Consent Decree. Nowhere in the Court Consultants' September 26, 2025, Semi-Annual Report do they note the presence of an emergency requiring immediate relief. (*See* Doc. 125). Plaintiffs' Motion must be dismissed as a premature attempt to invoke judicial intervention in violation of the Consent Decree.

## II.     SUMMARY OF THE DEPARTMENTS' BEST EFFORTS AND ACHIEVEMENTS.

In their Motion (Doc. 126), Plaintiffs allege the Department failed to exercise "Best Efforts" under Paragraph 18 of the *Briggs* Consent Decree and thus "materially violated" its terms by not achieving full compliance within approximately ninety (90) days of entry. Plaintiffs' argument misstates both the governing legal standard and the factual record.

The Court Consultants, in the "Summary" of their September 26, 2025, Semi-Annual Report, note:

> Since the appointment of Retired Rear Admiral Slavonic as Interim Commissioner, the Department's focus on the Decree has become much more evident, and progress has been made as we note at multiple points in this Report. Our findings that Best Efforts have not yet been attained in several areas should not be construed as an opinion that hard work and good faith have been absent; in fact, we believe that ODMHSAS has shown evidence of both.

(Doc. 125 at p. 61).

The Consultants further expressed "trust that under current leadership major progress will be accelerated." (*Id.*). The Consultants' conclusions dispute and dispose of Plaintiffs' claim that

---

Counsel likewise failed to mention or even advise the Court of the Department's September 9 email apology to both the Court Consultants and Plaintiffs' Counsel.

the Department failed to act diligently or transparently.  The Consultants found compliance with the Decree in multiple areas.

In fact, since June 9, 2025, the Department has[2]:

1. Restructured its forensic operations to restore focus on restoration to competency treatment and on acute care;

2. Consolidated more than a dozen fragmented spreadsheets into the Treat-to-Competency Portal—a single, auditable database tracking every evaluation, admission, and discharge statewide; the Court Consultants have been trained on the use of the Portal, have individual credentials, and 24/7/365 access to the data on the Portal. *See* Exhibit 4.  The use and process of the Portal was also demonstrated to Class Counsel;

3. Developed a tiered triage policy to prioritize admissions by clinical urgency;

4. Developed a Qualified Forensic Evaluator Policy (QFE) to establish uniform credentialing and reporting standards;

5. Strengthened medical oversight by appointing Dr. Clayton L. Morris Chief Medical Officer, advancing continuity between hospital and forensic settings;

6. Created a "*Tiger Team*" for on-site reviews, system reform implementation, and staff training at the Oklahoma Forensic Center. *See* Exhibit 2;

7. Between June 30 and October 17, Commissioner Slavonic traveled across the State of Oklahoma to visit six (6) of the eleven (11) Department facilities;

---

[2]   Some of these measures are still subject to Court Consultant and Class Counsel input and approval.

8. The Department recently completed construction of a new wing at the Oklahoma Forensic Center ("OFC") in Vinita.  This will add 84 beds to the OFC's current 268 beds;

9. On August 11, 2025, the Department contracted to buy a hospital in Oklahoma City which had been previously used by SSM Health for inpatient behavioral health treatment. This purchase will potentially add 197 beds to the Department, allowing consumers to be moved from the Griffin facility. On October 13, 2025, the Department received notice from SSM Health leadership that the Vatican had approved the sale of the property to the Department. That purchase is currently in the closing process. The purchase process began in May 2025.  When the Commissioner learned the property might be available, he immediately engaged with the SSM leadership in an effort to acquire the SSM Health South campus.  *See* Exhibit 2;

10. Commissioner Slavonic restructured the Department's leadership team in a manner that dramatically improved the Department's leadership culture and morale;

11. Implemented standing weekly meetings/calls with the Court Consultants, where the Department presents data, tracks implementation milestones, and documents progress in real time—a process that transformed oversight into active, cooperative problem-solving.  *See* Exhibit 5;

12. Devoted a total of 10,011 working hours and $472,519.00 of payroll costs to Consent Decree compliance efforts between June 2025 through September 2025.   Exhibit 8;

Each reform evidences "reasonable, professional steps in good faith." (*See* Doc. 116, ¶ 18). These measures have replaced fragmentation with order, and rhetoric with results. These improvements reflect disciplined triage process development, evaluator expansion, and data

verification—achievements realized in less than five (5) months under new leadership. While challenges remain, the record now reflects a system of structure, transparency, and professional integrity. These reforms embody the "Best Efforts" required by Paragraph 18 of the *Briggs* Consent Decree: a standard measured not by perfection, but by diligence, accountability, and sustained progress.

