IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA

LESLIE BRIGGS, as next friend of
T.W. and B.S.,
EVAN WATSON, as next friend of C.R.,
and
HENRY A. MEYER, III, as next friend
of A.M., for themselves and for others
similarly situated,

        Plaintiffs,

vs.

GREGORY SLAVONIC, in his official
Capacity as Interim Commissioner of the
Oklahoma Department of Mental Health
and Substance Abuse Services, and
HOLLY WEBB, in her official capacity
as Executive Director of the Oklahoma
Forensic Center,

        Defendants.

Case No. 23-cv-00081-GKF-JFJ

## ORDER

This matter comes before the court on the Motion for Injunctive Relief [Doc. 126] of plaintiffs Leslie Briggs, as next friend of T.W. and B.S.; Evan Watson, as next friend of C.R.; and Henry A. Meyer, III, as next friend of A.M., for themselves and for others similarly situated. For the reasons set forth below, the motion is respectfully denied.

### Background and Procedural History

This case relates to Oklahoma's competency restoration system. On March 1, 2023, plaintiffs filed a Complaint alleging that, due to a lack of forensic beds, persons who are declared incompetent in Oklahoma state court criminal proceedings were forced to wait prolonged periods of time to receive court-ordered competency restoration treatment and, during the waiting period, the persons received little to no mental health treatment. Plaintiffs asserted a claim for violation

of Due Process rights secured by the Fourteenth Amendment to the U.S. Constitution, among others, and brought the case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

In 2024, after months of efforts, the parties, including then-Commissioner Allie Friesen, reached a negotiated settlement. On joint motion of the parties, on March 10, 2025, the court granted the Motion for Final Approval and Entry of Consent Decree, appointed Class Counsel, and certified the following Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2):

> All persons who are now, or will be in the future, charged with a crime in Oklahoma State court and are: (i) declared incompetent to stand trial by the state court; (ii) court-ordered to receive competency restoration services by the Department or its designees; (iii) incarcerated in a county jail or similar detention facility while their criminal cases are stayed; and (iv) awaiting court-ordered competency restoration services to be provided by the Department or its designees, whether or not placed on a competency waitlist maintained by the Department or its designees.

[Doc. 115]. Contemporaneously therewith, the court entered the Consent Decree in this matter, designed to, among other things, "ensure implementation, monitoring, enforcement and, when necessary, modification of [a strategic] Plan to improve the Department's delivery of competency evaluations and timely Restoration Treatment." [Doc. 116, p. 7, ¶ 14].

To provide a mechanism of monitoring, enforcing, and reporting compliance with the Consent Decree, the court appointed Neil Gowensmith, Ph.D.; John Petrila, J.D.; and Dr. Darren Lish, Ph.D. as "Consultants" to:

> (i) investigate, monitor, and make findings with respect to Defendants' compliance with the terms of this Consent Decree; (ii) report the status of Defendants' compliance or progress (or lack thereof) to the Court and the Parties; (iii) advise, recommend, and facilitate methods to the Department regarding plans and practices for improving the delivery of competency evaluations and Restoration Treatment to Class Members, including addressing the short-term and long-term compliance with the Restoration Treatment timeframes set out herein; and (iv) serve as mediators for disputes between the Parties regarding any aspect of this Consent Decree as set out in the Dispute Resolution Process in Section VIII below.

[*Id.* at p. 15, ¶ 38].

The Consent Decree provided a ninety-day period for defendants, "in consultation with the Consultants and Class Counsel" to "develop and begin to implement the Plan" and required that defendants use "Best Efforts" to do so. [*Id.* at p. 21, ¶ 54]. The Decree defines "Best Efforts" as "taking reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines to accomplish or bring about the intended and described result." [*Id.* at p. 8, ¶ 18].