The impacts of these changes are starting to show up in the data. As of October 22, 2025, the Forensic Center admission waitlist decreased from 170 individuals in early June to 139, representing an 18% reduction, and the average wait time has declined from 214 days to 79 days, a 63% reduction:

| Date[3] | Average Length of Time on the Waitlist (in days) | Date | Average Length of Time on the Waitlist (in days) |
|---|---|---|---|
| 06/04/2025 | 214 | 08/20/2025 | 169 |
| 06/11/2025 | 215 | 08/27/2025 | 99 |
| 06/18/2025 | 215 | 09/03/2025 | 100 |
| 06/25/2025 | 220 | 09/10/2025 | 95 |
| 07/09/2025 | 208 | 09/17/2025 | 118 |
| 07/16/2025 | 196 | 09/24/2025 | 117 |
| 07/23/2025 | 189.7 | 10/01/2025 | 114 |
| 07/30/2025 | 192.6 | 10/08/2025 | 93 |
| 08/06/2025 | 165 | 10/15/2025 | 81 |
| 08/13/2025 | 156 | 10/22/2025 | 79 |

*See* Exhibit 7, Chart 1.

## III.     PLAINTIFFS CANNOT MEET THE HIGH BURDEN FOR INJUNCTIVE RELIEF.

---

[3] The dates above correspond with the Department's virtual or in-person meetings with the Court Consultants. The average length of time as of those dates were communicated by the Department to the Court Consultants. The basic data reliability increases weekly, with the Department training of jail personnel and doublechecking commitment reports with Court records.

Injunctive relief is an extraordinary remedy, not a routine enforcement tool. It should be granted only upon a clear showing that the moving party is entitled to such relief. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To prevail, Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits; (2) a likelihood of irreparable harm absent relief; (3) that the balance of equities tips in their favor; and (4) that an injunction serves the public interest. *Prairie Band Potawatomi Nation v. Wagnon,* 476 F.3d 818, 822 (10th Cir. 2007).

As detailed in Section II, the Department has exercised sustained diligence, transparency, and good-faith reform in every area of implementation. Those same facts defeat any claim of imminent harm or likelihood of success on the merits. Plaintiffs' request for extraordinary relief rests not on new violations, but on dissatisfaction with the pace of progress—precisely the sort of "mechanical enforcement" that the Supreme Court rejected in *Horne v. Flores*, 557 U.S. 433, 447–50 (2009).

## A.    Plaintiffs <u>Cannot</u> Demonstrate a Substantial Likelihood of Success on the Merits.

To obtain an injunction, Plaintiffs must first show a substantial likelihood of prevailing on the underlying claim. That claim turns first on (i) whether the mandatory dispute resolution process was excused by an emergency requiring immediate relief, and, if so, (ii) whether the Department failed to use its "Best Efforts" under Paragraph 18. As discussed in Section IV below, that standard measures professional diligence and sustained engagement, <u>not</u> instantaneous perfection. *Frew v. Hawkins*, 540 U.S. 431, 439–42 (2004); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 391 (1992). Plaintiffs' theory of noncompliance redefines "effort" into a demand for immediate and flawless execution—an interpretation that conflicts with both the Decree's language and settled precedent.

In *Horne*, the Court held that equitable relief under a decree is not automatic and must consider current conditions and ongoing necessity for relief. *Horne,* 557 U.S. at 447-50. The Department is actively implementing reforms under the decree in consultation with Court Consultants and Plaintiffs' attorneys. While some issues occurred during the first three months of the Consent Decree's implementation, the Department has taken swift and effective action to remedy the majority of suggestions identified by Consultants. Many items cited in the most recent Consultant report had been completed by the Department prior to submission, demonstrating that the agency is actively using its best efforts to comply with the Consent Decree. These corrective actions demonstrate the agency's good-faith efforts and undercut any claim of ongoing or irreparable harm. Further injunctive orders directing day-to-day agency operations or imposing additional fines would intrude upon state management prerogatives and risk destabilizing ongoing progress.