The Decree also includes a dispute resolution process applicable where, among other things, a party believes that another party has not complied with a provision of the Consent Decree, or a party disagrees or objects to the Consultants' findings, recommendations, approval or disapproval of any Plan component. [*Id.* at pp. 37-38, ¶ 96]. The enumerated process requires written notice, a meet and confer, a Consultants-led mediation, and a resulting Consultants' Decision, as well as judicial review on the Consultants' Decision. [*Id.*]. The Decree also states, "except for emergencies requiring immediate relief, no Party may seek relief for any dispute related to, or alleged non-compliance with, the terms of this Consent Decree without first obtaining a Consultants' Decision through the Dispute Resolution Process," and "[n]otwithstanding anything to the contrary herein, any Party may file a motion with the Court seeking emergency relief to address emergencies requiring immediate relief." [*Id.* at pp. 38-39, ¶¶ 97, 99]. Finally, pursuant to the Decree, "[i]f the Court finds that Defendants have committed a Material Violation of this Consent Decree, the Court may order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate to address the Material Violations." [*Id.* at p. 39, ¶ 100]. "Material Violation" means "any failure to use Best Efforts to adhere to any

3

plans or methods implemented by the Department so as to comply with the terms of this Consent Decree." [*Id.* at p. 11, ¶ 28].

On May 29, 2025, the Oklahoma Legislature removed Allie Friesen as the Department's Commissioner and, on June 3, 2025, Oklahoma Governor Kevin Stitt appointed retired Rear Admiral Gregory Slavonic as the Department's Interim Commissioner.[1] Likewise, Holly Webb was appointed as Interim Executive Director of the Oklahoma Forensic Center. Consequently, Interim Commissioner Slavonic and Ms. Webb were automatically substituted as parties in this action pursuant to Federal Rule of Civil Procedure 25(d). [Doc. 117; Doc. 118].

On June 13, 2025, the Consultants issued an Interim Report concluding that, progress in implementing "specific provisions of the Decree has been halting to date," highlighting certain positive factors within the Department including Interim Commissioner Slavonic's appointment, and providing three priority recommendations to accelerate the Department's progress. [Doc. 119, pp. 11-13].

On August 12, 2025, the Department submitted certain written materials to the Consultant, including a cover letter and a document titled, "Competency Restoration Plan." *See* [Doc. 124, pp. 3, 15, 28-32].

On August 21, 2025, the Consultants provided an initial response to the Plan. *See* [*Id.* at pp. 79-85]. Therein, the Consultants sought "specific clarification or correction" with respect to several individual areas, including the data provided, the competency restoration in-jail pilot program, and the staffing and training enhancements. [*Id.* at pp. 81-83]. Further, the response included additional requests for documents, not specific to the Plan, but which the Plan prompted.

---

[1] The court takes judicial notice of former Commissioner Friesen's removal, as well as Interim Commissioner Slavonic's appointment. *See Preston v. Edmondson*, 263 F. Supp. 370, 372 (N.D. Okla. 1967).

[*Id.* at p. 84]. Although the Consultants noted the existence of "important areas for clarification" and "important areas for correction," the Consultants stated that, for purposes of the next Report, they would be "using the August 12th submission as the point of reference." [*Id.* at p. 79].

In correspondence of August 26, 2025, the Department provided comments in response to the Consultants' individual areas for clarification or correction. [*Id.* at pp. 92-97].

On September 26, 2025, the Consultants issued the September 2025 Status Report. [Doc. 124]. The Report first identified positive factors within the Department, including: (1) leadership and staffing improvements, (2) enhanced forensic services and treatment culture; and (3) improved data systems and infrastructure. [*Id.* at pp. 16-17]. After defining "reasonable steps, actions and measures, consistent with best professional standards, practices and guidelines" for purposes of the "Best Efforts" requirement, the Consultants discussed the Department's adherence to specific provisions of the Decree, including whether the Department had utilized "Best Efforts." [*Id.* at pp. 18-56]. The Consultants specifically considered the Department's compliance with respect to the following Decree provisions and requirements:

(1) The Waitlist—that is, the Current Number of Class Members Waiting for Restoration Services and Their Average Number of Days Waiting (Report § E.1);

(2) Development and Implementation of the Strategic Plan (Decree ¶¶ 54-56, Report § E.3);

(3) Reevaluation of Class Members Within First 90 Days of the Decree (Decree ¶ 57, Report § E.2);

(4) Development and Implementation of Plan to Achieve Material Increase in New Inpatient Forensic Beds Dedicated Solely to Competency Restoration (Decree ¶ 62, Report § E.4);

(5) Forensic In-Patient Facilities and Staffing Plan (Decree ¶ 63, Report § E.15);

    (6) Continuing Education Requirements for OFC Psychiatrists, Psychologists, and Other Clinical Staff (Decree ¶ 64, Report § E.7);