**B.      Plaintiffs Have <u>Not</u> Demonstrated Imminent or Irreparable Harm.**

Plaintiffs bear the burden of proving that harm is both imminent and irreparable, and that ordinary decree enforcement mechanisms are inadequate. *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). Plaintiffs identify no such harm. The Consent Decree already provides a structured enforcement framework through written notice, Consultants-led mediation, and Court oversight. Those processes remain available and active, and there is no evidence that they are inadequate. Plaintiffs' attempt to bypass them through an "emergency" injunction is premature and procedurally improper.

Delay in seeking relief weakens any claim of emergency. Courts consistently deny "emergency" injunctions where plaintiffs waited weeks or months before filing. *See, e.g., GTE Corp.*, 731 F.2d at 678; *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256,

1260 (10th Cir. 2004) (holding that delay defeats a claim of irreparable harm). The conditions and operational issues Plaintiffs cite have existed for months while Plaintiffs continued to participate in regular monitoring and communication under the Decree. (Doc. 126, p. 2, stating a "scathing report" released in June 2025 but, Plaintiffs did not file their "emergency" Motion until October 13). The lack of emergency is further evidenced by Plaintiffs' request to reopen discovery and take depositions, all while delaying a hearing on this Motion for at least another 30 days. (Doc. 126, p.14). No emergency can exist after a delay of more than five months.

Plaintiffs' claims focus on disagreements about the pace of compliance, issues that the Decree's dispute resolution process already addresses. Plaintiffs also dispute data reporting even though objective measures show consistent improvement in patient outcomes. *See* Exhibit 7. These disagreements do not justify extraordinary injunctive relief. Plaintiffs' allegations of "unreliable data" challenge favorable results rather than demonstrate imminent harm. Relying on "speculative" data claims to justify fines or emergency measures would be both ineffective and counter-productive because monetary penalties neither improve data accuracy nor provide meaningful relief for Plaintiffs.

## C. The Balance of Equities and Public Interest Weigh Strongly Against Injunctive Relief.

Even if Plaintiffs could show some measure of harm, the balance of equities and public interest weigh heavily against further injunctive relief. Federal courts have repeatedly recognized that institutional reform decrees require flexibility and deference to state officials managing complex public systems. *Jackson v. Los Lunas Community Program*, 880 F.3d 1176, 1192 (10th Circuit); *Rufo,* 502 U.S. 367, 391 (1992); *Horne,* 557 U.S. 433, 448–50 (2009). As the Court

further noted in *Frew,* "the public interest is not served by injunctions that interfere with effective state administration once compliance mechanisms are in place." 540 U.S. 431, 442 (2004).

The Department has invested significant efforts in improving data accuracy, reducing wait times, and strengthening clinical operations. Additional injunctions or fines would not accelerate compliance; they would penalize ongoing cooperation and undermine the approved framework central to the Decree's success. The public interest is best served by allowing the Decree's existing processes to function as intended. Granting duplicative or expanded relief would create confusion, conflict with existing provisions within the Decree, and divert limited public resources away from treatment and systemic reform. Federal precedent is clear: durable, lasting compliance is achieved through cooperation and structured oversight, not through constant judicial intervention.

## IV. PLAINTIFFS' REQUEST TO REOPEN DISCOVERY IS NOT AUTHORIZED UNDER THE FEDERAL RULES OF CIVIL PROCEDURE, IS MERITLESS, AND UNWARRANTED.

In their Motion (Doc. 126), Plaintiffs move to reopen discovery "to effectuate the Consultants recommendations for injunctive relief, and to address the present emergency created by Defendants' ...failures to comply with the Consent Decree." (Doc. 126, p.3). Specifically, Plaintiffs request deposition discovery on three (3) topics related the August 12, 2025, Strategic Plan:

1. "the basis for multiple false statements and inaccuracies therein"

2. "the root causes of the Department's data reporting problems" and

3. "the circumstances that led to Defendants' failures to comply with the consent decree."