    (7) Competency Restoration Triage Process (Decree ¶¶ 65-66, Report § E.6);

    (8) Submission for Initial Evaluations Within 30 Days of Receipt of Order (Decree ¶ 67, Report § E.10);

    (9) Reevaluation of all Class Members Every 90 Days After Receipt of Order (Decree ¶ 67, Report, § E.13);

    (10) Contingent Community-Based Restoration Treatment Pilot Program (Decree ¶¶ 68-72, Report § E.14);

    (11) In-Jail Competency Restoration Pilot Program (Decree ¶¶ 74-76, Report § E.9);

    (12) Additional Department Staffing Requirements (Decree ¶ 77, Report § E.5);

    (13) Increased Training to Relevant State Personnel (Decree ¶¶ 78-81, Report § E.8);

    (14) Status Reports (Decree ¶¶ 82-84, Report § E.11); and

    (15) Qualified Forensic Examiners (Decree ¶ 31, Report § E.12).

[*Id.* at pp. 21-56]. Of the fifteen enumerated requirements, the Consultants concluded that five were "still outstanding" or "not met," six were "partially met," and one was met. Additionally, the Consultants designated one category as "unknown because of a lack of information from [the Department]" and one as "not clear." [*Id.* at pp. 45, 50]. One requirement was not applicable until the beginning of the next legislative session. [*Id.* at p. 52].

    The Consultants provided three "priority recommendations" to "accelerate progress from [the Department], as well as to ultimately alleviate the suffering of individuals with acute psychosis who remain in county jails while they wait for competency restoration services": (1) appoint an individual with responsibility and authority to exclusively oversee implementation of the Decree[2];

---

[2] This recommendation appears to be reasonable given the interim nature of Admiral Slavonic's appointment and that of his General Counsel, Mr. John Settle.

(2) reduce the restoration length of stay (LOS) at OFC; and (3) increase bed capacity across the state. [*Id.* at pp. 57-59]. Additionally, for those categories as "outstanding," "not met," or "unknown," the Consultants provided recommendations for additional relief pursuant to the court's authority under the Decree to "order immediate injunctive relief, impose liquidated damages, attorney's fees, or fashion any other relief deemed appropriate." [*Id.* at pp. 115-22].

Seventeen days later, on October 13, 2025, plaintiffs filed the Motion for Injunctive Relief. [Doc. 126]. Therein, plaintiffs request that the court:

- hold an expedited evidentiary hearing;

- before the hearing, reopen discovery to permit Class Counsel to "depose Defendants and other Department representatives with respect to the Department's August 12 'Strategic Plan' to discover the basis for the multiple false statements and inaccuracies therein, the root causes of the Department's data-reporting problems, and the circumstances that led to defendants' failures to comply with the Consent Decree";

- impose a fine of $10,000 per day for every day after entry of the court's Order on the motion for which the Department has not developed and begun to implement a Consultants-approved Plan;

- order defendants to designate a single representative with appropriate qualifications and forensic experience to be solely responsible for overseeing defendants' compliance with the Consent Decree and administering the Department's competency evaluation and restoration services; and

- order defendants to implement the remainder of the injunctive relief recommended by the Consultants in their September 2025 Status Report.

[Doc. 126, pp. 3-4]. Defendants responded in opposition. [Doc. 133]. Likewise, Attorney General Gentner Drummond, in his *ex officio* status, responded to request that the motion be stayed pending the outcome of the Dispute Resolution process enumerated in the Consent Decree. [Doc. 132]. Plaintiffs filed a reply in support of the motion. [Doc. 138].

7

**Request to Reopen Discovery Analysis**

The court first considers plaintiffs' request to reopen discovery. Plaintiffs cite no binding case law permitting post-judgment discovery in this context. Nor is post-judgment discovery explicitly contemplated by the Consent Decree. For this reason alone, plaintiffs' request is denied.

Nor does the requested relief appear warranted. Although other courts have permitted post-judgment discovery to "*establish* noncompliance with one of its judgments," *Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008) (emphasis added), plaintiffs do not seek to depose Department officials to determine whether or not a Material Violation has occurred. Rather, plaintiffs rely on the Consultants' September 2025 Status Report to establish the existence of a Material Violation. *See* [Doc. 126, pp. 9-10]. Instead, plaintiffs seek to depose Department officials regarding the circumstances surrounding and, "root causes" of, certain violations. But, pursuant to the Consent Decree, the court need only find that defendants have committed a Material Violation to impose immediate injunctive relief—not why that violation occurred.