(*Id*.) In its October 14, 2025, Minute Order, the Court ordered Defendants to address Plaintiffs' request to reopen discovery in their response to Plaintiffs' motion. (Doc. 128). Defendants object

to Plaintiffs' request to reopen discovery as it is not authorized by the Federal Rules of Civil Procedure and lacks merit.

"[D]iscovery, like all matters of procedure, has ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (quoting *Hickman,* 329 U.S. at 507). The scope and limits of discovery are defined by Rule 26(b)(1):

> *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: **Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense** and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

(emphasis added). Here, Plaintiffs state the purpose of the requested deposition discovery is to "effectuate" the injunctive relief proposed by the Court Consultants and "address" a present emergency, conspicuously not for any claim or defense.

The Supreme Court in *Oppenheimer Fund* addressed a similar issue in which a party sought discovery unrelated to the issues in the case. *See Oppenheimer Fund*, 437 U.S. 340 (1978). There, respondents brought a class action under Federal Rule of Civil Procedure 23(b)(3) against an investment fund and other related entities and requested petitioners assist them in compiling a list of class members from records kept by the fund's transfer agent to effectuate individual notice required by FED. R. CIV. P. 23(c)(2). *Id.* at 344-345. The estimated cost of compiling the list was over $16,000. *Id.* at 342. In denying respondent's motion to redefine the class, the district court held petitioners responsible for the cost of compiling the class list. *Id.* at 346.

On appeal, the U.S Court of Appeals for the Second Circuit, sitting *en banc*, affirmed the district court's decision and held that Federal Rule of Civil Procedure 26 authorized the district's

court order. *Id.* at 347-48. This decision brought the Second Circuit into conflict with the Fifth Circuit, which had earlier held that Rule 23, rather than the federal civil discovery rules, controlled. The *Oppenheimer Fund* Court granted *certiori* to resolve the conflict. *Id.* at 348.

The Court held that Rule 23(d), and not the discovery rules, is the source of authority for an order such as the one entered by the district court. *Id.* at 350. The *Oppenheimer Fund* Court noted the following:

> Although respondents' request resembles discovery in that it seeks to obtain information, we are convinced that it is more properly handled under Rule 23(d). **The critical point is that information is sought to facilitate the sending of notice rather than define or clarify the issues in the case.**

*Id.* (emphasis added). In analyzing Rule 26, the Court found Respondent's attempts to obtain class members' names and addresses "cannot be forced into the conception of 'relevancy'", and that respondents "do not seek this information for any bearing that it might have on the issues in the case." *Id.* at 352 (internal citation omitted). "Taking [respondents] at their word, it would appear that respondents' request is not within the scope of Rule 26(b)(1)." *Id.* at 353.

Here, Plaintiffs admit the purpose of their requested deposition discovery is to "effectuate" the injunctive relief proposed by the Court Consultants and to "address" a present emergency "caused by Defendants." (Doc. 126, p. 3). Taking Plaintiffs at their word, this information has no bearing on any issues in the case and does not fall within the scope of Rule 26(b)(1). Indeed, with the entry of a final judgment in the Consent Decree, there are no issues remaining in this case. (Doc. 116, ¶ 117) ("…[T]he Court hereby enters this Consent Decree as a final judgment under Federal Rules of Civil Procedure 54 and 58.").

Plaintiffs provide no authority permitting discovery after the entry of a final judgment. (S*ee, generally, Doc.* 126). With the exception of Rule 69(a), authorizing judgment creditors to

conduct discovery after the closure of a case, Defendants have not located any authority allowing post-judgment discovery within the Federal Rules of Civil Procedure. Should this Court determine that the authority falls within the consent decree itself, Plaintiffs' request to reopen discovery is nonsensical, meritless, and unwarranted.