Insofar as plaintiffs contend that discovery is necessary to "address the present emergency created by Defendants' persistent and pervasive failures to comply with the Consent Decree," [*Id.* at p. 3], the court is not persuaded that court-sanctioned discovery, with its concomitant procedural rules, is required. Rather, the Consent Decree authorizes the Consultants to "investigate" and "make findings regarding the Department's efforts to attain compliance with" the Consent Decree, including whether the Department has utilized "Best Efforts" to implement the Plan. [Doc. 116, p. 17]. To that end, defendants are required to use "Best Efforts to grant the Consultants reasonable access to all Department records, data, personnel, contractors, designees and competency restoration facilities necessary to perform the Consultants' duties under th[e] Consent Decree." [*Id.* at pp. 18]. Thus, insofar as it is necessary to determine the circumstances surrounding, and

root causes of, any Material Violations, the Consent Decree provides a mechanism for the Consultants to conduct such an investigation and court-sanctioned discovery is unnecessary. For this additional reason, plaintiffs' request to reopen discovery is denied.

### Request for Injunctive Relief Analysis

"A consent decree or order is to be construed for enforcement purposes basically as a contract." *United States v. N. Colo. Water Conservancy Dist.*, 608 F.2d 422, 430 (10th Cir. 1979). Thus, the court must consider traditional principles of contract interpretation. *See Joseph A. ex rel. Corrine Wolfe v. Ingram,* 275 F.3d 1253, 1266 (10th Cir. 2002).

"Under Oklahoma contract law, '[i]f the terms of a contract are unambiguous, clear and consistent, they are accepted in their plain and ordinary sense and the contract will be enforced to carry out the intention of the parties as it existed at the time it was negotiated.'" *Brent Elec. Co., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 584*, 110 F.4th 1196, 1215 (10th Cir. 2024) (quoting *Whitehorse v. Johnson*, 156 P.3d 41, 47 (Okla. 2007)). "Unless some technical term is used in a manner meant to convey a specific technical concept, language in a contract is given its plain and ordinary meaning." *Brent Elec. Co., Inc.*, 110 F.4th at 1215 (quoting *K&K Food Servs., Inc. v. S&H, Inc.,* 3 P.3d 705, 708 (Okla. 2000)).

Here, the Consent Decree permits a party to seek injunctive relief without engaging in the Dispute Resolution Process only in instances of "emergencies requiring immediate relief." [Doc. 116, pp. 38-39]. The Consent Decree does not define "emergencies requiring immediate relief." Accordingly, the court gives the phrase its "plain and ordinary meaning." *Brent Elec. Co., Inc.*, 110 F.4th at 1215. In a variety of contexts, courts have looked to Webster's Dictionary to define "emergency" as an "unforeseen combination of circumstances or the resulting state that calls for immediate action" or "a pressing need." *Sowell's Est. v. Comm'r of Internal Revenue*, 708 F.2d

1564, 1567 (10th Cir. 1983); *Int'l Bhd. of Teamsters v. Loc. Union No. 810,* 19 F.3d 786, 793 (2d Cir. 1994) ("Emergency is defined as 'an unforeseen combination of circumstances or the resulting state that calls for immediate action.'"); *Fogg v. Macaluso*, 892 P.2d 271, 274-75 n.1 (Colo. 1995) (collecting cases); *see also* Emergency, Black's Law Dictionary (12th ed. 2024) ("A sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm.").

It is true that Class Members continue to endure long wait times for restoration treatment, often in conditions that exacerbate their mental illness. The continued delay in the provision of restoration treatment by the Department should be and is of great concern to this court, as well as the general public. However, the Department's halting progress toward compliance with the Consent Decree's requirements is not "an *unforeseen* combination of circumstances" that requires immediate action *by this court*.[3] In fact, the Department's non-compliance is expressly contemplated by the Consent Decree through its inclusion of the Dispute Resolution Process. *See* [Doc. 116, pp. 37-39]. Having reviewed the briefs and other filings in this matter, the court concludes that the issues regarding the Department's compliance must be—and are best—first addressed through the Decree's Dispute Resolution Process.