The Court Consultants' September 2025 Report spans six (6) pages of recommended injunctive relief encompassing nine (9) programmatic areas and thirty-seven (37) distinct measures. (Doc. 125, pp. 115–120). It is implausible—indeed, bordering on frivolous—to claim that depositions of Department representatives could "effectuate" those recommendations. The Consultants' proposals require budgetary planning, staffing expansion, policy drafting, and intergovernmental coordination, not sworn testimony. Plaintiffs' discovery demand substitutes spectacle for substance and litigation for governance.

## V. DEFENDANTS HAVE EXERCISED BEST EFFORTS, DEMONSTRATED DURABLE COMPLIANCE, AND HAVE <u>NOT</u> COMMITTED MATERIAL VIOLATIONS.

The Consent Decree requires the Department use its "Best Efforts" to effectuate the Decree's purposes. (Doc. 116, ¶ 18). The Consent Decree defines "Best Efforts" as "taking reasonable steps, actions and measures, consistent with best professional standards, practices, and guidelines to accomplish or bring about an intended or described result." (Doc. 116, ¶ 18). By its plain text, this standard evokes diligence and professionalism, not perfection or speed. It also strongly implies that the Department's "Best Efforts" in pursuing the goals of the Consent Decree are to be measured against the Department's current capabilities.

Federal precedent confirms this interpretation. In *Frew*, the Supreme Court emphasized that the enforcement of institutional decrees must "encourage reasonable compliance consistent with the decree's purpose," and that oversight must end once the decree's objectives have been

met. 540 U.S. 431, 439–42 (2004). Likewise, *Rufo* instructs courts to apply such decrees "with flexibility and realism," giving "significant weight to the views of government officials" responsible for implementation. 502 U.S. 367, 391–92 & n.14 (1992). *Horne* reiterates that compliance must be assessed in light of current conditions, not past deficiencies, and that federal oversight must not "improperly deprive state and local officials of control over systems that are their responsibility." 557 U.S. 433, 447–50 (2009).

Together, these cases establish that the relevant inquiry is not whether the Department achieved flawless or instantaneous results, but whether it acted reasonably, professionally, and in good faith toward achieving the Decree's objectives. Recent precedent reinforces this principle. In *Shakman v. Pritzker*, the court held that a state defendant satisfied a long-standing decree where the last significant violations were years past and remedial systems were firmly in place. 43 F.4th 723, 728–32 (7th Cir. 2022). The court emphasized that federal courts are "not indefinite institutional monitors" and must respect the federalism and accountability concerns underlying state-led reform. *Id.* at 732. Those same principles apply here: this Court must assess the Department's present performance amid current conditions, not the glaring deficiencies of the former administration in the early months following entry of the Decree.

A.     **The Record Demonstrates Sustained, Transparent Compliance.**

Since June 9, 2025, the Department has implemented a disciplined, data-driven framework demonstrating continuous compliance with the requirements of the Consent Decree. Each reform reflects "reasonable, professional steps in good faith."

In furtherance of its obligations, the Department established a multidisciplinary *Tiger Team* to identify operational barriers and implement corrective measures across legal, clinical, and data systems. Supported by cross-divisional leadership, the *Tiger Team* serves as both a corrective body

and a training arm, advancing systemwide reform at the Oklahoma Forensic Center. Over the past 100 days, the *Tiger Team* has coordinated policy development, staffing reviews, and performance monitoring, while maintaining a biweekly on-site presence at OFC to provide training and mentorship. *See* Exhibit 2.

The Department has also demonstrated a responsive and respectful approach with the Court Consultants and Class Counsel. Beyond the required monthly reports, the Department holds weekly meetings with the Consultants to provide updates on all matters required by the Decree, including triage processes, staffing improvements, and detailed admission waitlist metrics—such as the number of individuals currently waiting, the average length of time on the waitlist, and the median wait time. *See* Exhibit 6.

The Department has taken concrete steps to comply with each provision of the Consent Decree that Class Counsel claims require Court intervention. Attached as Exhibit 2 is a chart identifying each area of noncompliance listed in the Court Consultants' September 2025 Status Report and the Department's corresponding action demonstrating compliance with the Decree.