Issues regarding the Department's provision of data exemplify the need for the parties to first utilize the Dispute Resolution Process. As previously stated, if a party believes that another party has not complied with a provision of the Consent Decree *or* if a Party disagrees or objects to the Consultants' findings or decision, the party ***must*** initiate the Dispute Resolution Process except in "emergencies requiring immediate relief." [Doc. 116, p. 38, ¶ 97]. In the September 2025

---

[3] At this point, the court disagrees with plaintiffs' characterization of the Department's noncompliance as "willful." *See* [Doc. 126, p. 11]. Rather, the court notes the Consultants' statement that the Department "is acting in good faith." [Doc. 124, p. 20]; *see also* [*id.* at p. 61 (finding evidence of both hard work and good faith)].

10

Status Report, the Consultants concluded that the Department had failed to provide reliable data regarding the current number of Class Members waiting for restoration services and their average number of days waiting. [Doc. 124, pp. 21-24]. Specifically, the Consultants concluded:

> We do not believe [the Department] used Best Efforts in the first few months of the Decree in creating a list of Class Members in custody waiting for restoration services. . . . Recently, after initially believing that the creation of this basic data had improved significantly, we were forced again to doubt the accuracy of the numbers we had been given, because the August 12 Strategic Plan provided fundamentally different (an internally contradictory) information than we received the very same day on the number of people on the waitlist and their length of stay. Although the Department has acknowledged the inaccurate data represented in the Plan, and although we believe their current waitlist data to be more accurate and reliable, all of the previous inconsistencies create the need for independent verification of the waitlist data.

[Doc. 124, p. 24]. Plaintiffs argue the "failure to provide reliable data on the foundational metrics of the Consent Decree—*i.e.*, the number of Class members and their wait times—by itself creates an emergency because Defendants' compliance cannot be accurately monitored without reliable data." [Doc. 126, p. 12]. However, the Department has submitted evidence that, on August 25, 2025, it informed the Consultants that the noted internal inconsistencies were due to a typographical error and, also, provided further clarification regarding the numbers in response to the Consultants' inquiries.[4] *See* [Doc. 133-3]. The Department therefore disagrees with the Consultants' findings regarding its provision of data. Accordingly, a party—plaintiffs—believes that another party—the Department—has not complied with the Consent Decree's provisions and, further, a party—the Department—disagrees with the Consultants' findings. Such circumstances are foreseeable and explicitly contemplated by the Consent Decree's Dispute Resolution Process. *See* [Doc. 116, p. 37, ¶¶ 96(i), (ii)].

---

[4] Due to time constraints and practicalities associated with providing the Status Report, in that Report, the Consultants were not able to meaningfully engage with the Department's response of August 25. *See* [Doc. 124, p. 79].

11

Nor do such circumstances lend themselves to immediate action by this court. It is clear from the September 2025 Status Report that, since Admiral Slavonic took office, the Department has regularly consulted with, and provided information to, the Consultants. In fact, consultation with Class Counsel and the Consultants in formulating and implementing the strategic Plan constitutes a foundational principle of the Consent Decree.[5] *See* [Doc. 116, p. 7, 11, 21 ¶¶ 13, 30, 54]. Further, since the drafting of the September 2025 Status Report, it appears that there have been further developments that bear upon the Consultants' findings that, due to time constraints, were not able to be considered by the Consultants. Accordingly, at this stage, the disputes are best resolved through continued consultation and work amongst the parties through the Dispute Resolution Process.

## Conclusion

WHEREFORE, the Motion for Injunctive Relief [Doc. 126] of plaintiffs Leslie Briggs, as next friend of T.W. and B.S.; Evan Watson, as next friend of C.R.; and Henry A. Meyer, III, as next friend of A.M., for themselves and for others similarly situated is respectfully denied.

IT IS SO ORDERED this 5th day of November, 2025.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

---

[5] The Consent Decree requires the Department to consult with the Consultants *and Class Counsel* to formulate and implement the strategic Plan. *See* [Doc. 116, p. 7, 11, 21 ¶¶ 13, 30, 54]. **Accordingly, the Department must not just communicate, but meaningfully engage, with Class Counsel regarding the Plan.**