**B.     No Willful Disregard or Material Violation Exists.**

The Decree defines a "Material Violation" as "any failure to use Best Efforts to adhere to any plans or methods implemented by the Department …," while expressly excluding "isolated, non-substantive, or immaterial deviations" where internal monitoring and corrective mechanisms exist. (Doc. 116, ¶ 28). The Department has institutionalized Best Efforts. Continuous compliance structures, rapid-correction protocols, and direct Consultant access to the Treat-to-Competency Portal exemplify the very mechanisms for assuring compliance, transparency and corrective measures the Decree contemplates and requires.

Inexplicably, the Court Consultants' September 26, 2025, Report references the Department's August 12 draft plan but makes *no mention* of the Department's prompt, detailed written responses – to the Consultants' August 21 letter – submitted on August 26, 2025. *See* Exhibit 3, Aug. 26, 2025, Letter to Consultants. Those responses addressed every substantive concern raised in the Consultants' August 21 letter. *Id.* The omission of the Department's honest, prompt and transparent acknowledgement of errors made in its August 12 report and corresponding apology from the September Report is not evidence of departmental neglect but of an incomplete record. This omission underscores that Plaintiffs' reliance on the September Report rests on outdated information and fails to account for the Department's confirmed good-faith engagement.

Plaintiffs rely heavily on the September 26, 2025, Court Consultants' Report to construct a narrative alleging that the Department has not met the "Best Efforts" standard by missing multiple deadlines. Indeed, the Report itself evaluates Best Efforts almost exclusively through the lens of deadline compliance—an approach that conflicts with both the Decree's language and federal precedent. (Doc. 125, p. 20). The Consultants defined "reasonable steps, actions, and measures, consistent with best professional standards, practices, and guidelines" as the Department's ability to "create and implement workplans to meet deadlines," "meet deadlines imposed by the Decree," and "make significant progress toward meeting Decree-imposed deadlines." *Id.*

The purposes and intent of the Consent Decree are multifold, but none require the Department to prove its capability to meet every interim deadline. (Doc. 116, ¶ 14). The Decree's ultimate purpose is to promote public safety through durable, systemic reform—not to enforce a rigid calendar. *Id.* Nothing in the Decree demands the Department achieve "Best Efforts" in ninety (90) days, six (6) months, or even one (1) year. Indeed, the Decree itself establishes a tiered

implementation schedule spanning from thirty (30) days to sixteen (16) months. (Doc. 116, ¶¶ 54–80, 86).

To grant Plaintiffs' Motion at this early stage would subvert that structure and impose an unattainable goal—instantaneous perfection rather than progressive compliance. It would also, in effect, amend the Decree without the Department's consent by imposing a far stricter definition of "Best Efforts" than the one negotiated and approved, as discussed in Section C below.

As *Horne v. Flores*, 557 U.S. 433 (2009), and *Shakman v. Pritzker*, 43 F.4th 723 (7th Cir. 2022), make clear, decrees must be enforced in light of present conditions, practical realities, and demonstrated reform, not mechanical adherence to timelines. One such reality is that the new leadership of the Department inherited a fractured data environment while the underlying problem, the number of individuals entering the competency system, continued. The Department's first task was to retrieve, reconcile, and centralize this information into a single, verifiable reporting system capable of meeting the Decree's standards for accuracy and transparency. That centralization process, undertaken amid a rising caseload and limited resources, necessarily required time to produce reliable, consistent, and replicable metrics.

This foundational work did not occur in isolation. The same operational realities that complicated data reconstruction also shaped every aspect of implementation. Persistent statewide workforce shortages, particularly among forensic evaluators, psychiatrists, and nursing staff, required immediate recruitment initiatives, expanded training programs, and hiring efforts to build capacity. The Consultants further recognize the Department's "need for additional Departmental staffing and resources, as we believe those are critical to the Department's success in attaining compliance with the Consent Decree." (Doc. 125, p. 61). The Consent Decree requires the Department to evaluate all Class Members within thirty (30) days and to re-evaluate Class

Members every ninety (90) days. While the Department is committed to meeting these time frames, the reality of a statewide shortage of qualified forensic mental health providers has posed challenges. Dr. Neil Gowensmith, in his Declaration to the Court, acknowledged Oklahoma faces a significant shortage of forensic examiners. (Doc. 48-5, ¶¶ 6, 24).

The Department developed the Treat-to-Competency Portal, a statewide data integration system connecting court information, facilities, and evaluators. Its creation required interagency coordination, technical design, security compliance, and comprehensive staff training. These interdependent reforms were not delays but deliberate, front-loaded investments necessary to ensure the long-term durability, accuracy, and transparency that the Consent Decree requires. *See* Exhibit 4.

In addition, each required deliverable—including the Strategic Plan, Triage Protocol, Qualified Forensic Evaluator Standards, and related implementation materials— required, and continues to require, multiple rounds of drafting, review, and revision with both the Court Consultants and Class Counsel before finalization. This iterative process is built into the structure of the Consent Decree to ensure accuracy, transparency, and shared accountability among all parties.

The data reinforces ODMHSAS's use of "Best Efforts:"

a. **Average Length of Time on the Waitlist[4]**

[see the table on p. 7 above]

*See* Exhibit 7, graph 3.

b. **Waitlist Population and Initial Evaluations**

| Date | Waitlist Population | # of Individuals found | Date | Waitlist Population | # of Individuals found |
|------|---------------------|------------------------|------|---------------------|------------------------|

---

[4] The dates above correspond with the Department's virtual or in-person meetings with the Court Consultants. The average length of time as of those dates were communicated by the Department to the Court Consultants.

| | | Incompetent (Initial Evaluations) | | | Incompetent (Initial Evaluations) |
|---|---|---|---|---|---|
| 06/04/2025 | 170 | 7 | 08/20/2025 | 164 | 13 |
| 06/11/2025 | 165 | 9 | 08/27/2025 | 164 | 17 |
| 06/18/2025 | 157 | 6 | 09/03/2025 | 165 | 10 |
| 06/25/2025 | 155 | 5 | 09/10/2025 | 171 | 13 |
| 07/09/2025 | 153 | 5 | 09/17/2025 | 161 | 8 |
| 07/16/2025 | 146 | 12 | 09/24/2025 | 164 | 10 |
| 07/23/2025 | 136 | 20 | 10/01/2025 | 170 | 4 |
| 07/30/2025 | 139 | 18 | 10/08/2025 | 146 | 9 |
| 08/06/2025 | 141 | 12 | 10/15/2025 | 146 | 7 |
| 08/13/2025 | 146 | 26 | 10/22/2025 | 139 | 2 |

*See* Exhibit 7, graph 1.

### c. Initial Evaluations Completed by Month (2025)

| Month | Initial Evaluation Orders Received | Initial Evaluations Completed | Average Number of Evaluations Pending over 30 Days |
|---|---|---|---|
| June | 56 | 70 | 66 |
| July | 56 | 122 | 32 |
| August | 39 | 83 | 44 |
| September | 49 | 67 | 55 |
| October | 33 | 43 | 32 |

*See* Exhibit 7, graph 2.

In fact, the Consultants' Report recognizes the Department's ability to make progress despite the many challenges it faces, stating the Department is "…taking steps to improve forensic services and treatment efficiency, particularly at OFC. This appears to have resulted in an overall reduction in time spent waiting for restoration treatment." (Doc. 125, p. 16). The reduction in wait time for restoration treatment is at the center of Plaintiffs' lawsuit. (Doc. 116, ¶ 4). The Consultants also agree that while compliance is not complete, the Department is using good faith efforts to adhere to the Consent Decree. (*See* p. 20, stating, "…while ODMHSAS is acting in good faith in our view, there is a long way to go before it can be said that ODMHSAS is using Best Efforts in every area needed to comply with the Decree.") The fact that the Department has been able to

make this much progress, while practical realities continue to hinder full compliance, is evidence of the Department's use of Best Efforts.

**C. Plaintiffs and the Consultants Attempt to Rewrite the Consent Decree Without Authority or Process.**

The Consultants' September 2025 Status Report and Plaintiffs' Motion for Injunctive Relief rest on a newly minted definition of "Best Efforts," one that equates compliance with the mechanical completion of interim deadlines rather than the good-faith, professional diligence the Decree actually requires. That interpretation substantively alters the obligations the parties negotiated, and the Court approved.

Federal law provides a single, structured mechanism for changing a consent decree: Rule 60(b)(5) of the Federal Rules of Civil Procedure. A decree may be modified only if "a significant change in factual conditions or law" makes continued application inequitable. *Rufo*, 502 U.S. 367, 383–84 (1992). In *Horne*, the Supreme Court reaffirmed that institutional decrees must remain flexible but cautioned that modification must occur through proper judicial channels, not unilateral redefinition. 557 U.S. 433, 447–50 (2009). Likewise, the Tenth Circuit in *Jackson v. Los Lunas Community Program*, held that courts may adjust or dissolve decrees only upon a showing of durable compliance or changed conditions. 880 F.3d 1176, 1199 (10th Cir. 2018).

Neither Plaintiffs nor the Consultants have invoked Rule 60(b)(5), demonstrated changed circumstances, or sought judicial approval for any amendment to Paragraph 18. Yet their new construction of "Best Efforts" functions as a substantive modification: it replaces a qualitative diligence standard with a quantitative deadline metric that the Decree itself never adopted.

Plaintiffs seek to amend the consent decree further by requesting the Court order the Department to designate a single individual to (1) oversee the Department's compliance with the

Consent Decree and (2) administering the Department's competency evaluation and restorative services. (Doc. 126, p. 4). Not only does the Department object on the grounds that the job is too large for any one person, but that Plaintiffs' request runs afoul of federalism. "In institutional reform litigation, the constitutional violation provides the authority for a court-imposed remedy which displaces local control." *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1021 (10th Cir. 1996). "Federal courts simply may not force local governments, 'over their objections, to undertake a course of conduct not tailored to curing a constitutional violation.'" *Id.* (internal citation omitted). One individual trying to oversee compliance with the Consent Decree and administer competency services would be more likely to cause a constitutional violation rather than cure it.

## CONCLUSION

Although Plaintiffs' Motion attempts to paint the Department as disobedient and incompetent, the actions of the Department, as articulated in this Response and supported by the evidence, prove that it continues to apply its "Best Efforts" toward compliance with the Consent Decree and the ultimate goal of enhancing public safety. Furthermore, Plaintiffs' Motion relies solely on the Court Consultants' September 2025 Status Report, and while it is not insignificant, the Department has actual evidence and proof of action taken, hours worked, and results achieved.

The so-called "Material Violation" Plaintiffs allege has led to a reduction on the waitlist, more competency evaluations being completed in a timely manner, and the beginning of the reformation of an entire statewide system. That progress alone confirms the Department's lack of "Material Violation" and use of "Best Efforts." And while there have been missed deadlines, strict adherence to a rigid schedule is explicitly not the definition of "Best Efforts."

Plaintiffs violated the Decree by failing to comply with the mandatory dispute resolution process. There is no emergency. The experts – the Court Consultants – make no reference to an emergency in their report.

In addition, the Plaintiffs cannot meet the burden needed for an injunction, provide no evidence of an emergency, and cite no authority that would allow for reopening discovery. The Court should, therefore, deny Plaintiffs' Motion for Injunctive Relief and Request for Expedited Consideration in its entirety.

Respectfully Submitted,

*/s/ John M. O'Connor*
John M. O'Connor, OBA No. 6741
JOHN M. O'CONNOR, PLLC
15 West 6th Street, Suite 2505
Tulsa, OK 74119
(918) 584-8445 – telephone
john@johnmoconnorlaw.com

*/s/ John M. Settle*
John M. Settle, OBA No. 8086
General Counsel
Keith Brecheen, OBA No. 33127
Assistant General Counsel
Oklahoma Department of Mental Health
and Substance Abuse Services
2000 N. Classen Blvd., Bldg. 600 E
Oklahoma City, OK 73106
(405) 248-9250
john.settle@odmhsas.org
keith.brecheen@odmhsas.org

**Counsel for Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of October, 2025, I electronically transmitted the foregoing document to the Clerk of the Court using the CM/ECF system. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the applicable ECF registrants.

*s/ John M. Settle*
John M. Settle